# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PENGUIN RANDOM HOUSE LLC;
HACHETTE BOOK GROUP, INC.;
HARPERCOLLINS PUBLISHERS LLC;
MACMILLAN PUBLISHING GROUP, LLC;
SIMON & SCHUSTER, LLC; SOURCEBOOKS
LLC; THE AUTHORS GUILD; JULIA
ALVAREZ; JOHN GREEN; LAURIE HALSE
ANDERSON; JODI PICOULT; ANGIE
THOMAS; HEIDI KELLOGG as parent and next
friend of R.K.; and JUDITH ANNE HAYES as
parent and next friend of J.H.,

                Plaintiffs,

                v.

BEN GIBSON, in his official capacity as Chair of
the Florida State Board of Education; RYAN
PETTY, in his official capacity as Vice Chair of
the Florida State Board of Education; ESTHER
BYRD, GRAZIE P. CHRISTIE, KELLY GARCIA,
and MARYLYNN MAGAR, in their official
capacities as members of the Florida State Board
of Education; TERESA JACOBS, in her official
capacity as Chair of the Orange County School
Board; ANGIE GALLO, MARIA SALAMANCA,
ALICIA FARRANT, PAM GOULD, VICKI-
ELAINE FELDER, KAREN CASTOR DENTEL,
and MELISSA BYRD, in their official capacities
as members of the Orange County School Board;
JAMIE HAYNES, in her official capacity as
Chair of the Volusia County School Board;
ANITA BURNETTE, in her official capacity as
Vice Chair of the Volusia County School Board;
and RUBEN COLÓN, CARL PERSIS, and
JESSIE THOMPSON, in their official capacities
as members of the Volusia County School Board,

                Defendants.

Case No. _____

COMPLAINT

Plaintiffs Penguin Random House LLC; Hachette Book Group, Inc.; HarperCollins Publishers LLC; Macmillan Publishing Group, LLC; Simon & Schuster, LLC; Sourcebooks LLC; The Authors Guild; Julia Alvarez; John Green; Laurie Halse Anderson; Jodi Picoult; Angie Thomas; Heidi Kellogg as parent and next friend of R.K.; and Judith Anne Hayes as parent and next friend of J.H., by their attorneys, for their Complaint against Defendants Ben Gibson, in his official capacity as Chair of the Florida State Board of Education; Ryan Petty, in his official capacity as Vice Chair of the Florida State Board of Education; Esther Byrd, Grazie P. Christie, Kelly Garcia, and MaryLynn Magar, in their official capacities as members of the Florida State Board of Education; Teresa Jacobs, in her official capacity as Chair of the Orange County School Board; Angie Gallo, Maria Salamanca, Alicia Farrant, Pam Gould, Vicki-Elaine Felder, Karen Castor Dentel, and Melissa Byrd, in their official capacities as members of the Orange County School Board; Jamie Haynes, in her official capacity as Chair of the Volusia County School Board; Anita Burnette, in her official capacity as Vice Chair of the Volusia County School Board; and Ruben Colón, Carl Persis, and Jessie Thomson, in their official capacities as members of the Volusia County School Board, state as follows:

## INTRODUCTION

1.      Maya Angelou's *I Know Why the Caged Bird Sings*, Ralph Ellison's *Invisible Man*, Ernest Hemingway's *For Whom the Bell Tolls*, Zora Neale Hurston's *Their Eyes Were Watching God*, Aldous Huxley's *Brave New World*, Toni Morrison's *The Bluest Eye*, Leo Tolstoy's *Anna Karenina*, Richard Wright's *Native Son*, Kurt Vonnegut's *Slaughter-House Five*, and Alice Walker's *The Color Purple* are some of the many books that the State of Florida has required be removed from school libraries.  These books are timeless classics, renowned for their literary value.  Many of them have won awards or are bestsellers.  They have been on the shelves of school libraries for years, and they are not remotely obscene.  But Florida has required these books and others to be removed from school libraries under its broad, across-the-board, content-based mandates that forbid consideration of the books' value.

2.      The First Amendment prohibits the suppression of "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription . . . solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.  In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors."  *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975).

3. The right to speak and the right to read are inextricably intertwined. Authors have the right to communicate their ideas to students without undue interference from the government. Students have a corresponding right to receive those ideas. Publishers and educators connect authors to students. If the State of Florida dislikes an author's idea, it can offer a competing message. It cannot suppress the disfavored message.

4. Section 1006.28 of the Florida Statutes, as amended by House Bill 1069, violates the First Amendment rights of publishers, authors, and students by forcing teachers, media specialists, and their school districts to remove books or face penalties, including loss of licensure. House Bill 1069 is attached as Exhibit A.

5. Section 1006.28 requires the removal of fiction and non-fiction books alike, depriving Florida students from encountering books that portray and describe critical aspects of the human experience.

6. This action concerns two provisions of Section 1006.28 that require the removal of books from school libraries and classroom collections without consideration of their value as a whole in violation of the First Amendment to the United States Constitution. This lawsuit does not challenge any of the numerous other provisions of Section 1006.28.

7. Rather than defer to trained professionals, such as teachers or media specialists, to determine which books are appropriate for school and

classroom libraries, Section 1006.28 automatically prohibits two categories of books that are at issue in this lawsuit.

8.     First, Section 1006.28 prohibits a category of school library books that contain any content that "describes sexual conduct," (a) without any consideration of the book as a whole as the Supreme Court requires, *Miller v. California*, 413 U.S. 15, 24 (1973), and (b) without specifying what level of detail or type of description is necessary for a book to "describe[] sexual conduct," Fla. Stat. s. 1006.28(2)(a)(2)(b)(II).   For example, some school districts have determined that books containing the phrase "made love" must be removed under Section 1006.28 because the phrase "made love" describes sexual conduct.

9.     Second, Section 1006.28—as interpreted and enforced by the State of Florida—prohibits school library books that contain so-called "pornographic" content without consideration of the book as a whole as the Supreme Court requires.   Fla. Stat. s. 1006.28(2)(a)(2)(b)(I).   The category that prohibits "pornographic" content states in full that it prohibits content that "[i]s pornographic or prohibited under s. 847.012."   Section 847.012 prohibits content that is "harmful to minors."   The Florida Statutes define the term

4

"harmful to minors" to conform to the Supreme Court's standard for content that is obscene as to minors.[1]

10.    Properly construed, "pornographic" content under Section 1006.28 is a synonym for content that is "harmful to minors."  In the alternative, if "pornographic" content is construed to be distinct from content that is "harmful to minors" despite being included in the same category, then "pornographic" content is an empty and meaningless overbroad standard.  Neither the Florida Statutes nor case law defines the term "pornographic."

11.    Plaintiffs do not challenge the "harmful to minors" standard and do not seek to prevent Florida school districts from ensuring that school libraries do not contain obscene books.  Moreover, parents of children in Florida schools have long had the power to determine which books their children can and cannot access in their school libraries.  Instead, Plaintiffs take issue with the removal of books under the guise of "pornography" that are not remotely obscene, resulting from the Florida State Board of Education's unconstitutional construction of the term "pornographic."

12.    These two restrictions apply to all grades, kindergarten through twelfth grade.  By so broadly regulating the display and availability of books that are constitutionally protected as to at least a significant number of

---

[1] References within this complaint to the term "harmful to minors" refer to the category of content that is prohibited under Section 847.012.

students, these restrictions—as interpreted and enforced by the State of Florida—violate the First Amendment because they are impermissibly overbroad content-based restrictions.

13.     The Publisher Plaintiffs and the Author Plaintiffs (as defined below) have the First Amendment right to disseminate and have read their constitutionally protected books and the Student Plaintiffs (as defined below) have the First Amendment right to receive and read constitutionally protected books, free from unconstitutional content-based restrictions mandated by the State of Florida.  Plaintiffs bring this action to safeguard their fundamental rights and the rights of others under the First Amendment.

14.     Plaintiffs seek a declaration that Section 1006.28's prohibition on content that "describes sexual conduct" is unconstitutionally overbroad in violation of their rights under the First Amendment.

15.     Plaintiffs also seek a declaration that the term "pornographic" is synonymous with the term "harmful to minors" and therefore consistent with the Supreme Court's obscenity standard for minors or, in the event that the construction of the term "pornographic" as synonymous with the term "harmful to minors" is rejected, that Section 1006.28's prohibition on "pornographic" content is unconstitutionally overbroad in violation of their rights under the First Amendment.

16.     Plaintiffs seek a speedy hearing on this declaratory judgment action pursuant to Federal Rule of Civil Procedure 57.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this action is brought under 42 U.S.C. § 1983 and seeks to vindicate civil rights protected by the First and Fourteenth Amendments to the U.S. Constitution.

18.     Venue is proper under 28 U.S.C. § 1391(b) because multiple Defendants reside in this district, all Defendants are residents of the State in which this district is located, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and are occurring in this district.

## PARTIES

19.     Plaintiffs Penguin Random House LLC; Hachette Book Group, Inc.; HarperCollins Publishers LLC; Macmillan Publishing Group, LLC; Simon & Schuster, LLC; and Sourcebooks LLC (collectively the "Publisher Plaintiffs") are publishers whose books have been targeted for removal or removed from school libraries throughout Florida as a result of Section 1006.28's prohibition on books with content that "describes sexual conduct" or "pornographic" content.

20.     Plaintiff Penguin Random House LLC (PRH), a Delaware limited liability company headquartered in New York, is the U.S. arm of Penguin

Random House, the world's largest trade publisher, which comprises more than 300 editorially and creatively independent publishing imprints globally. PRH's mission is to ignite a universal passion for reading by creating books for everyone and creating a world where independent thinking, free expression, and creativity flourish. PRH aims to publish books that provide children with a gateway to the whole world, promoting literacy, fostering empathy, and inspiring free and open debate. Continued inclusion of its books in public school libraries and classroom collections is critical to PRH's mission, especially for books intended for elementary and young-adult readers.

21. Plaintiff Hachette Book Group, Inc. ("Hachette") is a U.S. general-interest book publisher headquartered in New York City. Hachette's publishing groups include prominent imprints such as Little, Brown and Company; Little; Brown Books for Young Readers; Grand Central Publishing; Basic Books; Orbit; Running Press; Algonquin Books; and Workman. Hachette is part of Hachette Livre, the world's third-largest trade and educational publisher. Hachette's books and authors have garnered major awards, including the Pulitzer Prize, National Book Award, Caldecott Medal, Newbery Medal, Booker Prize, and Nobel Peace Prize. Hachette's publishing programs aim to reflect the broad range of backgrounds, experiences, and viewpoints that shape our society. Its mission is to make it easy for everyone to discover new worlds of ideas, learning, entertainment, and opportunity, and it is

fundamental to Hachette's mission that its books remain accessible to students in public school classrooms and libraries.

22.   Plaintiff HarperCollins Publishers LLC ("HarperCollins"), a subsidiary of News Corp, is the second largest consumer book publisher in the world, with operations in 15 countries.  With 200 years of history and more than 120 branded imprints around the world, HarperCollins publishes approximately 10,000 new books every year in 16 languages and has a print and digital catalog of more than 250,000 titles.  HarperCollins seeks to deliver content that presents a diversity of voices and speaks to the global community. Writing across dozens of genres, its authors include winners of the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize.

23.   Plaintiff Macmillan Publishing Group, LLC ("Macmillan") is a New York-based group of U.S. publishers that includes Celadon Books, Farrar, Straus and Giroux, Flatiron Books, Henry Holt & Company, Macmillan Audio, Macmillan Children's Publishing Group, St. Martin's Publishing Group and Tor Books.  The U.S. publishing group is part of Macmillan Publishers, a global trade book publishing company with prominent imprints around the world. Macmillan publishes a broad range of award-winning books for children and adults in all categories and formats.  Macmillan strongly advocates for the right to read, uniting a broad community of authors, educators, librarians, and

readers. Macmillan strives to ensure access to diverse literary works, highlighting the critical role of literacy in democracy, championing the transformative power of books in fostering understanding, and working to build an inclusive future.

24. Plaintiff Simon & Schuster, LLC ("S&S"), a global leader in general interest publishing, is dedicated to providing the best in fiction and nonfiction for readers of all ages, and in all printed, digital, and audio formats. Its distinguished roster of authors includes many of the world's most popular and widely recognized writers, and winners of the most prestigious literary honors and awards. It is home to numerous well-known imprints and divisions such as Simon & Schuster, Scribner, Atria Books, Gallery Books, Adams Media, Avid Reader Press, Simon & Schuster Children's Publishing, and Simon & Schuster Audio, and international companies in Australia, Canada, India, the United Kingdom, and VBK in the Netherlands and Belgium. It proudly brings the works of its authors to readers in more than 200 countries and territories. S&S is a New York limited liability company that is headquartered in New York.

