# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

<table>
<tr><td>

PENGUIN RANDOM HOUSE, LLC, et al.

    Plaintiffs,

       v.

BEN GIBSON, in his official capacity as Chair of the Florida State Board of Education, et al.,

    Defendants.

</td><td>

Case No. 6:24-cv-01573

</td></tr>
</table>

## STATE DEFENDANTS' MOTION TO DISMISS

Florida's HB 1069 requires district school boards to adopt policies allowing residents to petition for removal of "[a]ny material . . . made available in a school or classroom library," if it contains content that is "pornographic or prohibited under [Fla. Stat.] § 847.012," or if it "[d]epicts or describes sexual conduct as defined in [Fla. Stat.] § 847.001(19)." Fla. Stat. § 1006.28(2)(a)2.b.(I)–(II). Plaintiffs—publishers, authors, and students—allege that HB 1069 has resulted in the removal of books they would prefer to have available in public-school libraries. They ask this Court to declare that removing a school-library book on the bases allowed by HB 1069 violates the First Amendment. The State Defendants—the members of the Florida Board of Education in their official capacities—respectfully move to dismiss the complaint.

## ARGUMENT

The complaint should be dismissed on multiple threshold grounds—it is a shotgun pleading; Plaintiffs lack standing; and Plaintiffs lack a cause of action to

bring the second count in their complaint, which seeks an advisory opinion about the proper interpretation of the statute at issue. The complaint also fails to state a claim on the merits. First, the curation of school-library books is government speech, and when the government speaks, it may "regulate the content of . . . its own message." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). Second, the government does not abridge First Amendment rights merely by withdrawing a gratuitous benefit that facilitates the exercise of those rights. Finally, schools may restrict even student speech during activities bearing the school's "imprimatur" when doing so furthers a legitimate pedagogical interest, which plainly is the case here.

## I.    PLAINTIFFS' COMPLAINT IS A SHOTGUN PLEADING.

Plaintiffs' complaint should be dismissed because it is a shotgun pleading. "Shotgun pleadings violate Rule 8, which requires 'a short and plain statement of the claim showing that the pleader is entitled to relief,' . . . by 'fail[ing] to one degree or another . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.'" *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294–95 (11th Cir. 2018) (quoting Fed. R. Civ. P. 8(a)(2)); *see also Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). Thus, the Eleventh Circuit has explained that district courts can and should, even sua sponte, strike shotgun pleadings and "instruct counsel to replead the case," *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1357–58 (11th Cir. 2018), if repleading is permitted at all.

Plaintiffs' 93-page complaint is "the definition of a shotgun pleading" because, although "each cause of action [does not] incorporate[] by reference each and every prior cause of action," it "incorporate[s] by reference [163] paragraphs of factual allegations into each . . . enumerated cause[] of action." *Clifford v. Federman*, 855 F. App'x 525, 529 (11th Cir. 2021); *see* DE1 ¶¶ 164, 185, 197, 217, 235, 247, 267. Plaintiffs' "cumbersome" complaint "require[es] the reader to identify and sift through [over one] hundred[] paragraphs incorporated into each count, and then parse through numerous allegations to identify which of those [163] paragraphs ha[s] some relevance to a particular defendant or cause of action." *Clifford*, 855 F. App'x at 529. Count I illustrates this difficulty. Plaintiffs PRH, HarperCollins, Macmillan, Simon & Schuster, Sourcebooks, Anderson, Green, Picoult, Thomas, The Guild, Heidi Kellogg on behalf of R.K., and Judith Hayes on behalf of J.H. all purport to bring a First Amendment claim. But the only books mentioned in Count I are *You Too? 25 Voices Share Their #MeToo Stories*, edited by Janet Gurtler and published by HarperCollins, *and Love in the Time of Cholera*, written by Gabriel García Márquez and published by PRH. DE1 ¶¶ 143, 150, 174–75, 177–78. Thus, one must sift through all 163 paragraphs of the factual background to discern the grounds on which Macmillan, Simon & Schuster, Sourcebooks, Anderson, Green, Picoult, Thomas, and The Guild even claim to be injured.

