## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PENGUIN RANDOM HOUSE LLC, *et al.*,

     Plaintiffs,

v.                                                     Case No. 6:24-cv-01573-CEM-RMN

BEN GIBSON, in his official capacity
as Chair of the Florida State Board
of Education, *et al.*,

     Defendants.

_____

### Plaintiffs' Response To The State Defendants' Motion To Dismiss

In their Motion To Dismiss, the State Defendants argue that (1) First Amendment rights do not exist in public school libraries (an argument that has been rejected by every court to consider it), (2) Plaintiffs' injuries are not traceable to or redressable by the State Defendants (despite their substantial role in prescribing, implementing, and enforcing the objection form that results in Plaintiffs' injuries), (3) Plaintiffs' Count II, seeking a declaratory judgment for violations of the First Amendment, seeks a mere "advisory opinion" (it actually seeks to remedy a constitutional violation), and (4) Plaintiffs' Complaint is a "shotgun pleading" (despite the State Defendants' clear understanding of Plaintiffs' claims). Each argument lacks merit. The State Defendants' Motion should be denied.[1]

_____

[1] The State Defendants' Motion To Dismiss concerns only Counts I-III brought against the State Defendants, who are members of the State Board of Education. Plaintiffs' claims against two sets of district school board members are not at issue in the State Defendants' Motion.

## SUMMARY OF ALLEGATIONS

This case is about two provisions of Florida law under which the State Defendants mandate the removal of numerous books from school libraries, including award-winners and bestsellers, timeless classics, and books that have been available on library shelves for many years.[2]  Under these statutory provisions, the State Defendants prohibit school librarians, schools, and school districts from considering the literary, artistic, political, or scientific value of books taken as a whole by mandating that school libraries remove the two categories of books.  Fla. Stat. s. 1006.28(2)(a)(2)(b)(I), (II).

First, Section 1006.28 mandates the removal of school library books that contain any content that "describes sexual conduct," without specifying what level of detail or type of description is necessary for a book to "describe sexual conduct" and regardless of the book's value as a whole.  (ECF No. 1, Compl. ¶ 8 (citing *id.* s. 1006.28(2)(a)(2)(b)(II).)

Second, Section 1006.28—as interpreted and enforced by the State Defendants—mandates the removal of school library books that contain so-called "pornographic" content, without consideration of the book's value as a whole. (Compl. ¶ 9 (citing Fla. Stat. s. 1006.28(2)(a)(2)(b)(I)).)  The provision that prohibits "pornographic" content states in full that it prohibits content that "[i]s pornographic

---

[2] Some, but not all, of the books that have been removed as a result of the challenged provisions are identified in paragraphs 28-32, 34-35, 97, and 129-152 of the Complaint.

or prohibited under s. 847.012," which prohibits content that is "harmful to minors."[3] (*Id.*) The term "pornographic" content should be construed as a synonym for content that is "harmful to minors," which construction would save this provision from violating the First Amendment. (*Id.* ¶¶ 10-11, 15, 102-04.)

The prohibition on books that contain content that "describes sexual conduct" violates the First Amendment. This provision is overbroad because it encompasses any book with any content that describes sexual conduct without regard to the Supreme Court's standard for content that is obscene for minors, which is not reasonable in light of the purpose of school libraries. (*Id.* ¶¶ 87, 155, 157, 166-68.) Likewise, if "pornographic" content is construed to be distinct from content that is "harmful to minors" despite being included in the same category, then "pornographic" content is an empty and meaningless overbroad standard, and that provision would then similarly violate the First Amendment. (*Id.* ¶¶ 10, 94-98, 198-201.)

