## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PENGUIN RANDOM HOUSE LLC, *et al.*,

      Plaintiffs,

v.

      Case No. 6:24-CV-01573-CEM-RMN

BEN GIBSON, in his official capacity as
Chair of the Florida State Board of
Education, *et al.*,

      Defendants.

_____

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Section 1006.28 is an unprecedented assault on Florida school libraries that requires the removal of hundreds of books in violation of the First Amendment.[1]  It prohibits librarians and other educators from curating school libraries based on educational objectives, community standards, their professional judgment and best practices, and the First Amendment, as they are trained to do and as they have done for decades prior to Section 1006.28.  Moreover, there have long been procedures in place in Florida school districts to permit parents to regulate their own children's access to library books.  (*See*, *e.g.*, Exs. A-5, A-6.)  But under the guise of protecting students from obscene materials, the State has mandated the removal of a wide range

---

[1] As used herein, the term "school libraries" encompasses both traditional school libraries or media centers and also classroom collections of books, which are essentially classroom libraries.  As used herein, the term "books" refers to individual titles, not numbers of copies of books.

of literature that is not remotely obscene by proscribing two extremely broad and poorly defined categories of books.[2]

Section 1006.28 requires the removal of *any* book containing (1) *any* content that "describes sexual conduct" or (2) *any* so-called "pornographic" content (together, the "Challenged Provisions"). *See* Fla. Stat. s. 1006.28(2)(a)(2)(b)(I), (II). It prohibits media specialists,[3] other educators, and school districts from considering the value of the book as a whole; it requires the application of exactly the same standard concerning so-called "pornographic" content to books for high school seniors as it does to books for third graders or even younger students; and Florida law imposes harsh penalties on educators who do not comply. Examples of the books that school districts concluded must be removed under the Challenged Provisions include Kurt Vonnegut's *Slaughterhouse-Five*, Richard Wright's *Native Son*, Anthony Burgess's *A Clockwork Orange*, Toni Morrison's *Beloved*, and Alice Walker's *The Color Purple*. (Ex. B, Declaration of David Karp ("Karp Decl."), ¶ 8.) Because there are few, if any, obscene books in school libraries, the many unconstitutional applications of the Challenged Provisions substantially outweigh its constitutional applications. The Challenged Provisions are therefore unconstitutionally overbroad and violate the First Amendment.

---

[2] The Supreme Court has defined obscenity as "limited to works" that (a) "taken as a whole, appeal to the prurient interest in sex"; (b) "portray sexual conduct in a patently offensive way"; and (c) "taken as a whole, do not have serious literary, artistic, political, or scientific value." *See Miller v. California*, 413 U.S. 15, 24 (1972).

[3] The terms "media specialists" and "librarians" are used interchangeably herein.

2

Statutory mandates that require the removal of award-winning books without consideration of the book's value as a whole serve no valid educational purpose. Instead, the Challenged Provisions require educators and their school districts either to restrict the selection of books available in school libraries in a way that interferes with the First Amendment rights of students, authors, and publishers or to face discipline for noncompliance, including monetary fines and loss of licensure. The Challenged Provisions harm students by undermining their right to receive information in school libraries. They also harm publishers and authors by requiring the removal of their books from school libraries based on constitutionally impermissible, overbroad content-based restrictions.

Publishers and authors disseminate information and ideas of interest and value to students. Matching students to books is a subjective and inherently individual exercise. Not every book is for every person at every point in their life. For that reason, each student has the right to choose whether to read any particular book from a school library. And parents have the ability to choose which books their own children can access in a school library. But the Challenged Provisions bar all consideration of context, prohibiting local school librarians from exercising their professional judgment and constricting, rather than empowering, parental choice. Neither the value of the book nor a student's readiness and desire to read it count for anything. If the First Amendment has any force in public schools, the Challenged Provisions must be declared unconstitutional.

## FACTUAL BACKGROUND

**I.    The Challenged Provisions Mandate The Removal Of Library Books Regardless Of Their Value.**

Section 1006.28's prohibitions on content that "describes sexual conduct" and so-called "pornographic" conduct are across-the-board mandates that disregard the literary, artistic, scientific, or political value of each book as a whole, the interests and needs of the particular community served by the library, and the discretion and training of Florida educators, who have long been charged with selecting books to make available to their students.  Plaintiffs do not seek to prevent Florida school districts from ensuring that school libraries do not contain obscene books.  Instead, Plaintiffs take issue with the removal of books that are not remotely obscene.

**A.    The Prohibition On Content That "Describes Sexual Conduct."**

Section 1006.28's new prohibition on content that "describes sexual conduct" prohibits school library books with *any* description of *any* sexual conduct as defined by statute.  Fla. Stat. s. 1006.28(2)(a)(2)(b)(II) (enacted in H.B. 1069).[4]  Section 1006.28 separately forbids material containing "sexual conduct" that is "harmful to minors," which requires a finding that the book, "[t]aken as a whole, is without serious literary, artistic, political, or scientific value for minors" as required by the First Amendment. *Id.* s. 1006.28(2)(a)(2)(b)(I), 847.001(7), 847.012.  In stark contrast, the new separate

---

[4] That provision prohibits "[a]ny material . . . made available in a school or classroom library" that "(II) Depicts or describes sexual conduct as defined in s. 847.001(19), unless such material is for a course required by s. 1003.46 or s. 1003.42(2)(o)1.g. or 3., or identified by State Board of Education Rule."  Fla. Stat. s. 1006.28(2)(a)(2)(b)(II).

138875584.1

proscription on content that "describes sexual conduct" (*id.* s. 1006.28(2)(a)(2)(b)(II)) precludes any consideration of the value of the book as a whole.  Moreover, because the prohibition on content that "describes sexual conduct" does not define the word "describes" in relation to the term "sexual conduct," it is unclear what level of detail is necessary for a book to implicate that provision.  *See id.*  For example, a book that contains the phrase "made love" may be sufficiently detailed to be a prohibited description of sexual conduct.  (*See*, *e.g.*, Ex. C, Declaration of Christina Hackey ("Hackey Decl."), ¶ 17.)

The law requires that all books to which a school district receives an objection for describing sexual conduct be removed for students of all ages within five days pending further review.  In stark contrast, the statute does not require a prompt review to determine whether the book should be returned.  While the statute implicitly permits—but does not require—schools to return previously removed library books that contain content that "describes sexual conduct" for "any grade level or age group for which such use" is not "inappropriate" or "unsuitable," the statute does not define the terms "inappropriate" and "unsuitable" and ultimately provides no guidance to schools as to what the State of Florida might deem to be sufficiently appropriate or suitable.  *See* Fla. Stat. s. 1006.28(2)(a)(2)(b).  Nor does the statute provide any time period during which resolution of objections must take place.  *See id.*

## B.    The Prohibition On So-Called "Pornographic" Content.

Section 1006.28 also prohibits school library books that contain content that

138875584.1

"[i]s pornographic or prohibited under s. 847.012." Fla. Stat. s. 1006.28(2)(a)(2)(b)(I).[5] Section 847.012 concerns content that is "harmful to minors," which is defined in conformance with the Supreme Court's standard for obscenity set forth in *Miller v. California*, 413 U.S. 15 (1972), as applied to minors. Fla. Stat. s. 847.012, 847.001(7); *Simmons v. State*, 944 So.2d 317, 325 (Fla. 2006) (citing *Miller* and *Ginsberg v. New York*, 390 U.S. 629 (1968)). In contrast, neither this statute nor any other Florida law defines the term "pornographic." The State Defendants have thus construed "pornographic" to be distinct from—and to circumvent—the *Miller* obscenity standard and have imposed that erroneous construction on Florida school districts. Under Florida law, the State Defendants are responsible for promulgating a mandatory objection form for all school districts to use. Fla. Stat. s. 1006.28(2)(a)(2).[6] The objection form that the State Defendants promulgated includes separate categories for "pornographic" content and content that is "harmful to minors," meaning that a book could contain content that is considered "pornographic" under the statute but that is not "harmful to minors" under Florida law, namely, obscene under *Miller*.[7] *See* Fla. Admin. Code r. 6A-7.0714. The following chart illustrates the statutory categories in comparison to

---

[5] That provision prohibits "[a]ny material . . . made available in a school or classroom library" that "(I) Is pornographic or prohibited under s. 847.012." Fla. Stat. s. 1006.28(2)(a)(2)(b)(I).

[6] The objection form is attached hereto as Exhibit N and incorporated in Florida Administrative Code Rule 6A-7.0714(3)(e). *See also* Fla. Admin. Code r. 6A-7.0714(5)(e)(1)–(3).

[7] As explained in Section IV of the Argument, if the term "pornographic" were construed to be synonymous with "harmful to minors," it would be consistent with the *Miller* test and therefore constitutional.

138875584.1

the categories used on the objection form.

| Categories in Statute | Categories in Objection Form |
|---|---|
| "(I) Is pornographic or prohibited under s. 847.012 [harmful to minors]"<br><br>"(II) Depicts or describes sexual conduct as defined in s. 847.001(19)" | "☐The material is pornographic."<br><br>"☐The material is prohibited under Section 847.012, F.S."<br><br>"☐The material depicts or describes sexual conduct as defined in Sec☐on 847.001(19), F.S." |

All Florida school districts must use the State Defendants' objection form with no substantive modifications. *Id.* r. 6A-7.0714(d).

