# EXHIBIT C

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PENGUIN RANDOM HOUSE LLC, *et al.*,

      Plaintiffs,

v.                                                                Case No. 6:24-cv-01572-CEM-RMN

BEN GIBSON, in his official capacity
as Chair of the Florida State Board
of Education, *et al.*,

      Defendants.

_____

## <u>DECLARATION OF CHRISTINA HACKEY</u>

I, Christina (Tina) Hackey, declare that the following is true and correct to the best of my knowledge and belief:

1.      I am a resident of Florida and an Educational Media Specialist in the Volusia County School District.  An Educational Media Specialist is essentially a school librarian in the State of Florida.  This declaration is based upon my personal knowledge and best recollection of events and experiences and my review of documents, records, and other materials.  I am over the age of eighteen, competent and of sound mind, and, if called upon, will testify to the matters stated herein.

2.      I hold an M.Ed. in Educational Leadership and hold the following endorsements/certifications from the Florida Department of Education (FLDOE): Educational Leadership, Educational Media Specialist, Elementary Education, English for Speakers of Other Languages, Gifted, and Reading.

3.      My licensure's ethics and professional conduct rules require I comply

with all federal, state, and local laws applicable to the fulfillment of my professional obligations. A violation of these rules could result in a sanction against my licensure, including permanent revocation. Fla. Admin. Code r.6A-10.081.

4.     I have a teaching contract with the Volusia County School District, and 2024-25 is my sixth year in this county as an Educational Media Specialist. This contract is issued by the District and may be terminated for just cause. Just cause includes a sanction against my licensure.

5.     Prior to moving to Volusia County in 2019, I taught on the west coast of Florida for thirteen years, five as an Educational Media Specialist and eight as a classroom teacher. This is my eleventh year working as a Certified Educational Media Specialist.

6.     As an Educational Media Specialist my responsibilities include selecting books and other materials for the school library; reviewing classroom library titles; assisting classroom teachers in selecting books for small group and whole-class instructional units; developing reading lists for students, teachers, and families; enabling compliance with educational legislation and board-approved library policy; and coordinating visits from authors and other literary events.

7.     I am a member of the American Library Association (ALA) and the American Association of School Librarians, the American Association of School Librarians, the Florida Association for Media in Education, and the Volusia Association for Media in Education. The ALA's core value is intellectual freedom. The ALA's mission is "[t]o provide leadership for the development,

promotion, and improvement of library and information services and the profession

of librarianship in order to enhance learning and ensure access to information for all."

https://www.ala.org/aboutala/missionpriorities.    The ALA's Freedom to Read

Statement states: "It is in the public interest for publishers and librarians to make

available the widest diversity of views and expressions, including those that are

unorthodox, unpopular, or considered dangerous by the majority. . . Publishers and

librarians serve the educational process by helping to make available knowledge and

ideas required for the growth of the mind and the increase of learning.  They do not

foster  education  by  imposing  as  mentors  the  patterns  of  their  own

thought." https://www.ala.org/advocacy/intfreedom/freedomreadstatement.  In its

interpretation of the Library Bill of Rights for school libraries, the ALA states:

"Students and educators served by the school library have access to resources and

services  free  of  constraints  resulting  from  personal,  partisan,  or  doctrinal

disapproval.  School librarians resist efforts by individuals or groups to define what is

appropriate for all students or teachers to read, view, hear, or access regardless of

technology,        formats        or        method        of        delivery."

https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/accessresour

ces.

8.    Because of Section 1006.28's prohibitions on content that "describes

sexual conduct" and so-called "pornographic" content (the "Challenged Provisions,"

Fla. Stat. s. 1006.28(2)(a)(2)(b)(I), (II)), popular ALA award-winners like *Looking for

Alaska*, by John Green (Michael Printz Award, 2006); *Nineteen Minutes*, by Jodi Picoult

3

(Outstanding Books for the College Bound and Lifelong Learners, 2009); and *Monday's Not Coming* by Tiffany D. Jackson (Coretta Scott King/John Steptoe New Talent Author Award, 2019) are no longer available in Volusia County school libraries.

9.    Because of the Challenged Provisions, popular FAME Florida Teens Read award-winning titles such as *Grown* by Tiffany Jackson, *Heroine* by Mindy McGinnis, and *Sold* by Patricia McCormick are no longer available in Volusia County school libraries.

10.    The American Association of School Librarians (AASL) is a division of the ALA designed to empower leaders to transform teaching and learning.  The AASL's published resources such as *National School Library Standards for Learners*, *School Librarians, and School Libraries*, and *AASL Standards Framework for Learners* are fundamental to the development and revision of library standards for students in my District.  AASL standards emphasize the need for students to "read[] widely and deeply . . . for a variety of purposes" and examine diverse perspectives. https://standards.aasl.org/wp-content/uploads/2018/08/180206-AASL-framework-for-learners-2.pdf.

