## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| PENGUIN RANDOM HOUSE, LLC, et al.<br><br>　　Plaintiffs,<br><br>　　　　v.<br><br>BEN GIBSON, in his official capacity as Chair of the Florida State Board of Education, et al.,<br><br>　　Defendants. | Case No. 6:24-cv-01573 |

### STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Florida's HB 1069 requires district school boards to adopt policies allowing residents to petition for removal of "[a]ny material . . . made available in a school or classroom library," if it contains content that is "pornographic or prohibited under [Fla. Stat.] § 847.012," or if it "[d]epicts or describes sexual conduct as defined in [Fla. Stat.] § 847.001(19)." Fla. Stat. § 1006.28(2)(a)2.b.(I)–(II). Plaintiffs—publishers, authors, and students—contend that HB 1069 has resulted in the removal of books they would prefer to have available in public-school libraries. They ask this Court to declare that removing a school-library book on the bases allowed by HB 1069 violates the First Amendment. But Plaintiffs filed a shotgun pleading and lack standing. And on the merits, the government's decisions about what books to promote in its school libraries are its own speech, and the plaintiffs have failed to meet their burden on a facial challenge in any event. The Court should grant summary judgment for the State Defendants.

## BACKGROUND

Plaintiffs bring only a facial challenge to Florida Statutes Section 1006.28(2)(a)2.b.(I) and (II) (the "Challenged Provisions"). DE1 ¶¶ 12–15. Accordingly, Plaintiffs challenge no particular application of the Challenged Provisions, DE107 at 34, and this case presents a pure legal issue.

The Legislature passed HB 1069 to "increase[] school district transparency and accountability for selecting and using instructional . . . and library materials."[1] The bill ensures that school districts will be responsible for the content of "classroom libraries, in addition to instructional materials and school libraries,"[2] and requires them to create procedures for parents to object to certain materials. Fla. Stat. § 1006.28(2)(a)2.b. For instance, if, after receiving a parent's objection, the school district determines that the material "[i]s pornographic or prohibited under § 847.012," it "shall discontinue use of" that material. *Id.* § 1006.28(2)(a)2.b.(I). And if the school determines the material "[d]epicts or describes sexual conduct as defined in § 847.001(19)," it "shall discontinue use of the material for any grade level or age group for which such use is inappropriate or unsuitable." *Id.* § 1006.28(2)(a)2.b.(II). These are the two Challenged Provisions.

The Publisher, Author, and Student Plaintiffs challenge those two grounds for removal, claiming that withdrawing books on those bases violates their First

---

[1] Fla. H.R. Staff, Final Bill Analysis, CS/CS/HB 1069—Education at 1 (May 22, 2023), https://www.flsenate.gov/Session/Bill/2023/1069/Analyses/h1069z.EQS.PDF.

[2] *Id.*

Amendment rights. DE1 at 92. They seek only a declaratory judgment that restricting public-school-library books that contain pornographic content or describe sexual conduct violates their First Amendment rights. *Id.* They seek no other relief.

## LEGAL STANDARD

"Summary judgment is appropriate when the evidence," viewed in the light most favorable to the non-movant, "presents no genuine dispute of material fact and compels judgment as a matter of law." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1320 (11th Cir. 2023). "A factual dispute is genuine if it has a real basis in the record and the evidence is such that a reasonable jury could rule in favor of the nonmovant." *Id.* A fact is material if it could affect the outcome of the suit. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

## ARGUMENT

This Court should grant summary judgment for the State Defendants' because Plaintiffs' complaint is a shotgun pleading; Plaintiffs lack standing; and Plaintiffs lack a cause of action to bring the second count in their complaint, which seeks an advisory opinion about the proper interpretation of Florida law. Plaintiffs' claims also fail on the merits. First, the curation of school-library books is government speech, and when the government speaks, it may "regulate the content of . . . its own message." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). Second, the government does not abridge First Amendment rights merely by withdrawing a gratuitous benefit that facilitates the exercise of those

rights. Third, schools may restrict even student speech during activities bearing the school's "imprimatur" when doing so furthers a legitimate pedagogical interest, which plainly is the case here. And even if this Court rejects all of those arguments, Plaintiffs still have not met their burden to succeed on their overbreadth claim.

## I.    PLAINTIFFS' COMPLAINT IS A SHOTGUN PLEADING.

The Court should grant summary judgment for the State Defendants because the building block of Plaintiffs' case—their complaint—is an impermissible shotgun pleading. *See* DE85-1 at 2–5. The 93-page complaint incorporates by reference all 163 paragraphs of factual allegations into each enumerated cause of action—a prototypical shotgun pleading "sin." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).

Worse yet, the complaint is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland*, 792 F.3d at 1322. For example, the complaint states that books were removed under Section 1006.28's prohibitions on content that "describes sexual conduct" and "pornographic" content but fails to identify which school districts removed the books or what relevance those removals have to any particular claim. DE1 ¶¶ 130–32, 135–36, 138–41, 144, 146–47, 151.

Last, Plaintiffs fail to separate into a different count each cause of action or claim for relief. *Weiland*, 792 F.3d at 1323. In Count I alone, Plaintiffs jumble together a First Amendment overbreadth claim (asserting the rights of parties not before the Court), First Amendment claims based on alleged violations of the

Author and Publisher Plaintiffs' rights to make their books available to readers, and a First Amendment claim grounded in the Student Plaintiffs' supposed right to receive information in school libraries. DE1 ¶¶ 164–84. The complaint is thus a shotgun pleading all the way down, which warrants summary judgment. *See Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (vacating merits judgment because complaint was a shotgun pleading).

## II.   PLAINTIFFS LACK ARTICLE III STANDING.

Plaintiffs lack standing to sue the State Defendants because any alleged injury flowing from the statute is not traceable to them or redressable by a declaratory judgment against them. To demonstrate standing, Plaintiffs must establish "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citation omitted). Because "standing is not dispensed in gross," Plaintiffs must demonstrate these elements "for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). And they must support each standing element "in the same way as any other matter on which the plaintiff bears the burden of proof,"—here, with "specific facts" "'set forth' by affidavit or other evidence." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

1. To establish standing, Plaintiffs "must show a causal connection between [their] injur[ies] and the challenged action of the defendant[s] . . . as opposed to the action of a[] . . . third party." *City of South Miami v. Governor of Fla.*, 65 F.4th

631, 640 (11th Cir. 2023) (citations omitted). Plaintiffs argue that their alleged injuries are traceable to the State Defendants because the State Defendants play an "indispensable role in implementing and enforcing the Challenged Provisions." DE107 at 22–23. Plaintiffs point out that "parents and residents are required to use the State Defendants' objection form . . . to object to any particular library book[]" and "the State Defendants . . . 'approv[e] or reject[]' a special magistrate's recommendation . . . not to remove a library book based on an objection." DE107 at 22–23. But Plaintiffs ignore the fact that the statute imposes obligations on the school districts directly. The school districts' fulfillment of those obligations, apart from any action by the State Board of Education, leads to Plaintiffs' purported injuries. Because any injury to Plaintiffs "stems from [the school districts'] enforcement," not the State Board's, Plaintiffs' injuries are not traceable to the State Defendants. *City of South Miami*, 65 F.4th at 640.

