## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

PENGUIN RANDOM HOUSE LLC, *et al.*,

      Plaintiffs,

v.                                                            Case No. 6:24-CV-01573-CEM-RMN

BEN GIBSON, in his official capacity as
Chair of the Florida State Board of
Education, *et al.*,

      Defendants.

_____

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The State Defendants devote nearly half of their brief to repeating virtually verbatim arguments that this Court has already rejected, effectively seeking reconsideration of this Court's prior rulings. But the State Defendants do not even attempt to satisfy the standard for a motion for reconsideration—nor could they, because there has been no change in controlling law or discovery of new facts, and the Court did not err in its prior holdings.

Nor do the State Defendants offer any facts whatsoever to support their summary judgment arguments or to dispute Plaintiff's facts, even though it is their burden to do so on the "fact-intensive" government speech doctrine analysis. (Order, ECF No. 106, at 21.)

Defendants also again challenge standing, asserting that Plaintiffs' injuries are not traceable to or redressable by them. The State Defendants and School District Defendants point fingers at each other, asserting that Plaintiffs' injuries are caused solely by the other set of Defendants. Both sets of Defendants astonishingly suggest that a declaration of unconstitutionality would not remedy Plaintiffs' injuries, even though such a declaration would require the State Defendants to change their mandatory objection form and conform their enforcement powers to the requirements of the First Amendment and the School District Defendants to comply with the Constitution to the extent that they continue to remove school library books.

In stark contrast, Plaintiffs' undisputed factual record (1) demonstrates that they have suffered First Amendment injury that is traceable to and redressable by both sets of Defendants; (2) explains the thoughtful consideration given to library book selection and removal by Florida educators in their professional discretion—discretion that the Challenged Provisions supplant; and (3) sets forth categories of applications of the Challenged Provisions, which illustrate that the unconstitutional applications of the Challenged Provisions vastly outweigh the few, if any, constitutional applications. Plaintiffs have clearly met their burden on summary judgment. The Court should grant Plaintiffs' motion and deny Defendants' motions for summary judgment.[1]

---

[1] The "Challenged Provisions" are the prohibitions on material made available in a school or classroom library that (a) "describes sexual conduct" under Florida Statute Section 1006.28(2)(a)(2)(b)(II) and (b) is "pornographic" under Florida Statute Section 1006.28(2)(a)(2)(b)(I).

## I.  The State Defendants Effectively Seek Reconsideration Of This Court's Prior Ruling.

The State Defendants devote a substantial portion of their brief to arguments that they previously asserted in their motion to dismiss—arguments that this Court has already considered and rejected.  Among other things, the State Defendants reassert that (1) Plaintiffs' complaint is a shotgun pleading (State Br., ECF No. 109, at 4-5), (2) Count II of Plaintiffs' claims lacks a cause of action or is barred by the Eleventh Amendment (*id.* at 13-16), and (3) the removal of school library books is the withdrawal of a government benefit (*id.* at 29-32).[2]  The Court already rejected each of these arguments and there has been no change in controlling law or discovery of new evidence since this Court's February 28, 2025 ruling; nor have the State Defendants shown clear error in the Court's denial of their motion to dismiss.

"Reconsideration of a previous order is an extraordinary measure and should be applied sparingly."  *Scelta v. Delicatessen Support Servs., Inc.*, 89 F. Supp. 2d 1311, 1320 (M.D. Fla. 2000).  For that reason, courts recognize only three grounds for reconsideration of an interlocutory order:  "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice."  *Venerus v. Avis Budget Car Rental, LLC*, No. 613CV921ORL41GJK, 2019 WL 13203849, at *2 (M.D. Fla. June 20, 2019).  The State Defendants do not even attempt to contend any of these three grounds applies here—nor could they.

---

[2] The State Defendants also raise arguments concerning the traceability and redressability elements of Article III standing that this Court already rejected.  Those arguments are discussed more fully in Section II(B) of this brief.

First, as the Court correctly concluded in its prior ruling, Plaintiffs' complaint is not a shotgun pleading. In their summary judgment brief, the State Defendants do not identify any change in the law, new evidence, or clear error by this Court that would compel a different result. Even so, the State Defendants reiterate their failed argument, ignoring the Court's explanation that the State Defendants' "thorough and detailed" motion to dismiss "addressing the claims brought by Plaintiffs belies any argument that the complaint is a shotgun pleading." (Order at 15.) For this reason, among others, the Court rejected the State Defendants' argument to dismiss the complaint as a shotgun pleading.

Second, the State Defendants oppose Count II on the same grounds that this Court previously rejected, identifying no change in law, new evidence, or clear error on the part of this Court that would justify reconsideration. Count II of Plaintiffs' complaint properly alleges a cause of action seeking a declaration to remedy their constitutional injuries. That count seeks "neither an advisory opinion nor relief that violates the Eleventh Amendment" because "the declaratory relief sought would resolve the case or controversy before the Court" and "[a]ny declaration issued would ultimately instruct State Defendants on how to conform their conduct to the restrictions imposed by the First Amendment." (*Id.* at 12-14.) The State Defendants do not dispute that Plaintiffs are entitled to relief on Count II on the merits—that the rules of statutory construction compel a construction of "pornographic" that is consistent with "harmful to minors" as defined by Section 847.001(7) (if the

prohibition on books containing so-called "pornographic" content is not declared unconstitutional). The Court should again reject the State Defendants' argument.

