**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| PENGUIN RANDOM HOUSE, LLC, et al.<br><br>    Plaintiffs,<br><br>        v.<br><br>BEN GIBSON, in his official capacity as Chair of the Florida State Board of Education, et al.,<br><br>    Defendants. | Case No. 6:24-cv-01573 |

**STATE DEFENDANTS' REPLY IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiffs' summary judgment response and reply only confirm that their claims suffer fatal procedural and substantive defects. The State Defendants whom Plaintiffs have chosen to sue do not enforce HB 1069 against Plaintiffs and Plaintiffs still have offered no tenable theory about how their request for declaratory judgments against State Defendants will redress their alleged harms. Worse still, these problems emerge only after sifting and sorting through page upon page of nearly impenetrable shotgun pleading that fails to connect specific harms to specific parties and clumps together distinct constitutional challenges.

Substantively, Plaintiffs offer little in response to the wealth of Supreme Court and Eleventh Circuit precedent recognizing government speech in contexts where the government elects to speak through third parties. If not speech, public school libraries are at minimum a government benefit, in which nobody's favored publication can demand inclusion. The State has wide latitude on what to support

1

and what not to support with its resources. And even if public school libraries implicate speech in the way Plaintiffs insist, they have offered no principled justification for why *Hazelwood*'s deference to speech restrictions that advance legitimate pedological aims would not justify the law.

The State of Florida decided to create and maintain public-school libraries for the benefit of Florida students. HB 1069 merely identifies certain categories of material that do not benefit those students and therefore should not be made available in public school libraries. Plaintiffs are free to circulate or obtain these materials anywhere else they desire, but they have no legal or constitutional right to demand the State keep their books on its bookshelf. This Court should grant summary judgment for State Defendants.

## I.    Plaintiffs' reconsideration argument is irrelevant.

Plaintiffs begin their motion with an extended discussion equating the State Defendants' motion for summary judgment with a motion for reconsideration from this Court's prior motion to dismiss order. *See* DE118 at 1, 3–5. It is not clear what this comparison accomplishes. Those two motions serve different purposes, occur at different stages of the litigation, and are governed by different rules. *See* Fed. R. Civ. P. 56; Fed. R. Civ. P. 59(e). Regardless, "a denial of a motion to dismiss does not preclude the granting of summary judgment for the defendant . . . ." *King v. Bd. of Cnty. Comm'rs*, No. 8:16-CV-2651, 2018 WL 515350, at *2 (M.D. Fla. Jan. 23, 2018), *aff'd*, 916 F.3d 1339 (11th Cir. 2019); *see also Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 115 F.4th 1266, 1274 (11th Cir. 2024)

(affirming grant of summary judgment on defendant's government speech-claim despite previously reversing grant of defendant's motion to dismiss). This follows from the basic premise that "[a] motion to dismiss assumes Plaintiff's allegations to be true, while a motion for summary judgment tests the sufficiency of the actual evidence." *Steadman v. Calhoun Cnty. Bd. of Educ.*, No. CV 04-BE-1148, 2006 WL 8437346, at *1 (N.D. Ala. Jan. 10, 2006). The reconsideration framework is irrelevant at this stage of the litigation.[1]

## II.   Plaintiffs lack standing to sue the State Defendants.

Plaintiffs lack standing because they sued the wrong defendants with the wrong claims.

**A.**   State Defendants do not enforce the challenged provisions. That duty instead falls on the district school boards. *See* Fla. Stat. § 1006.28(2) (outlining district school board's duty to implement and enforce law). Given that HB 1069's enforcement structure "operates on officials at the local level," Plaintiffs cannot show a sufficient "causal connection between [their] injury and the challenged action of the" State Defendants instead of a "third party"—the district school boards.

---

[1] Plaintiffs' position also ignores the basic differences regarding finality and appealability between motions to dismiss and motions for summary judgment. *Compare Nice v. L-3 Commc'ns Vertex Aerospace LLC*, 885 F.3d 1308, 1311 (11th Cir. 2018) ("[D]enials of a motion to dismiss are normally not considered final . . . ."), *with United States v. One Colt Python .357 Cal. Revolver*, 845 F.2d 287, 289 (11th Cir. 1988) ("The disposition of a case on summary judgment grounds represents a final decision on the merits . . . .").

*City of South Miami v. Governor of Fla.*, 65 F.4th 631, 641, 642 (11th Cir. 2023)

(quotation marks omitted).

