UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**PENGUIN RANDOM HOUSE
LLC, HACHETTE BOOK
GROUP, INC., HARPERCOLLINS
PUBLISHERS LLC,
MACMILLAN PUBLISHING
GROUP, LLC, SIMON &
SCHUSTER, LLC,
SOURCEBOOKS LLC, THE
AUTHORS GUILD, JULIA
ALVAREZ, JOHN GREEN,
LAURIE HALSE ANDERSON,
JODI PICOULT, ANGIE
THOMAS, HEIDI KELLOGG and
JUDITH ANNE HAYES,**

> **Plaintiffs,**

**v.**                                      **Case No.  6:24-cv-1573-CEM-RMN**

**BEN GIBSON, RYAN PETTY,
ESTHER BYRD, GRAZIE P
CHRISTIE, KELLY GARCIA,
MARYLYNN MAGAR, TERESA
JACOBS, ANGIE GALLO,
MARIA SALAMANCA, ALICIA
FARRANT, ANNE DOUGLAS,
VICKI-ELAINE FELDER,
STEPHANIE VANOS, MELISSA
BYRD, JAMIE HAYNES, KRISTA
GOODRICH, RUBEN COLON,
DONNA BROSEMER, and JESSIE
THOMPSON,**

> **Defendants.**

_____/

**ORDER**

THIS CAUSE is before the Court on Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion," Doc. 107). This cause is also before the Court on Defendants Teresa Jacobs, Angie Gallo, Maria Salamanca, Alicia Farrant, Anne Douglas, Vicki-Elaine Felder, Stephanie Vanos, and Melissa Byrd ("Volusia County Defendants"), Jamie Haynes, Krista Goodrich, Ruben Colon, Donna Brosemer, and Jessie Thompson's ("Orange County Defendants") (collectively, "School Board Defendants") Motion for Summary Judgment ("School Board's Motion," Doc. 108), which also served as a Response to Plaintiffs' Motion. This cause is also before the Court on Defendants Ben Gibson, Ryan Petty, Esther Byrd, Grazie P Christie, Kelly Garcia, and Marylynn Magar's (collectively, "State Defendants") Motion for Summary Judgment ("State's Motion," Doc. 109), which also served as a Response to Plaintiffs' Motion. Plaintiffs filed a Response to the School Board's and State's Motions and a Reply (Doc. 118). State Defendants filed a Reply (Doc. 121). The Court held oral argument on May 21, 2025. (Min. Entry, Doc. 122, at 1). For the reasons set forth below, Plaintiffs' Motion will be granted, the State's Motion will be granted in part and denied in part, and the School Board's Motion will be granted in part and denied in part.

# I.    BACKGROUND

When J.H., a junior at an Orange County public high school, went to the school library to check out *On the Road* by Jack Kerouac, it was nowhere to be found. (J.H. Decl., Doc. 107-58, at 3). It was not checked out; it had been removed from the shelves. (*Id.*). The same thing happened to R.K., a senior at a Volusia County public high school, who tried to check out *The Bluest Eye* by Toni Morrison. (R.K. Decl., Doc. 107-57, at 3). Other removed books include *Looking for Alaska* by John Green, *Nineteen Minutes* by Jodi Picoult, *The Hate U Give* by Angie Thomas, *How the García Girls Lost Their Accents* by Julia Alvarez, and *Shout* by Laurie Halse Anderson. (Doc. 107-21 at 2 (Green); Doc. 107-41 at 4 (Picoult); Doc. 107-41 at 3 (Thomas); Doc. 107-15 at 39 (Alvarez); Doc. 107-23 at 8 (Halse Anderson)). These books were removed from the shelves—not because school librarians had, using their expertise, deemed them unsuitable for children but because fragments of their content were prohibited under HB 1069. H.R. 1069, 2023 Leg., 125th Reg. Sess. (Fla. 2023). The bill amended section 1006.28 of the Florida Statutes. *Id.*

The relevant portions of the statute are set forth below with the sections added by HB 1069 italicized.

> Each district school board must adopt a policy regarding an objection by a parent or a resident of the county to the use of a specific material, which clearly describes a process to handle all objections and provides for

resolution. *The objection form, as prescribed by State Board of Education rule, and the district school board's process must be easy to read and understand and be easily accessible on the homepage of the school district's website. The objection form must also identify the school district point of contact and contact information for the submission of an objection.*

Fla. Stat. § 1006.28(2)(a)2. (emphasis added as to amended language).

Relevant here, parents may object to any material "made available in a school or classroom library" containing content that:

> (I) Is pornographic or prohibited under s. 847.012;
>
> (II) *Depicts or describes sexual conduct as defined in s. 847.001(19), unless such material is for a course required by s. 1003.46 or s. 1003.42(2)(o)1.g. or 3., or identified by State Board of Education rule*;

Fla. Stat. § 1006.28(2)(a)2.b. (emphasis added as to amended language). "Any material that is subject to an objection on the basis of sub-sub-subparagraph b.(I) or sub-sub-subparagraph b.(II) *must* be removed within 5 school days after receipt of the objection and remain unavailable to students of that school until the objection is resolved." *Id.* (emphasis added). The statute also requires the district school boards themselves "discontinue use of the [proscribed] material" if they find in contains the above prohibited content. *Id.*

Pursuant to the statute, State Defendants promulgated the Template Objection Form, in which the text relevant here "must not be modified by school districts." Fla. Admin. Code r. 6A-7.0714. Among the bases on which a parent may object, the

Template Objection Form lists the following: "[t]he material is pornographic"; "[t]he material is prohibited under Section 847.012, F.S."; and "[t]he material depicts or describes sexual conduct as defined in Section 847.001(19), F.S." (Specific Material Objection Template, Doc. 107-59, at 3).

Plaintiffs include book publishers (Penguin Random House LLC, Hachette Book Group, Inc., HarperCollins Publishers LLC, Macmillan Publishing Group, LLC, Simon & Schuster, LLC, and Sourcebooks LLC (collectively, "Publisher Plaintiffs")) and authors (Julia Alvarez, John Green, Laurie Halse Anderson, Jodi Picoult, and Angie Thomas (collectively, "Author Plaintiffs")) whose books have been removed from school libraries through this process, as well as The Authors Guild, which is a non-profit professional association for authors. Plaintiffs also include parents (Heidi Kellogg and Judith Anne Hayes ("Parent Plaintiffs")), bringing claims on behalf of their children who are students that were unable to access books from school libraries due to their removal.

Plaintiffs bring seven counts seeking declaratory relief, pursuant to 28 U.S.C. § 2201, against Defendants. Counts I, IV, and VII challenge the prohibition of material that "describes sexual conduct" as an overbroad content-based restriction in violation of the First Amendment. These are brought against State Defendants, Volusia County Defendants, and Orange County Defendants, respectively. Counts II and V seek a declaration that the term "pornographic" is synonymous with

"harmful to minors" against State Defendants and Volusia County Defendants, respectively. Counts III and VI—which are pled in the alternative to Counts II and V, respectively—assert that if the term "pornographic" is not synonymous with "harmful to minors," then the prohibition of material that is "pornographic" is an overbroad content-based restriction in violation of the First Amendment. These counts are also brought against State Defendants and Volusia County Defendants, respectively. (*See generally* Compl., Doc. 1). The Court previously denied State Defendants' Motion to Dismiss. (Doc. 106). Plaintiffs, State Defendants, and School Board Defendants all move for summary judgment.