25. Plaintiff Sourcebooks, LLC ("Sourcebooks") is the largest woman-led publisher in the United States with offices in Illinois and New York. Publishing both fiction and non-fiction for children, young adults, and adults across 19 imprints and growing, Sourcebooks is committed to reaching readers

10

with books that will illuminate, inspire, and enlighten lives and believes that books change lives.

26.    Plaintiff The Authors Guild (the "Guild") was founded in 1912 and is a national non-profit association of more than 14,000 professional, published writers of all genres.  The Guild counts historians, biographers, academicians, journalists, and other writers of non-fiction and fiction as members.  The Guild works to promote the rights and professional interest of authors in various areas, including copyright, freedom of expression, and taxation.  Many Guild members earn their livelihoods through their writing.  Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field.  The ability to write on topics of their choosing and to have their work available through bookstores and libraries, including school libraries, is vital to their ability to make a living in their chosen profession.  Books written by the Guild's members, including Plaintiffs John Green, Jodi Picoult, and Angie Thomas, have been targeted for removal or removed from school libraries throughout Florida as a result of Section 1006.28's prohibition on books with content that "describes sexual conduct" or "pornographic" content.

27.    Plaintiffs Julia Alvarez, John Green, Laurie Halse Anderson, Jodi Picoult, and Angie Thomas are authors whose books have been targeted for

removal or removed from school libraries throughout Florida as a result of Section 1006.28's prohibition on books with content that "describes sexual conduct" or "pornographic" content. Alvarez, Green, Halse Anderson, Picoult, Thomas, and The Authors Guild are collectively referred to herein as the "Author Plaintiffs."

28.    Plaintiff Julia Alvarez resides in Vermont. Alvarez has authored over twenty books and is regarded as one of the most critically and commercially successful Latina writers of my time. Alvarez's works have been recognized by young adults, critics, librarians, and educators and have been featured on several best-seller lists and best-of lists over the course of her career. Alvarez has won numerous awards for her works and career achievements, including the "Lamont Prize" from the Academy of American Poets, the "Fitzgerald Award for Achievement in American Literature," the "PEN Oakland/Josephine Miles Literary Award," the "Belpre Medal," and the "Hispanic Heritage Award in Literature." Alvarez's book *How the García Girls Lost Their Accents* has been removed from school libraries in Florida under Section 1006.28's prohibition on so-called "pornographic" content.

29.    Plaintiff John Green resides in Indiana. He is the author of seven novels. His novels have sold more than 50 million copies in print worldwide, and his novel *The Fault in Our Stars* is one of the best-selling books of all time. Green has won awards such as the Edgar Alan Poe Award, the Corine

Literature Prize, the Children's Choice Book Awards, the Guardian's Children's Fiction Prize, the Uruguayan Premio Bartolomé Hidalgo for "Best children's Youth [Book] by a foreign Author," and the Young Reader's Choice Award.  At least four of Green's books have been removed from school libraries in Florida under Section 1006.28's prohibition on content that "describes sexual conduct."

30.    Plaintiff Laurie Halse Anderson resides in Pennsylvania.  She has authored ten novels.  Her novels have been selected for many best-of lists, including in the *New York Times*, in *Publishers Weekly*, and on the American Library Association's (ALA) Amelia Bloomer List.  Her novels have also been recognized by the International Reading Association, the New York Public Library, the Young Adult Library Services Association (YALSA), and the Junior Library Guild.  She has won the ALA Margaret A. Edwards Award, the Anne V. Zarrow Award, the Scott O'Dell Award for Historical Fiction, and the Astrid Lindgren Memorial Award during her distinguished career.  Anderson's book *Speak* has been removed from school libraries in Florida under Section 1006.28's prohibition on content that "describes sexual conduct."

31.    Plaintiff Jodi Picoult is a resident of New Hampshire.  She has authored 28 novels that have been translated into 34 languages and sold approximately 40 million print copies worldwide.  Picoult's novels have been selected for many best-of lists, including by *The New York Times*, *Publishers*

*Weekly*, and YALSA.  She has won awards such as the New England Bookseller Award for Fiction, YALSA's Alex Award, the Vermont Department of Libraries' Green Mountain Book Award, Maryland Association of School Librarians' Black-Eyed Susan Award, Romance Writers of America's Lifetime Achievement Award for mainstream fiction, and the Sarah Josepha Hale Award Medal.  At least 20 of Picoult's books have been removed from school libraries in Florida under Section 1006.28's prohibition on content that "describes sexual conduct," including in the School District of Volusia County and the Orange County Public Schools.

32.    Plaintiff Angie Thomas is a resident of Georgia.  She has authored four novels, each of which are *New York Times* #1 Bestsellers and have received critical acclaim.  Thomas was the inaugural winner of the Walter Dean Myers Grant 2015, and her debut novel *The Hate U Give* won the ALA's William C. Morris Debut Award and the Boston Globe-Horn Book Award.  Two books written by Thomas have been removed from school libraries in Florida: *Concrete Rose* under Section 1006.28's prohibitions on content that "describes sexual conduct" and "pornographic" content and *The Hate U Give* under Section 1006.28's prohibition on content that "describes sexual conduct."

33.    For each Author Plaintiff, school libraries are a critical means of reaching their intended audiences and securing the broadest possible readership.  The Author Plaintiffs' books, including those identified herein, are

14

vehicles for their personal messages and ideas.  The removal of their books from school libraries, including the associated stigma, causes them personal and professional harm.

34.   Plaintiff Heidi Kellogg is a resident of Volusia County, Florida. She is the mother, next friend, and general guardian of R.K., a senior at Deland High School in Volusia County, Florida.  During the 2023-2024 and 2024-2025 school years, R.K. wanted and had intended to check out specific books from her school library or her teachers' classroom libraries that were removed due to Section 1006.28's prohibitions on content that describes sexual conduct or "pornographic" content, including Toni Morrison's *The Bluest Eye* and Janet Gurtler's *You Too?  25 Voices Share Their #MeToo Stories.*  Heidi Kellogg wants R.K. to have access to these books and others like them so that she is presented with different viewpoints and experiences and therefore so she is better prepared to engage with a wide range of people.  R.K. wants to have access to these books and others like them for the same reasons.

35.   Plaintiff Judith Anne Hayes is a resident of Orange County, Florida.  She is the mother, next friend, and general guardian of J.H., a junior at William R. Boone High School in Orange County, Florida.  During the 2023-2024 and 2024-2025 school years, J.H. wanted and had intended to check out specific books from his school library or his teachers' classroom libraries that were removed due to Section 1006.28's prohibition on content that describes

sexual conduct, including Gabriel García Márquez's *Love in the Time of Cholera*. Judith Anne Hayes wants J.H. to have access to these books and others like them so that he is presented with different viewpoints and experiences and therefore so he is better prepared to engage with a wide range of people. J.H. wants to have access to these books and others like them for the same reasons.

36. The Florida State Board of Education (the "State Board") is the chief governing body of public education in Florida (excluding universities and colleges).

37. Florida law makes the State Board responsible for "enforc[ing] compliance with law and state board rule by all school districts," including by overseeing district school boards' enforcement of laws and board rules. Fla. Stat. s. 1001.03(8), 1008.32(1).

38. The State Board appoints the Commissioner of Education, who is tasked with investigating allegations of noncompliance with law or State Board rule by school districts. Upon a determination that there is probable cause of any such noncompliance, the Commissioner is to report that determination to the State Board, which has authority to order compliance and take other actions to punish noncompliance such withholding funds from school districts. Fla. Stat. s. 1008.32(2)-(4).

39.    The State Board is ultimately responsible for reviewing decisions made regarding objections to library books under Section 1006.28.  A school board's decision is subject to review by a special magistrate who is appointed by the Commissioner, and the State Board "must approve or reject the recommended decision" by the special magistrate.    Fla.  Stat.  s. 1006.28(2)(a)(6).

40.    Section 1006.28 requires the State Board to adopt rules relating to the objection and review process and to prescribe an "objection form" for school districts to make available to objectors.

41.    The State Board has prescribed an objection form, which requires the objector to "[i]dentify the basis for your objection" under Section 1006.28 and lists multiple separate bases for objections for the objector to select, including that the book (a) is "pornographic," (b) is "prohibited under s. 847.012, F.S." as harmful to minors, or (c) "depicts or describes sexual conduct as defined in s. 847.001(19), F.S."  The State Board's objection form is attached as Exhibit B.  The State Board's rules mandate that school districts use this objection form and that it "not be modified," with exceptions for changes to the title and changes to the appearance to assist in the ease of use.  Fla. Admin. Code r.  6A-7.0714(3)(a), (d).  The part of the form that lists the bases for objections "must not be modified by school districts."  Fla. Admin. Code r. 6A-7.0714.

17

42. The State Board meets throughout the State of Florida. In 2024, three of the State Board's eight meetings were held or are scheduled to be held in Orange County, Florida.

43. Defendant Ben Gibson is the Chair and a member of the State Board. Gibson resides in Leon County, Florida.

44. Defendant Ryan Petty is the Vice Chair and a member of the State Board. Petty resides in Polk County, Florida.

45. Defendants Esther Byrd, Grazie P. Christie, Kelly Garcia, and MaryLynn Magar are members of the State Board. Byrd resides in Duval County, Florida. Christie resides in Miami-Dade County, Florida. Garcia resides in Hillsborough County, Florida. Magar resides in Palm Beach County, Florida.

46. The members of the State Board are sued in their official capacity (the "State Defendants").

47. Orange County Public Schools ("Orange County") is governed by the Orange County School Board.

48. Defendant Teresa Jacobs is the Chair and a member of the Orange County School Board. Jacobs resides in Orange County, Florida.

49. Defendants Angie Gallo, Maria Salamanca, Alicia Farrant, Pam Gould, Vicki-Elaine Felder, Karen Castor Dentel, and Melissa Byrd are

members of the Orange County School Board.  Gallo, Salamanca, Farrant, Gould, Felder, Dentel, and Byrd reside in Orange County, Florida.

50.    The members of the Orange County School Board (the "Orange County Defendants") are sued in their official capacities.

51.    The School District of Volusia County ("Volusia County") is governed by the Volusia County School Board.

52.    Defendant Jamie Haynes is the Chair and a member of the Volusia County School Board.  Haynes resides in Volusia County, Florida.

53.    Defendant Anita Burnette is the Vice Chair and a member of the Volusia County School Board.  Burnette resides in Volusia County, Florida.

54.    Defendants Ruben Colón, Carl Persis, and Jessie Thompson are members of the Volusia County School Board.  Colón, Persis, and Thompson reside in Volusia County, Florida.

55.    The members of the Volusia County School Board (the "Volusia County Defendants") are sued in their official capacities.

56.    The Orange County Defendants and the Volusia County Defendants are referred to collectively within as the "District Defendants."

57.    Florida law and the State Board mandate that district school boards, including the District Defendants, ensure the removal of library books that are prohibited under Section 1006.28, including any book that (a) "depicts

or describes sexual conduct as defined in s. 847.001(19), F.S" or (b) is "pornographic."

## FACTUAL ALLEGATIONS

### *School Libraries*

58.    School libraries are and have always been places of self-directed learning.

59.    School libraries are also central to a student's First Amendment right to access new ideas and information.

60.    Matching students to books is an inherently individual exercise. Not every book is for every student at every point in their life.   For that reason, each student has the right to choose whether to read any particular book from a school library.

61.    As the Supreme Court has recognized, the school library "is the principal locus" of a student's freedom "to inquire, to study and to evaluate, to gain new maturity and understanding"—where a student can "explore the unknown" and "discover areas of interest and thought not covered by the prescribed curriculum." *Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868-69 (1982) (plurality opinion).

62.    The fact that schools are "educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount

important principles of our government as mere platitudes." *W. Virginia State Bd. Of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).

63.    In many locations, the concept of a school library predated the public library, as "libraries run by local school districts were often intended to make reading materials available not only to school children but to adults as well." Michael Kevane & William A. Sundstrom, *The Development of Public Libraries in the United States, 1870-1930: A Quantitative Assessment*, INFO. & CULTURE A J. OF HIST. 1, 7 (2012).

64.    Melvil Dewey, inventor of the library cataloging system, explained that a "collection of books in every schoolroom for everyday use is coming to be considered an essential part of a school building's furniture.  These books introduce children to the best literature of the world; they interest them in other phases of any subject they may be studying than those set forth in their text-books"; and they "familiarize the children with books and their use." Richard J. Peltz, *Pieces of Pico: Saving Intellectual Freedom in the Public School Library*, 2005 BYU Educ. & L.J. 103, 114 (2005).