Even undertaking those labors, it is "virtually impossible" to determine for sure "which allegations of fact are intended to support which claims for relief." *Clifford*, 855 F. App'x at 529. Plaintiffs' complaint is "replete with conclusory,

vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland*, 792 F.2d at 1322. For example, Plaintiffs allege that *How the García Girls Lost Their Accents*, *Looking for Alaska*, *Speak*, *Concrete Rose*, *The Hate U Give*, *The Color Purple*, *Native Son*, *The Kite Runner*, *Beloved*, *This is Where it Ends*, *I Know Why the Caged Bird Sings*, and *Kaffir Boy* have "been removed from school libraries in" varying numbers of "school districts in Florida since HB 1069 went into effect." DE1 ¶¶ 130–32, 135–36, 138–41, 144, 146–47. Plaintiffs further allege that six other books—*Anna Karenina*, *Brave New World*, *Forever*, *Invisible Man*, *The Sun Also Rises*, and *Their Eyes Were Watching God*—"were removed from school libraries under Section 1006.28's prohibitions on content that 'describes sexual conduct' and . . . 'pornographic' content." DE1 ¶ 151. But Plaintiffs do not bother to identify which school districts removed the books or what relevance the alleged removals have to any of Plaintiffs' claims against the State Board of Education or the Orange and Volusia County School Boards. In fact, none of these books are mentioned in Counts I through VII, DE1 ¶¶ 164–284. Instead, the counts against the State Defendants concern other books that student plaintiffs R.K. and J.H. allege they want to read "without . . . stigma." DE1 ¶ 175 (stating R.K. wants to read *You Too? 25 Voices Share Their #MeToo Stories*); DE1 ¶ 177 (stating J.H. wants to read *Love in the Time of Cholera*); DE1 ¶ 210 (stating R.K. wants to read *The Bluest Eye*). Because the reader of this complaint "must speculate as to which factual allegations pertain to which count," it is a shotgun pleading, and the Court should dismiss it. *Weiland*, 792 F.2d at 1322 n.12.

4

Compounding those problems, Plaintiffs fail to "separat[e] into a different count each cause of action or claim for relief." *Weiland*, 792 F.3d at 1322–23. In Count I, Plaintiffs allege that "Section 1006.28's prohibition on content that describes sexual conduct" is an impermissible content-based regulation of speech that violates the First Amendment because it is overbroad. DE1 ¶¶ 165, 167–68. In addition to their overbreadth claim, Plaintiffs assert that the same prohibition violates the Publisher and Author Plaintiffs' rights "under the First and Fourteenth Amendments . . . because it interferes with their ability to make their books available to readers," DE1 ¶ 172, as well as Student Plaintiffs R.K. and J.H.'s First Amendment "right to receive information in their school libraries," DE1 ¶ 173. Thus, Count I alone demonstrates that Plaintiffs' complaint is a "model 'shotgun' pleading" with "untold causes of action, all bunched together in one count." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 979–80 (11th Cir. 2008).

## II.    PLAINTIFFS LACK STANDING TO SUE THE STATE DEFENDANTS.

Plaintiffs lack standing to sue the State Defendants because any alleged injury flowing from the statute is not traceable to them or redressable by a declaratory judgment against them. To demonstrate standing, Plaintiffs must establish "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citation omitted). Because "standing is not dispensed in gross," Plaintiffs must demonstrate these elements "for each claim that they press and for each form of relief that they seek."

5

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). And they must support each standing element "in the same way as any other matter on which the plaintiff bears the burden of proof," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)—here, with "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

1. Plaintiffs contend they have standing to sue the State Defendants because the "State Defendants have mandated that school libraries not contain books with 'pornographic' content," DE1 ¶¶ 91, 212, or content that "describes sexual conduct," DE1 ¶ 180. But Plaintiffs "must show a causal connection between [their] injur[ies] and the challenged action of the defendant[s] . . . as opposed to the action of a[] . . . third party." *City of S. Miami v. Governor*, 65 F.4th 631, 640 (11th Cir. 2023) (citations omitted). Here, the statute imposes obligations on the school districts directly, apart from the State Board of Education, such that any injury to Plaintiffs "stems from [the school district's] enforcement," not the State Board's. *Id.* at 641.

The statute requires "district school board[s]" to "[a]dopt courses of study, including instructional materials, for use in the schools of the district." Fla. Stat. § 1006.28(2)(a). "Each school district must [also] adopt a policy regarding an objection by a parent or a resident of the county to the use of a specific material," and that process must provide "an opportunity to proffer evidence to the district school board that" the "material used in a classroom, made available in a school or classroom library, or included on a reading list contains content which (I) [i]s

pornographic or prohibited under s. 847.012" or "(II) [d]epicts or describes sexual conduct as defined in s. 847.001(19)." *Id.* § 1006.28(2)(a)2.b.(I), (II). If the school district determines that the material meets the requirements under subparagraph b.(I), it "shall discontinue use of" it, but if the school determines the material meets the requirements under subparagraph b.(II), it "shall discontinue use of the material" only "for any grade level or age group for which such use is inappropriate or unsuitable." *Id.* § 1006.28(2)(a)2.b.[1] The challenged statutory provisions "operate[] on officials at the local level" by requiring school districts to implement particular materials-selection procedures. *City of S. Miami*, 65 F.4th at 641.[2] Thus, the State Board of Education does not "act[] under [Sections 1006.28(2)(a)2.b.(I) and (II)] in such a way that [Plaintiffs'] injur[ies] [are] traceable to them or redressable by" a declaratory judgment against them. *City of S. Miami*, 65 F.4th at 641; *see also* DE1 ¶ 108 ("Section 1006.28 imposes an affirmative burden on *school districts*" (emphasis added)). Instead, any harm flows from alleged actions of the school districts themselves and would be redressable only by enjoining them.