The State Defendants play a foundational role in implementing and enforcing the statute. Section 1006.28(2)(a)(2) requires that district school boards provide objection forms for parents and residents to object to library books based on the challenged provisions (and other grounds). (*Id.* ¶ 40.) The State Defendants are

---

[3] The Florida Statutes define the term "harmful to minors" to conform to the Supreme Court's standard for content that is obscene as to minors, which requires consideration of the age of the minor and the value of the book as a whole. *See Miller v. California*, 413 U.S. 15, 24 (1973); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975) ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them. In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors.").

responsible for prescribing the objection form that every school district must use. (*Id.*) The objection form that the State Defendants prescribed requires the objector to identify the bases for their objection and lists multiple separate bases for objections for the objector to select, including that the library book (a) is "pornographic," (b) is "prohibited under s. 847.012, F.S." as harmful to minors, or (c) "depicts or describes sexual conduct as defined in s. 847.001(19), F.S."[4] (*Id.* ¶ 41.) The State Defendants are responsible for enforcing school districts' compliance with state law and State Board rules, including the challenged provisions. (*Id.* ¶ 37 (citing Fla. Stat. s. 1001.03(8), 1008.32(1)).) The State Defendants similarly have authority to take action to punish school districts' noncompliance. (*Id.* ¶ 38 (citing Fla. Stat. s. 1008.32(2)-(4).)

The State Defendants have mandated that school districts use their objection form and that the part of the form that lists the bases for objections "not be modified." Fla. Admin. Code r. 6A-7.0714(3)(a), (c), (d). Despite the fact that Section 1006.28 includes content that is "pornographic or prohibited under s. 847.012" in the same category of prohibited content—therefore demonstrating that "pornographic" is intended to be a synonym for content that is "prohibited under s. 847.012"—the State Defendants' form separates the two terms into different bases for objections. (Compl. ¶¶ 41, 102-04, 190-91.) The effect of the State Defendants' construction of the term "pornographic" is to go far beyond prohibiting books that are obscene as to minors

---

[4] The objection form is attached to the Complaint as Exhibit B (ECF No. 1-2) and incorporated in Florida Administrative Code Rule 6A-7.0714(3)(e). *See also* Fla. Admin. Code r. 6A-7.0714(5)(e)(1)-(3).

and to require the removal of even highly regarded books without any holistic evaluation or consideration of the book's literary, artistic, political, or scientific value. (*Id.* ¶¶ 98, 117.)

District school boards must remove library books that a parent or resident identifies on the State Defendants' objection form as prohibited under the challenged provisions. Fla. Stat. s. 1006.28(2)(a)(2)(b). Decisions regarding objections to library books under the challenged provisions are ultimately subject to review by the State Defendants. (Compl. ¶ 39.) A school board's decision not to remove a challenged book is subject to review by a special magistrate who is appointed by the Commissioner of Education, and the State Board "must approve or reject the recommended decision" by the special magistrate. (*Id.* (citing Fla. Stat. s. 1006.28(2)(a)(6).)

Plaintiffs are (1) publishers and authors whose books have been removed from Florida school libraries under Section 1006.28's prohibition on content that "describes sexual conduct" or is "pornographic" (*id.* ¶¶ 19-32) and (2) students who planned to read school library books that have been removed under Section 1006.28's prohibition on content that "describes sexual conduct" or is "pornographic" (*id.* ¶¶ 34-35). To remedy those injuries, Plaintiffs seek declaratory relief under the Free Speech Clause of the First Amendment against the State Defendants in Counts I-III of their Complaint.

**ARGUMENT**

**I.    Section 1006.28 Violates Plaintiffs' First Amendment Rights.**

    **A.    First Amendment Rights Exist In Libraries.**

        **1.    No Court Has Applied The State Defendants' Radical Government Speech Argument To Libraries.**

Numerous courts have specifically held that First Amendment rights exist in libraries, including school libraries. *See*, *e.g.*, *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667-68 (8th Cir. 2024) (affirming rejection of the government speech doctrine) (citing *Shurtleff v. Boston*, 596 U.S. 243 (2022); *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); and *Matal v. Tam*, 582 U.S. 218 (2017)); *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 188-190 (5th Cir. 1995); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582-83 (6th Cir. 1976); *PEN American Center, Inc. v. Escambia County School Board*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024); Order On Motion For Preliminary Injunction at 14, *Adams v. Matanuska-Susitna Borough School Dist.*, No. 3:23-cv-00265-SLG (D. Alaska Aug. 6, 2024); *Fayetteville Public Library v. Crawford County, Arkansas*, 684 F. Supp. 3d 879, 909-910 (W.D. Ark. 2023); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1004 (W.D. Ark. 2003); *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 547-48 (N.D. Tex. 2000); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 874-76 (D. Kan. 1995); *Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 686-89 (D. Me. 1982); *Salvail v. Nashua Bd. of Ed.*, 469 F. Supp. 1269, 1272-73 (D.N.H. 1979); *Right To Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*, 454 F. Supp. 703, 710-11 (D. Mass. 1978). The State Defendants entirely ignore this