Prior to the July 1, 2023 effective date of H.B. 1069, Florida schools were permitted to continue to use school library books that contained what the statute calls "pornographic" content so long as that use was not "inappropriate" or "unsuitable" for the particular grade level or age group. But H.B. 1069 removed that exception, meaning that the prohibition on so-called "pornographic" content now applies regardless of the age of the student. Under that prohibition, the State treats high school seniors the same as third graders or even younger students and prohibits all students regardless of age, maturity, or reading level from accessing certain books in their school libraries.

## II. Under The Challenged Provisions, Florida Educators Must Choose Between The First Amendment Or Harsh Penalties.

The Challenged Provisions of Section 1006.28 unleashed fear and chaos upon the Florida education community, which has struggled to determine what those

provisions require.  The State enforces the Challenged Provisions against educators through a harsh system of penalties, including loss of teaching licenses, monetary fines, and probation.[8]  Moreover, the State repeatedly urges Florida educators to "err on the side of caution"—by removing more rather than fewer books—when implementing the Challenged Provisions or else risk penalties for themselves and their school districts.  (Ex. A-7.)  The Governor has publicly stated that, in his view, educators who fail to remove enough books under the Challenged Provisions may face felony charges. (Exs. A-1, A-2.)  Media specialists and other educators are further incentivized to remove library books under the Challenged Provisions by the stigma that the State has imposed on those books.  Media specialists and other educators have been called "groomers" and "porn pushers" by emboldened proponents of the Challenged Provisions for merely doing their jobs.  (Ex. 3, Hackey Decl., ¶ 19.)

Because of the Challenged Provisions, school districts across the State have removed or identified for removal award-winning and classic books that have been in libraries for decades, including books that are commonly included on Advanced Placement exams.  (*See*, *e.g.*, Ex. B, Karp Decl., ¶ 8.)  Rocky Hanna, Superintendent of Leon County School District, has stated that "[t]he last thing [he] want[s] to do is take a book off the shelf that could be academically beneficial and impactful for a child," but that due to the Challenged Provisions, he "do[es] not want to be found in violation of the law and targeted by the [Department of Education] and the governor."

---

[8] *See* Fla. Stat. s. 1012.796(1)(a)–(f).

(Ex. A-3.)  Orange County Public Schools has advised its media specialists that they are "tasked with protecting [their] colleagues, [themselves], and OCPS to ensure content being made available to students is in compliance with" the Challenged Provisions.  (Ex A-4.)  Districts erred on the side of removing books to avoid penalties.  (*See, e.g.*, Ex. C, Hackey Decl., ¶ 18.)  The vague and overbroad Challenged Provisions have led to extensive First Amendment violations through the removal of protected literature.  Attached as Exhibits B-1 through B-32 and B-36 are lists of books that Florida school districts, including Orange County Public Schools and the School District of Volusia County, determined must be removed pursuant to Section 1006.28 since July 1, 2023.

## III.    The Challenged Provisions Are A Solution In Search Of A Problem.

In an attempt to demonize targeted books, Florida elected officials have characterized the Challenged Provisions as protecting Florida students from sexually explicit materials.  For example, the Governor stated that the Challenged Provisions were enacted to prevent efforts "to pollute and sexualize our children," making clear his opposition to the content of the books targeted by the Challenged Provisions.  (Ex. A-1.)  By enacting and enforcing the Challenged Provisions and characterizing their purpose as purging "pollut[ion]" from school libraries, Florida lawmakers have stigmatized the many books that have been removed (and their authors), as well as the students who seek to read them.

Florida media specialists are trained to understand the importance of exposing students to diverse authors, perspectives, and topics, and they look to professional

review journals and standards to help them to make those decisions.  (Ex. C, Hackey Decl., ¶ 23.)  When deciding which books to include in or exclude from their school libraries, teachers and librarians consider the particular populations who are likely to read the books, because no two families or communities in Florida are identical.  (*Id.* ¶ 27–28.)  This focus on community standards results in a compilation of school library books that reflect the values and needs of that school's community.  (*See*, *e.g.*, *id.*)  In contrast, across-the-board overbroad mandates like the Challenged Provisions—which forbid consideration of the values and needs of students, families, or communities— prohibit librarians from applying "professional judgment and experience to select books on sensitive subjects for students at a variety of ages." (*Id.* ¶ 25.)  In this way, the Challenged Provisions "limit[] many parents' rights."  (*Id.* ¶ 21.)

Student choice is particularly important given the focus in schools on "foster[ing] the love of reading."  (*See*, *e.g.*, *id.* ¶ 11.)  Students develop fluency and confidence in reading skills when they are permitted to choose books in which they are particularly interested, with the opportunity to discuss those books with peers and adults.  (*Id.* ¶ 22.)  For many students, the school library is the only means of doing so. (*Id.* ¶ 24.)  The Challenged Provisions prevent educators from fostering this love of learning and reading, especially as to students who have or might have created a connection with a particular book that the Challenged Provisions require to be removed.  (*Id.* ¶ 25.)  The Challenged Provisions also damage students' trust that their educators actually desire and are able to help students to grow as readers.  (*Id.* ¶ 31.) Moreover, some of the books that the Challenged Provisions prohibit can actually save

10

lives—in particular, books concerning sexual assault or abusive sexual experiences permit students to process similar experiences in their own lives or learn about potentially life-altering experiences through the lives of others, all in a safe environment. (*Id.* ¶ 24.)  The Challenged Provisions are therefore not only harmful but contrary to the purpose and professional training of librarians and other educators.

Parents of children in Florida schools have long had the power to determine which books their children can and cannot access in their school libraries.  Certain school districts, like Pinellas County Schools, permit parents to limit their children's access to the entire school library, requiring children to seek their parents' permission prior to checking out any library books.  (*See*, *e.g.*, Ex. A-5.)  Other districts, such as Polk County Public Schools, permit parents to decide each semester which particular books in the school library their children may check out and which they may not.  (*See*, *e.g.*, Ex. A-6.)  These parental rights are the norm and help Florida parents to ensure that their own children are exposed only to school library books that those parents deem appropriate for their own children.  Moreover, Florida's existing prohibition on school library books containing content that is "harmful to minors" ensures that books that are obscene for minors do not exist in Florida school libraries.  Fla. Stat. s. 1006.28(2)(a)(2)(b)(I), 847.001(7), 847.012.

## IV.    Plaintiffs Have Suffered Or Will Suffer Harm At The Hands Of Defendants Due To The Challenged Provisions.

### A.    Publisher and Author Plaintiffs.

Plaintiffs Penguin Random House ("PRH"); Hachette Book Group

("Hachette"); HarperCollins Publishers LLC ("HarperCollins"); Macmillan
Publishing Group, LLC ("Macmillan"); and Simon & Schuster, LLC ("S&S")
(collectively the "Publisher Plaintiffs") are the five largest trade publishers in the world.
(Ex. A, Declaration of Skip Dye ("Dye Decl."), ¶ 9.)  Many books published by the
Publisher Plaintiffs have been removed or identified for removal from school libraries
in Florida (including in Volusia and Orange County schools) under the Challenged
Provisions, which limit the audience for the Publisher Plaintiffs' books.[9] (*Id*. ¶¶ 9, 11.)

Plaintiff The Authors Guild (the "Guild") is the nation's oldest and largest
professional organization for published writers.  (Ex. D, Declaration of Mary E.
Rasenberger ("Rasenberger Decl."), ¶ 3.)  It serves as a collective voice of American
authors.  (*Id*.)  Many books written by the Guild's members, including Plaintiffs John
Green, Jodi Picoult, and Angie Thomas, have been removed or identified for removal
from Florida school libraries under the Challenged Provisions.  (*Id*.)  Plaintiffs Julia
Alvarez, John Green, Laurie Halse Anderson, Jodi Picoult, and Angie Thomas
(collectively with the Guild, the "Author Plaintiffs") are authors of critically acclaimed
novels aimed at young people that have been removed or identified for removal from
school libraries in Florida under the Challenged Provisions.  (Ex. A, Dye Decl., ¶ 11;
Ex. E, Declaration of Julia Alvarez ("Alvarez Decl."), ¶¶ 1–2; Ex. F, Declaration of

---

[9] These books include *How The García Girls Lost Their Accents*, written by Julia Alvarez and published
by Hachette; *Nineteen Minutes*, *My Sister's Keeper*, and *Change of Heart*, written by Jodi Picoult and
published by S&S; *Looking for Alaska*, written by John Green and published by PRH; *The Hate U Give*,
written by Angie Thomas and published by HarperCollins; and *Shout*, written by Laurie Halse
Anderson and published by Macmillan.

John Green ("Green Decl."), ¶ 1; Ex. G, Declaration of Laurie Halse Anderson ("Anderson Decl."), ¶¶ 1–2; Ex. H, Declaration of Jodi Picoult ("Picoult Decl."), ¶¶ 1–2; Ex. I, Declaration of Angie Thomas ("Thomas Decl."), ¶¶ 1–2.) Their books "make young adults feel seen." (Ex. H, Picoult Decl., ¶ 5.)