11.    The Florida Department of Education Library Media Reading Guidelines state that one of the goals of the school library media program is to "provide intellectual and physical access to a broad range of literature and informational reading materials for personal pleasure and curriculum support." https://www.fldoe.org/academics/standards/subject-areas/library-media-services-

4

instructional-t/. The mission of the Office of Library Media Services is to "support district library media supervisors and other stakeholders; ensuring that school librarians create and maintain quality library programs that foster the love of reading and the effective use of ideas and information by both students and faculty" by building programs that:

a. Provide intellectual and physical access to materials in a variety of formats;

b. Provide instruction to advance competence and stimulate interest in reading, viewing, and using information and ideas; and

c. Involve other educators in designing learning strategies that meet the needs of individual students.

https://www.fldoe.org/academics/standards/subject-areas/library-media-services-instructional-t/

12. Teachers in the State of Florida are bound by the Principles of Professional Conduct for the Education Profession in Florida (Fla. Admin. Code r.6A-10.081), which states: "The educator values the worth and dignity of every person, the pursuit of truth, devotion to excellence, acquisition of knowledge, and the nurture of democratic citizenship. Essential to the achievement of these standards are the freedom to learn and to teach and the guarantee of equal opportunity for all." https://www.fldoe.org/teaching/professional-practices/code-of-ethics-principles-of-professio.stml. Further, the rule states that the educator's obligation to students requires that we "[s]hall not unreasonably deny a student access to diverse points of

5

view."        https://www.fldoe.org/teaching/professional-practices/code-of-ethics-
principles-of-professio.stml.

13.    The Challenged Provisions are contrary to the values expressed in library
standards developed at the state and national level, violate students' freedom to read,
and restrict my capacity to respond to the educational needs of my students, especially
students who have experienced sex or sexual abuse.

14.    Under Section 1006.28, the State Board of Education has promulgated a
mandatory challenge form that requires Florida school librarians and other educators
to remove from school and classroom libraries any material that contains so-called
"pornographic" content or that "describes sexual conduct."   Parents or county
residents who object to books under the Challenged Provisions must do so using the
State Board of Education's mandatory challenge form.   Section 1006.28 requires
school districts to report to the FLDOE any objections that they receive using the State
Defendants' mandatory challenge form and how those objections were resolved.
Section 1006.28 separately requires school districts to remove books under the
Challenged Provisions, even where no parent or county resident has objected to those
books.  Because school districts are not required to report any books removed without
an objection to the FLDOE under Section 1006.28, school district reports to the
FLDOE probably do not identify all books that schools have removed under the
Challenged Provisions, meaning that the effect of those provisions is far more
pervasive than the reports suggest.

15.    Materials in Florida school libraries that are implicated by the

6

Challenged Provisions primarily consist of books, but may occasionally include
magazines, newspapers, and audiobooks.  Due to resource constraints, in my
experience, magazines and newspapers are less commonly found in school libraries
these days.

16.    Before HB 1069 introduced the new prohibition on content that
"describes sexual conduct," any book that described sexual conduct was evaluated in
its entirety in relation to the age and maturity of students who may read it under the
"harmful to minors" provision (Fla. Stat. s. 847.012).  HB 1069 circumvents the
"harmful to minors" provision.  As a result of the Challenged Provisions and the State
Board of Education's mandatory challenge form, Educational Media Specialists are
prohibited from considering books in their entirety for their merit.

17.    Without the benefit of evaluating each book as a whole and considering
what role the description of sexual conduct or so-called "pornographic" content in a
book plays, it is difficult to determine what level of detail is necessary for something
to implicate the vague and ambiguous Challenged Provisions.  Reading and writing
are subjective.  Authors frequently employ literary devices like symbolism and
metaphors to convey messages or themes or to advance the plot of the work.  Given
those literary devices, it's not clear how the State expects Educational Media
Specialists, educators, or other school officials to know exactly what crosses the line
in the State's eyes.  The statute does not clarify what level of detail is necessary for a
passage—or even a sentence or phrase—to describe sexual conduct in a way that
demonstrates that a book is prohibited in school libraries.  The statute also does not

define the term "pornographic" or provide us with any guidance as to how to apply that prohibition. Is a passing mention or reference to sexual conduct all that is necessary for a book to implicate the Challenged Provisions? Without clear guidance from the State, we are left on our own to determine whether a book should remain on the library shelf or whether we should remove it to avoid any risk of punishment—and we are not permitted to consider anything in that decision other than whether the book contains any description of sexual conduct or any "pornographic" content, whatever that means.