Specifically, the statute requires "district school board[s]" to "[a]dopt courses of study, including instructional materials, for use in the schools of the district." Fla. Stat. § 1006.28(2)(a). "Each school district must [also] adopt a policy regarding an objection by a parent or a resident of the county to the use of a specific material." *Id*. § 1006.28(2)(a)2. That process must provide "[an] opportunity to proffer evidence to the district school board that" the "material used in a classroom, made available in a school or classroom library, or included on a reading list contains content" falling into at least one of four categories. *Id*. § 1006.28(2)(a)2.b. The two categories whose potential exclusion Plaintiffs challenge are (1) material

that "[i]s pornographic or prohibited under s. 847.012" and (2) material that
"[d]epicts or describes sexual conduct as defined in s. 847.001(19)." *Id.*
§ 1006.28(2)(a)2.b.(I), (II). If the school district determines that the material "[i]s
pornographic or prohibited under s. 847.012," it "shall discontinue use of" it. *Id.*
§ 1006.28(2)(a)2.b. But if the school district determines the material "[d]epicts or
describes sexual conduct as defined in s. 847.001(19)," it "shall discontinue use of
the material" only "for any grade level or age group for which such use is inappro-
priate or unsuitable." *Id.*

Those statutory provisions "operate[] on officials at the local level" by re-
quiring *school districts* to implement particular materials-selection procedures.
*City of South Miami*, 65 F.4th at 641. Thus, the State Board of Education does not
"act[] under [Sections 1006.28(2)(a)2.b.(I) and (II)] in such a way that [Plaintiffs']
injur[ies] [are] traceable to them or redressable by" a declaratory judgment against
them. *City of South Miami*, 65 F.4th at 641; *see also* DE1 ¶ 108 ("Section 1006.28
imposes an affirmative burden on *school districts*." (emphasis added)).

Requiring the use of a particular objection form or approving a special mag-
istrate's determination does not provide the State Defendants with an enforcement
role under the statute sufficient to make the Plaintiffs' alleged injuries traceable to
the State Defendants and redressable by enjoining them. The Eleventh Circuit has
held that "traceability [is] lacking if the plaintiff would have been injured in pre-
cisely the same way without the defendant's alleged misconduct." *City of South
Miami*, 65 F.4th at 645 (quoting *Walters v. Fast AC, LLC*, 60 F. 4th 642, 650 (11th

7

Cir. 2023)). Because the county school districts "have an independent obligation
to follow the law," *id*. at 643, "an independent source would . . . cause[ ] [Plaintiffs]
to suffer the same injury" whether the State Defendants "are enjoined or not," *id*.
at 645. In other words, even if the counties did not have to use the State's current
objection form, the statute still would require them to "adopt a policy regarding an
objection by a parent . . . to the use of a specific material" that accounts for the
categories listed in the Challenged Provisions. Fla. Stat. § 1006.28(2)(a)2.

Still, Plaintiffs argue that "the State Defendants have coercive authority to
ensure that school districts comply," citing Florida Statutes Sections 1001.03(8)
and 1008.32(1). DE107 at 23–24. But Section 1001.03(8) simply provides that
"[t]he State Board of Education shall enforce compliance with law and state board
rule by all school districts . . . in accordance with Section 1008.32." Section
1008.32(1) grants the State Board of Education the authority to "request and re-
ceive information, data, and reports from . . . school districts" "to ensure compli-
ance with law or state board rule." These statutes show only that the State Board
of Education has general "supervisory authority" over school districts. *Support
Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1204 (11th Cir. 2021).
The State Defendants cannot enforce the statute directly against private parties,
like the Plaintiffs, such that their injuries cannot be traceable to the State Defend-
ants' actions. *City of South Miami*, 65 F.4th at 644–45 (injury was traceable not to
Governor, but to local officials tasked with enforcing the challenged law, even
though Governor could punish local officials for refusing to comply with the law);

*see also Nw. Ass'n. of Indep. Schs. v. Labrador*, No. 1:24-CV-00335-AKB, 2025 WL 843747, at *9 (D. Idaho Mar. 18, 2025) (holding that the parent plaintiffs had no standing because the Idaho law "does not prohibit a child, parent, or legal guardian's conduct and does not contain any enforcement provision applicable to them. Rather, the statute only prohibits the conduct of schools and public libraries and only provides for the enforcement of a violation against schools and public libraries.").

Plaintiffs rely on *Wilding v. DNC Services Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019), to argue that "[e]ven injuries that are indirect can satisfy traceability." DE107 at 23. That is true, but unhelpful to Plaintiffs here. That some indirect injuries *can* satisfy traceability does not change the fact that where particular defendants do not "act[ ] under" the relevant law, a plaintiff's "injury is [not] traceable to them or redressable by enjoining them." *City of South Miami*, 65 F.4th at 641.

2. Additionally, Plaintiffs lack standing because their alleged injury from the State Defendants' (at best indirect) enforcement of the Challenged Provisions under Florida Statutes Section 1006.28(2)(a)6. is "highly speculative." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). While the State Defendants may be "responsible for 'approv[ing] or reject[ing]' a special magistrate's recommendation (following review of a school district's decision) not to remove a library book," DE107 at 23, enforcement against the counties under that procedure sits at the end of a "chain of contingencies," *Clapper*, 568 U.S. at 410. A parent of a public-school student or a resident of the county would have to object to a school-library book

because it contains pornographic material or describes sexual conduct as defined in Florida Statutes Section 847.001(19). Fla. Stat. § 1006.28(2)(a)2.b.(I), (II). The district school board would have to determine that the book does not contain pornographic material or describe sexual conduct within the meaning of the statute. That parent would then have to disagree with the district school board's determination and request that the Commissioner of Education appoint a special magistrate. The special magistrate would have to find that the book contains pornographic material or describes sexual conduct within the meaning of the statute and, if the latter, that the material is not age-appropriate. The State Board of Education would, finally, have to approve that decision. Fla. Stat. § 1006.28(2)(a)3., 6. While Plaintiffs have shown that county school districts have removed books from their libraries, they have not shown that any, let alone all, of these steps has occurred or is likely to occur, so they cannot show a "certainly impending" injury from the State Defendants' enforcement of the challenged provisions under Section 1006.28(2)(a)6. *Clapper*, 568 U.S. at 410.