Finally, the State Defendants challenge this Court's denial of their government benefit and funding argument. As this Court previously explained, the Challenged Provisions do not "evenhandedly withdraw access to public school libraries or particular books throughout the state." (Order at 22.) Not only do the State Defendants fail to identify any change in law or newly discovered evidence to support their argument, but they offer no new law or facts in support of this argument whatsoever. Instead, the State Defendants' government benefit argument is nearly verbatim the argument that they previously presented to this Court in their motion to dismiss—an argument that this Court considered and rejected. As this Court previously ruled, the Challenged Provisions restrict "speech . . . , not funding." (*Id.*)

Because the State Defendants merely "disagree with the Court's analysis and re-hash previous arguments" from their motion to dismiss, their arguments that (1) Plaintiffs' complaint is a shotgun pleading, (2) Count II of Plaintiffs' claims lacks a cause of action or is barred by the Eleventh Amendment, and (3) the removal of school library books is the withdrawal of a government benefit should all be rejected. *See*, *e.g.*, *Daytona Friends Image, LLC v. United States*, No. 619CV1318ORL41DCI, 2019 WL 13183554, at *1 (M.D. Fla. Sept. 26, 2019); *Venerus*, 2019 WL 13203849, at *2.

## II.    Plaintiffs Have Standing.

### A.    Plaintiffs Have Prudential Standing To Bring Their Claims.

Both sets of Defendants ignore that the undisputed facts show that Plaintiffs themselves have suffered First Amendment injury as a result of the Challenged Provisions.  It is simply not true that "Plaintiffs do not challenge any particular applications of Florida law that violate their rights." (State Br. at 11.)  Plaintiffs have identified books that have been removed under the Challenged Provisions (including via the State Defendants' mandatory objection form), resulting in violations of their First Amendment rights.  (*See* Plaintiffs' Mot., ECF No. 107, at 19, 21; Ex. A to Plaintiffs' Mot. ¶ 11; Ex. B to Plaintiffs' Mot. ¶¶ 8-10; Ex. L to Plaintiffs' Mot. ¶ 4; Ex. M to Plaintiffs' Mot. ¶ 5.)  It is irrelevant that the Challenged Provisions do not directly "regulate authors, publishers, and students," because in the First Amendment context, plaintiffs need not be subject to penalties to have standing.  Instead, plaintiffs need only show that that they have been injured by the speech restriction.  *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n. 6 (1963) (holding that publisher plaintiffs had standing to challenge a state law because they had suffered a First Amendment injury: the "impaired sales of . . . two books published by" the plaintiffs); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (ruling for publisher on claim that state law requiring authors' income from works describing their crimes be made available to victims was inconsistent with the First Amendment).  Otherwise, the government could violate First Amendment rights without consequence.

The sole case on which Defendants rely for their prudential standing argument
has no relevance to this case.  In *Mata Chorwadi, Inc. v. City of Boynton Beach*, hotel
owners challenged a nuisance ordinance on behalf of themselves and their hotel guests.
66 F.4th 1259, 1265 (11th Cir. 2023).  The Eleventh Circuit first assessed whether the
ordinance had caused First Amendment injury to the hotel owners and found that it
did not, because the hotel owners and their employees admitted that the ordinance
had not chilled or otherwise impacted their speech.  *Id*. at 1264.  Therefore, the
Eleventh Circuit reasoned, the hotel owners' First Amendment rights were not
violated.  *Id*.  The hotel owners next asserted that they could bring claims to remedy
violations of their guests' First Amendment rights under the overbreadth doctrine,
despite the fact that those guests were not similarly situated to the hotel owners.  The
Eleventh Circuit recognized that the overbreadth doctrine is an "exception[] to the
prohibition against asserting third-party rights" but ultimately held that it did not apply
in this situation due to the lack of evidence of First Amendment injury suffered by the
hotel guests and the fundamental "misalignment between the hotel owners' interest
and hotel guests' interests."  *Id*. at 1264-66.

In direct contrast, Plaintiffs themselves have suffered First Amendment injury
as a result of the Challenged Provisions.  The Publisher and Author Plaintiffs have
identified books that they published and authored that have been unconstitutionally
removed from school libraries under Challenged Provisions (including via the State
Defendants' mandatory objection form), and the Student Plaintiffs have identified
books that they planned to read from their school libraries that have been

unconstitutionally removed under the Challenged Provisions (including via the State Defendants' mandatory objection form).  (*See* Plaintiffs' Mot. at 19, 21; Ex. A to Plaintiffs' Mot. ¶ 11; Ex. B to Plaintiffs' Mot. ¶¶ 8-10; Ex. L to Plaintiffs' Mot. ¶ 4; Ex. M to Plaintiffs' Mot. ¶ 5.)  Plaintiffs do not seek to vindicate the rights of unrelated parties who are not similarly situated.  Rather, the Publisher Plaintiffs, Author Plaintiffs, and Student Plaintiffs ask this Court to remedy their own constitutional injuries, which remedies would also resolve the constitutional injuries suffered by *similarly situated* parties—other publishers, authors, and students, respectively.