Plaintiffs attempt to manufacture causation and redressability by ascribing

to the State Defendants' a "coercive authority" to "implement and enforce" HB

1069. *See* DE118 at 11. Yet "[a] statute's use of the magic word 'enforce' does not

conjure up standing to challenge that law." *City of South Miami*, 65 F.4th at 642.

The Eleventh Circuit has repeatedly rejected this general enforcement theory of

standing. *See id.* (rejecting standing despite governor's authority to "sue local of-

ficers 'to *enforce* compliance'")[2]; *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236,

1253 (11th Cir. 2020) (rejecting standing despite Florida Secretary of State's au-

thority "to enforce the performance of any duties of a county supervisor"); *Lewis

v. Governor of Ala.*, 944 F.3d 1287, 1300 (11th Cir. 2019) (en banc) (rejecting

standing despite Alabama Attorney General's "general[]" "litigating and opinion-

giving authority").

---

[2] This Court previously concluded that HB 1069 granted State Defendants
greater authority to enforce the law than the law in *City of South Miami*. *See* DE106
at 6–7. The Court reached this decision because the State Defendants here offered
a binding "interpretation of the statute" through its objection form, DE106 at 7,
but that conclusion ignores the fact that the district school board is independently
required to "adopt a policy regarding an objection by a parent" for a book or mate-
rial barred by HB 1069, Fla. Stat. § 1006.28(2)(a)2. In other words, district school
boards would still have created an objection form that would lead to the same
harms Plaintiffs allege. And "a plaintiff lacks standing to sue over a defendant's
action if an independent source would have caused him to suffer the same injury."
*City of South Miami*, 65 F.4th at 645, which is precisely the case here.

**B.**     Plaintiffs' decision to seek only a declaratory judgment further undermines any claim to standing against the State Defendants. School board districts have an independent obligation to enforce HB 1069, so any declaration against the State Defendants will do nothing to redress Plaintiffs' alleged harms. *See Jacobson*, 974 F.3d at 1254. Put differently, a declaratory judgment against the State Defendants would not "settle[]" the issue "between [plaintiffs] and the officials who matter" and therefore "would leave the declaratory judgment powerless to remedy the alleged harm." *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023); *see also Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1228 (11th Cir. 2025) (holding alleged injury from election law was traceable to county supervisor, not Secretary of State).

**C.**     Plaintiffs' alternative claim to prudential standing fares no better. HB 1069 governs school board districts, not authors, publishers, or readers. And without being the directly regulated parties, Plaintiffs cannot show that HB 1069 "has been or could be enforced against" them. *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1265 (11th Cir. 2023). Plaintiffs attempt to distinguish *Mata Chorwadi* by claiming their own speech rights are implicated by HR 1069 even if they are not the regulated parties, *see* DE118 at 7–8, but that distinction is meaningless under *Mata Chorwadi*. The relevant factor for the Eleventh Circuit was not whether the law would implicate First Amendment rights in some way, but rather whether the law "could be enforced" against those parties. *See* 66 F.4th at 1265. And there, as here, the answer is no.

5

This mismatch for an overbreadth claim is only magnified by the fact that Plaintiffs brought only a facial challenge to HB 1069. Launching a facial attack without first raising an as-applied challenge is at direct odds with the overbreadth doctrine; it is "not the usual judicial practice," nor is "it generally desirable, to proceed to an overbreadth issue . . . before it is determined that the statute would be valid as applied." *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 484–85 (1989).[3] For good reason: overbreadth is a "strong medicine" that should be used "only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Plaintiffs should not be rewarded for ignoring these cautions.[4]

## III.    Plaintiffs' claims fail for additional threshold reasons.

**A.**    In addition to lacking standing against the State Defendants, Plaintiffs' complaint is still impermissible shotgun pleading. Among other flaws, the complaint "lumps multiple claims together in one count." *Ledford v. Peeples*, 657 F.3d 1222, 1239 (11th Cir. 2011). Specifically, Count I alleges—on behalf of differently situated parties—that HB 1069 (1) is an impermissible content-based distinction; (2) is unreasonable "in light of the purpose of school libraries"; (3) is facially

---

[3] In fact, Plaintiffs' chief case justifying their overbreadth claim—*Americans for Prosperity Foundation v. Bonta*—came from a facial *and* as-applied challenge. 594 U.S. 595, 611 (2021).