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.*

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). In ruling on a motion for summary judgment, the Court construes the facts

and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But when faced with a "properly supported motion for summary judgment," the nonmoving party "must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997) (citing *Anderson*, 477 U.S. at 248–49 (1986)); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he proper inquiry on summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Stitzel v. N.Y. Life Ins. Co.*, 361 F. App'x 20, 22 (11th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251–52). Put another way, a motion for summary judgment should be denied only "[i]f reasonable minds could differ on the inferences arising from undisputed [material] facts." *Pioch v. IBEX Eng'g Servs.*, 825 F.3d 1264, 1267 (11th Cir. 2016) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

### III.    ANALYSIS

#### A.    Article III Standing

Article III standing is a "bedrock constitutional requirement," *United States v. Texas*, 599 U.S. 670, 675 (2023), and it is Plaintiffs' burden to establish standing, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "[A] plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

"When First Amendment protections are implicated, [courts] apply 'most loosely' the injury-in-fact requirement 'lest free speech be chilled.'" *Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1241 (11th Cir. 2015) (quoting *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1253–57 (11th Cir. 2010)). "The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *FDA*, 602 U.S. at 380–81 (quoting *Sprint Commc'ns Co.* v. *APCC Servs., Inc.*, 554 U. S. 269, 288 (2008)). This means a judgment against a defendant who causes an injury is likely to redress that injury. *See id.* at 381. Here, the four sets of plaintiffs—Parent Plaintiffs, Publisher Plaintiffs, Author Plaintiffs, and The Authors Guild—must establish all three prongs of the standing inquiry, and The Authors Guild, an organization, must meet further requirements as outlined below.

First, injury in fact. Parent Plaintiffs sue on behalf of their minor children who have tried to access books that were removed from their school libraries, alleging a violation of the right to receive information. (Kellogg Decl., Doc. 107-55, at 2–3; Hayes Decl., Doc. 107-56, at 2–3). The right to receive information is protected by the First Amendment. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969). This right "comes from both the sender's right to provide it and the receiver's own rights under the First Amendment." *Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, 641 F. Supp. 3d 1218, 1244 (N.D. Fla. 2022).

Under this right, the Supreme Court "ha[s] identified a cognizable injury only where the listener has a concrete, specific connection to the speaker." *Murthy v. Missouri*, 603 U.S. 43, 75 (2024) (citing *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)). Unlike in *Murthy*, where the plaintiffs could "not point to any specific instance of content moderation that caused them identifiable harm," here, the parents have identified removals of specific books that their children sought to access. *Id.*; (Doc. 107-55 at 3; Doc. 107-56 at 3); *see also ACLU of Fla., Inc. v. Mia.-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009) (finding parent had standing to sue on behalf of his child over the removal of a particular school library book).

Each Author Plaintiff has had at least one of their books removed from the shelves, which prevents them from reaching their target audience. (Alvarez Decl., Doc. 107-50, at 6; Green Decl., Doc. 107-51, at 5; Anderson Decl., Doc. 107-52, at

6; Picoult Decl., Doc. 107-53, at 4–5; Thomas Decl., Doc. 107-54, at 7–9). Likewise, the same harm has been suffered by Publisher Plaintiffs, which have all had at least one book they published be removed. (Skye Decl., Doc. 107-2, at 5). Their speech has thus been chilled, establishing an injury in fact.

Second, causation. State and School Board Defendants point fingers at each other. But it is apparent both sets of Defendants caused Plaintiffs' injuries. Indeed, it is School Board Defendants that remove the books on the local level. Fla. Stat. § 1006.28(2)(a)2.b. But the Template Objection Form itself is "prescribed by State Board of Education rule," so Plaintiffs' alleged injuries can be readily traced back to State Defendants. *Id.* § 1006.28(2)(a)2. Moreover, State Defendants also have final reviewing authority over removal decisions. *Id.* § 1006.28(2)(a)6. And if School Board Defendants fail to adequately comply with the statute, the State Defendants may penalize them. *See id.* § 1012.796; Fla. Admin. Code r.6A-10.081.

Third, redressability. State Defendants argue that a declaration against them will not bind School Board Defendants and will ultimately be ineffectual. On the other hand, School Board Defendants argue that a declaration against them will not cause any removed books to be reshelved, they are powerless to change the Template Objection Form, and they do not interpret the statute. But that is not quite right.

Counts I, III, IV, VI, and VII seek to declare portions of the statute unconstitutional. A finding against State Defendants would require the Template

Objection Form be altered. A finding against School Board Defendants, as they correctly note, would not. Contrary to their assertion though, if they do not reshelve the books removed under the provisions at issue, they will have removed the books on unconstitutional grounds.

School Board Defendants are also incorrect that they do not interpret the statute. *See* Fla. Stat. § 1006.28(2)(a)2. ("If the district school board finds that . . . any other material contains prohibited content under sub-sub-subparagraph b.(I), the school district shall discontinue use of the material. If the district school board finds that any other material contains prohibited content under sub-sub-subparagraphs b.(II)-(IV), the school district shall discontinue use of the material for any grade level or age group for which such use is inappropriate or unsuitable."). These findings require interpretation of the statutory language to determine what "describes sexual conduct" and what is "pornographic."

This interpretive power brings the Court to Counts II and V, which ask the Court to construe the statute in a way that saves it but deems the interpretation advanced by the Template Objection Form unconstitutional. A finding against State Defendants on Count II—that "pornographic" is synonymous with "harmful to minors"—does not necessitate a change in the form. It requires a change in the way the form is interpreted. That is where Count V is also necessary. If bound by Count V, School Board Defendants that removed books under an incongruous reading

would be required to reshelve those books and be bound by the interpretation. Thus, Publisher, Author, and Parent Plaintiffs have all established standing to bring their claims.

Finally, The Authors Guild is an organization and asserts it has standing as a representative of its members. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). "To invoke [organizational standing], an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

The Authors Guild counts Author Plaintiffs John Green, Jodi Picoult, and Angie Thomas among its members. (Rasenberger Decl., Doc. 107-49, at 3). Given the authors have standing, the first prong is met. As for the second prong, it seeks to protect interests germane to its purpose because the organization "serves as a collective voice of American authors and has long supported the rich and diverse literary culture of our country." (*Id.* at 2). "Censorship efforts obstruct the right to read and publish freely by suppressing free speech and freedom of expression and by making it harder for authors to sell copies of their work" and thus earn their livelihood. (*Id.* at 3). These claims also do not require the participation of each

member because The Authors Guild only seeks declaratory relief that does not require individualized proof. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."). The Author's Guild has established standing.

### B.    Eleventh Amendment

Defendants renew their argument that Counts II and V, which seek a declaration that the term "pornographic" is synonymous with "harmful to minors," are barred by the Eleventh Amendment. First, they argue that the Declaratory Judgment Act does not create a standalone cause of action. Second, they assert any declaration as to how a state statute is interpreted violates the Eleventh Amendment because it directs that the state to conform to state law. As this Court has explained, Count II and V seek "neither an advisory opinion nor relief that violates the Eleventh Amendment" because "the declaratory relief sought would resolve the case or controversy [as to the alleged First Amendment violations] before the Court," and "[a]ny declaration issued would ultimately instruct State Defendants on how to conform their conduct to the restrictions imposed by the First Amendment." (Doc. 106 at 12–14). The Court will briefly review.

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The controversy must "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (alteration in original) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)).