65.    Florida's Library Media and Instructional Materials Training states that school library media centers must "provide a wide range of materials on all levels of difficulty, with diversity of appeal, and with the representation of different points of view."

66.     The Florida Department of Education explains on its website that "[o]ne of the goals of the school library media program is to provide intellectual and physical access to a broad range of literature and informational reading materials for personal pleasure and curriculum support."

67.     The Florida Department of Education further states, "Library media programs aggressively support reading through a variety of promotional and instructional strategies that are carefully crafted to meet the unique needs of learners at each developmental stage."

68.     Manny Diaz, Jr., Florida Commissioner of Education, agrees that schools are meant to enable "students [to] learn how to think and [to] receive the tools necessary to go forth and make great decisions."

69.     In addition to separate school libraries, many Florida teachers have a collection of books in their classrooms that are available for students to borrow and read.  Classroom libraries serve a similar purpose and function to school libraries.  References within this complaint to "school libraries" also include classroom libraries.

### *Overview of Section 1006.28 and House Bill 1069*

70.     On July 1, 2023, HB 1069 went into effect.  HB 1069 is a broad expansion of the State of Florida's efforts to regulate the books that students can access in school libraries under Section 1006.28 of the Florida Statutes.

71.    Prior to HB 1069, the State required school districts to remove books that contained the following content: (I) "pornographic" content or content that violates Section 847.012 "for any grade level or age group for which such use is inappropriate or unsuitable," (II) content that is not suited to student needs and their ability to comprehend the material, or (III) content that is inappropriate for the grade level and age group for which the material is made available.  Section 847.012 prohibits material "which is harmful to minors," which is defined as

> any reproduction, imitation, characterization, description, exhibition, presentation, or representation, of whatever kind or form, depicting nudity, sexual conduct, or sexual excitement when it:
> (a)  Predominantly appeals to a prurient, shameful, or morbid interest;
> (b)  Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material or conduct for minors; and
> (c)  Taken as a whole, is without serious literary, artistic, political, or scientific value for minors.

Fla. Stat. s. 847.001(7).

72.    Section 847.012 is based on the standard for obscenity that the Supreme Court set forth in *Miller v. California*, 413 U.S. 15, 24 (1973), which defines obscene material as "limited to works" that (a) "taken as a whole, appeal to the prurient interest in sex"; (b) "portray sexual conduct in a patently offensive way; and" (c) "taken as a whole, do not have serious literary, artistic, political, or scientific value."

23

73.  HB 1069 drastically expanded the content that the State prohibits in school libraries.

74.  Under HB 1069, the State created a new category of content that it prohibits in school libraries: content that depicts or describes sexual conduct, without regard for the Supreme Court's three-part test for obscenity.

75.  HB 1069 also no longer allows school districts to consider appropriateness and suitability when determining whether books contain content that is "pornographic" or "harmful to minors." The term "pornographic" remains in the same category as "harmful to minors" and remains undefined.

76.  HB 1069 expands the processes through which school library books must be removed. For example, following a parent's or county resident's objection to a school library book on the basis of "pornographic" content, content that violates Section 847.012, or content that "depicts or describes sexual conduct," HB 1069 requires school districts to automatically remove the book pending resolution of the objection. HB 1069 also creates a process that requires school districts to remove a school library book if a district school board prohibits a parent from reading passages from that book at a school board meeting.

77.  Through these processes and others, HB 1069 enables parents and county residents to exercise control over the books that all children in the

school can access—not just their own children, and even if they do not have any children who attend that school.

78.     Parents of children in Florida schools have long had the power to determine which books their children can and cannot access in their school libraries.  Certain school districts, like Pinellas County Schools, permit parents to limit their children's access to the entire school library, requiring children to seek their parents' permission prior to checking out any library books.  Other districts, such as Polk County Public Schools, permit parents to decide each semester which particular books in the school library their children may check out and which they may not.

79.     In enacting HB 1069, the State has mandated that school districts impose a regime of strict censorship in school libraries.  HB 1069 requires school districts to remove library books without regard to their literary, artistic, political, scientific, or educational value when taken as a whole.  As a result of HB 1069, hundreds of different titles have been removed from school libraries across the State.

80.     HB 1069 incentivizes school districts to remove many more books than the First Amendment allows.  Under HB 1069 and the supervision and authority of the State Defendants, school districts must create a policy to implement the process for receiving and resolving objections to school library books.  That objection process requires the use of school resources, including

25

large amounts of employee time.  Consequently, HB 1069 incentivizes school districts to preemptively remove school library books rather than wait to engage in the time-consuming objection-resolution process.  Some teachers have removed all of the books in their classroom libraries to avoid any objection to or controversy surrounding those books due to HB 1069.  Media specialists have done the same—removing books to avoid objections and controversies arising from HB 1069—to avoid jeopardizing their licensure.

81.    HB 1069 also gives school districts financial incentives to remove library books.   Under the objection-resolution process, a school district's decision regarding an objection to a library book can be appealed to a special magistrate who is appointed by the Commissioner of Education.  The special magistrate reviews a school board's resolution of an objection following an appeal by a parent.  The cost of the special magistrate is borne by school districts.  The State has interpreted this appeal process to make the special magistrate available only when a school district decides to overrule a parent's or county resident's objection—to keep a school library book on the shelves— not when a school district decides to remove a school library book.  HB 1069 therefore incentivizes schools to err on the side of removing books in the objection-resolution process—rather than retaining them—to avoid incurring the cost of the special magistrate.

26

82.    The State Defendants have ultimate authority over a school district's decision to remove a library book under HB 1069.  Following a special magistrate's review of a school board's resolution of an objection, HB 1069 requires the special magistrate to render a recommended decision concerning the objection to the State Defendants.  The State Defendants then "must approve or reject the recommended decision" of the special magistrate.  Fla. Stat. s. 1006.28(2)(a)(6).

83.    Annually, beginning on June 30, 2023, school districts are required to report to the Commissioner of Education a list of (1) all material to which the school district received an objection, (2) all material that was removed or discontinued from school libraries, and (3) all material that was not removed or discontinued, including the rationale for not removing or discontinuing the material.  Fla. Stat. s. 1006.28(2)(e)(3).

84.    Following receipt of the school districts' reports, the Florida Department of Education is required to publish and "regularly update" a list of materials that school districts removed as a result of an objection under HB 1069 for the school districts' "consideration in their selection procedures."  *Id*.

### *Content That Describes Sexual Conduct*

85.    Section 1006.28 as amended by HB 1069 requires the removal of school library books that "contain[] content which . . . describes sexual conduct

27

as defined in s. 847.001(19)." Fla. Stat. s. 1006.28(2)(a)(2)(b)(II).   Section

847.001(19) defines "sexual conduct" as

> actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual or simulated lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed.

86.   The prohibition on content that describes sexual conduct did not

exist in Section 1006.28 prior to HB 1069.

87.   Section 1006.28's prohibition of content that describes sexual

conduct disregards the *Miller* obscenity standard and does not account for the

value of the book as whole or the book's literary, scientific, medical, artistic, or

political value.

88.   Section 1006.28 requires school districts to remove books

containing content that describes sexual conduct.   Although school districts

may continue using books containing content that describes sexual conduct "for

any grade level or age group for which such use is []appropriate or []suitable,"

*see* Fla. Stat. s. 1006.28(2)(a), Section 1006.28 does not require school districts

to continue to make available books that they have determined are appropriate

and suitable.

89.   The term "describes sexual conduct" is vague and ambiguous.   In

particular, the term "describes" in relation to "sexual conduct" provides no

easily understood line as to which types of statements constitute a description of sexual conduct. The term "describes sexual conduct" is so broad that it would require removal of the Oxford English Dictionary—which defines "sex" as "physical activity between two people in which they touch each other's sexual organs, and which may include sexual intercourse"—from school libraries. The Oxford English Dictionary, however, is not obscene.

90.   It is also not clear, for example, whether the phrase "made love" is sufficiently specific in describing sexual conduct such that Section 1006.28 requires the removal of a book containing that phrase. School districts, erring on the side of caution, have removed books using that phrase. For example, Collier County Public Schools determined that it was required to remove Ernest Hemingway's *In Our Time*, published by Simon & Schuster, under Section 1006.28 because that book merely uses the phrase "made love" and therefore "describes sexual conduct."

91.   This vagueness and ambiguity result in overbroad interpretations of Section 1006.28's prohibition on content that describes sexual conduct and chill protected speech.

### *"Pornographic" Content*

92.   Section 1006.28 also requires the removal of school library books that "contain[] content which" is "pornographic" or "prohibited under s. 847.012." Fla. Stat. s. 1006.28(2)(a)(2)(b)(I).

29

93.   Section 847.012 prohibits material that is "harmful to minors," which is defined as

> any reproduction, imitation, characterization, description, exhibition, presentation, or representation, of whatever kind or form, depicting nudity, sexual conduct, or sexual excitement when it:
>     (a)  Predominantly appeals to a prurient, shameful, or morbid interest;
>     (b)  Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material or conduct for minors; and
>     (c)  Taken as a whole, is without serious literary, artistic, political, or scientific value for minors.

Fla. Stat. s. 847.001(7).

94.   The "harmful to minors" standard is based on the standard for obscenity that the Supreme Court set forth in *Miller v. California*, 413 U.S. 15, 24 (1973), which defines obscene material as "limited to works" that (a) "taken as a whole, appeal to the prurient interest in sex"; (b) "portray sexual conduct in a patently offensive way; and" (c) "taken as a whole, do not have serious literary, artistic, political, or scientific value."

95.   Whereas the term "harmful to minors" is defined to satisfy the Supreme Court's *Miller* standard, neither HB 1069, Section 1006.28, or any other Florida law defines the term "pornographic."

96.   The Florida Department of Education's Library Media and Instructional Materials Training, which is mandatory for all Florida media specialists, states that "[w]hile there is no statutory definition of pornography

in the Florida Statutes, the Merriam-Webster dictionary defines it as 'the depiction of erotic behavior (as in pictures or writing) intended to cause sexual excitement.'"

97.     The term "pornographic"—if not construed to be a synonym for "harmful to minors"—bears no relation to the *Miller* test for obscenity, which is the applicable legal standard.  Many of the books being removed from school libraries under the State Board's construction of "pornographic" content—such as Kurt Vonnegut's *Slaughterhouse-Five*, Richard Wright's *Native Son*, and Toni Morrison's *Song of Solomon*—do not remotely satisfy the *Miller* standard for obscenity.

98.     The State Board's construction of "pornographic" content goes far beyond prohibiting books that are obscene as to minors because it requires the removal of books without any holistic evaluation or consideration of their literary, artistic, political, or scientific value.   Under the State Board's construction of "pornographic" content, highly regarded books—even ones that have been on shelves for many decades—must be removed from school libraries in Florida even if the books taken as a whole are not obscene.

99.     When applied to students, the *Miller* obscenity standard must account for the age of the reader.  For example, a book that is obscene as to a third-grade student may not be obscene as to a high school student.  *See Virginia v. Am. Booksellers Ass'n, Inc.*, 488 U.S. 905 (1988); *Am. Booksellers*

*Ass'n, Inc. v. Virginia*, 882 F.2d 125 (4th Cir. 1989), *cert. denied*, 494 U.S. 1056

(1990).  The First Amendment prohibits suppression of

> [s]peech that is neither obscene as to youths nor subject to some other
> legitimate proscription . . .  solely to protect the young from ideas or
> images that a legislative body thinks unsuitable for them.  In most
> circumstances, the values protected by the First Amendment are no less
> applicable when government seeks to control the flow of information to
> minors.

*Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975).

100.   Section 1006.28, as amended by HB 1069 and as construed by the

State Board, precludes schools from considering the age of the potential reader

of books that contain "pornographic" content, in violation of the First

Amendment.  Prior to HB 1069, Florida law permitted school libraries to make

available books for any grade level or age group for which the books were

appropriate and suitable.  HB 1069 removes this discretion and prohibits any

material that contains so-called "pornographic" content for all students in

kindergarten through twelfth grade, regardless of age, and even if that

material would be appropriate or suitable for certain grades and ages.

*Compare* Fla. Stat. s. 1006.28(2)(a)(2) *with* Fla. Stat. s. 1006.28(2)(a)(2) (2022).

101.   A law that regulates or prohibits speech must sufficiently define

terms so that ordinary people can understand what conduct is prohibited and

enforcers of the regulation are able to enforce the law in a non-arbitrary, non-

discriminatory manner.  *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239,

253 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.*

102. Contrary to the interpretation of "pornographic" mandated by the State Board, "pornographic" should be construed to be a synonym for "harmful to minors." In Section 1006.28, the terms "pornographic" and "prohibited under s. 847.012" [harmful to minors] are separated only by the word "or," which "commonly introduces a synonym or 'definitional equivalent.'" *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1088 (11th Cir. 2017).