---

[1] Plaintiffs therefore wrongly assert that "[t]he prohibition on content that describes sexual conduct . . . covers any book with content that describes sexual conduct for all students of all age groups." DE1 ¶ 168. By the statute's own terms, the school district need only discontinue use of a material that describes sexual conduct for "any grade level or age group for which such use is inappropriate or unsuitable." Fla. Stat. § 1006.28(2)(a)2.b.

[2] Section 1006.28(2)(a)2.b. provides that "[t]he State Board of Education may adopt rules to implement this provision," *see also* DE1 ¶ 40, but Plaintiffs cite no State Board of Education rule other than Florida Administrative Code Rule 6A-7.0714, which directs school districts to use a particular objection form and "provide[s] school districts reporting instructions for materials that were subject to an objection by a parent or resident of a school district." Fla. Admin. Code R. 6A-7.0714(1), (3); *see also* DE1 ¶ 41.

2. Still, Plaintiffs contend that the State Board is responsible for enforcing the challenged portions of HB 1069 under Fla. Stat. §§ 1001.03(8) and 1008.32(1)–(4). DE1 ¶¶ 37–38.[3] But Sections 1001.03(8) and 1008.32(1)–(4) grant the State Board only generalized enforcement authority. Section 1001.03(8) authorizes the Board to "enforce compliance with law and state board rule by all school districts." Section 1008.32 equips the State Board with certain tools to effectuate that general authority, including "the authority to request and receive information, data, and reports from . . . school districts," *id.* § 1008.32(1), to "investigate allegations of noncompliance" and "require [a] . . . district school board . . . to document compliance with [the] law," *id.* § 1008.32(2), to "order compliance within a specified timeframe," *id.* § 1008.32(3), to report a school district's noncompliance to the legislature and recommend action be taken, *id.* § 1008.32(4)(a), and to withhold funds from the district until it complies, *id.* § 1008.32(4)(b). These statutes show only that the State Board of Education has general "supervisory authority" over school districts. *Support Working Animals, Inc. v. Gov'r of Fla.*, 8 F.4th 1198, 1204 (11th Cir. 2021). General authority of that nature does not establish traceability because otherwise the State Board would be a proper defendant in every suit

---

[3] Plaintiffs also allege that media specialists and other educators who fail to comply with the challenged portions of HB 1069 "risk penalties at the hands of the Education Practices Commission" under Fla. Stat. § 1012.796(1)(a)–(f). DE1 ¶ 122. Section 1012.796(1)(a)–(f) sets forth the procedure for the Department of Education to investigate and act upon complaints of teacher or administrator misconduct. The State Defendants do not enforce the challenged portions of HB 1069 under Section 1012.796 because the Education Practices Commission is responsible for entering a final order either dismissing a complaint or imposing an enumerated penalty. *Id.* § 1012.796(7). And "[t]he commission, in the performance of its powers and duties, may not be subject to control, supervision, or direction by the Department of Education." *Id.* § 1012.79(6)(a).

properly brought against a school district. *See, e.g.*, *City of S. Miami*, 65 F.4th at
643 (citing *Lewis v. Gov'r of Ala.*, 944 F.3d 1287, 1300 (11th Cir. 2019) (en banc)).

Even if generalized authority were enough, Plaintiffs would still fail to estab-
lish standing to sue the State Defendants because "an independent source would
have caused" their alleged harms. *Id.* at 645. The counties have an "independent
obligation to follow" Florida law, including HB 1069. *Id.* at 643. The true "source
of the [Plaintiffs'] alleged injury," then, is not the State, but the local entities' own
choice to enforce the statute. *See id.* at 644–45 (injury was traceable not to Gover-
nor, but to local officials tasked with enforcing the challenged law, even though
Governor could punish local officials for refusing to comply with the law).