longstanding, substantial body of authority holding that the First Amendment applies in public and school libraries. No court has ever held that the First Amendment does not apply in school libraries.

Although the State Defendants do not address any of this longstanding authority, they cite the Supreme Court's *Pico* decision. *See Bd. of Educ. v. Pico*, 457 U.S. 853, 872 (1982). Indeed, *Pico* provides useful guidance regarding the First Amendment implications of removing school library books, which other courts have relied upon. While *Pico* was a plurality decision, even the dissenting justices in *Pico* agreed that the government does not have unlimited authority to remove school library books without running afoul of the First Amendment.[5]

*Pico* also involved a much less extreme situation than that presented by the challenged provisions of Section 1006.28. In *Pico*, the Court considered whether a local school board's decision to remove nine books from a school library violated the First Amendment rights of students. *Id.* at 858. Here, the challenged statutory provisions impose a statewide mandate from Florida legislators to librarians, educators, and school districts that has resulted in the removal of hundreds of books.

---

[5] The plurality opinion in *Pico* expressly states that "the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library." *Pico*, 457 U.S. at 866 (plurality opinion). *Pico*'s concurrences and dissents articulate that limit in different ways and to different extents. *Id.* at 879–880 (Blackmon, J. concurring) ("[S]chool officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved" (emphasis in original).); 907 (Rehnquist, J.; Burger, C.J.; Powell, J. dissenting) (recognizing that a school board's "significant discretion to determine the content" of "school libraries" may not be "exercised in a narrowly partisan or political manner" or "motivated by racial animus" and that the Constitution "does not permit the official suppression of *ideas*" (emphasis in original)).

(Compl. ¶ 79.)  These provisions eliminate the traditional discretion that librarians, schools, and school districts have had by requiring them to remove books that they had selected for library shelves based on educational criteria, community standards, and the value of each book as a whole.

The State Defendants question the existence of a First Amendment right to receive information, but that right is well-established in constitutional law.  *See*, *e.g.*, *Reno v. Am. C. L. Union*, 521 U.S. 844, 874 (1997) (recognizing the "constitutional right to receive" information); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas.") (collecting cases); *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943) (The authors of the First Amendment "chose to encourage a freedom which they believed essential if vigorous enlightenment would triumph over slothful ignorance," which "embraces the right to distribute literature and necessarily protects the right to receive it.").

The First Amendment right to receive information exists in school libraries.  *See*, *e.g.*, *Campbell*, 64 F.3d at 189-190 (following *Pico* in finding that the First Amendment applies in school libraries); *Minarcini*, 541 F.2d at 583 (recognizing the "right of students to receive information which they and their teachers desire them to know"). *See also Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (holding that the right to receive information is "nowhere more vital" than in "schools and universities").  The fact that there may be other places where students may be able to access the books that the State Defendants have required to be removed from school libraries does not erase the

constitutional injury. *See Reno*, 521 U.S. at 880 ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.").

Publishers and authors also have First Amendment rights in school libraries. Once their books are included on school library shelves, publishers and authors have the right to speak through their books without the State censoring those books through impermissible content-based restrictions.[6] *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963) (rejecting as unconstitutional a content-based restriction on publishers' right to distribute books); *GLBT Youth in Iowa Schools Task Force*, 114 F.4th at 668 (finding in a similar case that publishers, authors, and students "have standing to pursue their First Amendment claim as to the Library Program"); *Minarcini*, 541 F.2d at 583 (holding that the removal of school library books was unconstitutional because "[f]reedom of speech presupposes a willing speaker [but] where a speaker exists" the "protection afforded is to the communication, to its source and to its recipients both"). *See also Bantam Books*, 372 U.S. at 64 n.6 (The First Amendment "embraces the circulation of books as well as their publication.").