### B. Parent and Student Plaintiffs.

Plaintiff Heidi Kellogg is the parent of minor student R.K., a senior in high school in the School District of Volusia County ("Volusia"). (Ex. J, Declaration of Heidi Kellogg ("Kellogg Decl."), ¶ 1.) Plaintiff Judith Anne Hayes is the parent of minor student J.H., a junior in high school in Orange County Public Schools ("Orange County"). (Ex. K, Declaration of Judith Anne Hayes ("Hayes Decl."), ¶ 1.) Because of the Challenged Provisions, R.K. and J.H. have been unable to find particular books that they intended to read in their school libraries and have been unable to discuss in school the books that their districts have targeted for removal under Section 1006.28 without risking stigma and judgment from their teachers and fellow students. (Ex. L, Declaration of R.K. ("R.K. Decl."), ¶¶ 4, 8–9; Ex. M, Declaration of J.H. ("J.H. Decl."), ¶¶ 5, 9–10.)

### C. The State Defendants.

The State Defendants play a foundational role in implementing and enforcing the Challenged Provisions. Section 1006.28(2)(a)(2) requires that district school boards provide objection forms for parents and residents to object to library books based on the Challenged Provisions (and other grounds). The State Defendants are responsible for prescribing the objection form that every school district must use. *Id.*

138875584.1

The objection form that the State Defendants prescribed requires the objector to identify the bases for their objection and lists multiple separate bases for objections for the objector to select, including that the library book (a) is "pornographic," (b) is "prohibited under s. 847.012, F.S." as harmful to minors, or (c) "depicts or describes sexual conduct as defined in s. 847.001(19), F.S."[10]   The State Defendants are responsible for enforcing school districts' compliance with state law and State Board rules, including the Challenged Provisions.  Fla. Stat. s. 1001.03(8), 1008.32(1).  The State Defendants similarly have authority to take action to punish school districts' noncompliance.  *Id.* s. 1008.32(2)–(4).

The State Defendants have mandated that school districts use their objection form and that the part of the form that lists the bases for objections "not be modified." Fla. Admin. Code r. 6A-7.0714(3)(a), (c), (d).  Despite the fact that Section 1006.28 includes content that is "pornographic or prohibited under s. 847.012" in the same category of prohibited content—therefore demonstrating that "pornographic" is intended to be a synonym for content that is "prohibited under s. 847.012"—the State Defendants' form separates the two terms into different bases for objections.  *Id*. r. 6A-7.0714(3)(e).   The effect of the State Defendants' construction of the term "pornographic" is to go far beyond prohibiting books that are obscene as to minors; instead, it requires the removal of even highly regarded books, by Nobel prize winning authors, without any evaluation or consideration of the book's literary, artistic,

---

[10] Fla. Admin. Code r 6A-7.0714(3)(e), 6A-7.0714(5)(e)(1)–(3).

political, or scientific value, and contrary to determinations made by school librarians.

District school boards must remove library books that a parent or resident identifies on the State Defendants' objection form as prohibited under the Challenged Provisions. Fla. Stat. s. 1006.28(2)(a)(2)(b). Decisions regarding objections to library books under the Challenged Provisions are ultimately subject to review by the State Defendants. *Id*. s. 1006.28(2)(a)(6). Specifically, a district school board's decision not to remove a challenged book is subject to review by a special magistrate who is appointed by the Commissioner of Education, and the State Board "must approve or reject the recommended decision" by the special magistrate. *Id.* Yet a parent, librarian, author, or publisher who objects to the removal of any given title has no recourse to challenge the removal.

### D.    The School District Defendants.

Plaintiffs also bring claims against the members of the Orange County School Board (the "Orange County Defendants"), which is the governing body of Orange County Public Schools ("Orange County"), and the members of the Volusia County School Board (the "Volusia Defendants"), which is the governing body of the School District of Volusia County. The Orange County Defendants and the Volusia Defendants (sued only in their official capacity) are collectively referred to as the "School District Defendants." Florida law and the State Defendants mandate that district school boards, including the School District Defendants, remove school library books that are prohibited under Section 1006.28's prohibitions on content that "describes sexual conduct" or so-called "pornographic" content. *See, e.g.*, Fla. Stat. s.

1006.28(2)(a)(1)–(2), (d)(2)(d).  Pursuant to the State's mandate, the School District
Defendants have removed hundreds of books that are not remotely obscene from their
school libraries.  (Exs. B-22, B-31, B-36.)

## LEGAL STANDARD

Courts grant summary judgment under Federal Rule of Civil Procedure 56(c)
where there is "no genuine issue as to any material fact and [] the moving party is
entitled to a judgment as a matter of law."  A genuine issue of material fact precluding
summary judgment exists only if the nonmoving party presents evidence sufficient for
a factfinder to return a verdict for that party.  *Stewart v. Happy Herman's Cheshire Bridge,
Inc.*, 117 F.3d 1278, 1284–85 (11th Cir. 1997).

## ARGUMENT

The Court should declare that the Challenged Provisions are unconstitutionally
overbroad under the First Amendment because their unconstitutional applications
substantially outweigh their few, if any, constitutional applications.  *See Moody v.
NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (citing *Americans for Prosperity Foundation
v. Bonta*, 594 U.S. 595, 615 (2021) (finding provision facially unconstitutional)).  First,
Plaintiffs have standing to bring their claims because the Challenged Provisions have
resulted in the removal of school library books in violation of their First Amendment
rights.  Second, the First Amendment applies with more force in school libraries than
in curricular activities because school libraries, unlike curricular activities, are not
compulsory.  Third, a substantial number of the Challenged Provisions' applications
are unconstitutional compared to the few, if any, applications that are constitutional.

At a minimum, a school library is a nonpublic forum, which requires that any First Amendment restrictions be reasonable in light of the purpose of school libraries. There are few, if any, constitutional applications of the Challenged Provisions because there are few, if any, books on school library shelves that are obscene as to minors. Rather, the Challenged Provisions prohibit a vast number of books without regard to the value of the book as a whole or the age of the reader, contrary to the Supreme Court's decisions in *Miller v. California*, 413 U.S. 15 (1972), and *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975).

## I.    Plaintiffs Have Standing To Bring Their Claims.

Plaintiffs have standing to bring their claims against Defendants. To establish standing, a plaintiff must demonstrate that (1) she suffered an "injury in fact" that (2) was likely caused by the defendant and that (3) could likely be redressed by judicial relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The Authors Guild, an association, has standing because (1) its members would "otherwise have standing to sue in their own right," (2) it seeks to protect interests that are "germane to the organization's purpose," and (3) its claims and the declaratory relief it seeks do not require the participation of its members. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Because they seek non-monetary relief, Plaintiffs need only demonstrate that one party has standing to pursue their claims. *See Rumsfeld v. Forum for Acad. & Inst'l Rights., Inc.*, 547 U.S. 47, 52 n.2 (2006). Plaintiffs satisfy these requirements.

138875584.1

## A.    Plaintiffs Are Suffering Injuries At The Hands Of Defendants.

Plaintiffs are suffering First Amendment injuries at the hands of Defendants as a result of the Challenged Provisions because (1) the Student Plaintiffs intended to check out books from their school libraries that have been removed under those provisions in violation of the Student Plaintiffs' First Amendment rights and (2) books published by the Publisher Plaintiffs or written by the Author Plaintiffs have been removed from Florida school libraries under the Challenged Provisions in violation of the Publisher Plaintiffs' and Author Plaintiffs' First Amendment rights.

For First Amendment claims, the "injury requirement is most loosely applied" because of "the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991). Every violation of First Amendment rights satisfies the injury requirement for standing. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

The Student Plaintiffs have First Amendment rights that are violated by school library book removals. The right to receive information is well-established in constitutional law,[11] and that right exists for students like the Student Plaintiffs in

---

[11] *See, e.g.*, *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943) (The authors of the First Amendment "chose to encourage a freedom which they believed essential if vigorous enlightenment would triumph over slothful ignorance," which "embraces the right to distribute literature and necessarily protects the right to receive it." (citation omitted)); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and

school libraries.  *See*, *e.g.*, *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 189–190 (5th Cir. 1995) (following *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982)); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 583 (6th Cir. 1976) (recognizing the "right of students to receive information which they and their teachers desire them to know").  *See also Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (holding that the right to receive information is "nowhere more vital" than in "schools and universities").  Defendants "do not possess absolute authority over [Florida] students." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511, 513 (1969) (holding that the First Amendment permits only "reasonable regulation of speech-connected activities in carefully restricted circumstances").  Students do not "shed their constitutional rights" at "the schoolhouse gate" and they "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Id.* at 506, 511.[12]  A state's power to protect children from harm "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011).

The Challenged Provisions have resulted in violations of the First Amendment rights of the Student Plaintiffs.  Because of the Challenged Provisions, R.K. has been

---

ideas.") (collecting cases); *Reno v. Am. C. L. Union*, 521 U.S. 844, 874 (1997) (recognizing the "constitutional right to receive" information).

[12] *See also Pratt v. Independent School District No. 831, Forest Lake, Minnesota*, 670 F.2d 771, 776 (8th Cir. 1982) (Federal courts that have "considered First Amendment challenges to the removal of books from school libraries" have "generally concluded that a cognizable First Amendment claim exists if the book was excluded to suppress an ideological or religious viewpoint with which the local authorities disagreed.") (collecting cases).

unable to access in R.K.'s school library books that R.K. intended to, including Toni
Morrison's *The Bluest Eye* and Janet Gurtler's *You Too? 25 Voices Share Their #MeToo
Stories*. (Ex. L, R.K. Decl., ¶ 4.)  R.K. and R.K.'s classmates have also been unable to
access in R.K.'s school library the books that Volusia has targeted for removal under
the Challenged Provisions or to discuss them without risking stigma and judgment
from their teachers and fellow students. (*Id.* ¶¶ 8–9.)  Because of the law's prohibition
on content that "describes sexual conduct," J.H. has been unable to access in J.H.'s
school library books that J.H. intended to, including Jack Kerouac's *On the Road* and
Erik Larson's *The Splendid and the Vile*.  (Ex. M, J.H. Decl., ¶ 5.)  J.H. and J.H.'s
classmates have also been unable to access in J.H.'s school library the books that
Orange County has targeted for removal under this prohibition or to discuss them
without risking stigma and judgment from their teachers and fellow students. (*Id.* ¶¶ 9–
10.)