18.    This ambiguity along with the required Department of Education training that repeatedly instructs educators to "err on the side of caution" has led many Educational Media Specialists and other educators and school officials to err on the side of removing books based on fear that they and their school districts will be punished. The challenged provisions force me to choose between selecting important, relevant, constitutionally protected books for the students who use the school library or exposing myself and my school district to penalties, up to and including loss of licensure.

19.    It has been challenging to work in this environment in which the vague Challenged Provisions encourage me to remove school library books, I am instructed to "err on the side of caution," and proponents of the Challenged Provision have called me a "groomer" and a "porn pusher" for doing my job as an Educational Media Specialist. I often refrain from telling people that I am a school librarian in an attempt to avoid insults and threats.

8

20.    The Challenged Provisions interfere with my ability to exercise my professional judgment in selecting library books for the students.  The Challenged Provisions force me to "unreasonably restrain a student from independent action in pursuit of learning" and "unreasonably deny a student access to diverse points of view," things that the *Principles of Professional Conduct for the Education Profession in Florida* state I should <u>not</u> do (Fla. Admin. Code r.6A-10.081).

21.    Proponents of the Challenged Provisions suggest that, before HB 1069 was signed into law, parents had little to no control over what their children were reading.  In my experience, this could not be further from the truth.  In my nineteen years in Florida public schools parents and guardians have always had have the right to make decisions affecting their child's learning opportunities.  For as long as I've worked in Florida public schools, parents have had the opportunity to influence their children's learning and hold great power by electing school board representatives who serve their students.  Volusia County, for example, has long had a policy that enables parents to limit their own children's access to school library books.  Instead of bolstering parental rights, HB 1069 limits many parents' rights, namely the right to send their child to a school that allows their Educational Media Specialists to exercise fully their professional judgment.

22.    In addition to acquiring and developing reading skills in the general education classroom, we know that students develop fluency and confidence in reading when they are given the opportunity to choose books they are personally interested in and are given time to read and talk about those books with peers and

adults.

23.    Educational Media Specialists are trained to recognize the significance of exposing students to diverse authors, perspectives, and topics.  We rely on our professional code and professional review journals to assist us in making those decisions.  We build connections with our students and engage in conversations about their book choices.  We understand that for many children, popular fiction captivates them in ways that other types of literature may not. As a professional, it is crucial for me to listen to students to ensure that our collections reflect their lives and experiences, regardless of whether these experiences are common among their peers or part of the mainstream culture.  When students see themselves represented in books, they realize they can connect with a supportive adult who has thoughtfully selected books for them. They feel confident in requesting books that ignite their interests and passions.  They are at ease borrowing books that address questions about their developing bodies and the emotions tied to growing up. School libraries play a pivotal role in providing a diverse selection of relevant and engaging books that represent every student in our schools.

24.    In many cases, a school library serves as the sole source of access to books that profoundly influence the lives of many children.  By compelling schools to eliminate books that hold particular significance for students, the Challenged Provisions pose a significant threat to those who cannot afford to purchase these books or do not have access to a public library.  This reduces the likelihood that these students will cultivate a love for reading and develop a habit of reading for personal

10

development.  One of my primary objectives is to assist in finding the right book for the right student at the right moment. Limiting my ability to use professional judgment in guiding students to the books they need hinders their learning and growth.  Florida Statute 48-1003.42 states that public schools must teach "Comprehensive age-appropriate and developmentally appropriate K-12 instruction on . . . health education" that includes prevention of child sexual abuse, exploitation, and human trafficking.  The State of Florida requires that all teachers to be mandatory reporters of child abuse, and in doing so, the State acknowledges that even our youngest students may be victims of sexual abuse and violence.  When students have faced sexual trauma or abuse or require guidance in making healthy choices, reading about such experiences can reassure them that they are not alone and empower them to discuss their experiences with a trusted adult.  For students who have not encountered trauma, books foster empathy towards those who have.

25.    The Challenged Provisions completely ignore the value of books as a whole and prohibit Educational Media Specialists from applying our professional judgment and experience to select books on sensitive subjects for students at a variety of age levels.  The Challenged Provisions force me and my colleagues to remove from our library collections popular and award-winning books that allow students to understand and process consensual or abusive sexual experiences that are common among both young and maturing teens.  For example, in Angie Thomas's popular novel *Concrete Rose*, the prequel to the award-winning novel and movie adaptation *The Hate U Give*, we read about different perspectives of Black teens and their