Plaintiffs' alleged injuries are also not redressable by a declaratory judgment against the State Defendants. *See Support Working Animals*, 8 F.4th at 1201 (explaining that traceability and redressability "often travel together"). After all, if a defendant does not enforce a statute, a "declaratory judgment [against that defendant] is not only worthless to [the plaintiff], it is seemingly worthless to all the world." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998); *see also Jacobson*, 974 F.3d at 1254 ("Nor can declaratory relief against the [State

Defendants] directly redress any injury to the [Plaintiffs]. A declaratory judgment against the [State Defendants] does not bind the [the counties] . . . ."). As the Supreme Court recently explained, a declaratory judgment against officials who do not administer the statute against the plaintiffs would be "little more than an advisory opinion." *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023).

### III.  PLAINTIFFS LACK PRUDENTIAL STANDING.

Plaintiffs also lack overbreadth standing first because the Challenged Provisions regulate county school districts, not private parties like Plaintiffs who are authors, publishers, and students; and second because Plaintiffs have not first brought an as-applied challenge.

1. Plaintiffs do not challenge any particular applications of Florida law that violate their rights. Instead, they invoke the First Amendment overbreadth doctrine and claim that Florida law is overbroad in infringing the rights of all authors, publishers, and students who want the State to carry their preferred books in its school libraries. But Plaintiffs may not use overbreadth doctrine to assert the rights of authors, publishers, and students not before the Court because the statute does not regulate authors, publishers, and students.

In *Mata Chorwadi, Inc. v. City of Boynton Beach*, the Eleventh Circuit foreclosed using the overbreadth doctrine to assert the rights of persons not regulated by the challenged statute. 66 F.4th 1259, 1265 (11th Cir. 2023). As the Court explained: "With few exceptions, 'a litigant may only assert his own constitutional rights or immunities.'" *Id.* at 1264. "The overbreadth doctrine allows litigants 'to

challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Id.* at 1265. And a law should not be held unconstitutional for over-breadth "unless it reaches a substantial number of impermissible applications." *Id.*

But if a law cannot be enforced against a third party because it does not regulate that third party, the plaintiff cannot rely on injury to that third party to establish overbreadth standing. *Id.* In *Mata Chorwadi*, hotel owners alleged that a municipal code was overbroad because it chilled hotel guests' speech, but the code imposed penalties only on the hotel owners. *Id.* Because the code had not been and could not be enforced against hotel guests, the hotel owners could not rely on the overbreadth doctrine to overcome the prudential limitation on asserting third-party rights. *Id.* The same is true here. The Challenged Provisions regulate only the county school districts. They cannot be enforced against authors, students, or publishers. Therefore, the Author, Student, and Publisher Plaintiffs cannot rely on the overbreadth doctrine to assert the rights of other similarly situated plaintiffs.

2. The Supreme Court has said repeatedly that facial overbreadth is "strong medicine," *United States v. Hansen*, 599 U.S. 762, 769–70 (2023), which should be reserved for cases in which a statute is constitutional as applied to the plaintiff but unconstitutional as applied to non-party claimants. *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 612–13 (1973) (overbreadth employed "only as a last resort").

Facial overbreadth is a special means of avoiding the prudential-standing doctrine that plaintiffs generally may not challenge violations of others' constitutional rights. *See Hansen*, 599 U.S. at 769. It is not a license to strike down statutes in their entirety when a plaintiff suffers constitutional injury from application of the statute. As-applied relief remains the ordinary course. *Fox*, 492 U.S. at 484–85.

Here, Plaintiffs claim that they suffer constitutional injury but bring no as-applied challenge to the Challenged Provisions. DE107 at 18–22. And if a court were "to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid *as applied*," it "would convert use of the overbreadth doctrine . . . into a means of mounting gratuitous attacks upon state and federal laws." *Fox*, 492 U.S. at 484–85 (emphasis added). Plaintiffs cannot skirt the prudential rule prohibiting raising violations of others' constitutional rights by electing not to bring an as-applied challenge.

## IV.    PLAINTIFFS LACK A CAUSE OF ACTION TO SUPPORT COUNT II, WHICH IN ALL EVENTS IS BARRED BY THE ELEVENTH AMENDMENT.

Plaintiffs continue to argue on summary judgment that the Court should "constru[e] the term 'pornographic' to be consistent with 'harmful to minors' as defined by Section 847.001(7)." DE107 at 48. Plaintiffs' Count II, labeled a claim for "Statutory Construction," DE1 at 65, asks this Court for a "declaratory judgment finding that the term 'pornographic' as used in Section 1006.28 is synonymous with the term 'harmful to minors'" in Florida Statutes Section 847.001(7), DE1 ¶ 195. Alternatively, Count III asks this Court for a "declaratory judgment finding

that Section 1006.28's prohibition on 'pornographic' content is unconstitutional."
DE1 ¶ 215. Plaintiffs, however, identify no cause of action that entitles them to ask
a federal court to interpret a state statute. The Declaratory Judgment Act itself is
not a source, as a "declaratory judgment is a form of relief, not a cause of action."
*Datum Software, Inc. v. Citizant, Inc.*, No. 23-12538, 2024 WL 3719111, at *2 n.3
(11th Cir. Aug. 8, 2024); *see also Davis v. United States*, 499 F.3d 590, 594 (6th
Cir. 2007) (The Declaratory Judgment Act "does not create an independent cause
of action."); *Musselman v. Blue Cross & Blue Shield of Ala.*, 684 F. App'x 824, 829
(11th Cir. 2017) (Tjoflat, J., concurring specially) ("Congress plainly intended [for]
the declaratory judgment [to] serve as a primary remedy available for any *under-
lying cause of action*." (emphasis added)). Still less does the Declaratory Judgment
Act provide a freestanding right to advisory interpretations of law. *See United Pub.
Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947). "[A]n Article III case
or controversy," DE106 at 11, does not cure Plaintiffs' cause-of-action deficiency on
Count II. "[T]he existence of jurisdiction is quite different from the existence of a
cause of action." *Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814,
834 (10th Cir. 2014) (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946)), *abrogated on
other grounds by Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

A stand-alone cause of action for construction of a state statute would fur-
thermore exceed this Court's jurisdiction, which the Eleventh Amendment limits
here. In Count II, Plaintiffs seek a declaratory judgment that "pornographic" as
used in Section 1006.28(2)(a)2.b.(I) "is a synonym for content that is 'harmful to

minors,'" as defined by Florida Statutes Section 847.001(7). DE1 ¶ 187. Plaintiffs
explain that such a "construction would . . . clarify that the provision merely incor-
porates the existing Supreme Court obscenity standards as applied to minors."
DE107 at 48. But providing such a construction is precisely what the Supreme
Court has said federal courts lack the authority to do. *See Pennhurst State Sch. &
Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Indeed, "it is difficult to think of a
greater intrusion on state sovereignty than when a federal court instructs state of-
ficials on how to conform their conduct to state law." *Id.*; *see also Doe ex rel. Doe
#6 v. Swearingen*, 51 F.4th 1295, 1303 n.1 (11th Cir. 2022). This Court "cannot
[require] Florida to follow [its] interpretation of Florida's own [statute]." *Hand v.
Scott*, 888 F.3d 1206, 1213–14 (11th Cir. 2018).