Moreover, in contrast to *Mata Chorwadi*, the factual record here demonstrates that the unconstitutional applications of the Challenged Provisions vastly outnumber any constitutional applications, justifying application of the overbreadth doctrine.  (*See* Plaintiffs' Mot. at 44-46; *infra* at 17-23, Section III(B).)  The State Defendants do not clearly state what they believe the overbreadth doctrine to require for standing:  they assert that facial overbreadth "should be reserved for cases in which a statute is constitutional as applied to the plaintiff but unconstitutional as applied to non-party claimants." (State Br. at 12 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484-85 (1989)).)  But they assert the opposite in faulting Plaintiffs for purportedly "not challeng[ing] any particular applications of Florida law that violate their rights." (*Id.* at 11.)  It is unclear whether, under the State Defendants' theory of the overbreadth doctrine, Plaintiffs need to have suffered their own constitutional injuries to proceed on their claims or whether they are forbidden from proceeding on their claims because they have suffered their own constitutional injuries.

However, the Supreme Court has granted relief under the facial overbreadth doctrine where Plaintiffs themselves have suffered First Amendment injury. *See*, *e.g.*, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 603, 615 (2021) (explaining that plaintiffs were affected by the law in question, which the Supreme Court found to be facially overbroad). Both sets of Defendants ignore *Bonta*, which illustrates that this is the paradigmatic facial overbreadth case, because the Challenged Provisions violate First Amendment rights in the same way "in every case." *Id*. at 615.

### B. Plaintiffs Have Article III Standing To Bring Their Claims Against The State Defendants.

In their motion for summary judgment, Plaintiffs presented evidence that they have suffered First Amendment injury, including at the hands of the State Defendants due to their mandatory objection form. In response, the State Defendants do not seriously challenge the injury element of standing and instead focus on arguments concerning traceability and redressability that this Court previously rejected. The Court should hold that Plaintiffs have standing to pursue their claims against the State Defendants.

The State Defendants do not offer any evidence to contradict the book removals that give rise to Plaintiffs' First Amendment injuries, and Plaintiffs' evidence to support their injuries demonstrate that those injuries are anything but "speculative" as the State Defendants claim. (State Br. at 9.)

Contrary to the State Defendants' contentions, the First Amendment right to receive information is well established in constitutional law. *See*, *e.g.*, *Martin v. City of*

*Struthers, Ohio*, 319 U.S. 141, 143 (1943) (The authors of the First Amendment "chose to encourage a freedom which they believed essential if vigorous enlightenment would triumph over slothful ignorance," which "embraces the right to distribute literature and necessarily protects the right to receive it." (citation omitted)); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas.") (collecting cases); *Reno v. Am. C. L. Union*, 521 U.S. 844, 874 (1997) (recognizing the "constitutional right to receive" information).

The Supreme Court's opinion in *Murthy v. Missouri*, 603 U.S. 43 (2024), did not modify the right to receive information in any way. Rather, the Supreme Court in *Murthy* noted its repeated recognition that a "First Amendment right to receive information and ideas" exists. *Id.* at 75. The Court's rejection of the plaintiffs' standing argument in *Murthy* was based not on the right to receive information but on the plaintiffs' failure to "point to any specific instance of content moderation that caused them identifiable harm" or identify "any specific speakers or topics that they [were] unable to hear or follow." *Id.* Therefore, the plaintiffs did not suffer a concrete, particularized injury and did not have Article III standing. In contrast, here the Student Plaintiffs identified specific harms sufficient to give them standing. Student Plaintiffs R.K. and J.H. demonstrated concrete and particularized injuries to their right to receive information by identifying specific books they wanted to read from their school libraries that the Challenged Provisions had required be removed. (*See* Ex. L to Plaintiffs' Mot. ¶¶ 4, 8–9; Ex. M to Plaintiffs' Mot. ¶¶ 5, 8–10.) As this Court

previously recognized, "censorship of social-media posts" as was at issue in *Murthy* is "readily distinguishable from that of published authors," and "parents have an interest in challenging the prohibition of school library books they and their children desire to read." (Order at 10.)

As to the Article III traceability and redressability requirements, the State Defendants merely repeat arguments that this Court rejected when denying their motion to dismiss. The State Defendants again contend that school districts' independent obligation to comply with the Challenged Provisions precludes a finding of traceability (State Br. at 7-8), but they ignore the coercive authority that the State Defendants have over the school districts. That coercive authority includes the power to "investigate" and "order compliance" with state laws, "to report a school district's noncompliance to the legislature and recommend action be taken," and "to withhold funds from the district until it complies." See Fla. Stat. s. 1008.32(1)-(4). The State Defendants previously acknowledged these sweeping coercive powers in their motion to dismiss (ECF No. 83 at 8) but omit them now from their summary judgment brief to suggest that their authority includes only the ability to "request and receive information, data, and reports from . . . school districts" (State Br. at 8). The Court did not find the State Defendants' argument persuasive previously (see Order at 6-7) and the State Defendants have offered no reason the Court should rule differently this time. Here, the Challenged Provisions "both operate[] on [the] State Defendants and afford[] them far greater authority to implement and enforce the law" than statutes at

issue in the State Defendants' authority.  (*See id.* at 7 (distinguishing *City of South Miami v. Governor of Fla.*, 65 F. 4th 631 (11th Cir. 2023).)