[4] Plaintiffs also take umbrage at being asked to offer sufficient evidence on the merits of their overbreadth claim, *see* DE118 at 22–23, but the Supreme Court has been clear that "[t]he overbreadth claimant bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists," *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (cleaned up).

overbroad; (4) impermissibly burdens students from checking out desired books;
(5) is impermissibly vague; (6) chills First Amendment rights of Plaintiffs "and
others"; (7) interferes with publishers' and authors' right to distribute books;
(8) interferes with the students' right to receive information; and (9) inflicted
"stigma" on the removed books and its readers. DE1 at 59–65; *see Cousins v. Sch.
Bd. of Orange Cnty., Fla.*, 687 F. Supp. 3d 1251, 1266 (M.D. Fla. 2023) (impermissible shotgun pleading in First Amendment context when plaintiffs "fail to adequately separate each claim for relief into separate counts").

Perversely, Plaintiffs attempt to excuse their deficiencies by noting that the
State Defendants shouldered the onerous task of sifting through the morass in
their complaint and identifying each sub-argument in their briefing. DE118 at 4.
But that is the whole point; the State Defendants should not have been made to
undertake that labor. Plaintiffs also devalue the burdens shotgun pleading place
on the courts by bogging down the evaluation of each claim. *See Vargas v. Lincare,
Inc.*, 134 F.4th 1150, 1162–63 (11th Cir. 2025) (Tjoflat, J., concurring).

**B.**     Plaintiffs' Count II—the "Statutory Construction" claim, DE1 at 65—
fails for the independent reason that it lacks a cause of action. Count II asks this
Court to offer a definitive interpretation of the term "pornographic" in Section
1006.28, but they identify no cause of action to enable this unusual request. *See
Fullman v. Graddick*, 739 F.2d 553, 556 (11th Cir. 1984) ("[T]he complaint must

state a cause of action sufficient to affirmatively show the plaintiff is entitled to relief. . . .").[5]

Plaintiffs say little in response to this defect and, remarkably, do not even attempt to identify what cause of action they claim they "properly allege[d]" in their complaint. *See* DE118 at 4. They instead note that the declaratory relief sought would "resolve the case or controversy" and would grant them relief "on the merits." *Id.* That defense ignores that "the concepts of standing and cause of action are distinct and involve separate inquiries." *In re Olympia Holding Corp.*, 88 F.3d 952, 959 n.13 (11th Cir. 1996).[6] And, in light of the lurking Eleventh Amendment concerns regarding a federal court's "instructing state officials on how to comply with state law," *Doe v. Swearingen*, 51 F.4th 1295, 1303 (11th Cir. 2022), this Court should refrain from adjudicating Count II.

## IV.    HB 1069 does not violate the First Amendment.

**A.**    Plaintiffs' frequent claims about the First Amendment rights of publishers, parents, and students to publish and receive information all fail for the

---

[5] In its order denying State Defendants' motion to dismiss, the Court noted a "direct threat of enforcement" and the general right "under Florida law" to resolve questions of law, DE 106 at 12, but neither of those facts provide Plaintiffs a cause of action for this specific claim.

[6] It is not entirely clear if Plaintiffs claim that the First Amendment is *itself* the cause of action, but that idea has been rejected by the Supreme Court. *See Bush v. Lucas*, 462 U.S. 367, 390 (1983) (denying freestanding cause of action for alleged First Amendment violation); *see also Hamman v. Univ. of Cent. Fla. Bd. of Trs.*, No. 6:23-cv-395-CEM, 2024 WL 3912913, at *6 (M.D. Fla. Aug. 23, 2024) ("[T]he First Amendment does not provide a standalone cause of action.").

same reason: "[T]he Government's own speech . . . is exempt from First Amendment scrutiny." *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1333 (11th Cir. 2023). And crucially here, government speech "includes choosing not to speak and speaking through the removal of speech that the government disapproves." *Dean v. Warren*, 12 F.4th 1248, 1264 (11th Cir. 2021) (citing *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074 (11th Cir. 2015)). Plaintiffs may not agree with the government's speech, but that gives them no right to change it, except through "the democratic electoral process that first and foremost provides a check on government speech." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

And here it is clear the curation of library books in public schools is government speech. Public school libraries have a long history of being controlled by the government; they are closely associated with the government, located on government property, and perceived to be its speech; and the government exerts total control over its content. Plaintiffs dismiss the many analogous cases from the Eleventh Circuit and Supreme Court because they do not address public libraries specifically, but miss the clear principles established across these rulings.