Plaintiffs seek a declaration that "State Defendants' construction of the term 'pornographic' under [s]ection 1006.28 infringes on the First Amendment rights of publishers, authors, parents, and students—including Plaintiffs—there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the term 'pornographic' as used in [s]ection 1006.28 is synonymous with the term 'harmful to minors.'" (Doc. 1 at 68 (Count II); *see id.* at 81 (Count V against Volusia County Defendants for their enforcement of the interpretation)). This declaratory relief is rooted in the alleged First Amendment violation. Plaintiffs do not seek to assert some sort of freestanding right or manufacture a cause of action out of nothing.

Defendants also take issue with the Court's statement that a finding for Plaintiff in Count II, and similarly Count V, would find that State Defendant's

interpretation is unconstitutional. They argue, instead, that is the relief sought in Count III, and by extension Count VI. They are wrong. Counts III and VI ask this Court to find that section of the statute unconstitutional wholesale. An extreme remedy indeed. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) ("It is a cardinal principle of statutory interpretation, however, that when an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." (cleaned up)). On the other hand, Counts II and V seek to save the statute by finding the interpretation unconstitutional. *See HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1248 (11th Cir. 2025) (Tjoflat, J., dissenting) ("[W]e could apply ordinary tools of statutory construction to read the statute narrowly and avoid unnecessary constitutional conflict[.]"). Counts II and V do not break new ground, they merely invoke the canon of constitutional avoidance.

In asserting the Eleventh Amendment bars Counts II and V, Defendants advance an argument that this Court cannot interpret state law to determine if it is constitutional. Whether the law at issue is state or federal is a distinction without a difference when it comes to compliance with the Constitution. *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1212 (N.D. Fla. 2018) ("It is axiomatic that federal courts can review state or local laws alleged to be unconstitutional." (citing *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008),

and *Loving v. Virginia*, 388 U.S. 1, 12 (1967))). "Simply put, a federal court can review a state official's interpretation of—or gloss over—state law when it is alleged to violate the United States Constitution. Otherwise, state legislatures could pass ambiguous statutes, giving cover for state officers to interpret vague laws in manners contrary to the U.S. Constitution." *Id.*

The Court is not attempting to direct the state to comply with state law. A declaration in favor of Plaintiffs would direct Defendants to conform to the United States Constitution—not state law. *See* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . . .").

### C.    Prudential Standing

Defendants then argue that Plaintiffs lack prudential standing to bring an overbreadth challenge. Prudential standing is "a doctrine not derived from Article III" and covers "the general prohibition on a litigant's raising another person's legal rights." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). Challenging a statute as overbroad necessarily implicates prudential standing concerns. That is because "the overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied." *United States v. Hansen*, 599 U.S. 762, 769 (2023).

Defendants first argue that Plaintiffs lack prudential standing because the statute at issue regulates school districts, not Plaintiffs. But that is the wrong question. The issue is not what entity the statute directly regulates; it is whose constitutional rights the statute violates. In advancing their argument, Defendants rely on *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259 (11th Cir. 2023). There, however, the plaintiffs were hotel owners who were attempting to assert the constitutional rights of the non-party hotel guests. *Id.* at 1264. The plaintiffs themselves suffered no violation of their own constitutional rights. *Id.* Not so here.

As explained in the Article III standing analysis, the constitutional rights of Plaintiffs themselves are implicated here. The mere fact that other non-parties' constitutional rights may also be implicated is of no import. Indeed, this is exactly the type of circumstance the overbreadth doctrine was intended to address. *See id.* ("[T]he overbreadth doctrine [ ] allows a litigant to challenge a statute not because it is unconstitutional as applied to him but because it may deter others from engaging in protected expression." *Id.* at 1265 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973))).

Defendants then argue that Plaintiffs cannot bring a facial challenge because they did not bring an as-applied challenge. While the Supreme Court has commented that "the lawfulness of the particular application of the law should ordinarily be

decided first," that is not a binding requirement. *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 485 (1989). In fact, as Justice Scalia explained earlier in the same opinion, "[i]t would make little sense to . . . preclude [Plaintiffs] from attacking that restriction on grounds that the statute is overbroad (because they have standing to attack its overbroad applications directly and therefore cannot invoke the overbreadth doctrine)—and then, next week, to permit some person whose [ ] speech is *not* restricted (so that he has no standing to attack that aspect of the statute directly) to *succeed* in his attack . . . because the statute is overbroad." *Id.* at 484.

This argument is also foreclosed by recent Supreme Court and Eleventh Circuit authority. *Moody v. NetChoice, LLC*, 603 U.S. 707, 718, 745 (2024) (permitting a facial challenge without an as-applied challenge, with Justice Barrett noting in her concurrence that there can be difficulties in bringing facial, as opposed to as-applied, challenges but not prohibiting parties from doing so); *HM Fla.-ORL*, 137 F.4th at 1247–48 (majority opinion) ("[W]e disagree that courts cannot reach an overbreadth challenge until they have evaluated an as-applied one." (citing *United States v. Stevens*, 559 U.S. 460 (2010), and *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021))). Defendants' prudential standing argument fails.

### D.    Shotgun Pleading

The first argument in the State's Motion is that State Defendants are entitled to summary judgment because the Complaint is a shotgun pleading. But State

Defendants have cited no case law that the appropriate remedy is granting summary judgment in their favor if the Complaint was a shotgun pleading. It is not. "[A] shotgun pleading is a shotgun pleading and the remedy is repleading." *Cardinal v. Haines City*, No. 8:19-cv-3137-KKM-TGW, 2021 U.S. Dist. LEXIS 146679, at *3 n.1, 4 (M.D. Fla. Aug. 5, 2021) (denying motion for summary judgment as moot, striking shotgun-pleading complaint with leave to refile an amended complaint); *see also Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) ("In the past when faced with [shotgun] complaints like this one, we have vacated judgments and remanded with instructions that the district court require plaintiffs to replead their claims.").

Because State Defendants make no new arguments on this point and this argument essentially seeks dismissal of the Complaint, the Court need not dwell here long. The Court incorporates by reference that portion of its Order on State Defendants' Motion to Dismiss that addresses the shotgun pleading argument. (Doc. 106 at 14–17). As explained there, while the Complaint is perhaps longer than it needed to be, it is not a shotgun pleading.

### E.    Government Speech

"The First Amendment prohibits Congress and other government entities and actors from 'abridging the freedom of speech'; the First Amendment does not say that Congress and other government entities must abridge their own ability to speak

freely." *Matal v. Tam*, 582 U.S. 218, 234 (2017). "But while the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Id.* at 235. Thus, this Court "must exercise great caution" before deeming the speech at issue here government speech. *Id.*

Defendants frame this case broadly as the government curating the selection of books in the library and argue that is government speech. That is problematic for two reasons. First, it is unclear whether, even under that broad umbrella, this would constitute government speech. And second, Defendants' framing ignores the narrower reality of the statutory scheme at issue here.

As to the broader concept, the Eleventh Circuit has not determined whether selecting and removing books from a library constitutes government speech. There is some conflicting authority among other circuits, but the argument that it is government speech has yet to obtain endorsement by a majority opinion. The Eighth Circuit has soundly rejected the argument, stating: "if placing these [disparate] books on the shelf of public school libraries constitutes government speech, the State 'is babbling prodigiously and incoherently.'" *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024) (quoting *Matal*, 582 U.S. at 236).

Recently, the Fifth Circuit—sitting en banc—held in *Little v. Llano County* that the plaintiffs could not challenge library book removals, but the holding amounted to a finding the plaintiffs lacked standing to bring their claim.[1] 138 F.4th 834, 836 (5th Cir. 2025). Earning only a plurality's support, Part IV of the opinion concluded library collection decisions are government speech. *Id.* at 865 (plurality opinion).