103. Construing "pornographic" as a synonym for "harmful to minors" is supported by canons of statutory interpretation, which counsel against reaching constitutional issues when an alternative reasonable statutory construction is available. The Supreme Court has instructed that the "elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality" and that the "corollary doctrine" is that a "statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Rust v. Sullivan*, 500 U.S. 173, 190-91 (1991) (emphasis, quotations, and citations omitted).

104.   In addition, the Florida legislature's decision to include content that is "pornographic" in the same category as content that is "harmful to minors" supports the terms being synonymous.

105.   The State Board's construction of "pornographic" content is vague and ambiguous.  In particular, the term "pornographic"—as construed by the State Board—provides no easily understood line as to which types of statements in a book are sufficient to require its removal as "pornographic."

106.   This vagueness and ambiguity have resulted in unconstitutionally overbroad interpretations of the prohibition on "pornographic" content and chill protected speech.

### *Removal Mechanisms*

107.   Section 1006.28 establishes multiple processes through which school library books must be removed for containing content that describes sexual conduct or "pornographic" content.

108.   First, Section 1006.28 imposes an affirmative burden on school districts on their own initiative to remove books from school libraries that contain content that describes sexual conduct or "pornographic" content.  *See*, *e.g.*, Fla. Stat. s. 1006.28(2)(a)(1)-(2), (d)(2)(d).

109.   Second, Section 1006.28 permits parents and county residents to object to the inclusion of particular books in a school library on the basis of content that describes sexual conduct or "pornographic" content.  Once a

parent or county resident submits an objection that a book contains content that describes sexual conduct or "pornographic" content, the school district must remove the book within five school days—even if the school district has not evaluated the objection and even if the objection is clearly frivolous. Fla. Stat. s. 1006.28(2)(a)(2).

110.  Third, books that have been temporarily removed pursuant to an objection must remain "unavailable to students of that school until the objection is resolved." *Id.* But Florida law does not specify any time frame by which school districts must resolve objections, meaning that books that have been "temporarily" removed pursuant to an objection may actually be removed indefinitely.

111.  For example, Santa Rosa County School District has not yet developed a policy to resolve objections to books that purportedly contain content that describes sexual conduct or "pornographic" content. That school district has removed books within five days of receiving an objection that a book purportedly contains content that describes sexual conduct or "pornographic" content, but it cannot evaluate or resolve the objection until it has a policy to do so. In some cases, a book has been "temporarily removed" from a library shelf for at least a year (since HB 1069's temporary removal process became effective).

112.    Volusia County has implemented a policy that requires parents or county residents who object to school library books for purportedly containing content that describes sexual conduct or "pornographic" content to meet with the school principal following an objection.  Parents and county residents determine the timing of that meeting.  For example, an objector submitted objections to books that purportedly contain content that describes sexual conduct or "pornographic" content at the beginning of the 2023-2024 school year and scheduled a meeting with the principal for the end of the school year, ensuring that the books to which she objected remained unavailable for the entire 2023-2024 school year.

113.    Because books have been removed under Section 1006.28 for entire semesters or school years without being reviewed, those removals are effectively permanent removals for many students.

114.    Finally, following an objection, parents have "the right to read passages" from the book that is subject to the objection.  Fla. Stat. s. 1006.28(2)(a)(2).  If the school board does not permit a parent to read a passage from a book because of content that describes sexual conduct or "pornographic" content, Section 1006.28 requires the school district to remove that book from the school library.  *Id*.  In this way, Section 1006.28 disregards the book's value as a whole, and instead requires the removal of school library books based on

a single sentence or passage from that book divorced from its context and overall value contrary to the *Miller* standard for obscenity.

115.   While Florida law requires school districts to consider the "age of the students who normally could be expected to have access to the materials" in the selection of library media, Fla. Stat. s. 1006.34(2)(b)(1), this statutory provision does not apply to the removal of school library books.

### *Penalties and Florida's Culture of Fear*

116.   Section 1006.28's overbroad restrictions have contributed to a culture of fear throughout Florida's education communities.

117.   Books that are required to be removed under the prohibitions on content that describes sexual conduct or content that is "pornographic" as construed by the State Board are stigmatized, without regard for their value as a whole or their literary, artistic, historical, medical, or educational value as the Supreme Court requires.

118.   Training materials from Florida's mandatory media specialist training repeatedly encourage media specialists to "[e]rr on the side of caution" in removing books from school libraries to comply with Section 1006.28.

119.   Florida Governor Ron DeSantis has also stated that, in his view, noncompliance with Section 1006.28 could result in felony charges for educators.

120.   The State repeatedly informs educators that it can and will pursue felony charges against educators who do not comply with the vague and overbroad requirements of Section 1006.28.   Those reminders cause school districts, media specialists, and other educators to "err on the side of caution" in removing school library books, as the State has instructed.

121.   Media specialists and other educators who retain library books that may implicate the prohibitions on content that describes sexual conduct or so-called "pornographic" content—or whose libraries previously contained books that were later removed under those prohibitions—risk being stigmatized.   Media specialists and other educators in Florida who oppose censorship have received threats, including at their residences, from emboldened proponents of censorship who seek to inhibit others' children from reading school library books.

122.   Media specialists and other educators who do not comply with the vague and overbroad requirements of Section 1006.28 risk penalties at the hands of the Education Practices Commission.   Those penalties include revocation or suspension of their teaching certificates, imposition of an administrative fine of up to $2,000 for each separate offence, and probation. Fla. Stat. s. 1012.796(a)-(f).

123. At least one school district—Leon County—has considered prohibiting students from checking out any book at the beginning of the school

year until it can ensure that it is abiding by Section 1006.28.  Rocky Hanna, Superintendent of Leon County School District, has stated that he does not want to remove or limit access to library books that "could be academically beneficial and impactful for a child," but that he believes that he must do so because of Section 1006.28 and out of fear that his district is "found in violation of the law and targeted by the DOE and the governor."

124.    Another school district—Orange County—warned its media specialists that they "are tasked with protecting [their] colleagues, [themselves], and OCPS to ensure content being made available to students is in compliance with Florida Statutes."

125.    Educators who are already afraid of official state action or action by vigilante members of the public fear the loss of their credentials and livelihood and even threats to their safety.

126.    Florida's culture of fear has massive consequences for the First Amendment rights of publishers, authors, students, and others.  As the members of the chief governing body of public education in Florida, the State Defendants are responsible for the injury to Plaintiffs' and others' First Amendment rights arising from Section 1006.28.

### The Effects Of HB 1069/Section 1006.28

127.    Section 1006.28's broad prohibitions of school library books with content that "describes sexual conduct" and so-called "pornographic" content—

as construed by the State Defendants—have required the removal from school libraries of award-winning books, classic books that have been on school library shelves for decades, and books that are commonly included on Advanced Placement (AP) exams.

128.  These two library book prohibitions require the removal of renowned, pedagogically important books that are not remotely obscene.

129.  A selection of books written by the Author Plaintiffs that were required to be removed from school libraries under Section 1006.28—Alvarez's *How the García Girls Lost Their Accents*, Green's *Looking for Alaska*, Anderson's *Speak*, Picoult's *Nineteen Minutes* and *Change of Heart*, and Thomas's *Concrete Rose* and *The Hate U Give*—demonstrates its substantially broad reach.

130.  Alvarez's book *How the García Girls Lost Their Accents*, published by Hachette, is a novel that traces the journey of the four García sisters as they are forced to flee their home due to political turmoil and grapple with the challenges of assimilation and cultural identity.  *How the García Girls Lost Their Accents* explores themes of exile, identity, and the generational clashes that arise from the immigrant experience and delves into the profound impact of displacement and the quest for self-identity.  It has won the PEN Oakland/Josephine Miles Literary Award, which recognizes outstanding multicultural literary works published in the United States; was listed among

the "100 Essential Books of the 20th Century" by the New York Public Library, which underscores the novel's significance and impact on contemporary literature; was selected as one of the Best Books for Young Adults by the American Library Association; and is commonly included on AP exams. *How the García Girls Lost Their Accents* has been removed from school libraries under Section 1006.28's prohibition on "pornographic" content since HB 1069 went into effect. *How the García Girls Lost Their Accents* has been removed from school libraries in at least two school districts in Florida since HB 1069 went into effect.

131.   Green's book *Looking for Alaska*, published by PRH, is a coming-of-age school story and teen romance about a boarding school student who gets bullied. This *New York Times* bestselling novel won the ALA's Michael L. Printz Award and was a finalist for the Los Angeles Times Book Prize. *Looking for Alaska* featured on the ALA's Top Ten Best Book for Young Adults, the YALSA's Teen's Top Ten Award, and the ALA's Quick Pick for Reluctant Young Adult Readers. It has been named a New York Public Library Book for the Teen Age, a Booklist Editor's Choice Pick, and a Borders Original Voices Selection. *Looking for Alaska* has been removed from school libraries under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect. *Looking for Alaska* has been removed from school

libraries in at least seven school districts in Florida since HB 1069 went into effect.

132.   Anderson's book *Speak*, published by Macmillan, is a young adult fiction novel based on Anderson's personal experience of having been sexually assaulted as a teenager and the resulting trauma.  *Speak* explores themes of identity, finding one's voice, trauma, and healing by reclaiming the narrative. *Speak* won the Golden Kite Award and a Michael Printz Honor and was named as a finalist for the Edgar Allen Poe Award, the *Los Angeles Times* Book Prize, and the National Book Award for Young People's Literature.  *Speak* was also named an ALA Best Book for Young Adults and listed in the ALA's Top Ten Best Books for Young Adults.  *Speak* is also commonly included in AP exams. *Speak* has been removed from school libraries under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect.  *Speak* has been removed from school libraries in at least five school districts in Florida since HB 1069 went into effect.

133.   Picoult's book *Nineteen Minutes*, published by Simon & Schuster, centers on a school shooting and demonstrates the devastating ramifications of failing a child who has been "othered."  Through Peter Houghton, who has been mercilessly bullied for most of his life, and Josie Cormier, who is being physically and sexually abused by her boyfriend, *Nineteen Minutes* shows that marginalization can take many different forms.  *Nineteen Minutes* debuted at

#1 on the *New York Times* Bestseller list and has since won several awards, including being selected as an "Outstanding Book for the College Bound and Lifelong Learners" by the American Library Association. *Nineteen Minutes* has been removed from school libraries in the School District of Volusia County under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect. *Nineteen Minutes* has been removed from school libraries in at least 15 school districts in Florida since HB 1069 went into effect.

134.   Picoult's book *Change of Heart*, published by Simon & Schuster, tells the story of character Shay Bourne, a death row prisoner who seeks to redeem himself by donating his heart post-execution to the sister of his victim, who needs a heart transplant. *Change of Heart* focuses on organized religion and belief and explores themes of loss, redemption, religion, spirituality, and punishment. *Change of Heart* is frequently tested on AP exams; earned Picoult the "Christopher Award," which is presented to the authors of books that affirm the highest values of the human spirit; and was selected as an "Outstanding Book for the College Bound and Lifelong Learners" by the American Library Association. *Change of Heart* has been removed from school libraries in the Orange County under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect. *Change of*

*Heart* has been removed from school libraries in at least two school districts in Florida since HB 1069 went into effect.

135.   Thomas's book *Concrete Rose*, published by HarperCollins, tells the powerful and emotional story of Maverick Carter as he navigates the challenges of fatherhood, loyalty, and personal growth.   At seventeen, Maverick is dealing with the dual pressures of school and his role in the King Lords, a local gang, when he discovers he is going to be a father.   Determined to break the cycle of violence and provide a better life for his child, Maverick grapples with the complexities of his circumstances and the expectations placed upon him.  *Concrete Rose* invokes themes of family, responsibility, and resilience and is a raw, compelling, and ultimately hopeful exploration of what it means to grow up and make difficult decisions in the face of overwhelming odds.  *Concrete Rose* earned the Goodreads Choice Award for Best Young Adult Fiction; the Coretta Scott King Author Honor, which recognizes outstanding books by African American authors that promote an understanding and appreciation of the African American experience; and the Michael L. Printz Award Honor, which is given by the American Library Association for excellence in literature written for young adults, highlighting the novel's literary quality and relevance.  *Concrete Rose* is commonly included on AP exams.  *Concrete Rose* has been removed from school libraries under Section 1006.28's prohibitions on content that "describes sexual conduct" and

"pornographic" content since HB 1069 went into effect. *Concrete Rose* has been removed from school libraries in at least four school districts in Florida since HB 1069 went into effect.