3. Finally, Plaintiffs lack standing because their alleged injury from the State
Defendants' enforcement of the challenged provisions of HB 1069 under Section
1006.28(2)(a)6. is "highly speculative." *Clapper v. Amnesty Int'l USA*, 568 U.S.
398, 410 (2013). While the State Board may be "responsible for reviewing decisions
made regarding objections to library books under Section 1006.28['s special-mag-
istrate procedure]," DE1 ¶ 39; *see also* DE1 ¶ 82, enforcement against the counties
under that procedure sits at the end of a "chain of contingencies," *Clapper*, 568
U.S. at 410. A parent of a public-school student or a resident of the county would
have to object to a school-library book because it contains pornographic material
or describes sexual conduct as defined in Fla. Stat. § 847.001(19). Fla. Stat.
§ 1006.28(2)(a)2.b.(I), (II). The district school board would have to determine that
the book does not contain pornographic material or describe sexual conduct within

the meaning of the statute. That parent would then have to disagree with the district school board's determination and request that the Commissioner of Education appoint a special magistrate. The special magistrate would have to find that the book contains pornographic material or describes sexual conduct within the meaning of the statute and, if the latter, that the material is not age-appropriate. The State Board of Education would, finally, have to approve that decision. Fla. Stat. § 1006.28(2)(a)3., 6. Plaintiffs have not alleged that any, let alone all, of these steps is likely to occur, so they cannot show injury from the State Defendants' enforcement of the challenged provisions under Section 1006.28(2)(a)6.

Plaintiffs' injuries are also not redressable by a declaratory judgment against them. *Support Working Animals*, 8 F.4th at 1201 (explaining that traceability and redressability "often travel together"). After all, if a defendant does not enforce a statute, a "declaratory judgment [against that defendant] is not only worthless to [the plaintiff], it is seemingly worthless to all the world." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998).

## III.    PLAINTIFFS LACK A CAUSE OF ACTION TO SUPPORT COUNT II, WHICH IN ALL EVENTS IS BARRED BY ARTICLE III AND THE ELEVENTH AMENDMENT.

Plaintiffs style Count II as a claim for "Statutory Construction," DE1 at 65, and ask this Court for a "declaratory judgment finding that the term 'pornographic' as used in Section 1006.28 is synonymous with the term 'harmful to minors'" in 847.001(7)," DE1 ¶ 195. Alternatively, in Count III, Plaintiffs ask this Court for a "declaratory judgment finding that Section 1006.28's prohibition on

'pornographic' content is unconstitutional." DE1 ¶ 215. But Plaintiffs identify no cause of action that entitles them to ask a federal court to interpret a state statute. The Declaratory Judgment Act itself is not a source, as a "declaratory judgment is a form of relief, not a cause of action." *Datum Software, Inc. v. Citizant, Inc.*, No. 23-12538, 2024 WL 3719111, at *2 n.3 (11th Cir. Aug. 8, 2024); *see also Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007) (Declaratory Judgment Act "does not create an independent cause of action."); *Musselman v. Blue Cross & Blue Shield of Ala.*, 684 F. App'x 824, 829 (11th Cir. 2017) (Tjoflat, J., concurring specially) ("Congress plainly intended [for] the declaratory judgment [to] serve as a primary remedy available for any *underlying cause of action*." (emphasis added)). Still less does the Declaratory Judgment Act provide a freestanding right to advisory interpretations of law. *See United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947).

A stand-alone cause of action for construction of a state statute would furthermore exceed this Court's jurisdiction under Article III and the Eleventh Amendment. In Count II, Plaintiffs seek a declaratory judgment that "pornographic" as used in Section 1006.28(2)(a)2.b.(I) "is a synonym for content that is 'harmful to minors,'" as defined by Florida Statutes Section 847.001(7). DE1 ¶ 187. It is unclear how such a construction would redress Plaintiffs' alleged injuries— Plaintiffs do not explain why state officials would not consider pornographic materials also to be "harmful to minors." In any case, providing such a construction is precisely what the Supreme Court has said federal courts lack the authority to do.

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Indeed, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.*; *see also Doe ex rel. Doe #6 v. Swearingen*, 51 F.4th 1295, 1303 n.1 (11th Cir. 2022). This Court "cannot [require] Florida to follow [its] interpretation of Florida's own [statute]." *Hand v. Scott*, 888 F.3d 1206, 1213–14 (11th Cir. 2018).

That Plaintiffs urge the Court to employ the canon of constitutional avoidance in interpreting Section 1006.28(2)(a)2.b.(I) does not change the analysis. Count II does not ask the Court to declare the statute unconstitutional. Count III, by contrast, does; it challenges the statute's use of the term "pornographic." That claim might, if it had merit (which it does not), permit this Court to construe the state statute to avoid that constitutional question, but only if that interpretation were "reasonable and readily apparent." *Boos v. Barry*, 485 U.S. 312, 330 (1988). But Count II's request for the Court, point-blank, to construe a state statute is a different animal entirely. It is instead an effort to bind the State to adhere to an interpretation of state law. Again, "federal courts lack the authority to direct state officials to comply with state law." *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988). "If the alchemist's wand can transmute a violation of state law into a violation of the Constitution, *Pennhurst* will be for naught . . . ." *Id.* In other words, if Plaintiffs succeed on Count III, "[a] federal court may determine state officials' enforcement of state law violates a *federal* right," or at least that it would absent an avoidance construction, but a federal court "may not order state officials

to conform their conduct to *state* law," as interpreted by that court. *In re Abbott*, 956 F.3d 696, 720 (5th Cir. 2020), *judgment vacated and remanded with instructions to dismiss as moot sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021). Count II cannot stand except as a recapitulation of Count III and is therefore due to be dismissed.