### 2.    Library Books Are Not Government Speech.

Library books are not government speech because (1) school libraries have historically not communicated messages from the State, (2) the public does not identify

---

[6] The State Defendants erroneously assert that Plaintiffs claim a right to "force their books onto school-library shelves." (Mot. at 16.) Actually, Plaintiffs seek only to prevent the State Defendants from requiring that librarians, schools, and school districts remove—for unconstitutional reasons—books that they have selected for their library shelves.

library books as State-endorsed messages, and (3) the State does not control the contents of library books.

As the Supreme Court has recognized, because the government-speech doctrine is a "doctrine that is susceptible to dangerous misuse," courts "must exercise great caution" when considering whether to "extend[] government-speech precedents." *Matal v. Tam*, 582 U.S. 218, 235 (2017) (Alito, J.). The doctrine is a limited exception to the First Amendment: when the government-speech doctrine applies, the Free Speech Clause does not apply. The Supreme Court has instructed that, to determine whether the government-speech doctrine applies, courts must consider whether (1) the State has historically "communicated messages" through the medium; (2) the medium is "closely identified in the public mind" with the State such that it "has endorsed that message," and (3) the State directly controls "the messages conveyed" through that medium. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209-213 (2015); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 472-73 (2009); *Matal*, 582 U.S. at 238 (assessing whether trademarks are government speech by applying the "three factors [*Walker*] distilled from *Summum*").

The State's regulation of school library books does not satisfy any of the three factors. First, school libraries have not historically communicated messages from the State. Instead, school libraries have long served as vehicles to expose students to a broad array of ideas from authors who express unique, personal points of view. (Compl. ¶¶ 33, 58-64.) As the Supreme Court has recognized, a school library is a place where students "can literally explore the unknown, and discover areas of interest

10

and thought not covered by the prescribed curriculum." *Pico*, 457 U.S. at 868−69 (explaining that "students must always remain free to inquire" and the "school library is the principal locus of such freedom"). A school library is meant to be a "regime of voluntary inquiry," affording students "an opportunity at self-education and individual enrichment that is wholly optional." *Id.* at 869. Libraries "pursue the worthy missions of facilitating learning and cultural enrichment" and are necessary for a "well-functioning democracy." *Fayetteville*, 684 F. Supp. 3d at 889, 891 (quoting *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 203 (2003) ("*ALA*")).

The discretion afforded to librarians in overseeing their library collections is inherent in the function of libraries. Librarians are tasked with "curat[ing] the collections of public libraries to serve diverse viewpoints" and must be "commit[ted] to freedom of speech." *Id.* Because that task requires librarians to have "broad discretion to decide what material to provide to their patrons," librarians are "afforded significant professional responsibility and deference with respect to their area of expertise." *Id.* at 890-91. The State Defendants admit that school librarians—not the State—have historically decided which library books to make available to the students in their local schools. (ECF No. 83, Mot. at 18.) The State Defendants' assertion that a school librarian's selection of books for a local student population communicates a message from the State of Florida has no support, particularly on a motion to dismiss.

Second, messages conveyed in school library books are diverse and contradictory—not endorsed by the State, as government speech must be. As Justice Alito explained in rejecting the application of the government-speech doctrine to

trademarks, the doctrine does not extend to speech that expresses "contradictory views." *See Matal*, 582 U.S. at 236, 238 (also explaining that *Walker*, concerning "Texas specialty license plates," "likely marks the outer bounds of the government-speech doctrine"); *Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 272-73 (2022) (Alito, J., concurring) (explaining that "flags flown [from a city flagpole] reflected a dizzying and contradictory array of perspectives that cannot be understood to express the message" of the government). The result would be the same if the government-speech doctrine were applied to school libraries. As the Eighth Circuit has stated, a "well-appointed school library could include copies of Plato's *The Republic*, Machiavelli's *The Prince*, Thomas Hobbes' *Leviathan*, Karl Marx and Freidrich Engels' *Das Kapital*, Adolph Hitler's *Mein Kampf*, and Alexis de Tocqueville's *Democracy in America*. . . . [I]f placing these books on the shelf of public school libraries constitutes government speech, the State 'is babbling prodigiously and incoherently.'" *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024) (quoting *Matal*, 582 U.S. at 236).