Publishers like the Publisher Plaintiffs and authors like the Author Plaintiffs also
have First Amendment rights in school libraries.  The First Amendment "embraces
the circulation of books as well as their publication."  *Bantam Books, Inc. v. Sullivan*,
372 U.S. 58, 64 n.6 (1963).  Publishers and authors have the right to speak through
their books without the State censoring those books through impermissible content-
based restrictions.  *See id.* at 71 (rejecting as unconstitutional a content-based restriction
on publishers' right to distribute books).  That right also exists in school libraries.  *See,
e.g.*, *Minarcini*, 541 F.2d at 583 (holding that the removal of school library books was
unconstitutional because "[f]reedom of speech presupposes a willing speaker [but]

20

where a speaker exists" the "protection afforded is to the communication, to its source and to its recipients both").

Section 1006.28 has resulted in violations of the First Amendment rights of the Publisher Plaintiffs and the Author Plaintiffs. Many books published by the Publisher Plaintiffs and written by the Author Plaintiffs have been removed or identified for removal from school libraries in Florida under the Challenged Provisions, including pursuant to the State Defendants' objection form. (Ex. A, Dye Decl., ¶ 11; Ex. B, Karp Decl., ¶ 8.) The School District Defendants have also removed books published by the Publisher Plaintiffs and written by the Author Plaintiffs under the Challenged Provisions. (Ex. A, Dye Decl., ¶ 11; Ex. B, Karp Decl., ¶¶ 9, 10.)

Section 1006.28 removed a key forum through which the Publisher Plaintiffs and the Author Plaintiffs reach young readers. School libraries are an important channel for publishers and authors to speak to students—the intended audiences for many of their books—through those books. (*See*, *e.g.*, Ex. A, Dye Decl., ¶ 8; Ex. D, Rasenberger Decl., ¶ 7.) If students are not able to access in their school libraries the books that the Challenged Provisions mandate be removed, they will have to discover them elsewhere (or not at all), imposing a burden on access to the speech of publishers and authors like the Publisher Plaintiffs and the Author Plaintiffs. (Ex. A, Dye Decl., ¶ 8.) Particular books appeal to students at particular times in their lives, so the opportunity to speak to those students may be lost if the Publisher Plaintiffs' or the Author Plaintiffs' books have been removed from school libraries. (*Id*.) Censorship of library books not only reduces readership for the specific books being removed; it

also reduces readership of publishers' and authors' other works because a student who reads one of their books is more likely to then read another. (*Id.*)

Further, by falsely labeling books that the Publisher Plaintiffs and Author Plaintiffs have made available to students as "pornography," Florida has stigmatized those books. (Ex. E, Picoult Decl., ¶ 7.) This stigmatization "travels . . . beyond the school setting" and decreases the likelihood that students will read the Publisher Plaintiffs' and the Author Plaintiffs' books both in school and elsewhere in the future. (Ex. A, Dye Decl., ¶ 8; Ex. D, Rasenberger Decl., ¶ 7 .) Moreover, the stigma chills the creative process. (Ex. A, Dye Decl., ¶ 5; Ex. D, Rasenberger Decl., ¶ 8.) Authors who have been stigmatized by Section 1006.28 may—consciously or subconsciously—self-censor their future works to avoid those works being wrongly labelled as "pornography." (*Id.*) That chill leads to "dimmer, less colorful dialogues in the marketplace of ideas." (Ex. D, Rasenberger Decl., ¶ 8.)

Those violations of Plaintiffs' First Amendment rights are injuries-in-fact that have occurred and will continue to occur until and unless Section 1006.28's prohibitions on school library books containing a description of "sexual conduct" or so-called "pornographic" content are declared unconstitutional.

**B.    Plaintiffs' Injuries Are Traceable To And Redressable By The State Defendants.**

Plaintiffs' injuries are fairly traceable to the State Defendants by virtue of their indispensable role in implementing and enforcing the Challenged Provisions. The State Defendants play an integral role, as explained above: parents and residents are

22

required to use the State Defendants' objection form, without modification, if they want to object to any particular library books and cause district school boards to remove library books under the Challenged Provisions. *See* Fla. Stat. s. 1006.28(2)(a)(2)(b)(I), (II); Fla. Admin. Code r. 6A-7.0714(3)(a)(2), (d). In addition, the State Defendants are ultimately responsible for "approv[ing] or reject[ing]" a special magistrate's recommendation (following review of a school district's decision) not to remove a library book based on an objection. Fla. Stat. s. 1006.28(2)(a)(6).

To satisfy the traceability requirement, plaintiffs need only show that their injuries are "connected with the conduct of which they complain." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (brackets omitted). This requirement is "less stringent" than proximate cause. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019). Even injuries that are indirect can satisfy traceability. *Wilding*, 941 F.3d at 1125.

The State Defendants' role in implementing and enforcing the Challenged Provisions satisfies the traceability requirement. It is the State Defendants' objection form that imposes the Challenged Provisions on school districts and unconstitutionally eliminates school librarians' and school districts' discretion to evaluate the value of each book as a whole, resulting in the district school boards' removal of books following an objection.[13] Moreover, the State Defendants have coercive authority to

---

[13] As this Court found in denying the State Defendants' motion to dismiss (ECF No. 106 at 7), as a result of their mandatory objection form, the State Defendants "are at the root of Plaintiffs' alleged injury."

ensure that school districts comply. *See* Fla. Stat. s. 1001.03(8), 1008.32(1). Plaintiffs need not show that the State Defendants' actions "are the very last step in the chain of causation" to satisfy traceability, especially where the "determinative and coercive effect" of their objection form and of their ultimate responsibility to review removal decisions contribute to the actions of district school boards. *See Bennett v. Spear*, 520 U.S. 154, 168–69 (1997).

Because the State Defendants' role in implementing and enforcing the Challenged Provisions is more than sufficient to satisfy traceability, Plaintiffs have also adequately demonstrated redressability. *See Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1202 (11th Cir. 2021) (noting that traceability and redressability "often travel together"). The State Defendants' mandatory objection form is "connected with" the book removals that have injured Plaintiffs. *See Wilding*, 941 F.3d at 1125. A declaratory judgment against the State Defendants that the Challenged Provisions violate the First Amendment would cause them to omit the Challenged Provisions from their objection form, and district school boards would be required to use a new objection form. That new form would not include the current form's unconstitutional categories of books that must be removed and would not limit school districts' ability to evaluate each book's value as a whole with respect to challenged titles, as the current form does.

### C. Plaintiffs' Injuries Are Traceable To And Redressable By The School District Defendants.

Plaintiffs' injuries are also traceable to and redressable by the School District

Defendants.[14]  The School District Defendants injured Plaintiffs by removing books in violation of their First Amendment rights as demonstrated above.  Those book removals are First Amendment injuries that are traceable to the School District Defendants in their capacities as agents of the State under Section 1006.28.  *See Wood v. Fla. Dept. of Educ.*, 729 F. Supp. 3d 1255, 1269 (N.D. Fla. 2024) (citing *Support Working Animals, Inc.*, 8 F.4th at 1201 and granting preliminary injunction on teacher's First Amendment claim against district school board and others because "[e]ven if the impetus for the [district school board's] actions comes from state law, its compliance still qualifies as enforcing state law," therefore the plaintiff's "chilled speech injury is fairly traceable to the [district school board's] actions").  *See also Echols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990) ("[W]hen a state statute directs the actions of an official, as here, the officer, be he state or local, is acting as a state official."); *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993) (similar).

Plaintiffs' injuries are traceable to the School District Defendants.  Under Section 1006.28, the School District Defendants are "responsible for the content" of materials "made available in a school or classroom library," including by removing school library books that contain content that "describes sexual conduct" or is "pornographic."  *See* Fla. Stat. s. 1006.28(2)(a)(1), (2)(a)(2)(b)(I), (II).  Districts are required under the law to use the objection form that the State Defendants prescribed

---

[14] As this Court found in denying the State Defendants' motion to dismiss (ECF No. 106 at 8), "Plaintiffs' alleged injury is both fairly traceable to the challenged action and redressable by a favorable ruling."

and have no discretion to alter that form. *See* Fla. Admin Code r. 6A-7.0714(3)(a)
("School districts must use the template incorporated in this rule for objections to the
school board for the following types of materials: . . . library books"), r. 6A-
7.0714(3)(c), (d) ("The text of Part II of the template [containing the categories of
prohibited content] must not be modified by school districts[.]").  Florida law and the
Florida Constitution require school districts to follow state law, including by
implementing and enforcing that law where required by statute, as is the case with
Section 1006.28.  *See, e.g.*, *Sch. Bd. of Collier Cnty. v. Fla. Dep't of Educ.*, 279 So. 3d 281,
286–87 (Fla. 1st D.C.A. 2019) (explaining that the Florida Constitution "creates a
hierarchy under which a school board has local control, but the State Board supervises
the system as a whole").