11

journeys into adulthood and the limitations that are imposed on us at a young age. We see the consequences of questionable decisions such as teenage pregnancy and gang activity. The story makes it clear to the reader that even when you make bad decisions, it's never too late to turn your life around. Instead of living this experience, students can process it in a safe environment by reading and talking about it with others. Students who share some of the struggles of Maverick (the protagonist) can see that they are not alone. These books can help students make informed choices, and can literally save their lives. By forcing schools to remove these books and others like them, the State robs students of opportunities to process similar experiences in their own lives or learn about potentially life-altering experiences through the lives of others. In no way do the descriptions of a sex act in these books make them "pornographic" or obscene as to students who may read them. I was required to remove *Concrete Rose* from Volusia school libraries because a parent or county resident objected to the book for containing content that "describes sexual conduct." While *Concrete Rose* was ultimately returned to Volusia school libraries sometime during the following school year, following the resolution of the objection process, it is a good example of a book with valuable themes that was unavailable to students for several months due to the Challenged Provisions.

26.    While some elected officials and their supporters reference "pornography" as a target of HB 1069 and the Challenged Provisions, I have never seen pornography or obscene materials in a public school library, including any of the libraries in my District.

27.    School library books are selected and curated by trained professionals who apply their training, experience, and professional judgment to curate library collections and who assist classroom teachers in curating their collections of developmentally appropriate library books. Different library books are made available to students of different ages. Our professional training requires books that are appropriate and valuable for high school students but that may be too mature for elementary school students not be made available to elementary school students, and I take my professional responsibilities seriously.

28.    The Challenged Provisions seriously restrict my professional judgment by prohibiting me from providing students with access to many titles with special appeal to young adults such as *The Handmaid's Tale*, by Margaret Atwood, and *The Bluest Eye*, by Toni Morrison. Educational Media Specialists are also forced to restrict access to award-winning adult books like *Slaughterhouse-Five*, by Kurt Vonnegut Jr.; *Native Son*, by Richard Wright; and *The Freedom Writers Diary*, by Erin Gruwell. Jodi Picoult's *Nineteen Minutes* was released in 2007 and was used in high school classrooms for years. It is especially significant because of the tragedy at Marjorie Stoneman Douglass High in South Florida. Now, because of a couple of pages that deal with sexual assault, *Nineteen Minutes* is no longer available in Volusia County Schools. These books (and others like them) are books—both fiction and nonfiction—that were specifically selected for school library shelves by trained professionals who regularly consider educational appropriateness, community standards, and literary value in making library curation decisions.

13

29.     If we are truly committed to preparing our students to engage in college-level coursework, our students deserve access to a rich selection of outstanding literature, and they deserve our trust that they are mature enough to read these books if that is what they choose to do.

30.     Some parents in Florida may believe their children are not ready for certain content.  I deeply respect that and believe they genuinely care about their kids.  This does not mean, though, that they have a right to limit access to books for *all* children on behalf of *all* parents or to seriously restrict my ability to exercise my professional judgment in selecting books for my students.  It is my belief that prohibiting access to certain books at a time when students are most likely to need them robs students of crucial opportunities to think critically about important issues and make informed decisions.  How does restricting access to information help our curious kids stay safe when they feel they have a need to know?  If students can't trust us to provide access to information, where will they turn instead?

31.     In the winter of 2023, a 16-year-old student in the high school I worked at was told he needed to return a book that he'd checked out weeks earlier, the first time he had checked out a book since 5th grade.  It had to be returned because it had been challenged under HB 1069.  This student was a slow reader and never liked to read, but he'd made a personal connection with *Concrete Rose*, by Angie Thomas.  I had suggested it because I was familiar with some of his personal struggles. When I told him it had to be removed, he replied, "But Miss, this is like the story of my life!"  This broke my heart.  The book has since been allowed back on high school

14

library shelves after several months of "quarantine," but what message did that student receive?  What message does the removal of similarly valuable literature under the Challenged Provisions send to students in other school districts?  I had to tell this student that he could not renew the book—the book that he related to so well that he described it as the story of his life.  It was devastating to me because I knew in that moment we likely lost a reader—one who had *finally* made a connection—and had damaged his trust in our desire and ability to help him grow as a reader.  This experience showed him that a book with characters like him was inappropriate.  It felt awful.  Upon reflection, it reminded me of a passage from *To Kill A Mockingbird*, by Harper Lee, historically one of the most frequently challenged and banned books in the country.  In that book, the narrator recalls that at a young age, a teacher told her that she had to stop reading adult books with her father.  The narrator says, "Until I feared I would lose it, I never loved to read.  One does not love breathing."  She'd taken for granted a right that she never imagined she'd lose.  This is where I'm at in Florida, stunned to realize that the State is forcing me to be that educator telling disillusioned students they have to stop reading the books that matter most to them.

Dated: 2/28/2025
Daytona Beach, Florida                                Christina Hackey