That Plaintiffs urge the Court to employ the canon of constitutional avoid-
ance in interpreting Section 1006.28(2)(a)2.b.(I), DE107 at 48, does not change
the analysis. Count II does not ask the Court to declare the statute unconstitu-
tional. Count III, by contrast, does; it challenges the statute's use of the term "por-
nographic." And of course, to decide whether a statute is constitutional a court
must necessarily interpret the statute. *See Boos v. Barry*, 485 U.S. 312, 331 (1988).
But that is a different animal entirely from a claim like Count II that simply asks
the federal court to interpret state law.[3] Count II is instead an effort to bind the

---

[3] The Court in its order denying the State Defendants' motion to dismiss stated that if it
found for "Plaintiffs on Count II and issues the sought declaration, it will only find State Defend-
ants' interpretation of section 1006.28 is in violation of the United States Constitution." DE106 at

State to adhere to an interpretation of state law. Again, "federal courts lack the authority to direct state officials to comply with state law." *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988). "If the alchemist's wand can transmute a violation of state law into a violation of the Constitution, *Pennhurst* will be for naught . . . ." *Id.*

In the end, if Plaintiffs succeed on Count III, "[a] federal court may determine state officials' enforcement of state law violates a *federal* right," or at least that it would absent an avoidance construction. *In re Abbott*, 956 F.3d 696, 720 (5th Cir. 2020), *judgment vacated for mootness sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021). But a federal court "may not order state officials to conform their conduct to *state* law," as interpreted by that court. *Id.* Count II cannot stand except as a recapitulation of Count III and therefore must be dismissed.

## V.    HB 1069 DOES NOT VIOLATE THE FIRST AMENDMENT.

### A.    The selection of public-school-library books is government speech and therefore not subject to the First Amendment.

Plaintiffs assert that Section 1006.28(2)(a)2.b.(I) and (II)'s regulation of school-library books burdens the Author and Publisher Plaintiffs' First Amendment rights because it "remove[s] a key forum through which [they] reach young readers" and stigmatizes those Plaintiffs' books, "chill[ing] the creative process." DE107 at 21–22. Public-school libraries, however, are not fora for private speech.

---

13. But that is not the relief Plaintiffs ask for in Count II. DE1 ¶ 195. That is the relief they request in Count III. DE1 ¶ 215.

The selection or removal of school-library materials is government speech, which "[t]he Free Speech Clause . . . does not regulate." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). When the government speaks, it "can freely select the views that it wants to express, including choosing not to speak and speaking through the removal of speech that the government disapproves." *Gundy v. City of Jacksonville*, 50 F.4th 60, 71 (11th Cir. 2022) (cleaned up).

1. Although the Eleventh Circuit has not yet directly addressed whether the government's "book collection (and book removal) decisions" for school libraries are "government speech," *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1201–02 (11th Cir. 2009),[4] it has held that the government engages in its own speech when it collects private speech for public use. In *McGriff v. City of Miami Beach*, an artist sued Miami Beach after the city removed his painting from a city art exhibit over concerns about the painting's message. 84 F.4th 1330, 1333 (11th Cir. 2023). In rejecting the artist's First Amendment claim, the Eleventh Circuit held that the collection of art for a public exhibit was government speech, and that the government was free to remove "speech that the government disapproves." *Id.* at 1333–34. If governments "are not obliged to display any particular artwork in the art exhibitions that they fund, organize, and promote," *id.* at 1336, then they

---

[4] In *Miami-Dade County School Board*, the court had no occasion to decide that question because the plaintiffs lost even under the "standard . . . of their dreams"—"the standard that failed to attract a majority in the *Pico* case." 557 F.3d at 1202 (citing *Bd. of Educ. v. Pico*, 457 U.S. 853, 872 (1982) (plurality opinion)).

are not obliged to display any particular book in the libraries they fund, organize,
and promote.

In line with *McGriff*, the Supreme Court and Eleventh Circuit have repeat-
edly held that the government may "regulate the content of . . . its own message,"
*Rosenberger*, 515 U.S. at 833, including when it speaks through the discretionary
selection, commission, purchase, or compilation of materials for presentation to
the public, *see Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586 (1998)
(government has discretion to make content-based judgments when selecting art
for funding); *Summum*, 555 U.S. at 470–73 (same for curating monuments); *Leake
v. Drinkard*, 14 F.4th 1242, 1253 (11th Cir. 2021) (parades); *Ark. Educ. Television
Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (televised content). In *Summum*, for
example, the Supreme Court held that the selection of monuments for a public park
was government speech, even when the monuments were funded or donated by
private parties. 555 U.S. at 470–73. "Government decisionmakers select[ed] the
monuments that portray[ed] what they view[ed] as appropriate for the place in
question, taking into account such content-based factors as esthetics, history, and
local culture." *Id.* at 472. Accordingly, the "decision to accept certain privately do-
nated monuments while rejecting respondent's" was "government speech," *id.* at
481, and the government was not required to "maintain viewpoint neutrality" in
making that decision, *id.* at 479. And because these same "principles . . . also apply
to a public library's exercise of judgment in selecting the material it provides to its
patrons," *United States v. Am. Libr. Ass'n,* ("*ALA*"), 539 U.S. 194, 205 (2003)

(plurality op.), library-collection decisions are also government speech, *PETA v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude."); *Bryan v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("'[G]overnment speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries.").[5]

The Supreme Court's three-factor test for determining whether a particular expressive activity constitutes government speech confirms that conclusion. Those factors—"the history of the expression at issue; the public's likely perception as to who . . . is speaking; and the extent to which the government has actively shaped or controlled the expression," *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022)—all compel the conclusion that the government is speaking when it selects or removes public-school-library books.