This Court also previously rejected the State Defendants' argument that a declaratory judgment would not redress Plaintiffs' injuries.  The State Defendants facilitate the removal of school library books for unconstitutional reasons through the mandatory objection form that they promulgate and require school districts to use. Fla. Stat. s. 1006.28(2)(a)(2); Fla. Admin. Code r. 6A-7.0714(3)(c)-(d).  They are also required to adopt rules to implement the special magistrate appeal procedure for books that have received an objection—a procedure under which they have ultimate authority to "approve or reject a recommended decision."    Fla. Stat. s. 1006.28(2)(a)(6).  As the Court previously held, "the remedy sought by Plaintiffs" against the State Defendants "amounts to a demand that the language in the objection form be altered.  And that cannot be done unless the State Defendants do so. . . . Therefore, Plaintiffs' alleged injury is both fairly traceable to the challenged action and redressable by a favorable reason."  (Order at 8.)  There is no reason for the Court to rule differently now.

**C.    Plaintiffs Have Article III Standing To Bring Their Claims Against the School District Defendants.**

The School District Defendants do not dispute that Plaintiffs have suffered Article III injuries as a result of the Challenged Provisions.  Instead, the School District Defendants contend that Plaintiffs lack standing to bring claims against them because

Plaintiffs have not demonstrated traceability and redressability. That argument suffers from two fundamental flaws.

First, the School District Defendants contend that Plaintiffs' injuries are not traceable to them because the injuries are traceable to the State Defendants. In doing so, the School District Defendants ignore that Plaintiffs' injuries are traceable to both the State Defendants and the School District Defendants. The School District Defendants are required to enforce the Challenged Provisions, including by removing school library books that contain content that "describes sexual conduct" or is "pornographic" based on the State Defendants' mandatory objection form. The School District Defendants play a direct role in causing Plaintiffs' injuries because it is they who ultimately remove books from school library shelves. That direct role is more than sufficient to satisfy the traceability requirement. *See Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (holding that, to satisfy the traceability requirement, plaintiffs need only show that their injuries are "connected with the conduct of which they complain") (cleaned up).

Second, the School District Defendants assert that they cannot redress any injury suffered by Plaintiffs because they "cannot change" the Challenged Provisions. (School Dist. Br., ECF No. 108, at 13.) This argument also fails. As this Court previously explained, "Any declaration issued would ultimately instruct [] Defendants on how to conform their conduct to the restrictions imposed by the First Amendment." (Order at 13.) The School Board Defendants would not be "powerless to do anything other than use the state-mandated objection form" if the Court declares the Challenged

Provisions to be unconstitutional.  (School Dist. Br. at 11.)  Rather, if the Court
declares the Challenged Provisions to be unconstitutional, the School District
Defendants would be required to act in conformance with the First Amendment and
no longer remove or prevent students from accessing books under the Challenged
Provisions.  The Court should reject the School District Defendants' standing
arguments.

## III.    The Court Should Grant Summary Judgment In Plaintiffs' Favor.

### A.    The Removal Of Library Books Is Not Government Speech.

In arguing that the removal of school library books is government speech, the
State Defendants double down on arguments from their motion to dismiss that this
Court previously found unpersuasive.  They also continue to rely on cases that do not
concern library books[3] (and even cases that do not concern the government speech
doctrine at all[4]), which are particularly irrelevant due to the "fact-intensive" nature of
the government speech test.  *See PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F.
Supp. 3d 1325, 1331 (N.D. Fla. 2024).  Those arguments did not persuade the Court

---

[3] *See Dean v. Warren*, 12 F.4th 1248, 1265-66 (11th Cir. 2021) (concerning a state university
cheerleading team, which the State controlled because "[i]t would be highly unusual for a public
university to allow its cheerleaders—while they are in uniform on the field at a football game—to say
or do whatever they please," such as "root for its rival"); *Leake v. Drinkard*, 14 F.4th 1242, 1250 (11th
Cir. 2021) (concerning a parade for which the government "maintain[ed] direct control over the
messages conveyed" in the parade).

[4] *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 576-77 (1995)
(concerning compelled private speech, not government speech); *303 Creative LLC v. Elenis*, 600 U.S.
570 (2023) (same); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 583 (1998) (concerning non-
binding considerations for arts funding, not government speech); *Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666, 669 (1998) (concerning a "nonpublic for[um]," not government speech).

14

to grant the State Defendants' motion to dismiss, and they are no more persuasive now.

For similar reasons, the State Defendants' reliance on *McGriff v. City of Miami Beach* is unavailing. (State Br. at 17.) The State Defendants insist that *McGriff* is "largely indistinguishable" and therefore binds this Court (*id.* at 26 n. 8), but *McGriff* is rife with facts that demonstrate it is distinct from this case. *McGriff* involved a city art exhibition in which the city contracted to commission and fund the artists' work and required artists and production companies to relinquish all rights to the artwork, including right of dissemination, in order to exhibit the work. 84 F.4th 1330, 1332-34 (11th Cir. 2023). In other words, artists who exhibited their work in the city exhibition were required to cede all control, including concerning any future dissemination of the artwork, in order to do so. In contrast, school libraries—by definition—do not have such control over authors or publishers whose books are on their shelves, and the State Defendants have not produced any evidence of such control. (*See* State Br. at 31 n. 10 (admitting that "Florida has not, for instance, conditioned a book's presence in a public-school library on the author's or publisher's willingness to alter the contents of the book in all its circulations").)