This is seen most clearly in Plaintiffs' attempt to run from *McGriff*. In that case, the Eleventh Circuit held that an art collection created by private artists was government speech and the city was therefore allowed to remove an art piece it did not want to display. 84 F.4th at 1334. Plaintiffs argue *McGriff* is inapplicable because artists there "were required to cede all control," unlike authors of books that

9

a school district decides to include in school library. DE118 at 15. It is unclear what Plaintiffs mean here exactly by an author's retaining control. Authors also cede control of their books—the physical copies, that is, when purchased by third parties, including the government. Just like somebody who purchases one of the author Plaintiffs' books at a Barnes and Noble, a school that purchases such a book could put it to any number of uses. It could include it in the school library; use it for classroom instruction; give the book to students to interlineate with all kinds of critical notes that an author might not appreciate; use the book as a prop to level an uneven desk; or discard the book entirely. But when the school chooses the first option, it sends a message to its students: "this book is worth your reading." That message is the government's and the government's alone.

More relevant is the fact that, in *McGriff* and here, the government exerts total control over what speech it chooses to sponsor. *See McGriff*, 84 F.4th at 1332 ("All installations shall be subject to review and approval by the City Manager's designee . . . ."); Fla. Stat. § 1006.28(2)(d)1 ("Each book made available to students through a school district library . . . must be selected by a school district employee . . . .").[7] Thus, government speech remains government speech even when "private parties take part in the design and propagation of a message." *McGriff*, 84 F.4th at 1334; *see also Cambridge Christian*, 115 F.4th at 1294 (affirming

---

[7] Plaintiffs also claim that no "history exists" of government expression through libraries, DE118 at 16, but that flatly ignores the multiple historical sources confirming the opposite cited in State Defendants' opening motion, *see* DE109 at 22–23.

government speech even though government generally accepted third-party "scripts without revision").

Plaintiffs next argue that no government speech occurs in a school library because libraries contain books with differing ideas, making any government speech inconsistent and incoherent. DE118 at 16. That same argument, however, was rejected in *Walker*, where the Supreme Court held that conflicting specialty license plates—e.g., those displaying rival colleges—were nonetheless government speech. *See* 576 U.S. 200, 236, (2015) (appendix of approved license plates). Again, the message the school is sending to its students is that the books in its library are worth reading, not that the school necessarily agrees with every word of what the book is saying.[8]

**B.**     Alternatively, Plaintiffs' arguments fail because public school libraries are a government benefit. Both parties agree that the First Amendment does not require that school libraries be built and maintained, so it follows that the State is allowed to tailor its benefit by reducing the number of books or services available. *See Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 549 (1983) ("[A]

---

[8] Finally, Plaintiffs cannot justify their inordinate reliance on *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024), by claiming the government speech analysis there was not dicta. Plaintiffs argue the government speech issue was jurisdictional because "plaintiffs would not have had standing to bring their claims because they would not have suffered a First Amendment injury." DE118 at 17 n.5. Government speech, however, is not a jurisdictional argument. Neither the Supreme Court nor the Eleventh Circuit has dismissed a case for lack of jurisdiction after finding the speech at issue to be government speech. *GLBT*'s dicta remains just that.

legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right . . . ."). Plaintiffs briefly offer two responses to this black-letter legal principle, but both are foreclosed by binding authority.

First, Plaintiffs argue that the removal of prohibited books under HB 1069 was not "evenhanded[]" and therefore impermissible. DE118 at 5 (quotation omitted). But there is no requirement that the government be evenhanded when determining the scope and nature of a government benefit. *See, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 356, 359 (2009) (withdrawing payroll deductions for political activities, but not general union dues, was consistent with First Amendment). Evenhandedness might be a political preference but it is not a constitutional imperative.