Critical to the plurality in *Little* was that "libraries curate their collections for expressive purposes." *Id.* at 837–38 (majority opinion). Expressive activity was also of paramount importance in the cases upon which *Little* relied: *United States v. Am. Libr. Ass'n ("ALA")*, 539 U.S. 194, 204 (2003) (plurality opinion) ("The librarian's responsibility . . . is to separate out the gold from the garbage[.]"); *City of Pleasant Grove v. Summum*, 555 U.S. 460, 473 (2009) ("The City has selected those monuments that it wants to display for the purpose of presenting the image of the City that it wishes to project to all who frequent the Park[.]"); and *Moody v. NetChoice, LLC*, 603 U.S. at 728 (2024) ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others.").[2]

---

[1] As discussed above, the Eleventh Circuit has taken a different track, *see ACLU of Fla.*, 557 F.3d at 1195, and Plaintiffs have established standing.

[2] Notably, *ALA* and *NetChoice* are not government speech cases. *ALA* also involved internet filtering, and ultimately, patrons could still access the restricted content if they requested the filter be turned off. *See* 539 U.S. at 209. Here, there is no "restricted section" of the library. The books are entirely off-limits. Compellingly written as that portion of the *Little* opinion might be, it is inapposite here.

Here, the government is not engaging in expressive activity. Despite
Defendant's best efforts to frame it as such, the statutory provision at issue does not
involve discretion of government employees in curating an appropriate collection of
library books that are "worth reading." *Little*, 138 F.4th at 837. Unlike *Little*, where
librarians were using their discretion to remove books that they felt were no longer
worthwhile additions to the library, *id.* at 839, the statute here mandates the removal
of books that contain even a single reference to the prohibited subject matter,
regardless of the holistic value of the book individually or as part of a larger
collection. Moreover, many removals at issue here are the objecting parents' speech,
not the government's.

Having addressed the persuasive authority regarding the issue of selecting and
removing library books generally, the Court turns to binding precedent addressing
the government speech analysis. The Supreme Court outlined a "holistic inquiry"
guided by consideration of the following factors: (1) "the history of the expression
at issue"; (2) "the public's likely perception as to who (the government or a private
person) is speaking"; and (3) "the extent to which the government has actively
shaped or controlled the expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 252
(2022). The Eleventh Circuit has considered a corresponding list of factors: history,
endorsement, and control. *See Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 76
(11th Cir. 2022). But, in line with the Supreme Court's holistic inquiry, the Eleventh

Circuit made clear that "[t]hese factors are neither individually nor jointly necessary for speech to constitute government speech," and that a court's "review is not mechanical; it is driven by a case's context rather than the rote application of rigid factors." *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1334 (11th Cir. 2023) (first quoting *Leake v. Drinkard*, 14 F.4th 1242, 1248 (11th Cir. 2021), then quoting *Shurtleff*, 596 U.S. at 252).

The Eleventh Circuit applied those factors in *McGriff*, when an artist sued after the city removed his painting from a city art exhibit over concerns about the painting's message. *Id.* at 1333. Applying the factors, the court held "the City was speaking when it selected some artwork, but not others, to display[.]" *Id.* at 1333–36. When compared to this case, however, *McGriff* is readily distinguishable. That is because the city removed the painting in its own discretion—not an outsider's input—and after considering the artwork in its entirety—not based on a single criterion excised from the work as a whole. *See id.* at 1333. ("After viewing the painting, the City Manager told the artists to remove [it] from the exhibition.").

Both parties miss the boat with their arguments as to parental removals. Under *Shurtleff*, the first inquiry in this case is not whether public school librarians—state employees certainly—have a history of selecting school library books. They do, of course. It is whether *parents* have.

As to the second *Shurtleff* factor, in the abstract, the public may believe the state is speaking through its the curation of school library books, but the statutory scheme here requires the school boards to advertise on the school district website that parents have the power to have books removed. Fla. Stat. § 1006.28(2)(a)2. ("The objection form . . . must be easy to read and understand and be easily accessible on the homepage of the school district's website."). If, historically, the state has actively controlled the selection of school library books as Defendants claim, the instant statute repudiates that role.

Furthermore, it is unclear what the government seeks to express by allowing a book to be removed on the given statutory grounds without any consideration of the book's holistic value. Following an objection, the book "*must* be removed within 5 school days after receipt of the objection and remain unavailable to students of that school until the objection is resolved." Fla. Stat. § 1006.28(2)(a)2.b. (emphasis added). Then, if it is determined that the book contains content falling within any of the listed categories, "the school district *shall* discontinue the use of the material in the school district." *Id.* (emphasis added).

Such strictures conflict with the sound discretion of school librarians necessary for the expressive activity emphasized in *Little* and the Supreme Court's government speech precedents. To be sure, parents have the right to "direct the upbringing and education of children," *Pierce v. Society of Sisters*, 268 U.S. 510,

534 (1925), but the government cannot repackage their speech and pass it off as its own. That is exactly what Justice Alito warned of in *Matal*. *See* 582 U.S. at 235.

Turning to removals carried out by the school district, the problem of expressive activity remains. Defendants cite no case law for the proposition that that the government may impose a blanket prohibition on non-obscene material in school—or even public—libraries. Even the plurality in *Little* did not go that far because, there, only a few books were removed through the library's "weeding" process. 138 F.4th at 839. In fact, case law bears out the opposite. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion[.]").

The functions of the statute cut against the first and third *Shurtleff* factors. Historically, librarians curate their collections based on their sound discretion not based on decrees from on high. (Doc. 109 at 23 ("But by 1920, standard practice required '[b]ook selections' to 'be made by the librarian with the approval of the principal.'" (citing Am. Library Ass'n, *Standard Library Organization and Equipment for Secondary Schools of Different Sizes* 21 (1920)))). As to the second factor, it is unclear whether the public would assume the government is speaking when they find the school library shelves emptier than before or if they would assume parents had spoken under this statutory scheme. *See also Reynolds*, 114 F.4th

at 668 ("[I]t is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking.").

Either way, the inquiry is holistic one, and it is clear to the Court that the removal of library books without consideration of their overall value cannot be expressive activity amounting to government speech. *See also Shurtleff*, 596 U.S. at 262 (Alito, J. concurring) ("[T]reating those factors as a test obscures the real question in government-speech cases: whether the *government* is speaking instead of regulating private expression.").

This outcome is also consistent with Justice Alito's concurrence in *Shurtleff*, which was joined by Justices Thomas and Gorsuch. "Facilitating speech by private persons cannot constitute government speech unless the government assigns a power to speak to those persons or appropriates the products of their expressive activity to express its own message. When the government's role is limited to applying a standard of assessment to determine a speaker's eligibility for a benefit, the government is regulating private speech, and ordinary First Amendment principles apply." *Id.* at 271. The statute here imposes a standard that librarians must apply blindly to determine whether an author is eligible to have their works shelved in school libraries.

"For the adopted expression to qualify as the government's, the private party must alienate control over the medium of expression to the government. And

government actors must put the medium to use to intentionally express a government message." *Id.* at 270. A blanket content-based prohibition on materials, rather than one based on individualized curation, hardly expresses any intentional government message at all. Slapping the label of government speech on book removals only serves to stifle the disfavored viewpoints. *See id.* at 264 ("Censorship is not made constitutional by aggressive and direct application."). That way, the Supreme Court has warned, lies danger. *Matal*, 582 U.S. at 235.