136.   Thomas's book *The Hate U Give*, published by HarperCollins, is a groundbreaking and powerful novel that dives deep into the complexities of race, identity, and social justice in contemporary America.  The story follows Starr Carter, a sixteen-year-old girl who navigates between two worlds—the impoverished neighborhood where she lives and the affluent, predominantly white private school she attends—when she witnesses the fatal shooting of her childhood friend by a police officer.  The novel explores themes of systemic racism, police brutality, and the power of activism through Starr's courageous journey.  The book is not only a story of personal growth and resilience but also a call to action, highlighting the importance of using one's voice to fight against oppression and demand change.  *The Hate U Give* has earned the William C. Morris Award, given by the American Library Association to honor a debut book published by a first-time author writing for teens; the Michael L. Printz Honor, which recognizes excellence in literature written for young adults; the Coretta Scott King Author Honor, which acknowledges outstanding books by African American authors that promote an understanding and appreciation of the African American experience; the Amelia Elizabeth Walden Award, which is presented by the Assembly on Literature for Adolescents and celebrates a

45

book that exemplifies literary merit; and the Goodreads Choice Award for Young Adult Fiction. *The Hate U Give* has sold over 5 million copies worldwide and spent 249 weeks on the *New York Times* bestseller list. It has been published in 28 languages and is commonly included on AP exams. *The Hate U Give* has been removed from school libraries under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect. *The Hate U Give* has been removed from school libraries in at least 10 school districts in Florida since HB 1069 went into effect.

137.   Section 1006.28's prohibitions on content that "describes sexual conduct" and content that is "pornographic"—as construed by the State Defendants—also requires school districts to remove classic, award-winning books and books that are commonly covered in AP exams, such as *The Color Purple*, *Native Son*, *The Kite Runner*, *Beloved*, *The Bluest Eye*, *Love in the Time of Cholera*, and *This Is Where It Ends*. A law that requires the removal of books from school libraries that are covered in AP exams disadvantages Florida students and serves no legitimate purpose.

138.   *The Color Purple*, written by Alice Walker and published by PRH, is a critically acclaimed novel that tells the story of a poor, young, uneducated African-American girl named Celie who lives in rural Georgia in the early 1900s. The novel details Celie's encounters with racism, sexism, abuse, and challenges to her own sexuality. *The Color Purple* won the 1983 Pulitzer Prize

for Fiction and the National Book Award for Fiction. *The Color Purple* has been removed by school districts under Section 1006.28's prohibitions on "pornographic" content and content that "describes sexual conduct" since HB 1069 went into effect. *The Color Purple* has been removed from school libraries in at least three school districts in Florida since HB 1069 went into effect.

139. *Native Son*, written by Richard Wright and published by HarperCollins, is a powerful, award-winning novel. Set in Chicago in the 1930s, *Native Son* is the story of Bigger Thomas, a young Black man whose life spirals downward after he kills a young white woman in a moment of panic. This novel both condemns social and racial injustice and paints an unsparing portrait of the Black experience in America, revealing the tragic effects of poverty, racism, and hopelessness on the human spirit. *Native Son* has been removed by school districts under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect. *Native Son* has been removed from school libraries in at least four school districts in Florida since HB 1069 went into effect.

140. *The Kite Runner*, written by Khaled Hosseini and published by PRH, tells the story of Amir, a young boy from Kabul, in the backdrop of turbulent events, from the fall of Afghanistan's monarchy through the Soviet invasion, the exodus of refugees to Pakistan and the United States, and the rise of the Taliban regime. This *New York Times* bestselling novel explores

themes of friendship, betrayal, guilt, redemption, and father-son relationships. The novel won the South African Boeke Prize, was twice voted Reading Group Book of the Year, and has been adapted into a motion picture and play. *The Kite Runner* has been removed by school districts under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect. *The Kite Runner* has been removed from school libraries in at least 10 school districts in Florida since HB 1069 went into effect.

141. *Beloved*, written by Toni Morrison and published by PRH, is set in the period after the American Civil War and tells the story of a family of formerly enslaved people whose Cincinnati home is haunted by a malevolent spirit. The novel explores themes of mother-daughter relationships, the psychological effects of slavery, the effect of slavery on African-American families, manhood and masculinity, pain and generational trauma, and heroism. *Beloved* won the Pulitzer Prize for Fiction and the Anisfield-Wolf Book Award and was a National Book Award Finalist. The novel has been adapted into a motion picture and was ranked by *The New York Times* as the best work of American fiction from 1981 to 2006. Toni Morrison was awarded the Nobel Prize in Literature in 1993. *Beloved* is frequently included on AP exams. *Beloved* has been removed by school districts under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into

effect. *Beloved* has been removed from school libraries in at least 10 school districts in Florida since HB 1069 went into effect.

142. *The Bluest Eye*, written by Toni Morrison and published by PRH, is set in 1941 and tells the story of a young African American girl who, against the backdrop of a country that seems to prefer blond, blue-eyed children, prays for her eyes to turn blue. *The Bluest Eye* examines an obsession with beauty and conformity and confronts themes of racism, class, and gender. *The Bluest Eye* is frequently included on AP exams. *The Bluest Eye* has been removed from school libraries in Volusia County under Section 1006.28's prohibition on "pornographic" content since HB 1069 went into effect. *The Bluest Eye* has been removed from school libraries in at least 10 school districts in Florida since HB 1069 went into effect.

143. *Love in the Time of Cholera*, written by Gabriel García Márquez and published by PRH, explores the complexities and endurance of love over the span of more than half a century. Set in a Caribbean seaport, the story revolves around the lives of Florentino Ariza and Fermina Daza, who fall in love in their youth but are separated by circumstance and societal expectations. *Love in the Time of Cholera* is a timeless narrative that explores themes such as social inequality, aging, mortality, and morality. It celebrates the power of love and the resilience of the human spirit. In 1982, Gabriel García Márquez was awarded the Nobel Prize in Literature for his body of

work, including *Love in the Time of Cholera*.  *Love in the Time of Cholera* is a *New York Times* Bestseller and is frequently listed among the greatest literary works of the 20th century.  *Love in the Time of Cholera* has been removed from school libraries in Orange County under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect.  *Love in the Time of Cholera* has been removed from school libraries in at least two school districts in Florida since HB 1069 went into effect.

144.  *This Is Where It Ends*, written by Marieke Nijkamp and published by Sourcebooks, is a young adult novel that tells the gripping and harrowing story of a school shooting in a small town in Alabama.  The book is unique in its narrative structure, as it unfolds over a 54-minute period and is told from the perspectives of four students who are all directly impacted by the tragic event.  Through the perspectives of four narrators, the book delves into themes of trauma, loss, resilience, and the power of human connection in the face of unimaginable horror.  *This Is Where It Ends* is a *New York Times* Bestseller, and National Indie Bestseller, and a *Publishers Weekly* Bestseller.  It is also a 2016 Cybils Awards Finalist in Young Adult Fiction, a 2016 ABC Best Book for Young Readers, and a Goodreads Choice Awards Finalist in Best Young Adult Fiction.  *This Is Where It Ends* has been removed from school libraries in at least one school district in Florida under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect.

145.   Under Section 1006.28's prohibitions on content that "describes sexual conduct" and "pornographic" content, school districts have also been required to remove nonfiction books such as history books, biographies, and memoirs, including Maya Angelou's *I Know Why the Caged Bird Sings*, Mark Mathabane's *Kaffir Boy: The True Story of a Black Youth's Coming of Age in Apartheid South Africa*, Erin Gruwell's *The Freedom Writers Diary: How a Teacher and 50 Teens Used Writing to Change Themselves and the World Around Them*, Erik Larson's *The Splendid and the Vile*, and Janet Gurtler's *You Too? 25 Voices Share Their #MeToo Stories*.

146.   *I Know Why the Caged Bird Sings* by Maya Angelou, published by PRH, is a memoir that chronicles the early years of the renowned poet and author, including her traumatic childhood, marked by racial discrimination, sexual abuse, and abandonment.  Central to Angelou's story is her unyielding spirit, the strength she draws from her love of literature and language, and the human capacity for resilience and transformation.  *I Know Why the Caged Bird Sings* is an essential and enduring work in American literature and explores themes such as race, identity, and the quest for freedom.  *I Know Why the Caged Bird Sings* was nominated for the prestigious National Book Award for Biography.  It is also an Autobiography Hall of Fame Inductee and a One Book, One Community Selection because it is frequently selected for community reading programs, which underscores its enduring relevance and educational

51

value.  *I Know Why the Caged Bird Sings* is frequently included on AP exams.

*I Know Why the Caged Bird Sings* has been removed by school districts under

Section 1006.28's prohibition on content that "describes sexual conduct" since

HB 1069 went into effect.  *I Know Why the Caged Bird Sings* has been removed

from school libraries in at least four school districts in Florida since HB 1069

went into effect.

147.  Mark Mathabane's *Kaffir Boy: The True Story of a Black Youth's Coming of Age in Apartheid South Africa*, published by Simon & Schuster, is a memoir that chronicles the author's childhood and adolescence under apartheid in South Africa.  Born in 1960 in the impoverished township of Alexandra, Mathabane recounts the brutal realities of living in a system designed to oppress and dehumanize black South Africans.  The memoir vividly depicts the daily struggles his family faced, including extreme poverty, violence, and systemic racism.  Despite the oppressive environment, Mathabane's determination to escape the cycle of poverty and discrimination drives him to pursue education against all odds and leads him to excel academically, eventually earning a scholarship to an American university.  *Kaffir Boy* is both an educational resource and an inspiring testament to the resilience of the human spirit, highlighting the transformative power of education and the enduring fight for justice and equality.  *Kaffir Boy* has earned the Christopher Award for media that affirms the highest value of the

human spirit and been recognized as one of the American Library Association's Best Books for Young Adults, which recognizes powerful storytelling and impact on young adult readers. *Kaffir Boy* is also a *New York Times* Bestseller and is frequently included on AP exams. *Kaffir Boy* has been removed by school districts under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect. *Kaffir Boy* has been removed from school libraries in at least three school districts in Florida since HB 1069 went into effect.

148.    Erin Gruwell's *The Freedom Writers Diary: How a Teacher and 50 Teens Used Writing to Change Themselves and the World Around Them*, published by PRH, is a collection of real-life diary entries from a group of high school students in Long Beach, California.   Under the guidance of their dedicated teacher, Erin Gruwell, these students—who once faced seemingly insurmountable challenges such as gang violence, poverty, and racial tension—begin to find their voices and change their lives through the power of writing.   The students' journey is marked by profound moments of self-discovery, empathy, and empowerment as they learn to see themselves and each other in new, more compassionate ways. *The Freedom Writers Diary* is not just a testament to the power of education but also a moving tribute to the human spirit's ability to overcome adversity. *The Freedom Writers Diary* has earned the Christopher Award for media that affirms the highest values of the

human spirit, and its impact on education and its inspiration for teachers and students is widely recognized. *The Freedom Writers Diary* has been removed from school libraries in Volusia County under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect. *The Freedom Writers Diary* has been removed from school libraries in at least seven school districts in Florida since HB 1069 went into effect.

149.   Erik Larson's *The Splendid and the Vile*, published by PRH, is a meticulously researched historical narrative that chronicles Winston Churchill's first year as Prime Minister of Britain during the harrowing days of World War II.  Through diaries, archival documents, and firsthand accounts, Larson paints a compelling picture of Churchill's indomitable spirit and strategic acumen and the unwavering resolve that inspired a country to stand firm in its darkest hour.  Interspersed with Churchill's political and military maneuvers are the personal struggles and triumphs of his family and close advisors, providing a humanizing glimpse into the lives of those who lived through the Blitz.  *The Splendid and the Vile* is an essential read for history enthusiasts and anyone interested in the remarkable story of Britain's defiance and survival during World War II.  *The Splendid and the Vile* is a *New York Times* Bestseller; was named one of the best books of 2020 by the Washington Post, the Economist, and Time; and has earned the Goodreads Choice Award for History & Biography.  The *Splendid and the Vile* is frequently included on

AP exams. *The Splendid and the Vile* has been removed from school libraries in Orange County under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect.