IV.    **HB 1069 DOES NOT VIOLATE THE FIRST AMENDMENT.**

    **A.    The selection of public-school-library books is government speech and therefore not subject to the First Amendment.**

Plaintiffs assert that Section 1006.28(2)(a)2.b.(I) and (II)'s regulation of school-library books violates the Author and Publisher Plaintiffs' First Amendment rights because it "interferes with their ability to make their books available to readers." DE1 ¶ 172; *see also* DE1 ¶¶ 165, 199, 207. That is wrong. The selection or removal of school-library materials is government speech, which "[t]he Free Speech Clause . . . does not regulate." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). When the government speaks, it "can freely select the views that it wants to express, including choosing not to speak and speaking through the removal of speech that the government disapproves." *Gundy v. City of Jacksonville*, 50 F.4th 60, 71 (11th Cir. 2022) (cleaned up).

1. Although the Eleventh Circuit has not yet directly addressed whether the government's "book collection (and book removal) decisions" for school libraries are "government speech," *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557

F.3d 1177, 1201–02 (11th Cir. 2009),[4] the Supreme Court and Eleventh Circuit have
repeatedly held that the government may "regulate the content of . . . its own mes-
sage," *Rosenberger*, 515 U.S. at 833, including when it speaks through the discre-
tionary selection, commission, purchase, or compilation of materials for presenta-
tion to the public, *see Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586
(1998) (government has discretion to make content-based judgments when select-
ing art for funding); *Summum*, 555 U.S. at 470–73; *Leake v. Drinkard*, 14 F.4th
1242, 1253 (11th Cir. 2021); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666,
674 (1998). In *Summum*, for example, the Supreme Court held that the selection
of monuments for a public park was government speech, even when the monu-
ments were funded or donated by private parties. 555 U.S. at 470–73. "Govern-
ment decisionmakers select[ed] the monuments that portray[ed] what they
view[ed] as appropriate for the place in question, taking into account such content-
based factors as esthetics, history, and local culture." *Id.* at 472. Accordingly, the
"decision to accept certain privately donated monuments while rejecting respond-
ent's" was "government speech," *id.* at 481, and the government was not required
to "maintain viewpoint neutrality" in making that decision, *id.* at 479. And because
these same "principles . . . also apply to a public library's exercise of judgment in
selecting the material it provides to its patrons," *United States v. Am. Libr. Ass'n,*

---

[4] In *Miami-Dade*, the court had no occasion to decide that question because the plaintiffs
lost even under the "standard . . . of their dreams"—"the standard that failed to attract a majority
in the *Pico* case." 557 F.3d at 1202 (citing *Bd. of Educ. v. Pico*, 457 U.S. 853, 872 (1982) (plurality
opinion)).

(*ALA*), 539 U.S. 194, 205 (2003) (plurality opinion), collection decisions are also government speech.

The Supreme Court's three-factor test for determining whether a particular expressive activity constitutes government speech confirms that conclusion. Those factors—"the history of the expression at issue; the public's likely perception as to who . . . is speaking; and the extent to which the government has actively shaped or controlled the expression," *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022)—all compel the conclusion that the government is speaking when it selects or removes public-school-library books.

*First*, the government "actively control[s]" the selection and removal of school-library books. *Id.* at 256. In *Summum*, the Supreme Court explained that the City "'effectively controlled' the messages sent by the monuments in the Park" because it exercised "'final approval authority' over their selection." 555 U.S. at 473. Specifically, it "selected th[e] monuments that it want[ed] to display for the purpose of presenting the image of the City that it wish[ed] to project," took "ownership" of the monuments, and "set forth the criteria it [would] use in making future selections." *Id.* It did not matter that the City did "not design[] or buil[d]" the monuments—it was enough that the City accepted and displayed them. *Id.* at 472–73; *see also, e.g.*, *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 212 (2015) ("including the designs that Texas adopts on the basis of proposals made by private individuals and organizations" among the license plates deemed government speech).