Third, the State does not "maintain[] direct control over the messages conveyed" in school library books. *See Walker*, 576 U.S. at 213. Rather, authors and publishers control the contents of their books. The State Defendants concede this point. (Mot. at 23 n. 6 ("Florida has not, for instance, conditioned a book's presence in a public-school library on the author's or publisher's willingness to alter the contents of the book in all its circulations.").) The State of Florida does not "dream up" the books or "edit [books] submitted for" inclusion in school libraries. *See Matal*, 582 U.S.

at 235.  *See also Shurtleff*, 596 U.S. at 256 (explaining that the "most salient feature" of the case was the defendant's failure to "control[] the flags' *content and meaning*" (emphasis added)); *Walker*, 576 U.S. at 213 (explaining that vanity license plates are government speech because Texas's control over the plates extended to "the design, typeface, color, and alphanumeric pattern for all license plates").  And despite the State Defendants' contention, this case is not *Summum*.  In *Summum*, the government exercised "editorial control" over the selection of the monuments at issue.  555 U.S. at 472.  In contrast, the State of Florida does not select books for inclusion on school library shelves—local school librarians and their schools do.  No court has found that school library collections constitute government speech because there is no plausible argument that school library collections deliver "a [State]-controlled message." *See id.* at 468.  The State Defendants' argument to the contrary is antithetical to the purpose of libraries.

Library books are fundamentally different than the limited media that constitute government speech.  For that reason, the application of the government speech doctrine in the non-library cases that the State Defendants cite does not support their argument.[7]  Application of the government speech doctrine to school library books

---

[7] *See Dean v. Warren*, 12 F.4th 1248, 1265-66 (11th Cir. 2021) (concerning a state university cheerleading team, which the State controlled because "[i]t would be highly unusual for a public university to allow its cheerleaders—while they are in uniform on the field at a football game—to say or do whatever they please," such as "root for its rival"); *Leake v. Drinkard*, 14 F.4th 1242, 1250 (11th Cir. 2021) (concerning a parade for which the government "maintain[ed] direct control over the messages conveyed" in the parade).  Other cases that the State Defendants cite for their government-speech argument have nothing to do with government speech.  *See, e.g., Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 576-77 (1995) (concerning compelled private speech, not government speech); *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (same); *Nat'l Endowment for the*

makes no sense and would drastically expand the reach of this doctrine. The State Defendants' government-speech argument should be rejected.[8]

### 3. The State Defendants' Government-Subsidy Argument Does Not Supplant Plaintiffs' First Amendment Rights.

The State Defendants' government-subsidy argument would yield the same radical result as their government-speech argument: the First Amendment would not apply to libraries. No court has ever found that government-spending powers supplant the First Amendment in school libraries and justify the otherwise-unconstitutional removal of books from library shelves. (*See supra* at 6-7.)

The challenged provisions of Section 1006.28 are regulations of school libraries, not a government subsidy. This is not a case where the government has "merely chosen to fund one activity to the exclusion of another." *See Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (internal citations and quotations omitted). Rather, the challenged provisions mandate that school librarians, schools, and school districts remove library books from their shelves without consideration of the value of the book as a whole. With the challenged provisions, the State Defendants do not argue that it provides a stream of funds for school libraries to use to purchase certain types of books (and not

---

*Arts v. Finley*, 524 U.S. 569, 583 (1998) (concerning non-binding considerations for arts funding, not government speech); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 669 (1998) (concerning a "nonpublic for[um]," not government speech).

[8] Determinations of government speech are generally "fact-intensive and generally not amenable to resolution at the motion to dismiss stage." *See PEN American Center, Inc. v. Escambia Cnty. School Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla.). Nonetheless, the State Defendants' government-speech argument fails to satisfy any of the three factors.

other books).  Instead, the State has required schools to *remove* library books that were *already purchased*—and, in many instances, have been on school library shelves for many years.