Because Plaintiffs have suffered First Amendment injuries that are traceable to
the School District Defendants, Plaintiffs have also satisfied the redressability
requirement.  A declaratory judgment against the School District Defendants that the
Challenged Provisions violate the First Amendment would require them to return
books that they had previously removed from school library shelves under those
unconstitutional provisions, thereby remedying the harms suffered by Plaintiffs.  It
would also require the School District Defendants to refrain from removing books
under the Challenged Provisions going forward, preventing future First Amendment
injury to Plaintiffs and others at the hands of the School District Defendants.

## II.    The First Amendment Applies In School Libraries.

Every court to consider this issue agrees:  the First Amendment right to freedom

of speech exists in public libraries, including public school libraries.[15]  Moreover, the
First Amendment applies with more force in school libraries than it does in the
compulsory curricular environment.  Those First Amendment rights are not displaced
by the government-speech doctrine, because under the Supreme Court's test for
government speech, that doctrine does not apply to school library books.

### A.    School Libraries Are Not Compulsory.

While the State has substantial discretion in certain compulsory functions of
public schools, school libraries are different.  School libraries are places of voluntary
learning in which student participation is self-driven and optional.  In contrast, other
aspects of the educational experience such as curriculum and instruction are
compulsory and require participation.  *See, e.g.*, *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*,
862 F.2d 1517, 1522–25 (11th Cir. 1989) (distinguishing between removal of curricular
and school library books).

School libraries serve an important purpose.  As the Supreme Court has
recognized, a school library is a place where students "can literally explore the

---

[15] *See, e.g.*, *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667–68 (8th Cir. 2024)
(affirming rejection of the government-speech doctrine); *Campbell v. St. Tammany Parish Sch. Bd.*, 64
F.3d 184, 188–190 (5th Cir. 1995); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582–83 (6th
Cir. 1976); *PEN American Center, Inc. v. Escambia County School Board*, 711 F. Supp. 3d 1325, 1331 (N.D.
Fla. 2024); *Little v. Llano Cnty.*, 103 F.4th 1140, 1151–52 (5th Cir.), *reh'g granted en banc*, 106 F.4th 426
(5th Cir. 2024); *Fayetteville Public Library v. Crawford County, Arkansas*, 684 F. Supp. 3d 879, 909–910
(W.D. Ark. 2023); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1004 (W.D. Ark. 2003); *Sund v.
City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 547–48 (N.D. Tex. 2000); *Case v. Unified Sch. Dist. No.
233*, 908 F. Supp. 864, 874–76 (D. Kan. 1995); *Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 686–
89 (D. Me. 1982); *Salvail v. Nashua Bd. of Ed.*, 469 F. Supp. 1269, 1272–73 (D.N.H. 1979); *Right To
Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*, 454 F. Supp. 703, 710–11 (D. Mass. 1978);
Order On Motion For Preliminary Injunction at 14, *Adams v. Matanuska-Susitna Borough School Dist.*,
No. 3:23-cv-00265-SLG (D. Alaska Aug. 6, 2024).

unknown, and discover areas of interest and thought not covered by the prescribed curriculum." *Pico*, 457 U.S. at 868–69 (1982) (plurality) (explaining that "students must always remain free to inquire" and the "school library is the principal locus of such freedom"). A school library is meant to be a "regime of voluntary inquiry," affording students "an opportunity at self-education and individual enrichment that is wholly optional." *Id.* at 869. Libraries "pursue the worthy missions of facilitating learning and cultural enrichment" and are necessary for a "well-functioning democracy." *Fayetteville*, 684 F. Supp. 3d at 889, 891 (quoting *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 203 (2003) ("*ALA*")).

The discretion afforded to librarians in overseeing their library collections is crucial to well-functioning libraries. Librarians are tasked with "curat[ing] the collections of public libraries to serve diverse viewpoints" and must be "commit[ted] to freedom of speech." *Id*. That task requires librarians to have "broad discretion to decide what material to provide to their patrons," and librarians are "afforded significant professional responsibility and deference with respect to their area of expertise." *Id*. at 890–91. Authors, publishers, students, and parents rely on trained librarians to facilitate voluntary book discovery through individualized consideration of a student's maturity, reading level, interests, and life experiences. The Challenged Provisions replace librarians' discretion with the dictates of the State and disregard community standards and the value of each book as a whole. (*See* ECF No. 106 at 23–24 (noting that in this case the Court is faced with "a regime built around not a librarian's sound judgment but rather any parent's objection, however capricious").)

School libraries are not compulsory educational environments, and the removal of a book from a school library is not a curricular decision. Because students are voluntary participants in school libraries, they are not compelled to read any particular book or any book at all, including the books that the Challenged Provisions now mandate be removed from every school library. The State's mandate to remove books from school libraries "must withstand greater scrutiny within the context of the First Amendment than would a decision involving a curricular matter." *See, e.g.*, *Virgil*, 862 F.2d at 1522–25; *Campbell*, 64 F.3d at 189 (citing *Pico*, 457 U.S. at 868–870). The Supreme Court has recognized this distinction between voluntary aspects of a school environment and the compulsory curricular environment. *See Pico*, 457 U.S. at 868–870 (contrasting the "compulsory environment of the classroom" to "the school library and the regime of voluntary inquiry that there holds sway"); *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 269 (1988) (concerning a school newspaper that was part of the school's "curriculum" and over which "school officials retained ultimate control").

**B.    The State Of Florida Does Not Speak Through School Library Books.**

Library books are not government speech because (1) school libraries have historically not communicated messages from the State, (2) the public does not identify library books as messages endorsed by the State, and (3) the State does not control the contents of library books.

As the Supreme Court has recognized, because the government-speech doctrine is a "doctrine that is susceptible to dangerous misuse," courts "must exercise great caution" when considering whether to "extend[] government-speech precedents."

*Matal v. Tam*, 582 U.S. 218, 235 (2017) (Alito, J.).  The doctrine is a limited exception to the First Amendment: when the government-speech doctrine applies, the Free Speech Clause does not apply.  The Supreme Court has instructed that, to determine whether the government-speech doctrine applies, courts must consider whether (1) the State has historically "communicated messages" through the medium; (2) the medium is "closely identified in the public mind" with the State such that it "has endorsed that message," and (3) the State directly controls "the messages conveyed" through that medium.  *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–213 (2015); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 472–73 (2009); *Matal*, 582 U.S. at 238 (assessing whether trademarks are government speech by applying the "three factors [*Walker*] distilled from *Summum*").[16]

The State's regulation of school library books does not satisfy any of the three factors.  First, school libraries have not historically communicated messages from the State.  Instead, school libraries have long served as vehicles to expose students to a broad array of ideas from authors who express unique, personal points of view.  (Dye Decl., Ex. A, ¶ 8.)  The State Defendants admit that school librarians—not the State— have historically decided which library books to make available to the students in their

---

[16] The statements in *Gittens* and in the concurrence in *Gates* about library books are dicta because neither case involves library books.  *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 25 (D.C. Cir. 2005) (concerning a government program "to showcase . . . sculptures of 100 donkeys and 100 elephants"); *Bryant v. Gates*, 532 F.3d 888, 898, 891 (D.C. Cir. 2008) (concerning advertisements in a Department of Defense publication whose "sole purpose" was "to facilitate accomplishment of the command or installation mission").  Moreover, both cases predate the three-part test for government speech the Supreme Court applied in *Summum* and reaffirmed in *Walker* and therefore do not apply that test.

138875584.1

local schools.  (ECF No. 83 at 18.)  It would make no sense for a library book, written
by an independent author and selected for library shelves by a local librarian, to be
understood as communicating a message from the State of Florida.

Second, messages conveyed in school library books are diverse and
contradictory—not endorsed by the State, as government speech must be.  As Justice
Alito explained in rejecting the application of the government-speech doctrine to
trademarks, the doctrine does not extend to speech that expresses "contradictory
views."  *See Matal*, 582 U.S. at 236, 238 (also explaining that *Walker*, concerning
"Texas specialty license plates," "likely marks the outer bounds of the government-
speech doctrine"); *Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 272–73 (2022)
(Alito, J., concurring) (explaining that "flags flown [from a city flagpole] reflected a
dizzying and contradictory array of perspectives that cannot be understood to express
the message" of the government).  The result would be the same if the government-
speech doctrine were applied to school libraries.  As the Eighth Circuit has stated, a
"well-appointed school library could include copies of Plato's *The Republic*,
Machiavelli's *The Prince*, Thomas Hobbes' *Leviathan*, Karl Marx and Freidrich
Engels' *Das Kapital*, Adolph Hitler's *Mein Kampf*, and Alexis de Tocqueville's
*Democracy in America*. . . .  [I]f placing these books on the shelf of public school libraries
constitutes government speech, the State 'is babbling prodigiously and incoherently.'"
*GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024)
(quoting *Matal*, 582 U.S. at 236).