*First*, the government "actively control[s]" the selection and removal of school-library books. *Id.* at 256. In *Summum*, the Supreme Court explained that the City "'effectively controlled' the messages sent by the monuments in the Park" because it exercised "'final approval authority' over their selection." 555 U.S. at

_____

[5] Plaintiffs note that the "statements in *Gittens* and in the concurrence in *Gates* about library books are dicta because neither case involves library books" and "predate the three-part test for government speech." DE107 at 30 n.16. While it is true that neither *Gittens*, 414 F.3d 23, nor *Gates*, 532 F.3d 888, concerns library books, the dicta in both cases is highly persuasive. And the Supreme Court has indicated that whether something constitutes government speech "is driven by a case's context rather than the rote application of rigid factors." *Shurtleff*, 596 U.S. at 252.

473. Specifically, it "selected th[e] monuments that it want[ed] to display for the purpose of presenting the image of the City that it wish[ed] to project," took "ownership" of the monuments, and "set forth the criteria it [would] use in making future selections." *Id.* It did not matter that the City did "not design[] or buil[d]" the monuments—it was enough that the City accepted and displayed them. *Id.* at 472–73; *see also, e.g.*, *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 212 (2015) ("including the designs that Texas adopts on the basis of proposals made by private individuals and organizations" among the license plates deemed government speech).

Public-school libraries are no different. When the government selects materials to make available in a public-school library, it conveys that, in its view, those materials are of the "requisite and appropriate quality" and will "be of the greatest direct benefit or interest to the community" served. *ALA*, 539 U.S. at 204 (plurality opinion) (quotations omitted); *see also* Fla. Stat. § 1006.28(2)(d)2.c. (requiring "[e]ach school district board" to "adopt procedures for developing library . . . collections" that appeal to "reader interest" and "support . . . state academic standards and aligned curriculum, and the academic needs of students and faculty"). The government, through public-school-library staff, effectively controls this message because it exercises final approval authority over book selection. *Id.* § 1006.28(2)(d)1. ("Each book made available to students through a school district library . . . must be selected by a school district employee . . . , regardless of whether the book is purchased, donated, or otherwise made available to

20

students."). Because school officials "always select[]" their library materials and "maintain[] direct control" of them, *Shurtleff*, 596 U.S. at 257 (citing *Summum*, 555 U.S. at 472–73; *Walker*, 576 U.S. at 213), the government alone speaks through the selection of school-library books. The Author and Publisher Plaintiffs have no First Amendment right to force their books onto school-library shelves.

Plaintiffs argue that the State does not control public-school library curation decisions because it does not "exercise[] 'editorial control' over the selection of . . . monuments" like in *Summum* and because "local school librarians and their schools," rather than the State, select the books. DE107 at 32. But, as stated, local school librarians and county school districts are government employees and entities that carry out state law in selecting library materials for public schools. Fla. Stat. § 1006.28(2)(d)1. And the Eleventh Circuit has made plain that the government does not need "editorial rights over the exact content of" the speech for it to be the government's speech—"selecting one speaker [or book] over another exhibits control." *Gundy*, 50 F.4th at 80.

*Second,* "the public would tend to view the [collection of books selected for a public-school library] as the government's" speech. *Shurtleff*, 596 U.S. at 255. Again, in *Summum*, the Court remarked that "property owners" do "not commonly[ly] . . . open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated." 555 U.S. at 471. For that reason, "persons who observe [those] monuments routinely—and

reasonably—interpret them as conveying some message on the property owner's behalf." *Id.*

So too here. People know that public-school officials—not authors, publishers, or students—select school-library materials for a purpose. That purpose is not that the government necessarily endorses every word on every page of every book in its collection, as Plaintiffs maintain, DE107 at 31, but that the materials it makes available are, in its view, those that will "interest" its readers and "support . . . the academic needs of students and faculty." Fla. Stat. § 1006.28(2)(d)2.c. As the plurality explained in *ALA*, a public library's mission is to provide materials of "requisite and appropriate quality" that will "be of the greatest direct benefit or interest to the community," not "universal coverage." 539 U.S. at 204. The fact that authors and publishers "take[] part in the . . . propagation of a message," by communicating their own message through their books, "does not extinguish the governmental nature of the message" communicated through the government's curation decisions "or transform the government's role into that of a mere forum-provider." *Gundy*, 50 F.4th at 79.

*Third* and finally, "the history of the expression at issue," *Shurtleff*, 596 U.S. at 252, supports that the selection and removal of public-school-library books is government speech. This factor favored the city in *Summum* because "[g]overnments have long used monuments to speak to the public." 555 U.S. at 470. The same is true of public-school-library books. Though American school libraries first began to take shape in the nineteenth century, they are "rightly

considered a twentieth century development." Tom J. Cole, *The Origin and Development of School Libraries*, 37 Peabody J. of Educ. 87, 87 (Sept. 1959), https://www.jstor.org/stable/1490648; *see also* U.S. Dep't of the Interior, *Public Libraries in the United States of America: Their History, Condition, and Management* 38–58 (1876), bit.ly/4dcouzw (providing a "historical sketch of common school libraries" in several states). In the early stages of their development, "differences of opinion arose as to who should select, purchase, and regulate or supervise the use of the materials." Cole, 37 Peabody J. of Educ. at 91. But by 1920, standard practice required "[b]ook selections" to "be made by the librarian with the approval of the principal." Am. Library Ass'n, *Standard Library Organization and Equipment for Secondary Schools of Different Sizes* 21 (1920). Thus, governments, via school officials, have long exercised control over the selection of public-school-library materials, conveying the message that the chosen materials are of the "requisite and appropriate quality" and will most benefit and interest the community. *ALA*, 539 U.S. at 204 (plurality opinion). Plaintiffs contend that "[t]he State Defendants admit that school librarians—not the State— have historically decided which library books to make available to students in their local schools." DE107 at 30–31. But again, public-school librarians are government employees and act on behalf of the government. *See* Fla. Stat. § 1006.29(6).

Despite Plaintiffs' contention that "[a]t a minimum, a school library is a non-public forum," DE107 at 17, 37, the three-factor test demonstrates that the government has not created any type of forum because it alone speaks through the

selection of public-school-library books. *See Walker*, 576 U.S. at 215 (stating that "forum analysis is misplaced" when "the State is speaking on its own behalf"). That result tracks the *ALA* plurality's conclusion that "forum analysis and heightened judicial scrutiny are incompatible with . . . the discretion that public libraries must have to consider content in making collection decisions." 539 U.S. at 205. That principle applies with even more force in public-*school* libraries, the purpose of which is to support the government's educational mission by "providing materials that properly supplement the basic readings assigned through the standard curriculum." *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980). School district employees would be unable to carry out the legislature's mandate in Section 1006.28(2)(d)2.c. to provide school-library collections that interest readers and support the academic needs of students, if private parties could hijack the government's message by forcing their preferred books onto school-library shelves. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572–73 (1995) (parade organizers not required to include voices they wished to exclude); *Leake*, 14 F.4th at 1253 (same for government-parade organizer). Forcing the government "to speak" in a school library "what [it] do[es] not believe on pain of" lawsuit, *303 Creative LLC v. Elenis*, 600 U.S. 570, 589 (2023), would put policy decisions about what to teach in schools in the hands of litigants rather than elected representatives. "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Summum*, 555 U.S. at 468.