Just as this Court recognized that monuments in a park meaningfully differ from public school libraries, so too does a city art exhibition like the one at issue in *McGriff*. (Order at 19 (quoting *GLBT Youth in Iowa School Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024).) In finding that the city art exhibition was government speech, the Eleventh Circuit relied on "the government's own long historical use of artistic

expression to convey messages." *McGriff*, 84 F.4th at 1336.  No such history exists for libraries, and the State Defendants present no evidence suggesting that Florida school libraries have historically conveyed a message from the State of Florida.  It would make no sense for a library to communicate the government's message, because a "well-appointed school library could include copies of Plato's *The Republic*, Machiavelli's *The Prince*, Thomas Hobbes' *Leviathan*, Karl Marx and Freidrich Engels' *Das Kapital*, Adolph Hitler's *Mein Kampf*, and Alexis de Tocqueville's *Democracy in America*. . . .  [I]f placing these books on the shelf of public school libraries constitutes government speech, the State 'is babbling prodigiously and incoherently.'" *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024) (quoting *Matal*, 582 U.S. at 236).

The two D.C. Circuit cases on which the State Defendants rely—*People for the Ethical Treatment of Animals, Inc. v. Gittens* and *Bryant v. Gates*—are completely inapplicable.  As the State Defendants themselves admit, neither case "concerns library books" and the passing reference in each to libraries is dicta.  (State Br. at 19 n. 5.)  Neither case applied the Supreme Court's three-part government speech test nor considered facts related to libraries, and every court to have considered the issue has held that the First Amendment right to freedom of speech exists in public libraries, including public school libraries.  (*See* Plaintiffs' Mot. at 27 n. 15.)  The State Defendants ask this Court to ignore any library cases that do not explicitly consider government speech, but they ignore the fact that cases holding that the right to freedom

of speech applies in libraries necessarily mean that the removal of library books is not government speech.[5]

In denying the State Defendants' motion to dismiss, the Court instructed the State Defendants to provide it with "a robust enough record" before it would "make the finding [the] State Defendants seek."  (Order at 21 (citation and quotations omitted).)  Ignoring this Court's instruction, the State Defendants have not supplied the Court with any facts that support their government speech argument or that dispute Plaintiffs' facts.  They have not met their burden.  Their government speech argument should be rejected once again.

### B.    Plaintiffs Succeed On The Overbreadth Analysis.

#### 1.    Defendants Misapply The *NetChoice* Decision.

Contrary to the State Defendants' argument, *NetChoice* does not require Plaintiffs to litigate overbreadth challenges as mass-scale as-applied challenges.[6] *Moody v. NetChoice, LLC*, 603 U.S. 707, 717 (2024).  Just as the parties in the *NetChoice* cases are not required to analyze how the laws apply to the technology companies' content moderation of specific posts by specific users on various platforms, the parties

---

[5] For the same reason, the Eighth Circuit's holding in *GLBT Youth* concerning government speech was not dicta as the State Defendants contend.  Had the Eighth Circuit been persuaded that the removal of school library books was government speech, the plaintiffs would not have had standing to bring their claims because they would not have suffered a First Amendment injury.  The Eighth Circuit's rejection of the government speech doctrine was therefore essential to its holding that the plaintiffs had standing to bring their First Amendment claims.

[6] "The Supreme Court's opinion in *Moody* [*NetChoice*] . . . did not break new ground; the Court has long espoused these requirements for a facial overbreadth challenge."  *Free Speech Coalition, Inc., v. Rokita*, 2024 WL 5055864, at *3 (S.D. Ind. July 25, 2024) (citing cases).

in this case are not required to "catalogue the books in public-school libraries" that implicate the Challenged Provisions. *See United States v. Hansen*, 599 U.S. 762, 783, n.5 (2023) ("Overbreadth doctrine traffics in hypotheticals"); *United States v. Stevens*, 559 U.S. 460, 475-77 (2010) (analyzing *categories* of protected speech swept up in the overbroad statute, such as depictions of hunting and livestock slaughter); *Willson v. City of Bel-Nor, Missouri*, 924 F.3d 995, 1002 (8th Cir. 2019) (stating that plaintiff's "examples of expressive conduct that are prohibited" by the law illustrate that the law is overbroad). The categories of non-obscene books that have been removed under the Challenged Provisions—identified by Plaintiffs in their motion and supported by undisputed evidence—are more than sufficient for a finding of overbreadth. (*See* Plaintiffs' Mot. at 44-45.)

Both this case and the *NetChoice* cases involve overbreadth challenges, but the similarities end there. In the *NetChoice* cases, the scope of the laws at issue was far from clear. Those laws regulate technology companies' content moderation (filtering, altering, prioritizing, and labeling) of certain user posts (messages, videos, and other content) and require individualized explanation to users if a platform removes or alters their post. *NetChoice, LLC*, 603 U.S. at 717. The Supreme Court remanded for discovery to determine which websites and apps are within the scope of the laws, how those websites and apps function, whether content moderation of each type of function

"creates an expressive product,"[7] and whether the individualized explanation requirement would unduly burden expression. *Id.* at 724-26. Here, in contrast, the scope of the Challenged Provisions is readily apparent—they prohibit school library materials that contain content that "describes sexual conduct" or so-called "pornographic" content—and the State Defendants do not dispute that such materials are primarily books.[8]