Second, Plaintiffs rely on the Court's prior holding that HB 1069 restricts speech, not funding. DE118 at 5. This distinction similarly cannot be squared with Supreme Court precedent. In *Rust v. Sullivan*, for example, the federal government required medical providers receiving funds as part of a government family-planning program not to discuss or recommend abortions for their patients in that program. 500 U.S. 173, 178–79 (1991). Even though the government was clearly withholding funds from speech of a certain viewpoint, the Supreme Court found no First Amendment violation. *Id.* at 194. It did so after rejecting "the position that if the government chooses to subsidize one protected right, it must subsidize analogous counterpart rights." *Id.*; *see also Nat'l Endowment for the Arts v. Finley*,

12

524 U.S. 569, 587 (1998) (similar). Reframing funding as "speech" does nothing to change this equation.

     **C.**     Finally, HB 1069 should be declared constitutional even if Plaintiffs' First Amendment rights are held to implicated. "[T]he First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, (1988) (citation and quotation omitted). As relevant here, that greater control includes regulating "sexually explicit" material that does not qualify as obscene. *Id.* (quotation omitted).

     Plaintiffs seek to water down *Hazelwood*'s import by emphasizing that the restricted content came from a "compulsory curricular environment" and not an optional benefit like a school library. *See* DE118 at 23–24. Such an exemption is at odds with *Hazelwood*'s basic reasoning. As *Hazelwood* made clear, states in school settings are allowed to limit and control speech if it is "reasonably related to legitimate pedagogical concerns," which includes ensuring "that readers or listeners are not exposed to material that may be inappropriate for their level of maturity." 484 U.S. at 271, 273. Exposure to sexually explicit or otherwise inappropriate material can occur in both compulsory or elective contexts, and nothing in *Hazelwood* can be read to limit this general authority to compulsory contexts alone.

     Plaintiffs rely on two Eleventh Circuit cases to try and bolster this distinction, but neither case supports such a view. One case invalidated a school's decision

to bar an anti-military organization from appearing at a career day event, deeming

the event to be a nonpublic forum. *See Searcey v. Harris*, 888 F.2d 1314, 1324 (11th

Cir. 1989). That is an entirely different context; the Supreme Court has made clear

that in a nonpublic forum, where the speech is *not* the government's, excluding

private speech on the basis of viewpoint violates the First Amendment. *See Cor-*

*nelius v. NAACP Legal Defense and Educ. Fund*, 473 U.S. 788, 805–06 (1985). The

other case upheld a school's decision to exclude sexually inappropriate content

from an elective class. The court did note that the restriction was part of the school

curriculum, but only to indicate that the materials would be perceived as bearing

"the imprimatur of the school." *Virgil v. Sch. Bd. of Columbia Cnty*, 862 F.2d 1517,

1522 (11th Cir. 1989) (quotation omitted). A public-school library—located on

school property and filled with school-selected books—also bears the imprimatur

of the school. And regardless, the court in *Virgil* also emphasized the "legitimate

concern" that was the "motivation for the Board's removal of the readings"—"the

explicit sexuality and excessively vulgar language in the selections." *Id.* at 1522–

23. It did not matter that the works at issue were "widely acclaimed masterpieces

of Western literature"; the board was justified in limiting students' access to the

material. *Id.* at 1523. So too here.[9]

---

[9] Plaintiffs also fault HB 1069 for "supplant[ing]" local control and instead imposing a state wide law on which books should not be in public school libraries. *See* DE118 at 26. That criticism is not legally or constitutionally relevant; "public education" is ultimately a "core state responsibility," regardless of how responsibilities are delegated. *See Horne v. Flores*, 557 U.S. 433, 448 (2009). Indeed, school districts are creatures of the state and are heavily governed and regulated

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and grant

State Defendants' motion for summary judgment.

Dated: May 9, 2025                     Respectfully submitted,

| | |
|---|---|
| Office of the Attorney General | JAMES UTHMEIER |
| The Capitol, PL-01 | *Attorney General* |
| Tallahassee, Florida 32399-1050 | JEFFREY PAUL DESOUSA (FBN 110951) |
| (850) 414-3300 | *Acting Solicitor General* |
| (850) 410-2672 (fax) | DAVID M. COSTELLO (FBN 1004952) |
| jason.muehlhoff@myfloridalegal.com | *Chief Deputy Solicitor General* |
| | */s/ Jason J. Muehlhoff* |
| | JASON J. MUEHLHOFF (admitted |
| | *pro hac vice*) |
| | *Deputy Solicitor General* |

*Counsel for State Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, a true and correct copy of the foregoing

was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Jason J. Muehlhoff*
*Deputy Solicitor General*

---

by Florida law. *See, e.g.*, Fla. Stat. § 1001.42 ("Powers and duties of district school
board").