### F.    Government Benefit

Defendants renew their argument that the government does not violate the First Amendment in withdrawing a benefit facilitating the exercise of a constitutional right. Indeed, the government "is not required to assist others in funding the expression of particular ideas[.]" *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009). But "the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214, (2013) (internal quotation omitted). Thus, it does not matter that school libraries are not compulsory. It also does not matter that a student may obtain the books elsewhere. *See Reno v. ACLU*, 521 U.S. 844, 880 (1997) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged

on the plea that it may be exercised in some other place." (quoting *Schneider v. State
of N.J. (Town of Irvington)*, 308 U.S. 147, 163 (1939))).

"Unlike the present case, [most] decisions on which [Defendants] rel[y] all
involved cash subsidies or their equivalent." *Matal*, 582 U.S. at 240. Wisely,
Defendants mostly rely on *Ysursa*, which involved a non-cash subsidy. When Idaho
passed a law preventing "payroll deductions for political purposes," unions sued
because employers could previously deduct union dues and fees for union political
activities. 555 U.S. at 356. Critical to the Court's holding there was that the unions
were not prevented from making political speech, the law merely prevented them
from "enlisting the State in support of that endeavor." 555 U.S. at 359. Here, speech
itself is being abridged. Even if *Ysursa* was on point, this law goes further because
it discriminates based on content.

"Differential subsidization 'of First Amendment speakers' raises
constitutional concerns 'when it threatens to suppress the expression of particular
ideas or viewpoints,' or 'if it targets a small group of speakers.'" *Alachua Cnty.
Educ. Ass'n v. Carpenter*, 741 F. Supp. 3d 1202, 1243 (N.D. Fla. 2024) (footnote
omitted) (quoting *Leathers v. Medlock*, 499 U.S. 439, 447 (1991)). The *Carpenter*
Court explained how *Leathers*, which addressed tax exemptions, applied in the
context of subsidies, and this Court agrees with its analysis. *See id.* at 1243 n.24.
Because parents are permitted to object to materials that "contain[ ] content" the

statute lists and district school boards must also assess if the "material[s] contain[ ]
prohibited content," Fla. Stat. § 1006.28(2)(a)2.b., it is the content of the speech, not
the speaker, that determines if the law applies. The Court next turns to determining
if this violates the First Amendment and what standard of scrutiny applies.

### G.    First Amendment Violation

Incorporated against the states though the Fourteenth Amendment, the First
Amendment commands that states "shall make no law . . . abridging the freedom of
speech." U.S. Const. art. I.; *see Va. State Bd. of Pharm. v. Va. Citizens Consumer
Council*, 425 U.S. 748, 749 n.1 (1976). Plaintiffs argue that Florida has done so with
HB 1069.

In First Amendment cases involving facial challenges, "[t]he question is
whether 'a substantial number of the law's applications are unconstitutional, judged
in relation to the statute's plainly legitimate sweep.'" *NetChoice*, 603 U.S. at 723
(alteration adopted) (quoting *Bonta*, 594 U.S. at 615). "So in this singular context,
even a law with 'a plainly legitimate sweep' may be struck down in its entirety. But
that is so only if the law's unconstitutional applications substantially outweigh its
constitutional ones." *Id.* at 723–24.

#### 1.    Standards of Scrutiny

First, the Court must determine what standard of scrutiny applies here. "The
question of what standard applies to school library book removal decisions is

unresolved." *ACLU of Fla.*, 557 F.3d at 1202. There are three possible standards of

scrutiny that the Court could apply here: (1) the standard set forth in *Hazelwood*

*School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988), (the "*Hazelwood* standard");

(2) the standard set forth in *Tinker v. Des Moines Independent Community School*

*District*, 393 U.S. 503 (1969) (the "*Tinker* standard"); and (3) the non-public forum

standard.

Defendants argue for the *Hazelwood* standard, which states that "educators do

not offend the First Amendment by exercising editorial control over the style and

content of *student speech in school-sponsored expressive activities* so long as their

actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 273

(emphasis added). That is, Defendants ask for rational basis review because the

school is entitled to greater deference as to the selection of its own materials. But

that is just an attempt to sneak the previously rejected government speech argument

past the Court under another name. The *Hazelwood* standard is even more out of

place where, as here, it is not students speaking.

At least one other district has agreed that the *Hazelwood* standard is

inappropriate to address a state law authorizing the removal of school library books

that contain "descriptions" of a "sex act." *See Penguin Random House LLC v.*

*Robbins*, 774 F. Supp. 3d 1001, 1018 (S.D. Iowa 2025) ("Here, the 'speakers' are

not students, but rather the authors and publishers of the books that are subject to

removal under [the challenged law].""). There, as here, "the First Amendment
analysis revolves around the rights of those authors to have their books reach their
intended audiences and of students to receive the information set forth in those
books." *Id.*

The court in *Robbins* also distinguished *Hazelwood* because it "involved
student speech that necessarily was (or would have been) disseminated to other
students in captive settings." *Id.* Like the situation in *Robbins*, should students here
not wish to read a book that runs afoul of this statute, they need not. Otherwise, "the
books remain harmlessly on the shelves except with respect to students who want to
read them." *Id.* Thus, the Court declines to apply the *Hazelwood* standard.[3]

On the opposite end of spectrum is the *Tinker* standard. As noted in *Tinker*,
"[i]t can hardly be argued that . . . students . . . shed their constitutional rights to
freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506. "*Tinker*
held that student expression may not be suppressed unless school officials
reasonably conclude that it will 'materially and substantially disrupt the work and
discipline of the school.'" *Morse v. Frederick*, 551 U.S. 393, 403 (2007).

---

[3] The *Robbins* Court went on to apply the standard in *Board of Education v. Pico*, 457 U.S.
853 (1982), but the Eleventh Circuit has found "*Pico* is of no precedential value," *ACLU of Fla.*,
557 F.3d at 1200. Nevertheless, the *Pico* standard is quite similar to the non-public forum standard
that, as discussed below, the Court will apply here. *See GLBT Youth in Iowa Sch. Task Force v.
Reynolds*, 709 F. Supp. 3d 664, 696 (S.D. Iowa 2023), *rev'd and vacated on other grounds*, 114
F.4th 660 (8th Cir. 2024).

Justice Alito explained the lay of the land in this area of law as follows: "In addition to *Tinker*, the decision in the [*Morse*] case allows the restriction of speech advocating illegal drug use; *Bethel School Dist. No. 403 v. Fraser*, permits the regulation of speech that is delivered in a lewd or vulgar manner as part of a high school program; and *Hazelwood School Dist. v. Kuhlmeier*, allows a school to regulate what is in essence the school's own speech, that is, articles that appear in a publication that is an official school organ." 551 U.S. at 422–23 (Alito, J. concurring) (internal citations omitted). He went on to explain that he joined the *Morse* majority "on the understanding that the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions." *Id.* at 423.

Here, it is apparent that the statute covers none of those applications that the Supreme Court has found previously impermissible. *See also Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001) (Alito, J.) ("Under *Fraser*, a school may categorically prohibit lewd, vulgar or profane language. Under *Hazelwood*, a school may regulate school-sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern. Speech falling outside of these categories is subject to *Tinker*'s general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others.").