150.    *You Too? 25 Voices Share Their #MeToo Stories*, edited by Janet Gurtler and published by HarperCollins, is a compelling anthology that brings together diverse voices to share their personal experiences with sexual harassment and assault. The anthology features a range of contributors, from well-known authors and activists to everyday people, each offering a unique perspective on the impact of sexual violence. The stories reflect the pain, resilience, and strength of survivors. Through their narratives, the contributors address the societal norms and systemic issues that perpetuate abuse, while also highlighting the importance of solidarity and support. *You Too?* has been removed from school libraries in Volusia under Section 1006.28's prohibition on content that "describes sexual conduct" since HB 1069 went into effect. *You Too?* has been removed from school libraries in at least two school districts in Florida since HB 1069 went into effect.

151.    Other notable books that were removed from school libraries under Section 1006.28's prohibitions on content that "describes sexual conduct" and so-called "pornographic" content are *Anna Karenina*, written by Leo Tolstoy and published by Macmillan; *Brave New World*, written by Aldous Huxley and published by HarperCollins; *Forever*, written by Judy Blume and published by

Simon & Schuster; *Invisible Man*, written by Ralph Ellison and published by PRH; *The Sun Also Rises*, written by Ernest Hemingway and published by Simon & Schuster; and *Their Eyes Were Watching God*, written by Zora Neale Hurston and published by HarperCollins.

152.   Orange County determined that Section 1006.28's prohibition on content that "describes sexual conduct" required it to remove school library books such as *Bel Canto*, written by Ann Patchett and published by HarperCollins and *Demian*, written by Herman Hesse and published by Macmillan.

153.   Volusia County determined that Section 1006.28's prohibition on "pornographic" content required it to remove school library books such as *Slaughterhouse-Five*, written by Kurt Vonnegut and published by PRH.

154.   Each of these books, when considered as a whole, has great value for student readers, and none of these books is obscene.

### *The First Amendment Applies In School Libraries*

155.   School libraries in Florida schools are at least nonpublic forums. In nonpublic forums, the State cannot impose restrictions on speech that are unreasonable in light of the forum's purpose. *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12, 16 (2018).

156.   The Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, prohibits state statutes that restrict a

substantial amount of protected speech in the course of regulating unprotected speech. Such statutes are unconstitutionally overbroad. *Moody v. NetChoice, LLC.*, 144 S. Ct. 2383, 2397 (2024) (citing *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). In assessing an overbreadth claim, a court "must evaluate the full scope of the law's coverage[,] decide which of the law's applications are constitutionally permissible and which are not, and finally weigh the one against the other." *Id.* at 2409. Under this test, statutes are overbroad when they are categorically untailored to any legitimate State interest. *See Bonta*, 594 U.S. at 615.

157. A statute that requires the content-based removal of school library books without regard to the value of the books as a whole is not constitutionally permissible.

158. Section 1006.28's prohibitions on content that "describes sexual conduct" and so-called "pornographic" content—as construed by the State Defendants—appear to be based on the State of Florida's interest in preventing students from accessing sexually explicit materials in school libraries.

159. Section 1006.28 separately advances this interest by prohibiting school library books that are "harmful to minors." The "harmful to minors" standard accounts for the value of books as a whole and is consistent with the Supreme Court's obscenity standard as applied to minors.

160.   Section 1006.28's prohibitions on content that "describe sexual conduct" and "pornographic" content—as construed by the State Defendants— limit substantially more books than would be limited by the Supreme Court's obscenity standard as applied to minors and do not allow consideration of the value of books as a whole.

161.   Section 1006.28's prohibitions on content that "describes sexual conduct" and "pornographic" content—as construed by the State Defendants— result in the sweeping removal of a substantial volume of protected school library books in comparison to the minimal number of books that could permissibly be removed.

162.   Section 1006.28's prohibitions on content that "describes sexual conduct" and "pornographic" content—as construed by the State Defendants— are categorically untailored to any legitimate State interest because they categorically require the broad, content-based removal of school library books without consideration for their value as a whole.

163.   Further, in the setting of a public school library, the First Amendment "protects the right to receive information and ideas." *Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867-68 (1982) (plurality opinion).  This right is violated when a school district or school board removes or restricts access to library books "in a narrowly partisan or political manner," and for the purpose of "deny[ing] students access to ideas with which" the

school district or school board disagrees or to "prescribe what shall be orthodox." *Id.* at 870-71.  This right is also violated by state laws that prohibit school libraries from containing categories of books based on the book's content without regard to the value of a book as a whole.

## CAUSES OF ACTION

**COUNT I – PLAINTIFFS PRH, HARPERCOLLINS, MACMILLAN, SIMON & SCHUSTER, SOURCEBOOKS, ANDERSON, GREEN, PICOULT, THOMAS, THE GUILD, HEIDI KELLOGG AS PARENT AND NEXT FRIEND OF R.K., AND JUDITH ANNE HAYES AS PARENT AND NEXT FRIEND OF J.H., AGAINST THE STATE DEFENDANTS
First Amendment, Impermissible Overbroad
Content-Based Restriction
(Content That Describes Sexual Conduct)**

164.   Paragraphs 1-163 are incorporated by reference as if fully set forth herein.

165.   Section 1006.28's prohibition on content that describes sexual conduct is a content-based restriction because it regulates the availability of books in school libraries based on "the topic discussed, or the idea or message expressed"—namely, whether the book contains a description of sexual conduct.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  *See also Reno v. Am. Civ. L. Union*, 521 U.S. 844, 849, 868 (1997) (holding that statutory provisions restricting "indecent" and "patently offensive" communications on the Internet were "content-based blanket restriction[s] on speech").

166.   The prohibition on content that describes sexual conduct violates the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because it is not reasonable in light of the purpose of school libraries.

167.   The prohibition on content that describes sexual conduct is overbroad because it prohibits a substantially broad swath of constitutionally protected material in comparison to its very few legitimate applications.

168.   The prohibition on content that describes sexual conduct is overbroad because it covers any book with content that describes sexual conduct for all students of all age groups without regard to (a) whether the book when "taken as a whole, appeal[s] to the prurient interest in sex," (b) whether the book "portray[s] sexual conduct in a patently offensive way," or (c) whether the book when "taken as a whole, [has] serious literary, artistic, political, or scientific value," as that standard applies to minors. *Miller*, 413 U.S. at 24.

169.   The prohibition on content that describes sexual conduct applies to all books in school libraries and all students across-the-board, prohibiting school districts from considering the age of the potential reader. That restriction prevents all students (including students who have reached the age of majority) from checking out those books at school, rather than requiring parents who seek to prevent their children from accessing those books to

inform a school district that their children should not be allowed to access those books.

170.  Further, the term "describes sexual conduct" is vague and confusing because it provides no guidance as to what types of statements contain sufficient descriptions of sexual conduct or what level of detail is necessary to implicate the prohibition on content that describes sexual conduct.  Because the State threatens to penalize media specialists who do not comply with the law, those media specialists—as well as other Florida educators—must decide whether to remove books that purportedly contain content that describes sexual conduct in violation of the First Amendment rights of publishers, authors, students, and others, or to risk loss of licensure for refusing to do so.

171.  As a result of the vagueness of the term "describes sexual conduct" when combined with the substantial penalties that the State threatens to impose on media specialists, constitutionally protected materials are and will be suppressed in much greater numbers than unprotected material and First Amendment rights are chilled, injuring Plaintiffs and others.

172.  The prohibition on content that describes sexual conduct violates the rights of the Publisher Plaintiffs and the Author Plaintiffs under the First and Fourteenth Amendments to the U.S. Constitution because it interferes with their ability to make their books available to readers and to distribute

constitutionally protected books, and it chills those plaintiffs and others from engaging in protected activity.

173.  The prohibition on content that describes sexual conduct also violates the rights of R.K. and J.H. under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with their right to receive information in their school libraries and it chills them from engaging in protected activity.

174.  Heidi Kellogg wants her child R.K., a student in Volusia County, to be able to check out and read from R.K.'s school or classroom libraries books that have been targeted for removal or removed under Section 1006.28's prohibition on content that describes sexual conduct, including *You Too?  25 Voices Share Their #MeToo Stories*.  Heidi Kellogg also wants R.K. to be able to possess, read, and discuss those books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate.

175.  R.K. likewise wants to be able to check out and read from her school or classroom libraries books that have been targeted for removal or removed under Section 1006.28's prohibition on content that describes sexual conduct, including *You Too? 25 Voices Share Their #MeToo Stories*.  R.K. also wants to be able to possess, read, and discuss those books in school without

incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate.

176. R.K. intended to check out these books from her school or classroom libraries this school year, but she has been unable to do so as a result of the prohibition on content that describes sexual conduct.

177. Judith Anne Hayes wants her child J.H., a student in Orange County, to be able to check out and read from J.H.'s school or classroom libraries books that have been targeted for removal or removed under Section 1006.28's prohibition on content that describes sexual conduct, including *Love in the Time of Cholera*. Judith Anne Hayes also wants J.H. to be able to possess, read, and discuss those books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate.

178. J.H. likewise wants to be able to check out and read from his school or classroom libraries books that have been targeted for removal or removed under Section 1006.28's prohibition on content that describes sexual conduct, including *Love in the Time of Cholera*. J.H. also wants to be able to possess, read, and discuss those books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate.

179.   J.H. intended to check out these books from his school or classroom libraries this school year, but he has been unable to do so as a result of the prohibition on content that describes sexual conduct.

180.   The State Defendants have mandated that school libraries not contain books with content that describes sexual conduct and are ultimately responsible for enforcing that mandate.

181.   The unlawful conduct of the State Defendants has injured the rights of R.K., J.H., and other students attending school in Florida school districts to access information and ideas within their school and classroom libraries.  It has also stigmatized other students as it has stigmatized R.K. and J.H.

182.   An actual and substantial controversy as to the constitutionality of Section 1006.28's prohibition on content that describes sexual conduct exists between Plaintiffs on the one hand and the State Defendants on the other hand.

183.   Because Section 1006.28's prohibition on content that describes sexual conduct infringes on the First Amendment rights of publishers, authors, parents, and students—including Plaintiffs—there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that Section 1006.28's prohibition on content that describes sexual conduct is unconstitutional.

184.    Declaratory relief as to the constitutionality of Section 1006.28's prohibition on content that describes sexual conduct would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

**COUNT II – PLAINTIFFS PRH, HACHETTE, HARPERCOLLINS, MACMILLAN, ALVAREZ, THOMAS, THE GUILD, AND HEIDI KELLOGG AS PARENT AND NEXT FRIEND OF R.K. AGAINST THE STATE DEFENDANTS**
**Statutory Construction – "Pornographic" Is Synonymous With "Harmful To Minors"**

185.    Paragraphs 1-163 are incorporated by reference as if fully set forth herein.

186.    Section 1006.28 prohibits school library books that contain content that "[i]s pornographic or prohibited under s. 847.012."    Fla. Stat. s. 1006.28(2)(a)(2)(b)(I).    Section 847.012 prohibits content that is "harmful to minors," which is defined to conform to the Supreme Court's standard for content that is obscene as to minors.    Fla. Stat. s. 847.012; 847.001(7).

187.    Properly construed, "pornographic" content under Section 1006.28 is a synonym for content that is "harmful to minors."

188.    In Section 1006.28, the terms "pornographic" and "prohibited under s. 847.012" are separated only by the word "or," indicating that "pornographic" and "harmful to minors" are synonyms or definitional

equivalents. *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1088 (11th Cir. 2017).

189.   The Supreme Court's canons of statutory interpretation confirm that the term "pornographic" should be construed as a synonym for "harmful to minors."  The Supreme Court has instructed that the "elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality" and that the "corollary doctrine" is that a "statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Rust v. Sullivan*, 500 U.S. 173, 190-91 (1991) (emphasis, quotations, and citations omitted).

190.   The Florida legislature's decision to include content that is "pornographic" in the same category as content that is "harmful to minors" rather than in a separate category is consistent with the terms being synonymous.

191.   The State Defendants have construed the term "pornographic" to be separate and distinct from the term "harmful to minors," as evidenced by the separate categories for "pornographic" content and content that is "prohibited under s. 847.012" on the State Board-promulgated objection form, which the State Board mandates all school districts adopt.  Under the State Board's construction of Section 1006.28, as evidenced by the State Board's

objection form, a book could contain content that is "pornographic" but not be "prohibited under s. 847.012."  The State Defendants have mandated that school libraries not contain books with "pornographic" content, and they are ultimately responsible for enforcing that mandate.

192.  The State Defendants' construction of "pornographic" content violates the rights of the Publisher Plaintiffs and the Author Plaintiffs under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with the Publisher Plaintiffs' and Author Plaintiffs' ability to make their books available to readers and to distribute constitutionally protected books, and it chills those plaintiffs and others from engaging in protected activity.