15

Public-school libraries are no different. When the government selects materials to make available in a public-school library, it conveys that, in its view, those materials are of the "requisite and appropriate quality" and will "be of the greatest direct benefit or interest to the community" served. *ALA*, 539 U.S. at 204 (plurality opinion) (quotations omitted); *see also* Fla. Stat. § 1006.28(2)(d)2.c. (requiring "each school district board" to "adopt procedures for developing library . . . collections" that appeal to "reader interest" and "support . . . state academic standards and aligned curriculum, and the academic needs of students and faculty"). The government, through public-school-library staff, effectively controls this message because it exercises final approval authority over book selection. Fla. Stat. § 1006.28(2)(d)1. ("Each book made available to students through a school district library . . . must be selected by a school district employee . . . , regardless of whether the book is purchased, donated, or otherwise made available to students."). Because school officials "always select[]" their library materials and "maintain[] direct control" of them, *Shurtleff*, 596 U.S. at 257 (citing *Summum*, 555 U.S. at 472–73; *Walker*, 576 U.S. at 213), the government alone speaks through the selection of school-library books. The Author and Publisher Plaintiffs have no First Amendment right to force their books onto school-library shelves.

*Second,* "the public would tend to view the [collection of books selected for a public-school library] as the government's" speech. *Shurtleff*, 596 U.S. at 255. Again, in *Summum*, the Court remarked that "property owners" do "not common[ly] . . . open up their property for the installation of permanent monuments

16

that convey a message with which they do not wish to be associated." 555 U.S. at 471. For that reason, "persons who observe [those] monuments routinely—and reasonably—interpret them as conveying some message on the property owner's behalf." *Id.*

So too here. People know that public-school officials—not authors, publishers, or students—select school-library materials for a purpose. That purpose is not that the government necessarily endorses every word on every page of every book in its collection, but that the materials it makes available are, in its view, those that will "interest" its readers and "support . . . the academic needs of students and faculty." Fla. Stat. § 1006.28(2)(d)2.c. As the plurality explained in *ALA*, a public library's mission is to provide materials of "requisite and appropriate quality" that will "be of the greatest direct benefit or interest to the community," not "universal coverage." 539 U.S. at 204.

*Third* and finally, "the history of the expression at issue," *Shurtleff*, 596 U.S. at 252, supports that the selection and removal of public-school-library books are government speech. This factor favored the city in *Summum* because "[g]overnments have long used monuments to speak to the public." 555 U.S. at 470. The same is true of public-school-library books. Though American school libraries first began to take shape in the nineteenth century, they are "rightly considered a twentieth century development." Tom J. Cole, *The Origin and Development of School Libraries*, 37 Peabody J. of Educ. 87, 87 (Sept. 1959), https://www.jstor.org/stable/1490648; *see also* U.S. Dep't of the Interior, *Public*

*Libraries in the United States of America: Their History, Condition, and
Management* 38–58 (1876), bit.ly/4dcouzw (providing a "historical sketch of
common school libraries" in several states). In the early stages of their
development, "differences of opinion arose as to who should select, purchase, and
regulate or supervise the use of the materials." Cole, 37 Peabody J. of Educ. at 91.
But by 1920, standard practice required "[b]ook selections" to "be made by the
librarian with the approval of the principal." Am. Library Ass'n, *Standard Library
Organization and Equipment for Secondary Schools of Different Sizes* 21 (1920).
Thus, governments, via school officials, have long exercised control over the
selection of public-school-library materials, conveying the message that the chosen
materials are of the "requisite and appropriate quality" and will most benefit and
interest the community. *ALA*, 539 U.S. at 204 (plurality opinion).

Despite Plaintiffs' contention that "[s]chool libraries in Florida schools are
at least nonpublic forums," DE1 ¶ 155, the three-factor test demonstrates that the
government has not created any type of forum because it alone speaks through the
selection of public-school-library books. *See Walker*, 576 U.S. at 215 (stating that
"forum analysis is misplaced" when "the State is speaking on its own behalf"). That
result tracks the *ALA* plurality's conclusion that "forum analysis and heightened
judicial scrutiny are incompatible with . . . the discretion that public libraries must
have to . . . consider content in making collection decisions." 539 U.S. at 205. That
principle applies with even more force in public-*school* libraries, the purpose of
which is to support the government's educational mission by "providing materials

18

that properly supplement the basic readings assigned through the standard curriculum." *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980). School district employees would be unable to carry out the legislature's mandate in Section 1006.28(2)(d)2.c. to provide school-library collections that interest readers and support the academic needs of students, if private parties could hijack the government's message by forcing their preferred books onto school-library shelves. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572–73 (1995) (parade organizers not required to include voices they wished to exclude); *Leake*, 14 F.4th at 1253 (same for government parade organizer). Forcing the government "to speak" in a school library "what [it] do[es] not believe on pain of" lawsuit, *303 Creative LLC v. Elenis*, 600 U.S. 570, 589 (2023), would put policy decisions about what to teach in schools in the hands of litigants rather than elected representatives. "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Summum*, 555 U.S. at 468.