The State Defendants mischaracterize Plaintiffs' argument, claiming that Plaintiffs seek to prevent librarians from "making content-based distinctions in the selection and removal of public-library materials."  (Mot. at 21-22 (citing *ALA*, 539 U.S. at 205 (plurality).)[9]  Plaintiffs seek to prevent the State Defendants from mandating that school librarians, schools, and school districts remove books that they had selected—based on each book's value when considered as a whole—for unconstitutional reasons.  The State Defendants' government-subsidy argument should be rejected.

**B.    The State Defendants' Arguments About The Substantive Legal Standard Are Premature And Not A Basis For Dismissal.**

Despite moving to dismiss based on purported pleading failures, the State Defendants repeatedly ask the Court to adopt their preferred substantive legal standard and to evaluate Plaintiffs' claims on the merits.  (*See*, *e.g.*, Mot. at 22 (asking this Court to apply "rational-basis review"), 23 (same).)  But the State Defendants do not contend that Plaintiffs' claims should be dismissed under rational-basis review.  Those

---

[9] The State Defendants' reliance on the plurality opinion in *ALA* is misplaced.  That case concerned government subsidies conditioned upon the use of internet-filtering software to block obscene images or child pornography in public libraries; it was not about government mandates concerning the content of library books.  *ALA*, 539 U.S. at 198-99.

arguments have no bearing on a motion to dismiss and are therefore more appropriate for merits briefing at a later stage of the case.

In any event, the State Defendants' reliance on *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), to support their argument for their preferred standard is misplaced. The Court's ruling in that case was about deference to educators' decisions regarding a school newspaper that was part of the "educational curriculum and a regular classroom activit[y]." *Id.* at 268. In contrast, this case challenges a state mandate that eliminates the discretion of educators (and school districts) by requiring that they remove books from school libraries regardless of community standards and the value of the book as a whole. Also unlike *Hazelwood*, this is a case about school libraries—places of voluntary inquiry—not about a school's discretion over the compulsory curriculum. Therefore *Hazelwood* does not supply the substantive standard for this case. *See also Searcey v. Harris*, 888 F.2d 1314, 1319 (11th Cir. 1989) (explaining that *Hazelwood* "does not alter the test for reasonableness in a nonpublic forum such as a school" but instead "provides the context" concerning when "educators may exercise control over student expression in a *curricular program*" (emphasis added)).

## II. Plaintiffs Have Standing.

Plaintiffs' injuries are fairly traceable to the State Defendants by virtue of their indispensable role in implementing and enforcing the challenged provisions. The State Defendants' argument that Plaintiffs lack standing due to lack of traceability and redressability is based on the false premise that they play no role in the removal of

books under the challenged provisions.[10]  In fact, the State Defendants play an integral role, as explained above:  parents and residents cannot object to library books and cause district school boards to remove library books under the challenged provisions without the State Defendants' objection form.  *See* Fla. Stat. s. 1006.28(2)(a)(2)(b)(I), (II); Fla. Admin. Code r. 6A-7.0714(3)(a)(2).  In addition, the State Defendants are ultimately responsible for "approv[ing] or reject[ing]" a special magistrate's recommendation (following review of a school district's decision) not to remove a library book based on an objection.  Fla. Stat. s. 1006.28(2)(a)(6).

To satisfy the traceability requirement, plaintiffs need only allege "that their injuries are "connected with the conduct of which they complain." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (brackets omitted).  This requirement is "less stringent" than proximate cause.  *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019).  Even injuries that are indirect can satisfy traceability.  *Wilding*, 941 F.3d at 1125.