Third, the State does not "maintain[] direct control over the messages

31

conveyed" in school library books. *See Walker*, 576 U.S. at 213. Rather, authors and publishers control the contents of their books. The State Defendants concede this point. (ECF No. 83 at 23 n. 6 ("Florida has not, for instance, conditioned a book's presence in a public-school library on the author's or publisher's willingness to alter the contents of the book in all its circulations.").) The State of Florida does not "dream up" the books or "edit [books] submitted for" inclusion in school libraries. *See Matal*, 582 U.S. at 235. *See also Shurtleff*, 596 U.S. at 256 (explaining that the "most salient feature" of the case was the defendant's failure to "control[] the flags' *content and meaning*" (emphasis added)); *Walker*, 576 U.S. at 213 (explaining that vanity license plates are government speech because Texas's control over the plates extended to "the design, typeface, color, and alphanumeric pattern for all license plates"). Unlike in *Summum*, in which the government exercised "editorial control" over the selection of the monuments at issue, 555 U.S. at 472, here, the State of Florida does not select books for inclusion on school library shelves—local school librarians and their schools do. No court has found that school library collections constitute government speech because there is no plausible argument that school library collections deliver "a [State]-controlled message." *See id.* at 468.

Library books are fundamentally different than the limited media that constitute government speech. Application of the government-speech doctrine to school library books makes no sense and would drastically expand the reach of this doctrine.

## III. The Challenged Provisions Are Unconstitutionally Overbroad.

The Challenged Provisions of Section 1006.28 are unconstitutionally

overbroad. Those prohibitions bar minors from accessing books that contain any content that "describes sexual conduct" or any so-called "pornographic" content without regard for the value of the books as a whole—even where those books are not remotely obscene under the Supreme Court's obscenity standard. *See* Fla. Stat. s. 1006.28(2)(a)(2)(b)(I), (II). Section 1006.28's prohibition on "pornographic" content also makes no attempt to differentiate, as it constitutionally must, between books that may be obscene as to all minors versus books that may be obscene only for younger minors.

The First Amendment prohibits laws that abridge the freedom of speech. U.S. Const. amend. I. Laws that restrict speech based on its content are disfavored. *See*, *e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). In addition, the First Amendment limits government restrictions on speech in public schools to "reasonable regulation of speech-connected activities in carefully restricted circumstances." *Tinker*, 393 U.S. at 511, 513 (explaining that speech restrictions must be "necessary to avoid material and substantial interference with schoolwork or discipline"). *See also Minarcini*, 541 F.2d at 582 ("The removal of books from a school library is a much more serious burden upon freedom of classroom discussion than the action found unconstitutional in [*Tinker*].").

A statute that burdens otherwise-protected speech is invalid as overbroad if a "substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *NetChoice*, 144 S. Ct. at 2397 (citing *Bonta*, 594 U.S. at 615 (finding provision facially unconstitutional)). In assessing an

33

overbreadth claim, a court "must [1] evaluate the full scope of the law's coverage[,] [2] decide which of the law's applications are constitutionally permissible and which are not, and [3] finally weigh the one against the other." *Id*. at 2409.[17]

The Supreme Court has held that facial overbreadth challenges are particularly appropriate and important where, as here, the "pertinent facts . . . are the same across the board." *Bonta*, 594 U.S. at 618. Facial challenges are an important tool to protect First Amendment rights when a law restricts and chills a substantial amount of protected speech.[18] The Challenged Provisions, which in every situation require the removal of books with no consideration of the book's value as a whole (as is constitutionally required), are the epitome of statutory provisions for which a facial challenge is appropriate. Plaintiffs are likely to succeed on the merits of their First Amendment overbreadth claim because the unconstitutional applications of those prohibitions vastly outweigh any constitutional applications.

---

[17] The Eleventh Circuit regularly invalidates unconstitutional laws on First Amendment overbreadth grounds. *See, e.g., Dimmitt v. City of Clearwater*, 985 F.2d 1565 (11th Cir. 1993) (affirming grant of summary judgment on plaintiffs' claims that city ordinance was an unconstitutionally overbroad restriction of protected speech); *Solomon v. City of Gainesville,* 763 F.2d 1212, 1214 (11th Cir. 1985) (per curiam) (reversing grant of defendants' summary judgment motion and holding that ordinance restricting any graphic or sign of an "obscene, indecent or immoral nature" was unconstitutionally overbroad); *Moms for Liberty – Brevard County, FL v. Brevard Public Schools*, 118 F.4th 1324, 1335 (11th Cir. 2024) (reversing grant of summary judgment for defendants and holding that a school district's ban on "abusive" speech was unconstitutionally overbroad).

[18] *See, e.g., Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) ("The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere."); *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (explaining that facial challenges are important because "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech[,] harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas").

## A.    The Challenged Provisions' Scope Is School Library Books.

Section 1006.28 requires the removal of school library materials that contain any content that "describes sexual conduct" or is purportedly "pornographic."  Fla. Stat. s. 1006.28(2)(a)(2)(b)(I), (II).  Plaintiffs do not challenge the portion of the statute concerning *visual depictions* of sexual conduct.  *Id*. s. 1006.28(2)(a)(2)(b)(II).  The scope of the challenged portions of Section 1006.28, therefore, is materials in Florida school libraries that contain a description of sexual conduct or so-called "pornographic" content.  Those materials primarily consist of books, but may also include magazines, newspapers, and audiobooks.[19]  (Ex. C, Hackey Decl., ¶ 15.)

These are books—both fiction and nonfiction—that were specifically selected for school library shelves by trained professionals who regularly consider educational appropriateness, community standards, and literary value in making library curation decisions.  (*See*, *e.g.*, *id*. ¶ 27.)  The restrictions imposed by the Challenged Provisions reach award-winning and other educationally valuable books, classics, books that have been on school library shelves for years, and even books that are commonly tested on Advanced Placement exams.  Those provisions sweep far too broadly.

## B.    The Challenged Provisions Have Limited Constitutional Applications.

The Challenged Provisions' constitutional applications are few, if any, because those provisions mandate the content-based removal of library books without regard

---

[19] References in this brief to "books" also include magazines, newspapers, and audiobooks.  The same overbreadth analysis that applies to books also applies to magazines, newspapers, and audiobooks.

for the value of each book as a whole and without regard to the discretion of librarians and other trained professionals in Florida schools. No exigency of the educational environment justifies the Challenged Provisions, which are inconsistent with the purpose of school libraries.

Courts agree that the government cannot require the content-based removal of library books to impose a "puritanical 'pall of orthodoxy'" or to rid libraries of messages with which they disagree. *See Pico*, 457 U.S. at 877; *Minarcini*, 541 F.2d at 580; *Campbell*, 64 F.3d at 188–89 (quoting *Pico*); *Counts*, 295 F. Supp. 2d at 1004–1005 (quoting *Pico*); *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 709 F. Supp. 3d 664, 697 (S.D. Iowa 2023), *reversed and remanded on other grounds*, 114 F.4th 660 (8th Cir. 2024). While the most recent Supreme Court decision concerning the removal of public-school library books—*Board of Education v. Pico*—was a plurality decision, it provides useful guidance regarding the First Amendment implications of removing school library books, which other courts have relied upon. Even the dissenting justices in *Pico* agreed that the government does not have unlimited authority to remove school library books without running afoul of the First Amendment.[20] *Pico* also involved a

---

[20] The plurality opinion expressly states that "the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library." *Pico*, 457 U.S. at 866 (plurality opinion). *Pico*'s concurrences and dissents articulate that limit in different ways and to different extents. *Id.* at 879–880 (Blackmon, J. concurring) ("[S]chool officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved" (emphasis in original).); 907 (Rehnquist, J., Burger, C.J., Powell, J. dissenting) (recognizing that "significant discretion to determine the content" of "school libraries" may not be "exercised in a narrowly partisan or political manner" or "motivated by racial animus"; the Constitution "does not permit the official suppression of *ideas*" (emphasis in original)).

138875584.1

much less extreme situation than that presented by the Challenged Provisions here—
there, the Court considered whether a local school board's decision to remove nine
books from a school library violated the First Amendment rights of students. *Id.* at
858. In contrast, the Challenged Provisions are a statewide mandate from the State to
school districts and their educators that resulted in the removal of hundreds of books.
(*See, e.g.*, Exs. B-1 through B-32, B-36.) The Challenged Provisions eliminate the
discretion that Florida school districts and educators have by requiring the removal of
books that schools and educators had selected for library shelves.

When the government restricts speech on government property, courts assess
those restrictions based on the nature of the forum and the type of speech that is
restricted. *See, e.g., Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800
(1985). At a minimum, a school library is a nonpublic forum. The standards that
courts apply to assess statutes requiring the removal of library books are consistent
with the standard used to assess speech restrictions in nonpublic forums. Within
nonpublic forums, content-based restrictions must be (1) reasonable in light of the
purpose of the forum and (2) viewpoint-neutral. *Cornelius*, 473 U.S. at 806. *Accord
Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12, 16 (2018) (holding that the state must
"articulate some sensible basis for distinguishing what [speech is allowed] from what
[speech is not allowed]" inside a polling place). Therefore, an application of the
Challenged Provisions is constitutional only if it is reasonable in light of the purpose
of a school library. *See also Counts*, 295 F. Supp. 2d at 1002 (requiring the State to show
that book-removal decisions were "justified by some exigency").

The purpose of school libraries is inconsistent with the broad content-based restrictions imposed by the Challenged Provisions that do not account for the value of the book as a whole. Libraries are places of voluntary inquiry that provide students with the opportunity for exploration, discovery, and growth. *See Pico*, 457 U.S. at 868–889. Libraries provide students with access to "areas of interest and thought not covered by the prescribed curriculum." *Id.* Critical to the success of libraries is the lack of "any kind of authoritative selection" of ideas by the State. *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603–04 (1967); *ALA*, 539 U.S. at 204 ("To fulfill their traditional missions, public libraries must have broad discretion[.]").