But even if public-school libraries were nonpublic fora, the Supreme Court's "decisions have long recognized that the government may impose some content-based restrictions on speech in [other types of] nonpublic forums" as well. *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12 (2018). The Court has explained that "a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). In sum, "the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Id*. The purpose of a public-school library is to support the government's educational mission by providing reading materials that supplement the curriculum. *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980). It is not to provide access to age-inappropriate descriptions of sexual conduct or pornographic content or materials that would be harmful to minor students. *See* Fla. Stat. § 1006.28(2)(a)2.b.(I), (II). Thus, even if public-school libraries were nonpublic fora, the Challenged Provisions would permissibly restrict content "not encompassed within the purpose of" school libraries, rather than viewpoint. *See Cornelius*, 473 U.S. at 806.

Plaintiffs argue that "[e]very court to consider this issue agrees" that "the First Amendment right to freedom of speech exists in public libraries, including public school libraries." DE107 at 26–27 & n.15. But Plaintiffs cite no binding

precedent in support of that proposition. Many cases they cite also rely on *Pico*,[6] which the Eleventh Circuit rejected as "a badly fractured decision" that is "of no precedential value as to the application of the First Amendment to these issues" and "establishes no standard." *Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1199–1200 (quotations omitted). Still other cases they cite do not discuss government speech at all, much less reject its application in the library context.[7] And the only two cases Plaintiffs cite rejecting the government-speech framework in this context either provide no explanation other than "library collection[s] [are] materially different," *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024), or address government speech in dicta while resolving the case on standing, *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667–68 (8th Cir. 2024).[8]

---

[6] *See* DE107 at 27 n.15 (citing *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995); *Fayetteville Pub. Libr. v. Crawford Cnty.*, 684 F. Supp. 3d 879, 909 (W.D. Ark. 2023); *Little v. Llano Cnty.*, 103 F.4th 1140, 1151–52 (5th Cir.) (relying on *Campbell*, which relies on *Pico*), *reh'g granted en banc*, 106 F.4th 426 (5th Cir. 2024); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1004 (W.D. Ark. 2003); *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 552 (N.D. Tex. 2000); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 874–76 (D. Kan. 1995); Order On Motion For Preliminary Injunction at 14, *Adams v. Matanuska-Susitna Borough Sch. Dist.*, No. 3:23-cv-00265-SLG (D. Alaska Aug. 6, 2024)).

[7] *See* DE107 at 27 n.15 (citing *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976); *Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 686–89 (D. Me. 1982); *Salvail v. Nashua Bd. of Ed.*, 469 F. Supp. 1269, 1272–73 (D.N.H. 1979); *Right To Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*, 454 F. Supp. 703, 710–11 (D. Mass. 1978)).

[8] This Court found the Eighth Circuit's opinion in *Reynolds* persuasive and noted that that court found "reliance on [*Summum*] unavailing as public school libraries do not share the characteristics of monuments in a park." DE106 at 19. But as mentioned above, *Reynolds* only discussed government speech in dicta, and this Court is bound by *McGriff*, 84 F.4th 1330, which presents a largely indistinguishable fact pattern.

2. Student Plaintiffs R.K. and J.H. also wrongly contend that Section 1006.28(2)(a)2.b.(I) and (II)'s regulation of school-library books that contain content that is pornographic or describes sexual conduct violates their right to receive information. DE107 at 18.[9] But the government has no constitutional obligation to present educational material with which it disagrees. At the outset, the Supreme Court has rejected that the First Amendment confers an abstract right to receive information without some sort of special relationship to the speaker. *Murthy v. Missouri*, 603 U.S. 43, 75 (2024). And even if there were a right to receive information here, "[t]he listener's right to receive information is reciprocal to the speaker's right to speak," *Doe ex rel. Doe v. Gov'r of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015), and that right cannot be deployed to interfere with the government's own message. Students have no more right to control what the government puts in its libraries than they do to control the content of a school cheer, *see Dean v. Warren*, 12 F.4th 1248, 1265–66 (11th Cir. 2021) (cheerleading is government speech), or the message the school communicates while students participate in a training practicum, *see Keeton v. Anderson-Wiley*, 664 F.3d 865, 877 (11th Cir. 2011) (clinical practicum is government speech). Holding otherwise would be equivalent to saying that motorists have a constitutional right to see vanity license plates of their choosing, or that tourists have a right to view public monuments that align with

---

[9] Student Plaintiff J.H. only brings claims in Counts I and VII, challenging Section 1006.28(2)(a)2.b.(II)'s regulation of materials that describe sexual conduct as defined in Section 847.001(19).

their preferred message—even if the government may constitutionally decline to offer such a license plate, *see Walker*, 576 U.S. at 219–20, or erect such a monument, *see Summum*, 555 U.S. at 470–73, in the first place.

For their right-to-receive-information theory, Plaintiffs cite *Campbell*, 64 F.3d 184, a case from the Fifth Circuit, DE107 at 19. But that circuit is presently considering *Campbell's* vitality en banc. *Little v. Llano Cnty.*, 106 F.4th 426, 427 (5th Cir. 2024) (per curiam) (granting rehearing en banc). *Campbell* also relies on *Pico*—a Supreme Court plurality opinion of no precedential value in the Eleventh Circuit. *See Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1199–1200. The *Pico* plurality furthermore suggests only that school-library materials may not be selected "in a narrowly partisan or political manner." 457 U.S. 853, 870 (1982) (plurality op.). It does not establish a general right to demand information from the government.

Plaintiffs also cite *Minarcini*, 541 F.2d at 583 and *Kleindienst v. Mandel*, 408 U.S 753, 763 (1972), to support their theory that students have a First Amendment right to receive information "in school libraries." DE107 at 18–19. But *Minarcini*, like *Pico*, predates the Supreme Court's government-speech cases, which have since established principles that—as Justice Rehnquist observed in his dissent—would have required a different result in those cases. *See* 457 U.S. at 920 (Rehnquist, J., dissenting, joined by Burger, C.J., and Powell, J.) ("[T]he Court will far better serve the cause of First Amendment jurisprudence by candidly recognizing that the role of government as sovereign is subject to more stringent limitations than is the role of government as . . . educator."). And *Kleindienst* did not

contemplate a student's right to receive information in a public-school library; ra-ther, it concerned the right of professors to hear a speaker invited to a conference organized and presented by private parties, not the government. 408 U.S. at 756–57, 762–64. And unlike the professors there, practical realities underscore that el-ementary, middle, and high school students do not have a right to demand access to any particular information in public-school libraries because, as even Plaintiffs acknowledge, "parents have the ability to choose which books their own children can access in a school library." DE107 at 3.