The State Defendants erroneously assert that *NetChoice* requires Plaintiffs to "catalogue the books in public-school libraries" to identify which are obscene and which are not. (State Br. at 36.) Their position, "if accepted, would essentially require the parties (and Court) to read hundreds—if not thousands—of books to determine whether there is" content that implicates the Challenged Provisions and "if so, how that [content] fits into the larger work." *See Penguin Random House LLC v. Robbins*, No. 4:23-CV-00478, 2025 WL 1156545, at *17 (S.D. Iowa Mar. 25, 2025). But Plaintiffs have not brought as-applied challenges concerning the removal of hundreds of specific books. Plaintiffs identify examples of books that have been removed to illustrate that the Challenged Provisions require the removal of numerous categories of non-obscene books without regard to their value as a whole—everything from classic novels and

---

[7] The First Amendment generally protects expressive activities, not nonexpressive activities. *See, e.g.*, *NetChoice*, 603 U.S. at 725-26.

[8] Other courts have similarly found that, unlike in the *NetChoice* cases, the scope of the challenged laws in their cases is clear. *See, e.g.*, *Rokita*, 2024 WL 5055864, at *3 (finding that, unlike in *NetChoice*, there are "no potentially unknown applications of the [challenged] statute; 'the Act's meaning is clear'"); *NetChoice, LLC v. Reyes*, 2024 WL 4135626, at *9 n. 92 (D. Utah Sept. 10, 2024) (finding that, unlike in the *NetChoice* cases, the scope of the challenged statute is easily determined).

histories to books about how to avoid being victimized by sexual assault. (Plaintiffs'

Mot. at 44-45.) That evidence is undisputed. The State Defendants do not offer any

evidence of their own on summary judgment, nor do they dispute that the Challenged

Provisions mandate the removal of a book within these categories if it contains merely

a single description of sexual conduct or so-called "pornographic content."[9]

### 2.    The Constitutional Applications Of The Challenged Provisions Are Few, If Any.

Despite the State Defendants' contentions, both the law and the undisputed

facts demonstrate that there are few, if any, constitutional applications of the

Challenged Provisions because there are few, if any, books that are obscene for minors

on Florida school library shelves. As the State Defendants admit, preexisting Florida

law prohibited the inclusion of books that are obscene for minors in Florida school

libraries. *See* Fla. Stat. s. 1006.28(2)(a)(2)(b)(I), 847.012 (precluding library books that

are "harmful to minors"); *Simmons v. State*, 944 So.2d 317, 325 (Fla. 2006) (construing

"harmful to minors" as currently defined by Section 847.001(7) as consistent with the

obscenity standard as applied to minors set forth in *Miller v. California*, 413 U.S. 15

(1972), and *Ginsberg v. New York*, 390 U.S. 629 (1968)). Violations of that preexisting

law are punishable as third-degree felonies under Florida law. *See* Fla Stat. s.

847.012(5), (6). This alone demonstrates that there are likely very few, if any,

---

[9] Courts commonly take "judicial notice of the contents of artistic works" for the purpose of evaluating facial challenges under the First Amendment. *See* Order Granting Motion For Preliminary Injunction at 26-27, *Penguin Random House v. Robbins*, Case No. 4:23-cv-000478 (S.D. Iowa Mar. 25, 2025) (collecting cases).

constitutional applications of the Challenged Provisions.  *See Penguin Random House*, 2025 WL 1156545, at *19 (holding that, where Iowa had a preexisting statute forbidding material that was obscene for minors, there were "almost no constitutional applications" of a similar law "because no books containing obscene material under the *Ginsberg* standard should have been in school libraries before the law was passed, and thus the law should not have resulted in the (constitutional) removal of any such books"); *Rokita*, 2024 WL 5055864, at *5 (applying the overbreadth test from NetChoice and explaining that "suppression of a website that is 100% obscene is not part of the [statute's] legitimate sweep" because a different statute "already" prohibits obscenity).

Nonetheless, the State Defendants assert that there is "no evidence" to support the argument that "material obscene for children will rarely find its way into a library." (State Br. at 35-36.) This assertion ignores the Florida statute that prohibits school library books that are obscene for minors.  Even if the State Defendants had presented any evidence that Florida school libraries contain books that are obscene for minors— which they did not do—the solution would be to enforce the statute that prohibits school library books that are obscene for minors.  Plaintiffs do not challenge that statute, which is consistent with the First Amendment and the Supreme Court's decisions in *Miller* and *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975).

The State Defendants also ignore the factual record.  Florida media specialist Christina Hackey explained that in her 19 years of experience working in media centers and classrooms across multiple Florida school districts, she had never seen

obscene materials in public school libraries.  (*See* Ex. C to Plaintiffs' Mot. ¶¶ 4, 5, 26.
*See also* Ex. A to Plaintiffs' Mot. ¶ 7.)  The State Defendants offer no evidence to rebut
Hackey's declaration.  In fact, they offer no evidence whatsoever to suggest that there
are *any* constitutional applications of the Challenged Provisions (*i.e.* obscene materials
in Florida school libraries).