Further tilting the scales towards applying the *Tinker* standard, this is also not

a situation like *Little*, which involved the removal of a few books, or like *ACLU of

Florida*, which involved just a single book. The statute here imposes a statewide

prohibition on vast swathes of the literature. That is quite different. *See Robbins*, 774

F. Supp. 3d at 1007–08. As such, it appears the *Tinker* standard might be warranted

here. Nevertheless, because the statute at issue here fails even under the lower level

of scrutiny contained in the non-public forum standard, the Court will use that

standard. *See also Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d

1242, 1261 (3d Cir. 1992) (explaining a library "constitutes a limited public forum").

So, the Court assumes that a public school library is a non-public forum.

"The government may reserve [a non-public] forum 'for its intended purposes,

communicative or otherwise, as long as the regulation on speech is reasonable and

not an effort to suppress expression merely because public officials oppose the

speaker's view.'" *Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018) (quoting *Perry

Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)). Here, the statute

does not discriminate as to viewpoint. Instead, as in *Mansky*, the inquiry would be if

the statutory prohibitions are "reasonable in light of the purpose served by the

forum." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806

(1985). "[T]he traditional purpose of a library is to provide information on a broad

range of subjects and viewpoints[.]" *Pen Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*,

711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024)); (*see also* Hackey Decl., Doc. 107-48,

at 5 ("The Florida Department of Education Library Media Reading Guidelines state

that one of the goals of the school library media program is to 'provide intellectual

and physical access to a broad range of literature and informational reading materials

for personal pleasure and curriculum support.'")).

### 2. *Overbreadth*

Now, applying the non-public forum standard, the Court turns to the Supreme

Court's process for assessing a law as facially overbroad. "[E]ach court must

evaluate the full scope of the law's coverage. It must then decide which of the law's

applications are constitutionally permissible and which are not, and finally weigh

the one against the other." *NetChoice*, 603 U.S. at 744. Plaintiffs bear a heavy burden

because, as Defendants warn, facial invalidation for overbreadth is "strong

medicine." *See Hansen*, 599 U.S. at 784.

### a. <u>Applications of the Challenged Provisions</u>

As relevant here, and as discussed more thoroughly below, to have a

constitutionally permissible application of the statute, the banned content must be

obscene as that term is understood in First Amendment jurisprudence. To assist

courts in determining what constitutes obscenity, the Supreme Court set forth the

"*Miller* test," which "defines speech as obscene if it satisfies three requirements:

> (a) whether the average person, applying contemporary
> community standards would find that the work, taken as a

> whole, appeals to the prurient interest; (b) whether the
> work depicts or describes, in a patently offensive way,
> sexual conduct specifically defined by the applicable state
> law; and (c) whether the work, taken as a whole, lacks
> serious literary, artistic, political, or scientific value.

*HM Fla.-ORL, LLC*, 137 F.4th at 1228.

However, "the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed or from whom it is quarantined." *Id.* at 1230 (quoting *Ginsberg v. New York*, 390 U.S. 629, 636 (1968)). Thus, when applying the obscenity analysis to minors, courts employ "[t]he *Miller*-for-minors test," which "takes the *Miller* prongs but adjusts the second and third standards (and sometimes the first) 'for minors.' So the 'patently offensive' requirement becomes 'patently offensive for minors,' and the 'serious value' exception becomes 'serious value for minors.'" *Id.* (internal citations omitted).

As the Florida Supreme Court has explained, "the 'societal value' requirement in the third *Miller* prong is 'particularly important' because it 'allows appellate courts to impose some limitations and regularity on the definition [of "harmful to minors"] by setting, as a matter of law, a [uniform] floor for socially redeeming value.'" *Simmons v. State*, 944 So. 2d 317, 329 (Fla. 2006) (alteration in original). "But the *Miller*-for-minors test does not do away with *Miller*'s procedural requirement that obscene content must be specifically identified to remove it from First-Amendment protection." *HM Fla.-ORL, LLC*, 137 F.4th at 1230. "And content

that is obscene as to minors may differ from its adult equivalent only in quality, not in kind[.]" *Id.* 'As for obscenity, only depictions of '"hard core"' sexual conduct' can satisfy that term." *Id.* at 1228.

With this context in mind, the Court turns to the substance of the statute. To differentiate permissible applications from impermissible ones requires a degree of statutory interpretation. *See id.* at 1226 ("[W]hen [courts] assess a statute's sweep in an overbreadth challenge, [they] evaluate the ambiguous as well as the unambiguous scope of the enactment."). Here, the law covers all library materials that "describe[ ] sexual conduct" and that are "pornographic or prohibited under [section] 847.012." Fla. Stat. § 1006.28(2)(a)2.b.(I), (II).[4] As applied here, section 847.012 prohibits content that is "harmful to minors." Fla. Stat. § 847.012(3)(b). "Sexual conduct" and "harmful to minors" are defined with specificity. Fla. Stat. §§ 847.001(19), 847.001(7). However, "describes" and "pornographic" are not.

To begin with, banning content because it is prohibited under section 847.012—i.e., harmful to minors—is plainly a constitutional application. Indeed, the definition of "harmful to minors" under Florida law incorporates the *Miller*-for-minors standard.[5] *See Simmons*, 944 So. 2d at 329 ("[T]he term 'harmful to minors'

---

[4] Plaintiffs, wisely, do not challenge that part of the law that references visual depictions of sexual conduct. Thus, the "[m]aterials in Florida school libraries that are implicated by the Challenged Provisions primarily consist of books, but may occasionally include magazines, newspapers, and audiobooks." (Hackey Decl., Doc. 107-48, at 7–8).

[5] Florida law defines "harmful to minors" as:

[in Fla. Stat. § 847.001(7)] is adequately defined by reference to the three-prong *Miller* standard, albeit modified to apply to minors."). This also means that everything that could be constitutionally censored because it constitutes obscenity already falls within the portion of the statute that bans content under section 847.012—i.e., content that is harmful to minors. This leaves the Court to grapple with the other categories banned under the statute—material that "describes sexual conduct" and that is "pornographic."

By leaving these items undefined, Florida has given parents license to object to materials under an "I know it when I see it" approach. *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J. concurring). There is a reason that was not the standard the Supreme Court adopted for defining obscenity then. *See id.* at 191 (majority opinion); *see also HM Fla.-ORL, LLC*, 137 F.4th at 1213 ("An 'I know it

---

any reproduction, imitation, characterization, description, exhibition, presentation, or representation, of whatever kind or form, depicting nudity, sexual conduct, or sexual excitement when it:

(a) Predominantly appeals to a prurient, shameful, or morbid interest;

(b) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material or conduct for minors; and

(c) Taken as a whole, is without serious literary, artistic, political, or scientific value for minors.

A mother's breastfeeding of her baby is not under any circumstance "harmful to minors."

Fla. Stat. § 847.001(7).

when I see it' test would unconstitutionally empower those who would limit speech to arbitrarily enforce the law. But the First Amendment empowers speakers instead.").

Here, neither a prohibition on content that "describes sexual conduct" nor that which is allegedly "pornographic" takes the third *Miller* prong into account. Both prohibitions lack the specificity required in identifying obscene material. Given that obscene material as to minors is already prohibited under Florida law, these terms must, therefore, target non-obscene material. Thus, the applications of the law plainly slip into those barred by the First Amendment. Both provisions "threaten[ ] a broad range of protected speech, even if the law has some permissible applications at its core. These provisions turn the Act into an 'I know it when I see it' law. But the Constitution requires more clarity." *HM Fla.-ORL, LLC*, 137 F.4th at 1225.