193.  The prohibition on "pornographic" content as construed by the State Defendants also violates the rights of R.K. under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with her right to receive information in her school library, including *The Bluest Eye*, and it chills her from engaging in protected activity. The unlawful conduct of the State Defendants has injured the rights of R.K. and other students attending school in Florida school districts to access information and ideas within their school and classroom libraries.

194.   An actual and substantial controversy exists as to the meaning of the term "pornographic" under Section 1006.28 between Plaintiffs on the one hand and the State Defendants on the other hand.

195.  Because the State Defendants' construction of the term "pornographic" under Section 1006.28 infringes on the First Amendment rights of publishers, authors, parents, and students—including Plaintiffs—there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the term "pornographic" as used in Section 1006.28 is synonymous with the term "harmful to minors."

196.  Declaratory relief as to the meaning of "pornographic" would clarify and settle the legal relations at issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

### COUNT III – PLAINTIFFS PRH, HACHETTE, HARPERCOLLINS, MACMILLAN, ALVAREZ, THOMAS, THE GUILD, AND HEIDI KELLOGG AS PARENT AND NEXT FRIEND OF R.K. AGAINST THE STATE DEFENDANTS
### First Amendment, Impermissible Overbroad Content-Based Restriction
### ("Pornographic" Content)

197.   Paragraphs 1-163 are incorporated by reference as if fully set forth herein.

198.   This Count is pled in the alternative to Count II, in the event the construction of the term "pornographic" as synonymous with the term "harmful to minors" is rejected.

199.   Section 1006.28's prohibition of "pornographic" content is a content-based restriction because it regulates the availability of books in school libraries based on "the topic discussed, or the idea or message expressed"— namely, whether the book contains undefined "pornographic content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  *See also Reno v. Am. Civ. L. Union*, 521 U.S. 844, 849, 868 (1997) (holding that statutory provisions restricting "indecent" and "patently offensive" communications on the Internet were "content-based blanket restriction[s] on speech").

200.   The prohibition on "pornographic" content violates the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because it is not reasonable in light of the purpose of school libraries.

201.   The prohibition on "pornographic" content is overbroad because it prohibits a substantially broad swath of constitutionally protected material in comparison to its very few, if any, legitimate applications.

202.   Section 1006.28 requires that books that contain "pornographic content" be removed from school libraries or not selected for school libraries in the first place.

203.  The prohibition on "pornographic" content prohibits any school library book with content that could be considered "pornographic" without regard to (a) whether the book when "taken as a whole, appeal[s] to the prurient interest in sex," (b) whether the book "portray[s] sexual conduct in a patently offensive way," or (c) whether the book when "taken as a whole, [has] serious literary, artistic, political, or scientific value," as that standard applies to minors. *Miller*, 413 U.S. at 24.

204.  The prohibition on "pornographic" content applies to all books in school libraries and all students across-the-board, prohibiting school districts from considering the age of the potential reader.  That restriction prevents all students (including students who have reached the age of majority) from checking out those books at school, rather than requiring parents who seek to prevent their children from accessing those books to inform a school district that their children—and only their children—should not be allowed to access those books.

205.  Further, the term "pornographic" is vague and confusing because it provides no guidance as to what types of statements constitute a violation of the prohibition on "pornographic" content.  Because the State threatens to penalize media specialists who do not comply with the law, those media specialists—as well as other Florida educators—must decide whether to remove books that purportedly contain "pornographic" content in violation of

the First Amendment rights of publishers, authors, students, and others, or to risk loss of licensure for refusing to do so.

206.   As a result of the vagueness of the term "pornographic" when combined with the substantial penalties that the State threatens to impose on media specialists, constitutionally protected materials are and will be suppressed in much greater numbers than unprotected material and First Amendment rights are chilled, injuring Plaintiffs and others.

207.   The prohibition on "pornographic" content violates the rights of the Publisher Plaintiffs and the Author Plaintiffs under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with the Publisher Plaintiffs' and Author Plaintiffs' ability to make their books available to readers and to distribute constitutionally protected books, and it chills those plaintiffs and others from engaging in protected activity.

208.   The prohibition on "pornographic" content also violates the rights of R.K. under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with her right to receive information in her school library and it chills her from engaging in protected activity.

209.   Heidi Kellogg wants her child R.K., a student in Volusia, to be able to check out and read from R.K.'s school or classroom libraries books that have

been targeted for removal or removed under Section 1006.28's prohibition on "pornographic" content, including *The Bluest Eye*. Heidi Kellogg also wants R.K. to be able to possess, read, and discuss those books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate.

210. R.K. likewise wants to be able to check out and read from her school or classroom libraries books that have been targeted for removal or removed under Section 1006.28's prohibition on "pornographic" content, including *The Bluest Eye*. R.K. also wants to be able to possess, read, and discuss those books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate.

211. R.K. intended to check out these books from her school or classroom libraries this school year, but she has been unable to do so as a result of the prohibition on "pornographic" content.

212. The State Defendants have mandated that school libraries not contain books with "pornographic" content and are ultimately responsible for enforcing that mandate.

213. The unlawful conduct of the State Defendants has injured the rights of R.K. and other students attending school in Florida school districts to

access information and ideas within their school and classroom libraries.  It has also stigmatized other students as it has stigmatized R.K.

214.  An actual and substantial controversy as to the constitutionality of Section 1006.28's prohibition on "pornographic" content exists between Plaintiffs on the one hand and the State Defendants on the other hand.

215.  Because Section 1006.28's prohibition on "pornographic" content infringes on the First Amendment rights of publishers, authors, parents, and students—including Plaintiffs—there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that Section 1006.28's prohibition on "pornographic" content is unconstitutional.

216.  Declaratory relief as to the constitutionality of Section 1006.28's prohibition on "pornographic" content would clarify and settle the legal relations at issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

### COUNT IV – PLAINTIFFS PRH,  HARPERCOLLINS, SIMON & SCHUSTER, PICOULT, THE GUILD, AND HEIDI KELLOGG AS PARENT AND NEXT FRIEND OF R.K. AGAINST THE VOLUSIA COUNTY DEFENDANTS First Amendment, Impermissible Overbroad Content-Based Restriction (Content That Describes Sexual Conduct)

217.  Paragraphs 1-163 are incorporated by reference as if fully set forth herein.

73

218.   Section 1006.28's prohibition on content that describes sexual conduct is a content-based restriction because it regulates the availability of books in school libraries based on "the topic discussed, or the idea or message expressed"—namely, whether the book contains a description of sexual conduct. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). *See also Reno v. Am. Civ. L. Union*, 521 U.S. 844, 849, 868 (1997) (holding that statutory provisions restricting "indecent" and "patently offensive" communications on the Internet were "content-based blanket restriction[s] on speech").

219.   The prohibition on content that describes sexual conduct violates the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because it is not reasonable in light of the purpose of school libraries.

220.   The prohibition on content that describes sexual conduct is overbroad because it prohibits a substantially broad swath of constitutionally protected material in comparison to its very few legitimate applications.

221.   The prohibition on content that describes sexual conduct is overbroad because it covers any book with content that describes sexual conduct for all students of all age groups without regard to (a) whether the book when "taken as a whole, appeal[s] to the prurient interest in sex," (b) whether the book "portray[s] sexual conduct in a patently offensive way," or (c) whether the book when "taken as a whole, [has] serious literary, artistic,

political, or scientific value," as that standard applies to minors.  *Miller*, 413 U.S. at 24.

222.  The prohibition on content that describes sexual conduct applies to all books in school libraries and all students across-the-board, prohibiting school districts from considering the age of the potential reader.  That restriction prevents all students (including students who have reached the age of majority) from checking out those books at school, rather than requiring parents who seek to prevent their children from accessing those books to inform a school district that their children should not be allowed to access those books.

223.  Further, the term "describes sexual conduct" is vague and confusing because it provides no guidance as to what types of statements contain sufficient descriptions of sexual conduct or what level of detail is necessary to constitute content that "describes sexual conduct."  Because the State threatens to penalize media specialists who do not comply with the law, those media specialists—as well as other Florida educators—must decide whether to remove books that purportedly contain content that describes sexual conduct in violation of the First Amendment rights of publishers, authors, students, and others, or to risk loss of licensure for refusing to do so.

224.  As a result of the vagueness of the term "describes sexual conduct" when combined with the substantial penalties that the State threatens to

impose on media specialists, constitutionally protected materials are and will be suppressed in much greater numbers than unprotected material and First Amendment rights are chilled, injuring Plaintiffs and others.

225.   The prohibition on content that describes sexual conduct violates the rights of the Publisher Plaintiffs and the Author Plaintiffs under the First and Fourteenth Amendments to the U.S. Constitution because it interferes with their ability to make their books available to readers and to distribute constitutionally protected books, and it chills those plaintiffs and others from engaging in protected activity.

226.   The prohibition on content that describes sexual conduct also violates the rights of R.K. under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with her right to receive information in her school library and it chills her from engaging in protected activity.

227.   Heidi Kellogg wants her child R.K., a student in Volusia, to be able to check out and read from R.K.'s school or classroom libraries books that have been targeted for removal or removed under Section 1006.28's prohibition on content that describes sexual conduct, including *You Too?  25 Voices Share Their #MeToo Stories*.  Heidi Kellogg also wants R.K. to be able to possess, read, and discuss those books in school without incurring the stigma associated

with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate.

228.   R.K. likewise wants to be able to check out and read from her school or classroom libraries books that have been targeted for removal or removed under Section 1006.28's prohibition on content that describes sexual conduct, including *You Too?  25 Voices Share Their #MeToo Stories.*  R.K. also wants to be able to possess, read, and discuss those books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate.

229.   R.K. intended to check out these books from her school or classroom libraries this school year, but she has been unable to do so as a result of the prohibition on content that describes sexual conduct.

230.   The Volusia County Defendants are responsible for enforcing the State mandate that school libraries not contain books with content that describes sexual conduct.

231.   The unlawful conduct of the Volusia County Defendants has injured the rights of R.K. and other students attending school in Florida school districts to access information and ideas within their school and classroom libraries.  It has also stigmatized other students as it has stigmatized R.K.

232.   An actual and substantial controversy as to the constitutionality of Section 1006.28's prohibition on content that describes sexual conduct exists

between Plaintiffs on the one hand and the Volusia County Defendants on the other hand.

233.   Because Section 1006.28's prohibition on content that describes sexual conduct infringes on the First Amendment rights of publishers, authors, parents, and students—including Plaintiffs—there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that Section 1006.28's prohibition on content that describes sexual conduct unconstitutional.

234.   Declaratory relief as to the constitutionality of Section 1006.28's prohibition on content that describes sexual conduct would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

**COUNT V – PLAINTIFFS PRH, HACHETTE, HARPERCOLLINS, AND HEIDI KELLOGG AS PARENT AND NEXT FRIEND OF R.K. AGAINST THE VOLUSIA COUNTY DEFENDANTS**
**Statutory Construction – "Pornographic" Is Synonymous With "Harmful To Minors"**

235.   Paragraphs 1-163 are incorporated by reference as if fully set forth herein.

236.   Section 1006.28 prohibits school library books that contain content that "[i]s pornographic or prohibited under s. 847.012." Fla. Stat. s. 1006.28(2)(a)(2)(b)(I). Section 847.012 prohibits content that is "harmful to

minors," which is defined to conform to the Supreme Court's standard for content that is obscene as to minors. Fla. Stat. s. 847.012; 847.001(7).

237.  Properly construed, "pornographic" content under Section 1006.28 is a synonym for content that is "harmful to minors."

238.  In Section 1006.28, the terms "pornographic" and "prohibited under s. 847.012" are separated only by the word "or" because "pornographic" and "harmful to minors" are synonyms or definitional equivalents. *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1088 (11th Cir. 2017).

239.  The Supreme Court's canons of statutory interpretation confirm that the term "pornographic" should be construed as a synonym for "harmful to minors."  The Supreme Court has instructed that the "elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality" and that the "corollary doctrine" is that a "statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Rust v. Sullivan*, 500 U.S. 173, 190-91 (1991) (emphasis, quotations, and citations omitted).

240.  The Florida legislature's decision to include content that is "pornographic" in the same category as content that is "harmful to minors" rather than in a separate category further demonstrates that the terms are synonymous.

241.   The State Defendants have construed the term "pornographic" to be separate and distinct from the term "harmful to minors," as evidenced by the separate categories for "pornographic" content and content that is "prohibited under s. 847.012" on the State Board-promulgated objection form, which the State Board mandates all school districts, including Volusia County, adopt.  Under the State Board's construction of Section 1006.28, which Volusia County and the Volusia County Defendants have adopted, a book could contain content that is "pornographic" but not be "prohibited under s. 847.012."  That book, under Section 1006.28, would not be allowed in school libraries.