2. Student Plaintiffs R.K. and J.H. also wrongly contend that Section 1006.28(2)(a)2.b.(I) and (II)'s regulation of school-library books that contain content that is pornographic or describes sexual conduct within the meaning of the statute "interferes with their right to receive information in their school libraries." DE1 ¶ 173; *see also* DE1 ¶ 208.[5] The government has no constitutional obligation

---

[5] Student Plaintiff J.H. only brings claims in Counts I and VII, challenging Section 1006.28(2)(a)2.b.(II)'s regulation of materials that describe sexual conduct as defined in Section 847.001(19).

to present educational material with which it disagrees. Because "[t]he listener's right to receive information is reciprocal to the speaker's right to speak," *Doe ex rel. Doe v. Gov'r of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015), that right cannot be deployed to interfere with the government's own message. Students have no more right to control what the government puts in its libraries than they do to control the content of a school cheer, *see Dean v. Warren*, 12 F.4th 1248, 1265–66 (11th Cir. 2021) (cheerleading is government speech), or the message the school communicates while students participate in a training practicum, *see Keeton v. Anderson-Wiley*, 664 F.3d 865, 877 (11th Cir. 2011) (clinical practicum is government speech). Holding otherwise would be equivalent to saying that motorists have a constitutional right to see vanity license plates of their choosing, or that tourists have a right to view public monuments that align with their preferred message— even if the government may constitutionally decline to offer such a license plate, *see Walker*, 576 U.S. at 219–20, or erect such a monument, *see Summum*, 555 U.S. at 470–73. That is not the law.

For their right-to-receive-information theory, Plaintiffs rely on *Board of Education v. Pico*, in which a plurality of the Supreme Court concluded that school-library materials may not be selected "in a narrowly partisan or political manner." 457 U.S. 853, 870 (1982) (plurality op.); DE1 ¶ 163. But the Eleventh Circuit has recognized that *Pico* was "a badly fractured decision" that is "of no precedential value as to the application of the First Amendment to these issues" and "establishes no standard." *Miami-Dade*, 557 F.3d at 1199–1200 (quotations omitted). In

addition, *Pico* predates the Supreme Court's government-speech cases, which have
since established principles that—as Justice Rehnquist observed in his dissent—
would have required a different result in that case. *See* 457 U.S. at 920 (Rehnquist,
J., dissenting, joined by Burger, C.J., and Powell, J.) ("[T]he Court will far better
serve the cause of First Amendment jurisprudence by candidly recognizing that the
role of government as sovereign is subject to more stringent limitations than is the
role of government as . . . educator.").

### B.    The government has no First Amendment obligation to pro-vide benefits such as public-school libraries.

Even apart from whether the selection (or removal) of school-library books
is government speech, Plaintiffs' First Amendment claims still fail because the gov-
ernment does not generally violate the First Amendment when it withdraws a ben-
efit that merely facilitates the exercise of a constitutional right. *See Ysursa v. Poc-
atello Educ. Ass'n*, 555 U.S. 353, 359–60 & n.2 (2009); *Rust v. Sullivan*, 500 U.S.
173, 200 (1991). That makes sense because "[t]he First Amendment . . . protects
the right to be free from government abridgment of speech." *Ysursa*, 555 U.S. at
358. It does not require the government "to assist others in funding the expression
of particular ideas." *Id.* Thus, "[a] legislature's decision not to subsidize the exer-
cise of a fundamental right does not infringe the right." *Id.* (quotation omitted).

The *ALA* plurality opinion said as much. As the plurality explained—without
invoking the government-speech doctrine—no one has a First Amendment right to
prevent the government from making content-based distinctions in the selection

21

and removal of public-library materials. 539 U.S. at 205. Instead, the government
has "wide latitude" to insist that "public funds be spent for the purpose for which
they were authorized." *Id.* at 203, 211 (quoting *Rust*, 500 U.S. at 196). And—just as
in school libraries—selecting and removing library books on that basis is directly
related to libraries' "traditional role of obtaining material of requisite and appro-
priate quality for educational and informational purposes." *Id.* at 211.