The State Defendants seek to escape responsibility for their role in implementing and enforcing the challenged provisions by blaming district school boards for removing library books.  (*See* Mot. at 7 (arguing that the challenged provisions "operate on officials at the local level")).)  But it is the State Defendants' objection form that imposes the challenged provisions on school districts and

---

[10] The State Defendants do not directly assert that Plaintiffs lack an injury in fact, but they argue that Plaintiffs have no First Amendment rights concerning school libraries under the "government speech doctrine."  Plaintiffs address this argument in Section I herein.

unconstitutionally removes school librarians and school districts' discretion to evaluate the value of each book as a whole, resulting in the district school boards' removal of books following an objection. The State Defendants have coercive authority to ensure that school districts comply. (*See* Compl. ¶ 37 (citing Fla. Stat. s. 1001.03(8), 1008.32(1)).) Plaintiffs need not allege that the State Defendants' actions "are the very last step in the chain of causation" to satisfy traceability, especially where the "determinative and coercive effect" of their objection form and of their ultimate responsibility to review removal decisions contribute to the actions of district school boards. *See Bennett v. Spear*, 520 U.S. 154, 168-69 (1997).[11]

Because the State Defendants' role in implementing and enforcing the challenged provisions is more than sufficient to satisfy traceability, Plaintiffs have also adequately alleged redressability. *See Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1202 (11th Cir. 2021) (noting that traceability and redressability "often travel together"). The State Defendants' mandatory objection form is at least "connected with" the book removals that have injured Plaintiffs. *See Wilding*, 941 F.3d at 1125. A declaratory judgment against the State Defendants that the challenged provisions violate the First Amendment would cause them to omit the challenged provisions from their objection form, and district school boards would be required to

---

[11] *See also Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (finding traceability based on the "predictable effect" of government action on decisions of third parties); *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1247 (11th Cir. 1998) (explaining that traceability is not defeated "merely because the alleged injury can be traced to the actions of both parties and non-parties"). Moreover, there is nothing "speculative" (Mot. at 9) about expecting school districts to use the State Defendants' objection form, as the statute requires.

use a new objection form. The new form could not include the current form's unconstitutional categories of books that must be removed, and it could not limit school districts' ability to evaluate each book's value as a whole, as the current form does.[12]

## III. Count II Is A Declaratory Judgment Action For Violation Of The First Amendment.

The State Defendants' argument that Count II should be dismissed is based on a mischaracterization of Count II. Contrary to the State Defendants' assertion, Count II does not claim that the State Defendants have violated Florida state law through their construction of the term "pornographic" content in Section 1006.28. Rather, Count II alleges that the State Defendants have mandated a construction of that statutory provision that violates the First Amendment. This claim does not seek an "advisory opinion" and is not barred by Article III or the Eleventh Amendment.[13] Instead, there is an actual and substantial controversy as a result of the State Defendants' unconstitutional construction of the term "pornographic."

---

[12] The State Defendants' standing argument is based primarily on a case in which the plaintiffs "profoundly fail[ed] to establish an injury in fact based on highly speculative harm" and therefore could not establish traceability and redressability. *See City of S. Miami v. Governor*, 65 F.4th 631, 640 (11th Cir. 2023). In that case, the defendants—the Governor and Attorney General of the State of Florida—had no role whatsoever in implementing the challenged provisions. In contrast, the State Defendants play a significant role in the removal of books under the challenged provisions.

[13] The State Defendants assert that "Plaintiffs identify no cause of action that entitles them to ask a federal court to interpret a state statute" in Count II, but Count II expressly seeks a declaratory judgment because the State Defendants' "construction of the term 'pornographic' under Section 1006.28 *infringes on the First Amendment rights*" of Plaintiffs and others. (Compl. ¶ 195 (emphasis added). *See also id.* ¶¶ 97-106, 191-93.)

As set forth in the Complaint, Plaintiffs allege that the State Defendants have mandated a construction of the term "pornographic" content (in Section 1006.28) that has resulted in the removal of protected books from school libraries in violation of the First Amendment.   (Compl. ¶¶ 92-106, 191-93, 195.)   Through their mandatory objection form, the State Defendants have required that district school boards remove books that contain so-called "pornographic" content even if the books are not harmful to minors.  The State Defendants' actions violate the First Amendment because they require "the removal of books without any holistic evaluation or consideration of their literary, artistic, political, or scientific value."  (*Id.* ¶ 98.)