In light of these purposes, the reasonable and therefore constitutional applications of the Challenged Provisions are minimal. Because the Challenged Provisions are a statewide mandate with the purported purpose of keeping sexually explicit content out of school libraries, their reasonableness must be evaluated using the Supreme Court's standard that governs speech concerning sexual content—the obscenity standard. The Supreme Court has defined obscenity as "limited to works" that (a) "taken as a whole, appeal to the prurient interest in sex"; (b) "portray sexual conduct in a patently offensive way"; and (c) "taken as a whole, do not have serious literary, artistic, political, or scientific value." *See Miller*, 413 U.S. at 24. The first and second parts of the *Miller* obscenity test are to be determined "applying contemporary community standards." *Pope v. Illinois*, 481 U.S. 497, 500 (1987). When applied to minors, the *Miller* obscenity standard accounts for the age of the reader. *See Erznoznik*, 422 U.S. at 213–14.

The *Miller* obscenity standard as applied to minors is not novel in Florida school libraries. Section 1006.28 has long prohibited Florida school libraries from containing content that is "harmful to minors," which Florida law defines as consistent with the *Miller* obscenity standard.[21] *Simmons*, 944 So.2d at 325 ("[T]he term 'harmful to minors' is adequately defined by reference to the three-prong *Miller* standard, albeit modified to apply to minors.").

The constitutional applications of the Challenged Provisions are therefore any school library books that are obscene under the *Miller* standard accounting for the age of the minor. Because obscene materials have long been prohibited in Florida school libraries under the statutory prohibition on content that is "harmful to minors," that population is necessarily extremely limited. Moreover, library collections are curated by trained professional librarians who take into account community standards. (*See, e.g.*, Ex. C, Hackey Decl., ¶¶ 27–28.) As a result, it would be the rare exception that a school library would contain a book that would be obscene. (*Id.* ¶ 27 (explaining that educators' "professional training requires [that] books that are appropriate and valuable for high school students but that may be too mature for elementary school students not be made available to elementary school students").) Therefore, the

---

[21] *Compare* Fla. Stat. s. 847.001(7) (defining "harmful to minors" as "any reproduction, imitation, characterization, description, exhibition, presentation, or representation, of whatever kind or form, depicting nudity, sexual conduct, or sexual excitement when it: (a) Predominantly appeals to a prurient, shameful, or morbid interest; (b) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material or conduct for minors; and (c) Taken as a whole, is without serious literary, artistic, political, or scientific value for minors") *with Miller*, 413 U.S. at 24.

constitutional applications of the Challenged Provisions are few, if any.

### C.    The Challenged Provisions' Unconstitutional Applications Vastly Outweigh Their Constitutional Applications.

In contrast, the unconstitutional applications of the Challenged Provisions are vast and substantially outweigh any potential constitutional applications.    The Challenged Provisions prohibit school librarians from considering the literary, political, or scientific value of each book when taken as a whole, resulting in a blanket prohibition that ignores school district and educator discretion and differing community standards.    In addition, Section 1006.28's prohibition on so-called "pornographic" content, as interpreted and implemented by the State, fails to differentiate based on the age of the potential minor reader, as it constitutionally must.

While the State has a legitimate interest in prohibiting students from accessing books that are obscene for minors in school libraries, a book is not obscene merely because it describes sexual content or includes so-called "pornographic" content.  As Justice Scalia explained, the Supreme Court has "rejected the approach previously adopted by some courts, which would permit the banning of an entire literary work on the basis of one or several passages that in isolation could be considered obscene." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 250 (1990) (Scalia, J., concurring) (explaining that "the standards for judging obscenity safeguard the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest" (quoting *Roth v. United States*, 354 U.S. 476, 488 (1957))).  Moreover, the State cannot suppress "[s]peech that is neither obscene as to

40

youths nor subject to some other legitimate proscription" solely "to protect the young
from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*,
422 U.S. at 213–14 (striking ordinance as overbroad).    For these reasons, the
Challenged Provisions are unconstitutional.

### 1.    The Prohibition On Content That "Describes Sexual Conduct."

Section 1006.28's prohibition on content that "describes sexual conduct"
prohibits school library books with *any* description of *any* sexual conduct as defined by
statute.  Long before July 2023—the effective date of the prohibition on content that
"describes sexual conduct"—the statute forbade material containing "sexual conduct"
that was "harmful to minors."    Fla. Stat. s. 1006.28(2)(a)(2)(b)(I).    That prior
proscription required a finding that the book, "[t]aken as a whole, is without serious
literary, artistic, political, or scientific value for minors" as required by the First
Amendment under *Miller*.  Fla. Stat. s. 847.001(7), 847.012.  In stark contrast, the new
proscription forbids any content that "describes sexual conduct" with total disregard
for the value of the book taken as a whole.

The fact that the statute permits schools to retain library books with content that
"describes sexual conduct" so long as they are appropriate or suitable does not save it.
First, those criteria are not substitutes for the requirements of the Supreme Court's
obscenity test, because they bear no relation to *Miller*'s requirement that each book be
considered holistically.    Second, the terms "inappropriate" and "unsuitable" are
ambiguous and undefined in the statute, providing no guidance to schools as to what
the State of Florida might deem sufficient to overcome an otherwise-blanket

prohibition on content that "describes sexual content."  The vagueness of the statutory language combined with the harsh penalties imposed on educators for failure to comply—including loss of licensure and monetary fines, *see* Fla. Stat. s. 1012.796(1)(a)–(f)—renders illusory schools' discretion to retain appropriate and suitable material that describes sexual content.  The statute encourages the broad removal of any library book containing any description of sexual conduct for all ages and then—under threat of penalty—dares school districts to find that a description of sexual conduct is sufficiently appropriate or suitable to retain that library book.  All the while, the State Defendants provide no guidance or assurance to schools that Florida will defer to the school district's decision to retain a book or refrain from penalizing that district or its educators.  And all the while, books remain off of school library shelves.[22]

### 2.    The Prohibition On So-Called "Pornographic" Content.

Section 1006.28's prohibition on so-called "pornographic" content in school library books, as interpreted and implemented by Defendants, similarly bears no relation to the Supreme Court's obscenity test.  Nor does it account for the age of the minor reader, as the First Amendment requires.

---

[22] The statute requires school districts to remove books from library shelves "within 5 school days after receipt of an objection" on the basis of content that describes sexual conduct or so-called "pornographic" content and to ensure that the book in question "remain[s] unavailable to students of that school until the objection is resolved."  *See* Fla. Stat. s. 1006.28(2)(a)(2).  The statute does not provide a time period during which school districts must resolve the objection.  Even for those books that are eventually returned to library shelves, their removal for an indefinite and extended period of time violates the First Amendment rights of Plaintiffs and others.  *See Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Section 1006.28 prohibits school library books that contain content that "[i]s pornographic or prohibited under s. 847.012." Section 847.012 prohibits content that is "harmful to minors," which is defined in conformance with the Supreme Court's obscenity standard for minors under *Miller*. Fla. Stat. s. 847.012, 847.001(7). Florida law does not define the term "pornographic," but the State Defendants have construed the term "pornographic" as distinct from the *Miller* obscenity standard. The State Defendants' mandatory objection form includes separate categories for "pornographic" content and content that is "harmful to minors," meaning that a book could contain content that is considered "pornographic" under the statute but that is not "harmful to minors," *i.e.*, obscene. (*See* Ex. N; Fla. Admin. Code r. 6A-7.0714(3)(e).) Because the State Defendants require all Florida school districts to adopt their objection form with no substantive modifications, they have imposed this unconstitutional construction of the term "pornographic" on school districts.

The prohibition on so-called "pornographic" content also makes no attempt to differentiate, as it constitutionally must, between books that may be obscene as to all minors versus books that may be obscene only for younger minors. In that way, the State treats high school seniors the same as third graders and prohibits all students regardless of age, maturity, or reading level from accessing certain books in their school libraries. The First Amendment requires that books be considered in relation to the age and maturity of the students who may access them. *See Erznoznik*, 422 U.S. at 214 n.11 ("[T]he age of a minor is a significant factor."). A book is not obscene as to all minors if it has serious value for a legitimate minority of minors, such as older

43

minors. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 488 U.S. 905 (1988); *Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125, 127–28 (4th Cir. 1989), *cert. denied*, 494 U.S. 1056 (1990).[23] Nevertheless, the prohibition on so-called "pornographic" content applies to all school libraries and all students without differentiating based on the age of the prospective reader—even if the reader is an adult under Florida law—and therefore prevents older minors from accessing non-obscene school library books that contain any so-called "pornographic" content, in violation of the First Amendment.