### B.    The government has no First Amendment obligation to pro-vide benefits such as public-school libraries.

Plaintiffs themselves acknowledge that "school libraries are not compul-sory." DE107 at 27. So even apart from whether the selection (or removal) of school-library books is government speech, Plaintiffs' First Amendment claims fail because the government does not generally violate the First Amendment when it withdraws a benefit that merely facilitates the exercise of a constitutional right. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359–60 & n.2 (2009); *Rust v. Sulli-van*, 500 U.S. 173, 200 (1991). That makes sense because "[t]he First Amendment . . . protects the right to be free from government abridgement of speech." *Ysursa*, 555 U.S. at 358. It does not require the government "to assist others in funding the expression of particular ideas." *Id.* Thus, "[a] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Id.* (quotation omitted).

The *ALA* plurality opinion said as much. As the plurality explained even before formal recognition of the modern government-speech doctrine, *see infra* note 9, no one has a First Amendment right to prevent the government from making content-based distinctions in the selection and removal of public-library materials. 539 U.S. at 205. Instead, the government has "wide latitude" to insist that "public funds be spent for the purpose for which they were authorized." *Id.* at 203, 211 (quoting *Rust*, 500 U.S. at 196). And—just as in school libraries—selecting and removing library books on that basis is directly related to libraries' "traditional role of obtaining material of requisite and appropriate quality for educational and informational purposes." *Id.* at 211.

In *Ysursa*, similarly, Idaho law had previously authorized employers to deduct both general union dues and fees for union political activities from an employee's wages. 555 U.S. at 356. In 2003, the Idaho Legislature passed a law prohibiting "payroll deductions for political purposes." *Id.* Labor organizations sued a county and the State alleging that the law violated the First and Fourteenth Amendments. *Id.* The Supreme Court observed first that the State was "not constitutionally obligated to provide payroll deductions at all." *Id.* at 359. In addition, even though "publicly administered payroll deductions for political purposes [could] enhance the unions' exercise of First Amendment rights," the unions were still free to engage in the same speech activities under the new law. *Id.* Thus, the State's decision not to subsidize the unions' speech did not abridge their speech, and Idaho only had to demonstrate a rational basis to justify its law. *Id.*

30

The same is true here. The First Amendment does not require the government to provide access to particular materials in public-school libraries or to have school libraries at all. *See id.* at 358. Plaintiffs admit that "[s]chool libraries are not compulsory." DE107 at 29. The students are free to access those books elsewhere, and authors and publishers can still distribute their books to students through bookstores or other libraries.[10] Thus, the government's decision to withdraw the public benefit of facilitating access to certain books for students or enhancing an author or publisher's ability to speak to students is subject at most to rational-basis review. And Florida's restriction of school-library books containing pornographic content or describing sexual conduct is rationally related to the State's interest in "protect[ing] the welfare of children." *Ginsberg v. New York*, 390 U.S. 629, 640 (1968) (quotation omitted).

This Court previously found this argument unpersuasive because "the statute does not evenhandedly withdraw access to public school libraries or particular books throughout the state" and because "speech is being restricted here, not funding." DE106 at 22. But if the government is not required fund any public libraries at all, library patrons cannot claim a First Amendment right to demand that a public-school library the government does choose to fund include particular books.

---

[10] This is therefore not a case in which the government has unconstitutionally sought "to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). Florida has not, for instance, conditioned a book's presence in a public-school library on the author's or publisher's willingness to alter the contents of the book in all its circulations.

Moreover, that the government in *Ysursa* stopped facilitating union speech by withdrawing a subsidy, whereas here the government stopped providing access to certain speech by removing books from the library, is a distinction without a difference.

### C.    The First Amendment permits restriction of student speech during activities that bear a public school's imprimatur.

Even if the First Amendment did limit the selection and removal of public-school-library books, Plaintiffs would be entitled at most to the rational-basis review set forth in *Hazelwood School District v. Kuhlmeier*, which HB 1069 easily survives. There, the Supreme Court held that schools may restrict even *student* speech during "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," if doing so is "reasonably related to legitimate pedagogical concerns." 484 U.S. 260, 271, 273 (1988). And students certainly are not entitled to more stringent review of the school's decisions about its own materials than decisions affecting the student's own speech. More so than any student speech, the public reasonably perceives school-library materials to "bear the imprimatur of the school" because they understand, and Florida law confirms, that public-school officials control the selection of school-library materials. *See supra* 19–20; Fla. Stat. § 1006.28(2)(d)2.c.

In *Hazelwood*, the Court explained that restrictions advance a "legitimate pedagogical concern" when they shield students from topics that are "vulgar or profane," "inadequately researched," or "unsuitable for immature audiences,"

including "potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting," or "matters of political controversy." 484 U.S. at 271–72. Those are precisely the interests advanced by Section 1006.28(2)(a)2.b.(I) and (II)'s restrictions on school-library books containing pornographic content or describing sexual conduct—i.e., materials that may be "vulgar or profane," "unsuitable for immature audiences," or include "potentially sensitive topics." *Id.* The statute therefore does not violate the Student Plaintiffs' right to receive information.

The Author and Publisher Plaintiffs additionally claim that interfering with their ability to make their books available to students violates their First Amendment rights. DE107 at 20–22. These claims fail because no Florida official has "evince[d] either by policy or by practice, any intent to open" public-school libraries to "indiscriminate use" by authors or publishers. *Hazelwood*, 484 U.S. at 270 (quotation omitted). Instead, school districts alone select and remove materials from school libraries. Fla. Stat. § 1006.28(2)(d)2.c., d. As a matter of common sense, if "[a] school . . . retain[s] the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with 'the shared values of a civilized social order,'" a school need not tolerate author or publisher speech in its libraries that does the same. *Hazelwood*, 484 U.S. at 272. (quotation omitted).