The State Defendants erroneously assert that the constitutional applications, if
any, of the Challenged Provisions must be evaluated separately for every age group of
students.  But for the First Amendment overbreadth inquiry, courts focus on whether
a law prohibits older minors and adults from accessing non-obscene material, even if
that material might otherwise be obscene for younger minors.  *See*, *e.g.*, *Virginia v. Am.
Booksellers, Inc.*, 484 U.S. 383, 394-95 (1988) (explaining that a statute that applied to
"a huge number of works" that are non-obscene for older minors or adults "would
raise correspondingly greater First Amendment questions"); *Shipley, Inc. v. Long*, 454
F. Supp. 2d 819, 829-830 (E.D. Ark. 2004) (holding that a statute prohibiting "material
which is only harmful to the youngest of minors . . . even though such material would
not be harmful to adults or older minors" was unconstitutionally overbroad because it
"effectively stifles the access of adults and older minors to communications and
material they are entitled to receive and view"); *Fayetteville Public Library v. Crawford
County, Arkansas*, 684 F. Supp. 3d 879, 904–905 (W.D. Ark. 2023) (similar).

Moreover, there is no evidence in the record that books that implicate the
Challenged Provisions have been made available to the youngest students, which
makes sense:  "it is highly doubtful that elementary school students would have the

capacity to read or comprehend" such books. *See Penguin Random House*, 2025 WL 1156545, at *20. Considering such "hypothetical-but-unrealistic applications" of the Challenged Provisions to elementary school students would "flip First Amendment principles on their head by allowing [the Challenged Provisions'] breadth to be a reason for sustaining the law against a facial constitutional challenge. Ordinarily, the First Amendment works the other way around, with broader laws being subject to greater constitutional scrutiny." *Id.* (citing *Boos v. Barry*, 485 U.S. 312, 319 (1988); *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 537 (1980)). The State Defendants' arguments further demonstrate that the Challenged Provisions are a solution in search of a problem. The Court should reject these arguments.

### 3. The Challenged Provisions Are Unconstitutional Under The Nonpublic Forum Standard.

The State Defendants concede that, if the First Amendment applies to the removal of school library books, the nonpublic forum standard applies. (*See* State Br. at 32-35.) But the State Defendants mischaracterize the nonpublic forum standard as the "*Hazelwood* standard," referring to the particular application of the nonpublic forum standard in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988).) As the Eleventh Circuit and this Court have recognized, *Hazelwood* concerns the application of the nonpublic forum standard in the context of the compulsory curricular environment—which differs meaningfully from the voluntary school library environment at issue in this case. (*See* Order at 25 (quoting and citing *Searcey v. Harris*,

888 F.2d 1314, 1319 (11th Cir. 1989); *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d

1517, 1521-23 (11th Cir. 1989).)

The State Defendants misapply the nonpublic forum standard.  Under the

nonpublic forum standard, courts evaluate First Amendment restrictions by assessing

whether they are reasonable in light of the purpose of the particular forum in which

the restriction is applied.  *See Cornelius v. NAACP Legal Defense Fund*, 473 U.S. 788, 806

(1985) (holding that in a nonpublic forum, First Amendment restrictions must be

"reasonable in light of the purposes served by the forum").[10]  Here, the Challenged

Provisions restrict First Amendment rights in school libraries, which is a voluntary

environment that differs meaningfully from the compulsory school curriculum that

was at issue in *Hazelwood*.  As courts have recognized—and despite the State

Defendants' contentions to the contrary—the difference between First Amendment

rights in captive, compulsory environments and in an environment of voluntary

inquiry is stark.  *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457

U.S. 853, 868–69 (1982) (plurality) (distinguishing between the school library's

"regime of voluntary inquiry" that is "wholly optional" and the "prescribed

---

[10] Puzzlingly, the State Defendants also separately advocate for a more stringent standard of
constitutional review than Plaintiffs seek.  (State Br. at 37 (contending that Plaintiffs must "show that
[the unconstitutional applications of the Challenged Provisions] would fail strict scrutiny").)  Plaintiffs
do not seek application of the strict scrutiny standard and, moreover, under strict scrutiny review it is
the State—not Plaintiffs—who bear the burden of establishing a compelling interest for the law and
that the law is narrowly tailored to achieve that interest.  *See Johnson v. California*, 543 U.S. 499, 505
(2005) ("Under strict scrutiny, the government has the burden of proving" that the restriction is a
"narrowly tailored measure[] that further[s] compelling government interests.")  Moreover, it would
make no sense to first apply rational basis review and then to apply strict scrutiny, as Plaintiffs propose.
(*See* State Br. at 32, 37.)

curriculum"); *Virgil*, 862 F.2d at 1522–25 (distinguishing between removal of
curricular books and school library books)[11]; *Penguin Random House*, 2025 WL
1156545, at *10(distinguishing between "captive settings" and school libraries, where
"books remain harmlessly on the shelves except with respect to students who want to
read them").