Thus, leaving these terms undefined results in impermissible applications. So, the Court turns to the question of whether these terms can be construed in a manner that results in a constitutional application. As a reminder, the text of the statute groups together in one sub-sub-subparagraph "pornographic or prohibited under [section] 847.012" and then lists "[d]epicts or describes sexual conduct" in a separate sub-sub-subparagraph. Additionally, as discussed above, what is prohibited under section 847.012 is *all* content that can constitutionally be categorized as obscene because it is harmful to minors under the *Miller*-for-minors standard. As such, the

provision that prohibits material that "describes sexual conduct" must mean something different than the "harmful to minors" content that is prohibited under section 847.012—i.e., different than what is permissibly censored as obscenity by the *Miller*-for-minors standard. Any other "interpretation would . . . violate the 'basic premise of statutory construction . . . that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage.'" *Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*, 65 F.4th 1261, 1271 (11th Cir. 2023) (quoting *United States v. Canals-Jimenez*, 943 F.2d 1284, 1287 (11th Cir. 1991)). The Court must conclude that there is no constitutional application of a prohibition against books containing material that "describes sexual conduct."

Interpreting "pornographic" as synonymous with "harmful to minors," however, as Plaintiffs invite the Court to do in Counts II and V, does not suffer the same problem. "Pornographic" here is in the same sentence as "prohibited under [section] 847.012" and is connected by the word "or." "The word 'or' commonly introduces a synonym or 'definitional equivalent.' That construction may be an example of the 'ill-conceived but lamentably common belt-and-suspenders approach' to legal writing, but it is the better reading of the text when the terms share the same ordinary meaning." *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1088 (11th Cir. 2017) (internal citations omitted). Thus, the

prohibition against "pornographic" content can be constitutionally applied when it is construed as meaning harmful to minors.

> b.    The Unconstitutional Applications of the Challenged Provisions Outweigh the Constitutional Applications

Finally, the Court turns to determining whether the law's unconstitutional applications substantially outweigh its constitutional ones. In its constitutional application, the statute must not unreasonably restrict the library's purpose of providing students information on a broad range of subjects and viewpoints. Although there is some support that "[t]he purpose of public school libraries is to advance the school curriculum—that is, to facilitate the pedagogical mission of the school, which may involve some limitation of expression." *Reynolds*, 114 F.4th at 670. Even Plaintiffs do not challenge that some limits may be placed on what lines a school library's shelves.

Justice Alito has warned, however, of taking this view too far when it comes to even student speech. "The 'educational mission' of the public schools is defined by the elected and appointed public officials with authority over the schools and by the school administrators and faculty." *Morse*, 551 U.S. at 423. "The 'educational mission' argument would give public school authorities a license to suppress speech on political and social issues based on disagreement with the viewpoint expressed. The argument, therefore, strikes at the very heart of the First Amendment." *Id.*

By enacting HB 1069, the Florida legislature sought to prohibit material from entering or remaining in school libraries that is not obscene for minors. That is apparent because the *Miller*-for-minors test is already baked into Florida law, *see Simmons*, 944 So. 2d at 329, which means that material was already prohibited before the legislature sought to amend the law, *see* Fla. Stat. § 1006.28 (2022). Before HB 1069, "any book that described sexual conduct was evaluated in its entirety in relation to the age and maturity of students who may read it under the 'harmful to minors' provision[.]" (Doc. 107-48 at 8). To amend the law to say the same thing or effectuate the same purpose would be a pointless endeavor.

"Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). "It is . . . essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise." *Interstate Circuit, Inc. v. City of Dall.*, 390 U.S. 676, 689 (1968) (quoting *People v. Kahan*, 206 N.E.2d 333, 335 (N.Y. 1965) (Fuld, J., concurring)). And "[e]ven when a statute only indirectly limits protected adult speech—such as . . . by forcing speakers to 'err on the side of caution' because of statutory ambiguities—the law still must do so narrowly and in proportion to the

government's interest in shielding children from speech that is unprotected as to minors." *HM Fla.-ORL, LLC*, 137 F.4th at 1230 (internal citation omitted). The law here fails all these tests.

Plaintiffs provide the unrebutted declaration of Christina Hackey—an Education Media Specialist in the Volusia County School District to establish that "[she] ha[s] never seen pornography or obscene materials in a public school library, including any of the libraries in [her] District." (Doc. 107-48 at 13). Defendants are thus incorrect that Plaintiffs have provided the Court with no evidence for the argument that it is rare that obscene material would be found in Florida public school libraries. Rather, it is Defendants speculating that surely a plethora of obscene materials must exist in Florida school libraries if the legislature passed HB 1069.

Defendants then argue Plaintiffs must catalogue the books in public school libraries that might be implicated by the statute to determine which are and are not obscene as to minors. That is, Defendants demand Plaintiffs and the Court read thousands of pages to determine which books, if any, are indeed obscene as to minors. That burden is beyond the requirements of *NetChoice*. As the *Robbins* Court detailed, courts "have essentially taken judicial notice of the contents of artistic works." 774 F. Supp. 3d at 1026 (citing *Ashcroft v. ACLU*, 535 U.S. 564, 584 n.16 (2002) (Thomas, J.); *FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 251 (1990) (Scalia, J., concurring); *Couch v. Jabe*, 737 F. Supp. 2d 561, 567–69 & n.4–14 (W.D. Va.

2010); and *Cline v. Fox*, 319 F. Supp. 2d 685, 692–93 (N.D. W. Va. 2004)). The
Court would be comfortable keeping such company.

Even without that, the evidence shows that Ms. Hackey must grapple with the
"vague and ambiguous" statutory language to determine which library books run
afoul of the provisions and that through it all she has not encountered a single piece
of obscene content. (Doc. 107-48 at 8, 13 ("Authors frequently employ literary
devices like symbolism and metaphors to convey messages or themes or to advance
the plot of the work. Given those literary devices, it's not clear how the State expects
Educational Media Specialists, educators, or other school officials to know exactly
what crosses the line in the State's eyes.")). The vagueness of the provisions only
serves to expand their sweep. *See HM Fla.-ORL, LLC*, 137 F.4th at 1237 ("The
vagueness of the 'lewd conduct' term only exacerbates its breadth.").

The Hackey Declaration, taken together with Declarations of R.K. and J.H.,
establishes that many non-obscene books have been removed from public school
libraries to the dismay of students that deeply identify with these books. (*Id.* at 4–5,
12–13, 14, 15–16; Doc. 107-57; Doc. 107-58). Plaintiffs have also submitted the
declarations of Author Plaintiffs attesting that their novels are not obscene. (*See* Doc.
Nos. 107-50; 107-51; 107-52; 107-53; and 107-54; *see also* Doc. 107-2 at 4
("Penguin Random House does not publish pornography.")). Defendants have

pointed to no obscene books that have been removed. The Court returns to the provisions.

The first challenged provision prohibits material that "describes sexual conduct." As outlined earlier, the first problem with this provision is that it does not evaluate the work to determine if it has any holistic value. Further, as established in the Hackey Declaration, the statute does not specify what level of detail "describes sexual conduct." As Plaintiffs note, it is unclear what the statute actually prohibits. It might forbid material that states characters "spent the night together" or "made love." Perhaps not. Defendants do not attempt to explain how the statute should work. The Florida Department of Education ("FLDOE") also directs educators to "err on the side of caution," which has "led many Educational Media Specialists and other educators and school officials to err on the side of removing books based on fear that they and their school districts will be punished." (Doc. 107-48 at 9). But even a reading of the statute that excludes allusions to sexual activity nevertheless requires the removal of any material that contains even a single sentence that is prohibited by the statute—with no consideration of its overall value.