242.   The State Defendants' construction of "pornographic" content, as enforced by the Volusia County Defendants, violates the rights of the Publisher Plaintiffs and the Author Plaintiffs under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with the Publisher Plaintiffs' and Author Plaintiffs' ability to make their books available to readers and to distribute constitutionally protected books, and it chills those plaintiffs and others from engaging in protected activity.

243.   The prohibition on "pornographic" content as construed by the State Defendants and enforced by the Volusia County Defendants also violates the rights of R.K. under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with her

right to receive information in her school library, including *The Bluest Eye*, and it chills her from engaging in protected activity.  The unlawful conduct of the Volusia County Defendants has injured the rights of R.K. and other students attending school in Florida school districts to access information and ideas within their school and classroom libraries.

244.   An actual and substantial controversy exists as to the meaning of the term "pornographic" under Section 1006.28 between Plaintiffs on the one hand and the Volusia County Defendants on the other hand.

245.   Because the State Defendants' construction of the term "pornographic" under Section 1006.28, as enforced by the Volusia County Defendants, infringes on the First Amendment rights of publishers, authors, parents, and students—including Plaintiffs—there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the term "pornographic" as used in Section 1006.28 is synonymous with the term "harmful to minors."

246.   Declaratory relief as to the meaning of "pornographic" would clarify and settle the legal relations at issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

**COUNT VI – PLAINTIFFS PRH, HACHETTE, HARPERCOLLINS,
AND HEIDI KELLOGG AS PARENT AND NEXT FRIEND OF R.K.
AGAINST THE VOLUSIA COUNTY DEFENDANTS
First Amendment, Impermissible Overbroad
Content-Based Restriction
("Pornographic" Content)**

247.  Paragraphs 1-163 are incorporated by reference as if fully set forth herein.

248.  This Count is pled in the alternative to Count V, in the event the construction of the term "pornographic" as synonymous with the term "harmful to minors" is rejected.

249.  Section 1006.28's prohibition on "pornographic" content is a content-based restriction because it regulates the availability of books in school libraries based on "the topic discussed, or the idea or message expressed"—namely, whether the book contains undefined "pornographic content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). *See also Reno v. Am. Civ. L. Union*, 521 U.S. 844, 849, 868 (1997) (holding that statutory provisions restricting "indecent" and "patently offensive" communications on the Internet were "content-based blanket restriction[s] on speech").

250.  The prohibition on "pornographic" content violates the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because it is not reasonable in light of the purpose of school libraries.

251.   The prohibition on "pornographic" content is overbroad because it prohibits a substantially broad swath of constitutionally protected material in comparison to its very few legitimate applications.

252.   Section 1006.28 requires that books that contain "pornographic content" be removed from school libraries or not selected for school libraries in the first place.

253.   The prohibition on "pornographic" content prohibits any school library book with content that could be considered "pornographic" without regard to (a) whether the book when "taken as a whole, appeal[s] to the prurient interest in sex," (b) whether the book "portray[s] sexual conduct in a patently offensive way," or (c) whether the book when "taken as a whole, [has] serious literary, artistic, political, or scientific value," as that standard applies to minors. *Miller*, 413 U.S. at 24.

254.   The prohibition on "pornographic" content applies to all books in school libraries and all students across-the-board, prohibiting school districts from considering the age of the potential reader.  That restriction prevents all students (including students who have reached the age of majority) from checking out those books at school, rather than requiring parents who seek to prevent their children from accessing those books to inform a school district that their children—and only their children—should not be allowed to access those books.

255.   Further, the term "pornographic" is vague and confusing because it provides no guidance as to what types of statements constitute a violation of the prohibition on "pornographic" content.  Because the State threatens to penalize media specialists who do not comply with the law, those media specialists—as well as other Florida educators—must decide whether to remove books that purportedly contain "pornographic" content in violation of the First Amendment rights of publishers, authors, students, and others, or to risk loss of licensure for refusing to do so.

256.   As a result of the vagueness of the term "pornographic" when combined with the substantial penalties that the State threatens to impose on media specialists, constitutionally protected materials are and will be suppressed in much greater numbers than unprotected material and First Amendment rights are chilled, injuring Plaintiffs and others.

257.   The prohibition on "pornographic" content violates the rights of the Publisher Plaintiffs and the Author Plaintiffs under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with the Publisher Plaintiffs' and Author Plaintiffs' ability to make their books available to readers and to distribute constitutionally protected books, and it chills those plaintiffs and others from engaging in protected activity.

84

258.   The prohibition on "pornographic" content also violates the rights of R.K. under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with her right to receive information in her school library and it chills her from engaging in protected activity.

259.   Heidi Kellogg wants her child R.K., a student in Volusia County, to be able to check out and read from R.K.'s school or classroom libraries books that have been targeted for removal or removed under Section 1006.28's prohibition on "pornographic" content, including *The Bluest Eye*.  Heidi Kellogg also wants R.K. to be able to possess, read, and discuss those books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate.

260.   R.K. likewise wants to be able to check out and read from her school or classroom libraries books that have been targeted for removal or removed under Section 1006.28's prohibition on "pornographic" content, including *The Bluest Eye*.  R.K. also wants to be able to possess, read, and discuss those books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate.

261.   R.K. intended to check out these books from her school or classroom libraries this school year, but she has been unable to do so as a result of the prohibition on "pornographic" content.

262.   The Volusia County Defendants are responsible for enforcing the State mandate that school libraries not contain books with "pornographic" content.

263.   The unlawful conduct of the Volusia County Defendants has injured the rights of R.K. and other students attending school in Volusia County to access information and ideas within their school and classroom libraries.  It has also stigmatized other students as it has stigmatized R.K.

264.   An actual and substantial controversy as to the constitutionality of Section 1006.28's prohibition on "pornographic" content exists between Plaintiffs on the one hand and the Volusia County Defendants on the other hand.

265.   Because Section 1006.28's prohibition on "pornographic" content infringes on the First Amendment rights of publishers, authors, parents, and students—including Plaintiffs—there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that Section 1006.28's prohibition on "pornographic" content is unconstitutional.

266.   Declaratory relief as to the constitutionality of Section 1006.28's prohibition on "pornographic" content would clarify and settle the legal

relations at issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

**COUNT VII – PLAINTIFFS PRH, HARPERCOLLINS, MACMILLAN, SIMON & SCHUSTER, PICOULT, THE GUILD, AND JUDITH ANNE HAYES AS PARENT AND NEXT FRIEND OF J.H. AGAINST THE ORANGE COUNTY DEFENDANTS**
**First Amendment, Impermissible Overbroad**
**Content-Based Restriction**
**(Content That Describes Sexual Conduct)**

267.  Paragraphs 1-163 are incorporated by reference as if fully set forth herein.

268.  Section 1006.28's prohibition on content that describes sexual conduct is a content-based restriction because it regulates the availability of books in school libraries based on "the topic discussed, or the idea or message expressed"—namely, whether the book contains a description of sexual conduct. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). *See also Reno v. Am. Civ. L. Union*, 521 U.S. 844, 849, 868 (1997) (holding that statutory provisions restricting "indecent" and "patently offensive" communications on the Internet were "content-based blanket restriction[s] on speech").

269.  The prohibition on content that describes sexual conduct violates the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because it is not reasonable in light of the purpose of school libraries.

270.  The prohibition on content that describes sexual conduct is overbroad because it prohibits a substantially broad swath of constitutionally protected material in comparison to its very few legitimate applications.

271.  The prohibition on content that describes sexual conduct is overbroad because it covers any book with content that describes sexual conduct for all students of all age groups without regard to (a) whether the book when "taken as a whole, appeal[s] to the prurient interest in sex," (b) whether the book "portray[s] sexual conduct in a patently offensive way," or (c) whether the book when "taken as a whole, [has] serious literary, artistic, political, or scientific value," as that standard applies to minors. *Miller*, 413 U.S. at 24.

272.  The prohibition on content that describes sexual conduct applies to all books in school libraries and all students across-the-board, prohibiting school districts from considering the age of the potential reader.  That restriction prevents all students (including students who have reached the age of majority) from checking out those books at school, rather than requiring parents who seek to prevent their children from accessing those books to inform a school district that their children should not be allowed to access those books.

273.  Further, the term "describes sexual conduct" is vague and confusing because it provides no guidance as to what types of statements

contain sufficient descriptions of sexual conduct or what level of detail is necessary to constitute content that "describes sexual conduct." Because the State threatens to penalize media specialists who do not comply with the law, those media specialists—as well as other Florida educators—must decide whether to remove books that purportedly contain content that describes sexual conduct in violation of the First Amendment rights of publishers, authors, students, and others, or to risk loss of licensure for refusing to do so.

274. As a result of the vagueness of the term "describes sexual conduct" when combined with the substantial penalties that the State threatens to impose on media specialists, constitutionally protected materials are and will be suppressed in much greater numbers than unprotected material and First Amendment rights are chilled, injuring Plaintiffs and others.

275. The prohibition on content that describes sexual conduct violates the rights of the Publisher Plaintiffs and the Author Plaintiffs under the First and Fourteenth Amendments to the U.S. Constitution because it interferes with their ability to make their books available to readers and to distribute constitutionally protected books, and it chills those plaintiffs and others from engaging in protected activity.

276. The prohibition on content that describes sexual conduct also violates the rights of J.H. under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it

interferes with his right to receive information in his school library and it chills him from engaging in protected activity.

277.   Judith Anne Hayes wants her child J.H., a student in Orange County, to be able to check out and read from J.H.'s school or classroom libraries books that have been targeted for removal or removed Section 1006.28's prohibition on content that describes sexual conduct, including *Love in the Time of Cholera*.  Judith Anne Hayes  also wants J.H. to be able to possess, read, and discuss those books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate.

278.   J.H. likewise wants to be able to check out and read from her school or classroom libraries books that have been targeted for removal or removed under Section 1006.28's prohibition on content that describes sexual conduct, including *Love in the Time of Cholera*.  J.H. also wants to be able to possess, read, and discuss those books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate.

279.   J.H. intended to check out these books from his school or classroom libraries this school year, but he has been unable to do so as a result of Section 1006.28's prohibition on content that describes sexual conduct.

280.   The Orange County Defendants are responsible for enforcing the State mandate that school libraries not contain books with content that describes sexual conduct.

281.   The unlawful conduct of the Orange County Defendants has injured the rights of J.H. and other students attending school in Florida school districts to access information and ideas within their school and classroom libraries.  It has also stigmatized other students as it has stigmatized J.H.

282.   An actual and substantial controversy as to the constitutionality of Section 1006.28's prohibition on content that describes sexual conduct exists between Plaintiffs on the one hand and the Orange County Defendants on the other hand.

283.   Because Section 1006.28's prohibition on content that describes sexual conduct infringes on the First Amendment rights of publishers, authors, parents, and students—including Plaintiffs—there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that Section 1006.28's prohibition on content that describes sexual conduct unconstitutional.

284.   Declaratory relief as to the constitutionality of Section 1006.28's prohibition on content that describes sexual conduct would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Set this matter for a speeding hearing pursuant to Federal Rule of Civil Procedure 57 at the earliest possible date.

B.     Enter a declaratory judgment that Section 1006.28's prohibition on content that "describes sexual conduct" is unconstitutional because it abridges rights protected by the First Amendment to the U.S. Constitution.

C.     Enter a declaratory judgment that the term "pornographic" in Section 1006.28 is synonymous with the term "harmful to minors" as defined by Section 847.001(7) or, in the event the construction of the term "pornographic" as synonymous with the term "harmful to minors" is rejected, that Section 1006.28's prohibition on "pornographic" content is unconstitutional because it abridges rights protected by the First Amendment to the U.S. Constitution.

D.     Award Plaintiffs the costs of this action.

E.     Award Plaintiffs their reasonable attorneys' fees and other expenses pursuant to 42 U.S.C. § 1988; and

F.     Grant such other relief as the Court deems just and proper.

Dated:  August 29, 2024

CARLTON FIELDS

By:  /s/ David A. Karp
  David A. Karp
  Florida Bar No. 69226
  2 MiamiCentral
  700 NW 1st Avenue, Suite 1200
  Miami, Florida 33136
  Telephone: (305) 539-7280
  dkarp@carltonfields.com

  Frederick J. Sperling
  Adam J. Diederich
  Kirstie Brenson
  ArentFox Schiff LLP
  233 South Wacker Drive, Suite 7100
  Chicago, Illinois 60606
  Telephone: (312) 258-5500
  frederick.sperling@afslaw.com
  adam.diederich@afslaw.com
  kirstie.brenson@afslaw.com
  (*pro hac vice* applications
  forthcoming)

  *Attorneys for Plaintiffs*