In *Ysursa*, similarly, Idaho law had previously authorized employers to de-
duct both general union dues and fees for union political activities from an em-
ployee's wages. 555 U.S. at 356. In 2003, the Idaho Legislature passed a law pro-
hibiting payroll deductions for political purposes. *Id.* Labor organizations sued the
county and the state alleging that the law violated the First and Fourteenth Amend-
ments. *Id.* The Supreme Court observed first that the State was "not constitution-
ally obligated to provide payroll deductions at all." *Id.* at 359. In addition, even
though "publicly administered payroll deductions for political purposes [could] en-
hance the unions' exercise of First Amendment rights," the unions were still free
to engage in the same speech activities under the new law. *Id.* Thus, the state's
decision not to subsidize the unions' speech did not abridge their speech, and
Idaho only had to demonstrate a rational basis to justify its law. *Id.*

The same is true here. The First Amendment does not require the govern-
ment to provide access to particular materials in public-school libraries or to have
school libraries at all. *See Ysursa*, 555 U.S. at 358. The students are free to access
those books elsewhere, and authors and publishers can still distribute their books

to students through bookstores or other libraries.[6] Thus, the government's decision to withdraw the public benefit of facilitating access to certain books for students or enhancing an author or publisher's ability to speak to students is subject at most to rational-basis review. And Florida's restriction of school-library books containing pornographic content or describing sexual conduct is rationally related to the State's interest in "protect[ing] the welfare of children." *Ginsberg v. New York*, 390 U.S. 629, 640 (1968) (quotation omitted).

### C. The First Amendment permits restriction of student speech during activities that bear a public school's imprimatur.

Even if the First Amendment did limit the selection and removal of public-school-library books, Plaintiffs would be entitled at most to the rational-basis review set forth in *Hazelwood School District v. Kuhlmeier*, which HB 1069 easily survives. There, the Supreme Court held that schools may restrict even *student* speech during "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," if doing so is "reasonably related to legitimate pedagogical concerns." 484 U.S. 260, 271, 273 (1988). And students certainly are not entitled to more stringent review of the school's decisions about its own materials than decisions affecting the student's own speech. More so than any student speech, the public reasonably perceives

---

[6] This is therefore not a case in which the government has unconstitutionally sought "to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). Florida has not, for instance, conditioned a book's presence in a public-school library on the author's or publisher's willingness to alter the contents of the book in all its circulations.

school-library materials to "bear the imprimatur of the school" because they understand, and Florida law confirms, that public-school officials control the selection of school-library materials. *See supra* Part IV.B; Fla. Stat. § 1006.28(2)(d)2.c.

In *Hazelwood*, the Court explained that restrictions advance a "legitimate pedagogical concern" when they shield students from topics that are "vulgar or profane," "inadequately researched," or "unsuitable for immature audiences," including "potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting," or "matters of political controversy." 484 U.S. at 271–72. Those are precisely the interests advanced by Section 1006.28(2)(a)2.b.(I) and (II)'s restrictions on school-library books containing pornographic content or describing sexual conduct—i.e., materials that may be "vulgar or profane," "unsuitable for immature audiences," or include "potentially sensitive topics." The statute therefore does not violate the Student Plaintiffs' right to receive information.

The Author and Publisher Plaintiffs additionally claim that interfering with their ability to make their books available to students violates their First Amendment rights. DE1 ¶¶ 172, 207. These claims fail because no Florida official has "evince[d] either by policy or by practice, any intent to open" public-school libraries to "indiscriminate use" by authors or publishers. *Hazelwood*, 484 U.S. at 270 (quotation omitted). Instead, school districts alone select and remove materials from school libraries. Fla. Stat. § 1006.28(2)(d)2.c., d. As a matter of common sense, if "[a] school . . . retain[s] the authority to refuse to sponsor student speech

that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with 'the shared values of a civilized social order,'" a school need not tolerate author or publisher speech in its libraries that does the same. *Hazelwood*, 484 U.S. at 272. (quotation omitted).

## CONCLUSION

For the foregoing reasons, the Court should dismiss all claims against the State Defendants.

Dated: December 4, 2024                Respectfully submitted,

                                       ASHLEY MOODY
                                         *Attorney General*
                                       HENRY C. WHITAKER (FBN 1031175)
                                         *Solicitor General*
                                       DANIEL W. BELL (FBN 1008587)
                                         *Chief Deputy Solicitor General*

Office of the Attorney General
The Capitol, PL-01                     */s/ Bridget K. O'Hickey*
Tallahassee, Florida 32399-1050        BRIDGET K. O'HICKEY (FBN 1048521)
(850) 414-3300                           *Deputy Solicitor General*
(850) 410-2672 (fax)                   FOSTER H. SWARTZ (FBN 1059583)
bridget.ohickey@myfloridalegal.com       *Solicitor General Fellow*

*Counsel for the State Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 4, 2024, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

## LOCAL RULE 3.01(g) CERTIFICATE

I also certify that the State Defendants' counsel conferred with Plaintiffs' counsel via email on December 3–4, 2024, and Plaintiffs oppose the relief requested above.

                                       */s/ Bridget K. O'Hickey*
                                       Deputy Solicitor General

25