Rather than seeking a declaration that this provision of Section 1006.28 violates the First Amendment in the first instance, Plaintiffs in Count II request a declaration that the State Defendants' *construction* of this provision is unconstitutional and incorrect as a matter of statutory interpretation.  (*Id.* ¶ 195.)  In an attempt to avoid a finding that that the underlying statutory provision is unconstitutional, Plaintiffs specifically request "a declaratory judgment finding that the term 'pornographic' as used in Section 1006.28[(2)(a)(2)(b)(I)] is synonymous with the term 'harmful to minors.'"  (*Id.*)

In the alternative, in the event the Court rejects the relief that Plaintiffs request in Count II, Plaintiffs in Count III request a declaration that the prohibition on "pornographic" content in Section 1006.28(2)(a)(2)(b)(I) violates the First

Amendment. (*Id.* ¶¶ 198, 215.) Both Count II and Count III are appropriately pled First Amendment claims for which Plaintiffs seek declaratory judgments.[14]

## IV. Plaintiffs' Complaint Is Not A "Shotgun Pleading."

Plaintiffs' Complaint complies with the rules of pleading and is not a shotgun pleading. It clearly articulates each claim and the responsible parties, giving the State Defendants (and the other defendants) notice of the claims against them.

The "unifying characteristic" of all shotgun pleadings is that they fail to give the defendants "adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321-23 (11th Cir. 2015). So-called "shotgun" pleadings do not provide a short and plain statement of a claim under Rule 8. *Id.* at 1320.

Here, the Complaint lacks the features of a "shotgun pleading" as identified in *Weiland*. *See id.* at 1321-23 (listing the four types of shotgun pleadings). The Complaint contains separate counts against different sets of defendants: three causes of action seeking declaratory judgments on First Amendment grounds against the State Defendants and four claims against two groups of school district defendants. As is common, the counts incorporate the general allegations, but they do not incorporate the other counts. Each count sets forth the legal standards for that count.

---

[14] If Plaintiffs had combined Count II and Count III into a single count, as the State Defendants imply Plaintiffs should have done, the State Defendants likely would have argued that this combined count makes the Complaint an improper "shotgun pleading."

Contrary to the State Defendants' argument, it is unnecessary to separate Count I into two separate counts (one on behalf of authors/publishers and one on behalf of students) because the First Amendment rights of speakers and listeners are generally coextensive and reciprocal. *See, e.g.*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 757 (1976). Count I is a First Amendment overbreadth challenge (which applies to the State Defendants under the Fourteenth Amendment). It is a single cause of action.

Plaintiffs' shotgun pleading argument should be rejected because the State Defendants had adequate notice of the claims against them, as they illustrated by arguing extensively against them in their Motion. *See Weiland*, 792 F.3d at 1324 (holding that a complaint was not a shotgun pleading because "this is not a situation where a failure to more precisely parcel out and identify the facts relevant to each claim materially increased the burden of understanding the factual allegations underlying each count[, which] may explain why the defendants did not move for a more definite statement under Federal Rule of Civil Procedure 12(e) or otherwise assert that they were having difficulty knowing what they were alleged to have done and why they were liable for doing it"). *See also PEN American Center*, 711 F. Supp. 3d at 1329 (rejecting shotgun pleading argument because "Defendant's 36-page motion to dismiss and its thorough discussion of the merits of the claims at oral argument show that Defendant has a clear understanding of the claims being asserted against it and the grounds upon which those claims rest").

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court deny the State Defendants' Motion To Dismiss.

Dated:  December 20, 2024

By:  /s/ *David A. Karp*
David A. Karp (Florida Bar No. 69226)
Carlton Fields
2 MiamiCentral
700 NW First Avenue, Suite 1200
Miami, Florida 33136
Telephone: (305) 539-7280
dkarp@carltonfields.com

Frederick J. Sperling
Adam J. Diederich
Kirstie Brenson
ArentFox Schiff LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
Telephone: (312) 258-5500
frederick.sperling@afslaw.com
adam.diederich@afslaw.com
kirstie.brenson@afslaw.com
(admitted *pro hac vice*)

*Attorneys for Plaintiffs*