### 3. The Substantial Unconstitutional Applications Of The Challenged Provisions.

The unconstitutional applications of the Challenged Provisions are many. Those provisions require the removal of numerous categories of non-obscene books, many of which have been in school libraries in Florida and throughout the nation for decades:

- Historical classics (*e.g.*, *Native Son* by Richard Wright; *Slaughterhouse-Five* by Kurt Vonnegut) (*see* Exs. B-13, B-31, B-36);

- Modern award-winners or highly acclaimed books (*e.g.*, *Herzog* by Saul Bellow; *Beloved*, *Song of Solomon* and *The Bluest Eye* by Toni Morrison; *The Kite Runner* by Khaled Hosseini; *Nineteen Minutes* by Jodi Picoult; *Shout* by Laurie Halse Anderson; *Looking for Alaska* by John Green; *Last Night at the Telegraph Club* by Malinda Lo) (*see* Exs. B-5, B-11, B-13, B-26, B-31, B-36);

- Books on AP exams or that serve important educational purposes (*e.g.*, *The Color Purple* by Alice Walker, *Native Son* by Richard Wright, *The Handmaid's*

---

[23] *See also Shipley Inc. v. Long*, 454 F. Supp. 2d 819, 829–830 (E.D. Ark. 2004) (holding that the State cannot "effectively stifle[] the access" of "older minors to communications and material they are entitled to receive and view" just because such material may be "harmful to the youngest of the minors"); *Fayetteville*, 684 F. Supp. 3d at 904–905 (finding obscenity restriction on library books to be overbroad, even where the statutory language was consistent with *Miller*, because the restriction burdened older minor and adult access to books).

138875584.1

*Tale* by Margaret Atwood; *Slaughterhouse-Five* by Kurt Vonnegut, *A Clockwork Orange* by Anthony Burgess) (*see* Exs. B-5, B-11, B-13, B-31, B-36);

- Non-fiction history books about important historical events (*e.g.*, *Kaffir Boy: The True Story of a Black Youth's Coming of Age in Apartheid South Africa* by Mark Mathabane, *The Splendid and the Vile* by Erik Larson, *The Freedom Writers Diary: How a Teacher and 50 Teens Used Writing to Change Themselves and the World Around Them* by Erin Gruwell) (*see* Exs. B-13, B-17, B-31, B-36);

- Non-fiction books to help minors avoid being victimized by sexual assault (*e.g.*, *You Too? 25 Voices Share Their #MeToo Stories* edited by Janet Gurtler) (*see* Ex. B-31);

- Books that address bullying, racism, and sexual assault (*e.g.*, *The Bluest Eye* and *Song of Solomon* by Toni Morrison; *Last Night at the Telegraph Club* by Malinda Lo; *Looking for Alaska* by John Green, *Nineteen Minutes* by Jodi Picoult, *Homegoing* by Yaa Gyasi, *You Too? 25 Voices Share Their #MeToo Stories* edited by Janet Gurtler) (*see* Exs. B-5, B-11, B-13, B-26, B-31);

- Books that address trauma and grief (*e.g.*, *Shout* by Laurie Halse Anderson, *This is Where it Ends* by Marieke Jijkamp, *My Sister's Keeper* by Jodi Picoult) (*see* Exs. B-5, B-13);

- Books that address injustice (*e.g.*, *Native Son* by Richard Wright, *The Freedom Writers Diary: How a Teacher and 50 Teens Used Writing to Change Themselves and the World Around Them* by Erin Gruwell) (*see* Exs. B-13, B-17, B-31); and

- Works of fiction geared toward the emotional and intellectual challenges of being a teenager or young adult (*e.g.*, *Looking for Alaska* by John Green, *The Hate U Give* by Angie Thomas, *How the García Girls Lost Their Accents* by Julia Alvarez) (*see* Exs. B-5, B-13, B-31).

The Challenged Provisions require the removal of books that contain only one sentence describing sexual conduct or containing so-called "pornographic" content—even if the content in question was an impetus for legislation concerning sexual assault; was historically significant, such as in an impeachment, presidential campaign, or international events; or was central to character development in an award-winning

work of fiction.  The Challenged Provisions are indifferent to the educational and literary qualities in the hundreds of school library books that they require be removed.

The breadth of the Challenged Provisions is even greater because they are vague.  The prohibition on content that "describes sexual conduct" requires Florida educators to remove library books but does not explain what constitutes a description in relation to "sexual conduct" or what level of detail is necessary for that prohibition to apply.  And the term "pornographic" has no meaning whatsoever under Florida law.  If Florida educators fail to divine what the Challenged Provisions require, they risk substantial penalties—including, in the Governor's view, being charged with a third-degree felony.  *See* Fla. Stat. s. 1012.796(1)(a)–(f); Ex. A-7.  In that way, the Challenged Provisions incentivize educators and school districts to err on the side of caution and to remove books liberally.

The vagueness concern is real.  It is unclear, for example, whether a book that contains the phrase "spent the night together" (or other phrases that might imply a sexual interaction) is descriptive enough to offend the Challenged Provisions.  (*See, e.g.*, Ex. C, Hackey Decl., ¶ 17.)  Nor is it clear whether a book that states that two characters "made passionate love" or "had sexual intercourse" must be removed.  Given the draconian penalties for noncompliance, however, those sorts of books are fairly implicated by the Challenged Provisions.  (*Id.*)

It is not necessary to hypothesize about the broad reach of the Challenged Provisions.  Since H.B. 1069 went into effect in July 2023, Florida school districts have removed large numbers of books that are not remotely obscene from school library

46

shelves under the Challenged Provisions—books that fall within the categories mentioned above. (*See*, *e.g.*, Exs. B-1 through B-32, B-36.)  The books that Florida schools have actually removed or have identified for removal from school libraries under the Challenged Provisions exemplify and confirm their substantial unconstitutional applications.

Those substantial unconstitutional applications vastly outweigh the few, if any, constitutional applications of the Challenged Provisions.  There are only few, if any, books on school library shelves that are obscene for minors under the *Miller* test that therefore could be permissibly removed pursuant to the State's mandate.  In contrast, the Challenged Provisions reach far beyond obscenity to prohibit books with *any* description of "sexual conduct" and to prohibit books with *any* so-called "pornographic" content—whatever that means—for *any* age.  Because any permissible applications of the Challenged Provisions are "dwarfed" by their "presumptively impermissible applications," those provisions are "substantially overbroad, and therefore invalid" under the First Amendment.  *See U.S. v. Stevens*, 559 U.S. 460, 481–82 (2010).  The "pertinent facts in these cases are the same across the board"—the Challenged Provisions disregard the value of the book as a whole, in violation of the First Amendment.  *See Bonta*, 594 U.S. at 618.  For these reasons, the Challenged Provisions are unconstitutional.

## IV.    In The Alternative, Construing The Term "Pornographic" To Be Consistent With "Harmful To Minors" Would Save That Provision.

Rather than finding the prohibition on so-called "pornographic" content to be

47

unconstitutionally overbroad, this Court could resolve Plaintiffs' claims concerning that provision by construing the term "pornographic" to be consistent with "harmful to minors" as defined by Section 847.001(7). That construction would remedy any constitutional problem with the prohibition on "pornographic" content because it would clarify that the provision merely incorporates the existing Supreme Court obscenity standards as applied to minors.

The Supreme Court has instructed that the "elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality" and that the "corollary doctrine" is that a "statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *See Rust v. Sullivan*, 500 U.S. 173, 190–91 (1991) (emphasis, quotations, and citations omitted). To save a statute from unconstitutionality, courts acknowledge that legislatures frequently use a "belt-and-suspenders" approach to drafting legislation. *See McCarthan v. Dir. Of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1087–88 (11th Cir. 2017). The "belt-and-suspenders" canon of statutory construction recognizes that the word "or" "commonly introduces a synonym or definitional equivalent." *Id.* Therefore, where two statutory terms "share the same ordinary meaning" and are separated only by the word "or," the "better reading of the text" recognizes that the definitions of the two terms "overlap." *Id. See also In re Wild*, 994 F.3d 1244, 1268 n. 22 (11th Cir. 2021) (explaining that "[d]oublets and triplets abound in legalese, especially given that [legislatures] often use[] a 'belt-and-suspenders' approach when drafting statutes"

(internal quotations omitted)).

The "belt-and-suspenders" approach best explains Section 1006.28's prohibition on so-called "pornographic" content. The prohibition on "pornographic" content and the prohibition on content that is "harmful to minors" have long coexisted in the same numbered category of proscribed content in the statute. *See* Fla. Stat. s. 1006.28(2)(a)(2)(b)(I). Those terms are separated in the statute by only the word "or," indicating that "pornographic" and "prohibited under s. 847.012 [*i.e.*, harmful to minors]" are "synonym[s] or definitional equivalent[s]." *See McCarthan*, 851 F.3d at 1087–88. Therefore, not only does the belt-and-suspenders compel a statutory construction that the term "pornographic" means the same thing as "harmful to minors" as defined by statute, but it is the "better reading of the text." *See id.*

Construing the term "pornographic" to mean "harmful to minors" as defined by Section 847.001(7) would resolve any constitutional issues with the prohibition on so-called "pornographic" content. The statutory definition of "harmful to minors" conforms to the Supreme Court's obscenity standard for minors. Therefore, construing "pornographic" content as a statutory redundancy would save that provision—which otherwise is vague and overbroad—from unconstitutionality. If the Court applies this construction, the State Defendants' objection form would have to be revised accordingly.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion For Summary Judgment.

49

Dated:  March 4, 2024

By:  */s/ David A. Karp*
David A. Karp
Florida Bar No. 69226
Carlton Fields P.A.
2 MiamiCentral
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Telephone: (305) 539-7280
dkarp@carltonfields.com

Frederick J. Sperling
Adam J. Diederich
Kirstie Brenson
ArentFox Schiff LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
Telephone: (312) 258-5500
frederick.sperling@afslaw.com
adam.diederich@afslaw.com
kirstie.brenson@afslaw.com
(admitted *pro hac vice*)

*Attorneys for Plaintiffs*