Plaintiffs attempt to create a distinction between "compulsory" and "voluntary" educational "environments," arguing that library-book selection decisions

"must withstand greater [First Amendment] scrutiny" than "curricular" decisions. DE107 at 29 (quotation omitted). For that, Plaintiffs rely on *Campbell*, "at 189," and *Virgil v. School Board of Columbia County*, 862 F.2d 1517 (11th Cir. 1989), "1522–25." DE107 at 29. In *Campbell*, at 189, the Fifth Circuit applied *Pico* to the removal of a book from the public-school library, while in *Virgil*, at 1522, the Eleventh Circuit applied *Hazelwood* to the removal of a book from the curriculum.[11] Neither dictates what standard this Court should apply in this case. *Campbell* followed *Pico*, which, again, has no precedential value in the Eleventh Circuit. *Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1199–1200. And *Virgil* did not concern a school-library book. As evidence that *Virgil* has no import in the school-library context, when considering which standard to apply to a school-library book removal in a later case, the Eleventh Circuit considered whether to apply the *Pico*, *Hazelwood*, or government-speech standard. *Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1202. Though the court ultimately left "[t]he question of what standard applies to school library book removal decisions . . . unresolved," *id.*, it did not cite *Virgil* as dictating the result in that case. If this Court rejects the State Defendants' arguments that the selection and removal of public-school library books is government speech

---

[11] *Virgil* likely would have come out differently today. *Virgil* was decided in 1989 "before *Rust*, *Rosenberger*, *Forbes*, *Finley*, and *ALA*, and therefore did not have the benefit of the Supreme Court's clarification of the government's authority over its own message." *Chiras v. Miller*, 432 F.3d 606, 617 (5th Cir. 2005). By 2005, the Supreme Court formally recognized the government-speech doctrine in *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), and that same year, in *Chiras*, the Fifth Circuit rejected *Hazelwood* as the standard applicable to First Amendment challenges to text book selection, instead holding that "the selection and use of textbooks in the public school classrooms constitutes government speech." *Chiras*, 432 F.3d at 616.

or a government benefit, then it should apply the *Hazelwood* standard to those types of curation decisions because school-library materials bear the imprimatur of the school and school officials have not opened school libraries for indiscriminate use by authors and publishers.

### D. If the Court determines it is appropriate to conduct an overbreadth analysis, Plaintiffs have not met their evidentiary burden.

Even if Plaintiffs could scale all those hurdles, they still would not have met their evidentiary burden to prove their facial overbreadth challenge. To succeed on a facial First Amendment challenge, Plaintiffs must establish that "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quotation omitted). Plaintiffs identify the "scope of the challenged portions of Section 1006.28 . . . [as] materials in Florida school libraries that contain a description of sexual conduct or so-called 'pornographic' content." DE107 at 35. And they state that "[i]n light of the[] purposes [of libraries], the reasonable and therefore constitutional applications of the Challenged Provisions are" limited to materials that would be obscene for minors. DE107 at 38–39. These "constitutional applications" would be "few, if any," Plaintiffs contend, because "it would be the rare exception that a school library would contain a book that would be obscene." DE107 at 39–40. Yet that theory is rife with problems.

First off, Plaintiffs offer no evidence to support the sweeping assumption that material obscene for children will rarely find its way into a library. The Florida

Legislature obviously rejected that premise in passing a law that requires schools to remove obscene books. *See* Fla. Stat. § 1006.28(2)(a)2.b.(I) (requiring school districts to remove materials with content "prohibited under s. 847.012," which in turn prohibits materials "harmful to minors," which in turn is defined in Fla. Stat. § 847.001(7) as material that would be obscene under current Supreme Court precedent for minors); *see also id.* § 1006.28(2)(a)2.b.(II). And Plaintiffs make no attempt to prove the Legislature wrong. They do not catalogue the books in public-school libraries that contain descriptions of sexual conduct or pornographic content and identify which titles might be obscene for minors. *See Moody*, 603 U.S. at 724 (Plaintiffs must address "the full range of [books] the law[] cover[s], and measure the constitutional against the unconstitutional applications."). Nor do they adequately explain what facts make it unlikely that obscene materials might find their way into a school library. *See* DE107 at 17, 39. They simply assert, without evidence, that library personnel are likely to have plucked obscene books at the schoolhouse gates. *See* DE107 at 39. But that is not sufficient evidence to convince a reasonable jury. *OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 776 (6th Cir. 2024) (Because "[t]he plaintiffs never presented evidence that lawful permanent residents spend significantly more money on Ohio elections than other categories of foreign nationals," and it was their burden "to show that [the law] sweeps too broadly, . . . their overbreadth challenge fail[ed]"); *see Moody*, 603 U.S. at 726. "What can be asserted without evidence, can be dismissed without

evidence." Raina Haque et. al., *The Non-Obvious Razor & Generative AI*, 25 N.C. J. L. & Tech. 399, 405 n.24 (2024).

Worse yet, "whether a work qualifies as obscenity [for minors] . . . is a question of fact," tied to age, making it exceedingly difficult to assess how many applications of HB 1069 will involve obscenity. *United States v. Salcedo*, 924 F.3d 172, 176 (5th Cir. 2019) (quotation omitted). What is obscene to a minor, after all, is quite different from what is obscene to an adult. As a result, HB 1069's constitutionality in a given application turns not only on the book to which it is applied, but also on whether it would be obscene for the age of its reader in the first place. And that age-variable standard adds yet another layer of factual inquiry for which Plaintiffs have failed to account.

Finally, Plaintiffs assume that the statute's application to non-obscene materials would be unconstitutional without attempting to show that those applications would fail strict scrutiny. They simply declare that any application "beyond obscenity" would be "[im]permissible." DE107 at 47. That conclusion does not follow. If a given book is not obscene, and is subject to full First Amendment protection, removal of that book on the basis of content does not necessarily become unconstitutional. It would just become subject to strict scrutiny. And Plaintiffs have made no effort to explain how strict scrutiny would cash out in all of the law's varied applications. They have thus failed to meet their burden to show that the vast majority of the statute's applications would be unconstitutional, judged in relation to the statute's plainly legitimate sweep.

"[T]he Supreme Court has noted that the overbreadth doctrine is strong medicine that should be employed only with hesitation and . . . as a last resort." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1500 (11th Cir. 1990) (quotation omitted). Plaintiffs have not met their burden on summary judgment to enable this Court to prescribe such strong medicine here.

## CONCLUSION

For the foregoing reasons, the Court should grant the State Defendants' motion for summary judgment.

Dated: April 1, 2025

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
bridget.ohickey@myfloridalegal.com

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General*
JEFFREY PAUL DESOUSA (FBN 110951)
  *Acting Solicitor General*
DAVID M. COSTELLO (FBN 1004952)
NATHAN A. FORRESTER (FBN 1045107)
  *Chief Deputy Solicitors General*

*/s/ Bridget K. O'Hickey*
BRIDGET K. O'HICKEY (FBN 1048521)
  *Deputy Solicitor General*

*Counsel for the State Defendants*

## CERTIFICATE OF SERVICE

I certify that on April 1, 2025, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Bridget K. O'Hickey*
Deputy Solicitor General