Even setting aside the fundamental differences between the compulsory nature
of the curricular environment at issue in *Hazelwood* and the voluntary nature of school
libraries, *Hazelwood* does not (as the State Defendants argue) justify the sweeping reach
of the Challenged Provisions. The pervasive theme throughout *Hazelwood* and its
progeny is deference to the discretion of local school officials and educators—not to a
one-size-fits-all state mandate that eliminates that discretion. *See, e.g.*, *Hazelwood*, 484
U.S. at 267 (explaining that the "determination of what manner or speech in the
classroom or in school assembly is inappropriate properly rests with the school
board"—not the State (quoting *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 683
(1986)). *Hazelwood* and similar cases recognize that educators and schools—not state
legislatures—are in the best position to evaluate the needs of their students, taking into
account the values of their local communities and the age and maturity level of the
students. *See, e.g.*, *id.* at 271 (holding that *educators* are "entitled to substantial

---

[11] The State Defendants contend that *Virgil* "has no import" because it did not concern school library
books. But in *Virgil*, the Eleventh Circuit clearly distinguished between the curricular books that were
at issue and a "ban[]" on books that would otherwise be "available in the school library." *Id.* at 1521-
23, 1525. That distinction exists in *Hazelwood* as well.

deference"). *See also Milliken v. Bradley*, 418 U.S. 717, 741-42 (1974) (explaining that "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools," because "local control over the educational process affords citizens an opportunity to participate in decision-making, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence'").

The State Defendants recognize the importance of a "school's decisions about its own materials" (State Br. at 32) but again "fail to grapple with the fact that discretion is what this statute removes." (Order at 23-24 (explaining that the Challenged Provisions are "a regime built not around a librarian's sound judgment but rather any parent's objection, however capricious").) Rather than permitting trained librarians to exercise their authority consistent with their professional training and the values of their school communities, the State Defendants have supplanted librarian discretion with their own judgment and agenda. The State Defendants' desire to "shield students" (State Br. at 32) from library books through the Challenged Provisions ignores the Supreme Court's admonition that the government's power to protect children from harm "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011). *See also W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion").

As Plaintiffs explained in their motion, under the nonpublic forum standard, the Challenged Provisions are unconstitutionally overbroad because a substantial number of the Challenged Provisions' applications are unconstitutional when judged in relation to the statute's plainly legitimate sweep. *NetChoice*, 603 U.S. at 723 (citing *Bonta*, 594 U.S. at 615 (finding provision facially unconstitutional)). An application of the Challenged Provisions is constitutional only if it is reasonable in light of the purpose of a school library. *See also Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1002 (W.D. Ark. 2003) (requiring the State to show that book-removal decisions were "justified by some exigency"). The broad content-based restrictions imposed by the Challenged Provisions, which prohibit consideration of the value of the book as a whole, are inconsistent with the purpose of school libraries.

Because the Challenged Provisions are a statewide mandate with the purported purpose of keeping sexually explicit content out of school libraries, their reasonableness must be evaluated using the Supreme Court's standard that governs speech concerning sexual content—the obscenity standard—which requires consideration of the value of the book as a whole. *See Miller*, 413 U.S. at 24. When applied to minors, the *Miller* obscenity standard accounts for the age of the reader. *See Erznoznik*, 422 U.S. at 213–14.[12] As Plaintiffs have demonstrated, the non-obscene books that must be removed from school library shelves under the Challenged

---

[12] The State Defendants rely on *Ginsberg*, which strongly supports Plaintiffs' argument. (State Br. at 31.) *Ginsberg* sets forth an obscenity standard that is consistent with *Miller* as applied to minors. 390 U.S. at 646.

Provisions are vast in comparison to the few, if any, books that could constitutionally be removed under the obscenity standard as applied to minors.

*Miller*'s contextual approach does not mean that schools are powerless to remove inappropriate books from school libraries or that parents are powerless to regulate which books their children can access in school libraries.[13] *Pico* suggested that school districts may be able to remove library books that are "pervasively vulgar" or not "educational[ly] suitab[le]." *See Pico*, 475 U.S. at 871. Books that are pervasively vulgar or not educationally suitable may also be obscene as to minors under the *Miller* test, which requires consideration of both the book's appeal to prurient interests and its value as a whole. *Miller* also requires consideration of community standards, which may differ among school districts and across the state. Even as to books that are not obscene under the *Miller* standard, school librarians may also consider vulgarity and educational suitability when considering which books should be on school library shelves. Simply put, the *Miller* obscenity standard as applied to minors permits a contextual approach that allows school librarians and school districts to continue to curate school library books as they always have by considering their educational suitability, the needs of their school communities, and the value of each book as a whole.

---

[13] Parents of children in Florida schools have long had the power to choose which school library books their children can and cannot access. (*See, e.g.*, Exs. A-5 and A-6 to Plaintiffs' Mot.) These parental rights allow Florida parents to ensure that their own children are exposed only to school library books that those parents deem appropriate for their own children.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motions for summary judgment and grant Plaintiffs' motion for summary judgment, ordering (1) that Section 1006.28(2)(a)(2)(b)(II)'s prohibition on material made available in a school or classroom library that "describes sexual conduct" is unconstitutional and (2) Section 1006.28(2)(a)(2)(b)(I)'s prohibition on material made available in a school or classroom library that is "pornographic" is synonymous with the term "harmful to minors" as defined by Section 847.001(7) or, in the alternative, is unconstitutional.

Dated: April 29, 2025

By:  */s/ David A. Karp*
David A. Karp
Florida Bar No. 69226
Carlton Fields P.A.
2 MiamiCentral
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Telephone: (305) 539-7280
dkarp@carltonfields.com

Frederick J. Sperling
Adam J. Diederich
Kirstie Brenson
ArentFox Schiff LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
Telephone: (312) 258-5500
frederick.sperling@afslaw.com
adam.diederich@afslaw.com
kirstie.brenson@afslaw.com
(admitted *pro hac vice*)

*Attorneys for Plaintiffs*