The second challenged provision prohibits material that is "pornographic." Without further definition, this provision treats all minors as if they are the same, rendering content that is obscene as to younger children also obscene as to older children. The law demands the opposite. The Eleventh Circuit has held that "[a]s

applied to a *Ginsberg*-type adaptation of the adult obscenity test . . . if any reasonable minor, including a seventeen-year-old, would find serious value, the material is not 'harmful to minors.'" *Am. Booksellers v. Webb*, 919 F.2d 1493, 1504–05 (11th Cir. 1990). Thus, the Eleventh Circuit's "interpretation of typical 'harmful to minors' statutes protects older children's rights. But it means that younger children may encounter material suitable for kids a few years older." *HM Fla.-ORL, LLC*, 137 F.4th at 1240; *see also* Fla. Stat. §§ 847.001(7); 847.012. "In *Webb*, [the Eleventh Circuit] noted that 'only a minimal number of works will have serious value for reasonable adults but not for reasonable older minors." *HM Fla.-ORL, LLC*, 137 F.4th at 1244 (quoting *Webb*, 919 F.2d at 1506). "The burdens on speech purveyors and consumers alike [there] were minimal." *Id.* The statute here imposes a much greater burden on all.

The statute's provision requiring districts to only "discontinue use of the material for any grade level or age group for which such use is inappropriate or unsuitable" does little to rescue it. Fla. Stat. § 1006.28(2)(a)2.b. In fact, that language compounds the issues with the law. *See HM Fla.-ORL, LLC*, 137 F.4th at 1245 ("The Act's age-variable standard poses as a well-tailored limit on its application. But in practice it is yet another 'I know it when I see it' provision."). Educators must again perform statutory interpretation on the fly to determine what exactly is "inappropriate" or "unsuitable" because those terms go undefined. All the while, the

specter of harsh penalties looms in the background. *See* Fla. Stat. § 1012.796; Fla. Admin. Code r.6A-10.081. Educators are already able account for this across school levels. (Doc. 107-48 at 14 ("Our professional training requires books that are appropriate and valuable for high school students but that may be too mature for elementary school students not be made available to elementary school students, and I take my professional responsibilities seriously.")). Ultimately, the statute forces educators to make a "series of difficult judgment calls about what is obscene for children of different ages." *HM Fla.-ORL, LLC*, 137 F.4th at 1242. It also flies in the face of *Webb*. *See id.* at 1244.

There is also evidence that the statute has swept up more non-obscene books than just the ones referenced here. (Doc. 107-48 at 7 ("Because school districts are not required to report any books removed without an objection to the FLDOE under Section 1006.28, school district reports to the FLDOE probably do not identify all books that schools have removed under the Challenged Provisions, meaning that the effect of those provisions is far more pervasive than the reports suggest.")). And the harms extend beyond that of chilling of speech.

The Hackey Declaration also establishes that the provisions "restrict [her] capacity to respond to the educational needs of [her] students, especially students who have experienced sex or sexual abuse." (*Id.* at 7). She explains that "[t]he Challenged Provisions force [her] and [her] colleagues to remove from [their] library

collections popular and award-winning books that allow students to understand and process consensual or abusive sexual experiences that are common among both young and maturing teens." (*Id.* at 12). "In no way do the descriptions of a sex act in these books make them 'pornographic' or obscene as to students who may read them." (*Id.* at 13).

Plaintiffs have established multiple unconstitutional applications of the statutory provisions at issue. The following books, among others, have been removed: *The Color Purple*, *Half of a Yellow Sun*, *Cloud Atlas*, *The Splendid and the Vile*, *I am Not Your Perfect Mexican Daughter*, *The Freedom Writers Diary: How a Teacher and 150 Teens Used Writing to Change Themselves and the World Around Them*, *On the Road*, *Nineteen Minutes*, *Paper Towns*, *Looking for Alaska*, *How the García Girls Lost Their Accents*, *The Kite Runner*, *Slaughterhouse-Five*, *Shout*, *Last Night at the Telegraph Club*, *The Handmaid's Tale*, *Native Son*, *Kaffir Boy: The True Story of a Black Youth's Coming of Age in Apartheid South Africa*, *Water for Elephants*, *Beloved*, *Song of Solomon*, *The Bluest Eye*, and *Homegoing*. None of these books are obscene. (*See* Doc. Nos. 107-2; 107-50; 107-51; 107-52; 107-53; and 107-54); *see also Robbins*, 774 F. Supp. 3d at 1034–35 (finding the removal of many of these books as unconstitutional and noting many are classics, modern award winners, and tested on AP exams). The restrictions placed on these books are thus unreasonable in light of the purpose of school libraries. And if so, the

presence of these books in school libraries certainly does not materially and substantially disrupt the work and discipline of the school.

Defendant's final salvo bewilderingly argues that Plaintiffs have failed to show that the statute would not survive strict scrutiny. But Plaintiffs established it would not survive an even weaker form of scrutiny. To put it another way, if the statute cannot clear a three-foot hurdle, there is no need to demonstrate whether it can clear a six-foot hurdle. Strict scrutiny is the least favorable standard of review for the government. To make this argument even more baffing, the burden there is *on the government. See Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (explaining strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest"). Therefore, it is readily apparent to the Court that the statute fails strict scrutiny. The statute's prohibition of material that "describes sexual conduct" is overbroad and unconstitutional. Thus, Plaintiffs will prevail on Counts I, IV, and VII.

As for Counts III and VI, Plaintiffs request too much. To hold a law facially overbroad as Defendant's have repeatedly reminded this Court is an extreme remedy and strong medicine. So, the Court will take up Plaintiffs' invitation to save the law under Counts II and V. The Court finds that the term "pornographic" is synonymous with "harmful to minors" under section 847.012. *See In re Wild*, 994 F.3d 1244, 1268 n.22 (11th Cir. 2021) ("'Doublets and triplets abound in legalese,' especially

given that Congress often uses a 'belt-and-suspenders' approach when drafting statutes." (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176–77 (2012))).

Beyond the constitutional avoidance issue, the interpretation advanced by Defendants runs counter to another canon of statutory interpretation. Under "the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the [a]cts of [legislatures]." *Yates v. United States*, 574 U.S. 528, 543 (2015) (internal quotation omitted). The reading prescribed by the Objection Form unmoors the word "pornographic" from any context and expands its scope into unconstitutional applications. Construed in that way, it becomes an "I know it when I see it" provision. Furthermore, that portion of the statute was not amended by HB 1069, Fla. Stat. § 1006.28 (2022), and the harm to Plaintiffs only stems from the new interpretation of the statute advanced by the Template Objection Form. So, an interpretation of section 1006.28 of the Florida Statutes that finds "pornographic" synonymous with "harmful to minors" under Florida law keeps the statute well within the constitution's purview. Therefore, Plaintiffs will prevail on Counts II and V, and necessarily because they were alleged in the alternative, judgment will be entered in favor of Defendants on Counts III and VI.

## IV.  CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiffs' Motion for Summary Judgment (Doc. 107) is **GRANTED**.

2. School Board Defendants' Motion for Summary Judgment (Doc. 108) is **GRANTED in part** and **DENIED in part**.

3. State Defendants' Motion for Summary Judgment (Doc. 109) is **GRANTED in part** and **DENIED in part**.

4. The Clerk is directed to enter judgment in favor of Plaintiffs and against Defendants as to Counts I, II, IV, V, and VII.

5. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiffs as to Counts III and VI.

6. Thereafter, the Clerk is directed to close this case.

**DONE** and **ORDERED** in Orlando, Florida on August 13, 2025.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record